UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONVERGEN ENERGY LLC, L'ANSE WARDEN ELECTRIC COMPANY, LLC, EUROENERGY BIOGAS LATVIA LIMITED, and LIBRA CAPITAL US, INC. | Index No. |
| Plaintiffs, | |
| -against- | **COMPLAINT** |
| STEVEN J. BROOKS, NIANTICVISTA ENERGY LLC, GREGORY MERLE, RIVERVIEW ENERGY CORPORATION, DANIEL ESCANDON GARCIA, RAMON URIARTE INCHAUSTI, CHIPPER INVESTMENT SCR, SA, URINCHA SL, THEODORE JOHN HANSEN, BRIAN R. MIKKELSON, and CONVERGEN ENERGY WI, LLC, | |
| Defendants. | |

Plaintiffs Convergen Energy LLC ("**Convergen**"), L'Anse Warden Electric

Company, LLC (the "**Power Plant**"), EuroEnergy Biogas Latvia Limited ("**Biogas Latvia**"), and

Libra Capital US, Inc. (the "**Company**") allege as follows:

## NATURE OF ACTION

1.      This is a case about corporate betrayal at the highest level; a saboteur who

stole millions of dollars from his employer with the help of fellow deceitful insiders and corrupt

outside investors.

2.      Plaintiffs are part of an international conglomerate headquartered in New

York known as the Libra Group (the "**Group**"). Defendant Steven J. Brooks ("**Brooks**") was,

until his recent termination, Senior Vice President, Investments, of the Group. Among other

responsibilities, Brooks was responsible for overseeing the Group's energy investments, which

included Convergen, a 100% owned subsidiary of the Group that owns and operates a portfolio

of alternative energy assets including two cogeneration or combined head and power (CHP) facilities in Manhattan, several biogas facilities in Latvia (Northern Europe), a 20 megawatt electric power plant in Michigan (the Power Plant) and a renewable pellet manufacturing plant in Wisconsin (the "**Pellet Plant**"). The Pellet Plant provides renewal fuel pellets to the Power Plant.

3.     In 2019, Brooks arranged for the sale of the Pellet Plant to what he represented was a third party, defendant Nianticvista Energy LLC ("**Niantic**"). Brooks introduced defendant Greg Merle as the principal of Niantic and the representative of Niantic's other investors, to the Company's principal at the Company's New York headquarters. Brooks was the senior Company officer charged with vetting, negotiating and consummating the transaction. As part of the sale, Brooks arranged for the Pellet Plant to continue supplying the Power Plant with fuel pellets pursuant to a 10-year agreement. The sale closed on January 31, 2020.

4.     Shortly after the sale closed, the Group uncovered evidence of Brooks' treachery: (i) Brooks was secretly the buyer of the Pellet Plant (*i.e.*, he is an owner of Niantic); (ii) Brooks provided a $2.3 million personal guaranty to finance the purchase; (iii) he also solicited investments in Niantic from the other defendants while employed by the Company in New York; (iv) the purchase price paid by Brooks and his co-conspirators was at least ten million dollars less than the fair market value of the Pellet Plant; (v) contrary to Company policy and practice and in order to ensure his multi-million dollar booty, Brooks failed to procure other competing bids, going so far as to affirmatively rebuff interest from other potential buyers; (vi) Brooks inflated the price of the pellets in the long term supply contract with the Power Plant, effectively shifting future profit from the Power Plant to his new business, the Pellet Plant; (vii) without the knowledge or approval of the Group Brooks instructed Convergen to pay for

2

hundreds of thousands of dollars of improvements to the Pellet Plant right before the closing; and (viii) acting in concert with other with other defendants, Brooks failed to account for and then absconded with $196,420 in cash that was supposed to be paid to Convergen at the closing.  The Company had unknowingly entrusted the fox with guarding the hen house.

5.     When his employer confronted Brooks with his self-dealing scheme in a face-to-face recorded meeting in Manhattan, Brooks, after repeated denials, confessed to his fraudulent conduct, saying "I am very much responsible" and acknowledged the knowing participation of the other defendants. He later asked for forgiveness and an opportunity to repay the Group for what he had done. Unfortunately, despite his confession and expressions of remorse, Brooks and the other defendants have not remedied their wrongdoing.

6.     On the contrary, the Group very recently discovered that as part of the Pellet Plant sale, Brooks and his co-conspirators retained access to active Office 365 email accounts of other Convergen subsidiaries containing highly proprietary and confidential information, including trade secrets. Office 365 is a cloud-based software that includes a hosted email Exchange Server and data storage, which Convergen uses for email accounts and data storage. Among other things these files contain records of Convergen's operation and management of two CHP facilities in Manhattan, the Power Plant in Michigan and Biogas facilities in Latvia. These Office 365 accounts should have been segregated and migrated to Convergen as part of the sale.  There was absolutely no justification for defendants to maintain administrator access to the Office 365 accounts of Convergen and its subsidiaries that were unrelated to the Pellet Plant. Upon this discovery, the Company requested immediate cessation of access to and transfer of those Office 365 accounts email files to Convergen. Defendants refused.  As a result, defendants continue to have unauthorized access to Convergen's emails that

contain proprietary information, including financial and personal information and intellectual property and trade secrets. Defendants also refused to turn over the historical email files of the Pellet Plant (needed by Convergen for tax, audit, and compliance purposes), presumably to conceal incriminating emails.

7.      By this action, Plaintiffs seek compensatory and punitive damages and related relief arising out of: (i) the theft of the Company's assets by Brooks and his co-conspirators; and (ii) defendants' refusal to turn over access to active, proprietary email files of Convergen entities and the Pellet Plant.

## **PARTIES**

8.      Plaintiff Convergen Energy LLC is a Delaware limited liability company with a principal place of business in New York, New York. Convergen is owned by the Group. Convergen was the owner of defendant Convergen Energy WI, LLC, the entity that owned and continues to own the Pellet Plant. Convergen is also the owner of the other entities whose emails have been misappropriated by the defendants.

9.      Plaintiff L'Anse Warden Electric Company, LLC is a Delaware limited liability company with a principal place of business in L'Anse, Michigan.  L'Anse Warden Electric Company, LLC is a subsidiary of Convergen and owns the Power Plant that purchases fuel pellets from the Pellet Plant.

10.     Plaintiff EuroEnergy Biogas Latvia Limited is a Cyprus company with assets and operations in the Republic of Latvia (in Northern Europe). EuroEnergy Biogas Latvia Limited is a subsidiary of Convergen.

11.     Plaintiff Libra Capital US, Inc. is a Delaware corporation with a principal place of business in New York, New York.

4

12.     Defendant Brooks resides at 201 East 36th Street, Apartment 19B, New York, New York 10016.

13.     Defendant Convergen Energy WI, LLC is a Delaware limited liability company with a principal place of business at 600 Liberty Street, Green Bay, Wisconsin 54304.

14.     Defendant NianticVista Energy LLC is a Delaware limited liability company with a principal place of business at 222 Ridgedale Avenue, Suite 302, Cedar Knolls, New Jersey 07927.

15.     Defendant Gregory Merle ("**Merle**") is a member and CEO of Niantic and Brooks' close friend and partner in the scheme to defraud Plaintiffs. Merle became the President of the Pellet Plant after the fraudulent acquisition. Upon information and belief, Merle resides at 15797 111th Terrace North, Jupiter, Florida 33478-6730.

16.     Defendant Riverview Energy Corporation ("**Riverview**") is a Delaware corporation. Upon information and belief, Riverview has a principal place of business at 6671 W. Indiantown Road, Suite 50, #240, Jupiter, FL 33458. Merle is the President of Riverview and Niantic is, upon information and belief, a special purpose entity and instrument of Riverview and Merle.

17.     Defendant Chipper Investment SCR, SA ("**Chipper**") is a co-investor of Niantic in the fraudulent acquisition of the Pellet Plant. Chipper's principal place of business is at Plaza de La Independencia 6, 28001, Madrid, Spain.

18.     Defendant Urincha SL ("**Urincha**") is a co-investor of Niantic in the fraudulent acquisition of the Pellet Plant. Urincha's principal place of business is at Calle Isla de Lanzarote 5, Boadilla Del Monte 28660, Madrid, Spain. Upon information and belief, Urincha is Chipper's corporate president and advisor.

19.     Defendant Ramon Uriarte Inchausti ("**Inchausti**") is a co-investor of Niantic in the fraudulent acquisition of the Pellet Plant. Inchausti resides at Calle Isla de Lanzarote 5, Boadilla Del Monte 28660, Madrid, Spain. Inchausti is an owner of Urincha and Chipper. Upon information and belief, Inchausti is the president, advisor and attorney-in-fact of Urincha.

20.     Defendant Daniel Escandon Garcia ("**Escandon**") is a co-investor of Niantic in the fraudulent acquisition of the Pellet Plant. Escandon resides at Calle Alcala, 105, Piso 1 DR, Madrid, 28009, Spain. Upon information and belief, Escandon is an owner of Chipper. Further upon information and belief, Escandon is a representative and attorney-in-fact of Chipper.

21.     Chipper, Escandon, Inchausti, and Urincha are collectively referred to as the "**Spanish Investors**."

22.     Defendant Theodore John Hansen ("**Hansen**") was an employee of Convergen who served as the President of the Pellet Plant and Vice President of the Power Plant prior to the fraudulent acquisition. Hansen is now the CEO of the Pellet Plant and resides at 798 Terra Cotta Drive, Neenah, Wisconsin 54956.

23.     Defendant Brian R. Mikkelson ("**Mikkelson**") was an employee and Vice President of Convergen, Vice President and Controller of the Pellet Plant and Vice President of the Power Plant prior to the fraudulent acquisition. Mikkelson is now the Controller of the Pellet Plant and resides at 2144 Barberry Lane, Green Bay, Wisconsin 54304.

## JURISDICTION AND VENUE

24.     The Court has subject matter jurisdiction in this case pursuant to 28 U.S.C. § 1331. The action arises under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 as well

as the Stored Communications Act, 18 U.S.C. § 2701. The Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

25.     This Court has personal jurisdiction over defendants because each participated in and benefitted from the fraudulent scheme orchestrated and consummated in New York where Brooks was employed, and where victims of the fraudulent scheme – the Company and Convergen – are headquartered. Upon information and belief, each defendant wired money to New York, directly or indirectly through Niantic, to consummate the fraudulent transaction. Further upon information and belief, each of the defendants had extensive contacts with Brooks while he was in New York and employed by the Company in New York as part of the fraudulent scheme set forth in this complaint.

26.     Venue is proper in this district pursuant to 28 U.S.C. § 1391. A substantial part of the events or missions giving rise to the claims asserted herein occurred in the Southern District the acts giving rise to defendants' misconduct occurred in substantial part in this district and because the Company and Convergen (victims of the fraud) and Brooks (the perpetrator of the fraud) are located in this district.

## FACTUAL ALLEGATIONS

### A. Background

27.     The Group is a privately owned international business group that is active in 35 counties and focused primarily on energy, hospitality, real estate, shipping and aviation that traces its origin to a shipping company established in 1976.  In parallel to its business interests, the Group is well known for its extensive social programs, which are for the most part focused on those that have been traditionally denied opportunity. The Group was founded on the values of mutual trust, respect, and loyalty and operates with these same values, empowering and

placing significant trust in its employees and officers. The Group was created and runs on the premise of empowerment, as is well known to anyone that has transacted with the group.

28.     The Company, a member of the Group, is a 15-year-old in-house asset management and professional service company that supports other companies that are part of the Group, including Convergen, the Power Plant and the Pellet Plant prior to its sale to Niantic.

29.     In January 2014, the Company hired Brooks. Brooks was introduced to the Company through a close personal relationship with one of the principals of the Group. Brooks worked closely with a senior officer at the Company's New York office and over time Brooks was elevated to Senior Vice President, Investments, of the Group.

30.     One of the areas that Brooks oversaw as a Senior Vice President (and for the relevant period here) was Convergen's investments in sustainable energy, including the Pellet Plant. The Pellet Plant produces cost-effective fuel alternatives that can be used as a substitute for traditional fossil fuels and burned by the Pellet Plant's customers, including biomass industrial power plants such as the Power Plant, to generate electricity in an environmentally sustainable manner. The pellets efficiently combust to generate sufficient power with less industrial residue and waste products than other alternative fuel sources, which, in turn, reduces scheduled plant outages and lowers maintenance costs. The Pellet Plant generates income from supply agreements that charge a flat fee per ton for its fuel pellets. The Group expected the Pellet Plant to yield a sizable return and formed Convergen to acquire the Pellet Plant in June 2010 for $5 million. In addition to the initial purchase price, since the acquisition Convergen has made additional equity investments in excess of $10.2 million to upgrade the Pellet Plant and enhance the business. Prior to the fraudulent acquisition, defendant Hansen managed the day-to-day operations of the Pellet Plant and reported directly to Brooks.

31.     The Group authorized Convergen to acquire the Power Plant in 2016 as part of a strategy pitched in part by Brooks to unlock value at the Pellet Plant. The strategy was to add the Power Plant as a customer of the Pellet Plant and thereby increase the Pellet Plant's profitability and showcase the advantages of using the Pellet Plant's pellets to attract more customers. In 2019, the Power Plant started purchasing increasing amounts of fuel pellets from the Pellet Plant at $40 per ton. Prior to the fraudulent acquisition, Hansen and Brooks oversaw the Power Plant.

**B.  The Sale of the Pellet Plant**

32.     Over the last few years, the Group has instituted a strategy of selling non-core assets to streamline the Company's portfolio management function and to reallocate capital for new Group investments in core assets.  This strategy notwithstanding, in 2019 the Group had no plans or intentions to sell the Pellet Plant or any other Convergen business. As stated above, the Pellet Plant was the primary reason Convergen acquired the Power Plant just three years prior. In 2019, after his direct manager suffered a near fatal accident that required him to go on disability for a good part of the year, Brooks stood as the sole Company executive trusted with overseeing these assets and ensuring that the strategic purposes for their acquisitions were achieved.

33.     Notwithstanding Convergen's long-term corporate objectives, which were supposedly being curated by Brooks, on September 3, 2019 Brooks reached out to the Company's General Counsel to request a non-disclosure agreement for Niantic, a firm Brooks stated was interested in purchasing the Pellet Plant. Brooks represented that Niantic's interest was unsolicited and that Niantic was an affiliate of defendant Riverview, and that both entities were owned and controlled by defendant Merle. Brooks never even hinted at his association with

these defendants.

34.     Thereafter, Brooks inserted himself as the point person for a potential deal

with Niantic. He facilitated the due diligence and negotiated the sale price and terms with

Niantic, taking great care to maintain the appearance of a *bona fide* transaction when

communicating with Company's e-mail. Shortly after the NDA was signed, Hansen and

Mikkelson, under Brooks' direction, prepared and provided complete disclosure of the Pellet

Plant to Niantic.

35.     On November 5, 2019, Merle executed a letter of intent on behalf of

Niantic to acquire the Pellet Plant for $5.8 million. The letter of intent was sent from Merle's

Riverview email and confirmed that Niantic is "an affiliate of Riverview." Around this time,

Brooks said in a text message to an Executive Board member of the Group in New York,

"[Niantic] appears to be serious."

36.     On November 12, 2019, Brooks emailed an Executive Board member of

the Group that Merle would be in New York (where the Company has offices) and had a short

window to meet the next morning. The choreographed introduction of Merle to the Group took

place at 9:30 am on November 13, 2019. Brooks was present and represented Merle as the CEO

of Niantic. Brooks did not disclose that he is an owner of Niantic and close friend of Merle.

37.     As the sole arbiter within the Group of the merits of this transaction in

2019, Brooks recommended that Convergen accept the offer. The parties subsequently executed

the Acquisition Agreement with an effective date of January 29, 2020. The sale closed on

January 31, 2020 for $5.5 million.[1]

38.     The employees of the Pellet Plant, including Hansen and Mikkelson, went

---

[1]     Brooks negotiated a $300,000.00 reduction in the sale price from the original $5.8 million offer in exchange for a $1 million hard deposit from Niantic.

to work for the new owners. Because Hansen had overseen both the Pellet Plant and the Power

Plant prior to the sale, Brooks arranged as a condition of the Acquisition Agreement for Hansen

to continue overseeing the Power Plant after the sale until a replacement could be installed. Thus,

one of the terms required the Power Plant to reimburse the Pellet Plant $120,000.00 for 12

months of Hansen's time (20 hours per month for 12 months). Unbeknownst to the Company,

the $120,000.00 fee represented the vast majority of Hansen's total compensation from the Pellet

Plant for overseeing both the Pellet Plant and the Power Plant after the sale.

39.     Another condition of the Acquisition Agreement required the Power Plant

to enter into a 10-year supply agreement with the Pellet Plant, the terms of which Brooks never

disclosed to, nor sought approval for from, any other member of the Group's commercial team.

The ensuing Supply Agreement dated January 31, 2020 required the Power Plant to pay the

Pellet Plant $50 per ton of pellet fuel, which was $10 more per ton than the Power Plant had paid

before the sale to Niantic; this put the value of the Supply Agreement at $40 million.

40.     Brooks spearheaded the entire sale process and "agreed" to the terms on

behalf of Convergen. As a result, the sale process was relatively quick and without issue. This is

reflected in the fact that Niantic was initially represented by attorneys from the law firms of

Clemente Mueller, P.A. and Andolino & Associates but on the date of the closing, the law firms'

involvement was negligible.

## C.  The Fraudulent Scheme Uncovered

41.     On the day immediately following the closing, the Company fortuitously

learned that Brooks may have had an economic interest in Niantic. The suggestion was greeted

by extreme shock and utter disbelief by other principals of the Group and senior employees of

the Company. Brooks was not only a trusted senior executive within the Company, but he also

was a personal friend of one of the principals of the Group.

42.     At approximately 5:00 pm on February 3, 2020, a senior principal of the Group confronted Brooks in a face-to-face meeting at the Company's headquarters in New York. The meeting was recorded. Up until the meeting, the Group's senior principal had held out hope that the suspicions about Brooks were unfounded.

43.     To the Group's surprise, in that recorded meeting, Brooks admitted to having an undisclosed ownership interest in Niantic and to orchestrating the sale of Convergen's asset to his own entity for less than fair market value. When asked who benefitted from the transaction, Brooks stated, "at this point myself, Greg [Merle], and [the Spanish Investors]." Brooks explained that he had raised the funds to buy the Pellet Plant from Merle and the Spanish Investors. Brooks expressed remorse and asked for forgiveness saying, "I'm genuinely sorry." He was told that he had no future with the Company based on his massive breach of trust. At a meeting the following day, Brooks acknowledged "this was a huge huge mistake."

44.     Brooks' admissions sent shockwaves through the Group. Brooks was the person charged with overseeing the Group's assets and maximizing value of Convergen, and it turned out that he had secretly engaged in self-dealing for his own personal benefit and to the detriment of the Company with respect to those very assets under his watch. The pressing question for the Company was how much damage Brooks had caused the Company as a result of his faithlessness and thievery.  The Company immediately launched an examination of Brooks and the sale of the Pellet Plant to Niantic. The investigation uncovered a number of disturbing ways in which Brooks unlawfully embezzled Convergen funds, most of which Brooks did not admit to when confronted with his fraudulent scheme.

45.     First, while Brooks acknowledged that he secretly "undersold" the Pellet

Plant, he did not acknowledge the magnitude of how much he had undersold the asset to himself and the other defendants. After its initial investigation, the Company conservatively believes that the Pellet Plant was worth at least $10 million more than Niantic paid for it at the time of the sale. In other words, Brooks negotiated a purchase price that was as low as one third of the asset's fair market value.[2]

46.     Through its preliminary investigation, the Company learned that, contrary to longstanding Company divestiture policy and his fiduciary duties, Brooks did not obtain competing bids for the asset to be sold (the Pellet Plant). Brooks had gone so far as to rebuff unsolicited interest in the Pellet Plant from an energy sector investment banker who coincidentally reached out to Brooks at around the time Brooks was arranging the sale to Niantic.

47.     Second, a closer examination of the supply terms between the Pellet Plant and the Power Plant revealed that Brooks increased the price of pellets $10 per ton above the fair market value for such pellets and $10 more per ton than the Pellet Plant had previously sold the pellets for. Brooks locked in this significantly above market price for 10 years and for a minimum contracted tonnage of 40,000 per year. In one move, Brooks shifted $4 million in profit ($400k per year for 10 years) from the Power Plant to the Pellet Plant. The long-term agreement also effectively precluded the Power Plant from purchasing the much less expensive fuel sourced over the previous 10 years by the Power Plant from alternative fuel suppliers; this less expensive fuel is readily available and continues to be a viable and competitive substitute for the pellets in the Power Plant's energy generation process.

48.     Third, after the letter of intent had been executed but prior to closing, Brooks, Mikkelson and Hansen purchased a new shredder for the Pellet Plant at a cost of

---

[2]     Convergen had invested $15.2 million in the Pellet Plant by the time of the sale and Brooks arranged for Niantic to pay $5.5 million.

$350,000.00. Brooks knew that under the terms of the acquisition, this capital expense would be borne by Convergen immediately prior to the sale but would exclusively benefit the Pellet Plant and the defendants after the sale. In other words, Brooks had the seller "gift" the buyer with a new $350,000.00 shredder for the personal benefit of Brooks and the other defendants. Emails subsequently discovered show that both Mikkelson and Hansen, both full time employees of Convergen at the time, knew of the financial windfall to Niantic resulting from the pre-sale purchase of the shredder, specifically that Convergen's net proceeds from the sale would be reduced if a new shredder were purchased by the Pellet Plant prior to its sale to Niantic. In an email exchange between Mikkelson and Brooks on December 17, 2019, Mikkelson writes, "From what we discussed a few weeks ago, it would be best to wait until early 2020 to close on the shredder loan since it would reduce sale proceeds to Libra."

49.     Fourth, Brooks arranged for the Power Plant to pay the Pellet Plant for Hansen's continued oversight of the Power Plant after the sale of the Pellet Plant. On its face, this seemed like a favorable term to assist Convergen transition management of the Power Plant until a replacement could be found. However, a closer examination of the financial terms indicates that Brooks secretly shifted the vast majority of the cost of Hansen's employment from the Pellet Plant to the Power Plant (the Power Plant is paying Hansen $120,000.00 per year, which, upon information and belief, represents most of his total compensation, including his responsibilities for Niantic). This is consistent with Brooks' self-serving scheme to shift as much profit from the Power Plant to the Pellet Plant after his acquisition.

50.     Fifth, Brooks ensured that Niantic did not pay Convergen $196,420.00 that the Pellet Plant had in cash as of the closing. In accordance with the Acquisition Agreement, that cash was to be transferred to the seller (Convergen). As part of its investigation, Convergen

14

determined that the cash was never paid to it because Brooks was in charge and he made sure his new company and not his soon to be former employer received those monies.

**D. Defendants' Roles in the Fraudulent Scheme**

51.     As stated above, Brooks was able to execute his fraudulent scheme (and nearly get away with it) because in 2019 he was the senior most officer charged and trusted with vetting and overseeing these kinds of transactions. He also benefitted from the knowing assistance he received from his co-conspiring underlings, Hansen and Mikkelson, who as employees of Convergen were also responsible for the management of both the Power Plant and Pellet Plant. The investigation uncovered emails that unequivocally confirm Hansen and Mikkelson's knowledge of and roles in the fraudulent scheme. For example, a September 12, 2019 email from Mikkelson to Brooks and copied to Hansen indicated that he and Hansen knew of Brooks' fundraising from the Spanish Investors at around the time Brooks formally initiated the sale process with Niantic: "Hola Tio Esteban ["Hello Uncle Steve], [Hansen] mentioned that you are in Spain."

52.     The Spanish Investors knew that Brooks was a senior officer of the Company, knew that he was overseeing the sale of the Pellet Plant and was a financial stakeholder in the buyer (Niantic). During the February 3rd taped confession, Brooks admitted that the Spanish Investors had funded the fraudulent acquisition of the Pellet Plant. Upon information and belief, Brooks solicited the Spanish Investors on the basis that his double-dealing was expected to yield the Pellet Plant at a purchase price several million dollars below its fair market value. Brooks solicited investments from the Spanish Investors in September 2019, in and around the time he introduced Niantic to the Group. Upon information and belief, the Spanish Investors had extensive contacts with Brooks while he was in New York and employed

by the Company in New York, and each wired funds directly or indirectly to New York for the fraudulent purchase of the Pellet Plant.

53.     Defendant Merle similarly knew of Brooks' duplicity and the financial windfall he would achieve as a result. Neither he nor Brooks disclosed their long-standing personal relationship to anyone at the Group. In fact, they both took deliberate steps to keep their relationship a secret. The two exchanged very few emails via Brooks' Company email account and those limited exchanges were written in an obvious formal, contrived arms' length manner. The lack of emails on a deal of this type and magnitude suggests that the parties engaged in discussions through some other clandestine means. Not surprisingly, the Company's investigation uncovered emails between the two utilizing Brooks' personal Gmail account. The Gmail account emails reflect the hidden personal relationship and stand in sharp contrast to the faux formal emails to and from Brooks' Company email account. Indeed, in one of the recently discovered emails, Brooks referred to Merle as a "close friend" in pitching an energy project of Merle's to the above-referenced investment banker. None of this was disclosed to anyone at the Group, including during the meeting at which Merle was introduced to the Group's principal in New York.

54.     Also not disclosed was the significant fact that Brooks covertly signed a personal guaranty of more than two million dollars to finance the fraudulent acquisition of the Pellet Plant. At closing Plaintiffs knew that Niantic's ability to close the transaction was predicated on obtaining a credit agreement. Unbeknownst to anyone at the Company, the personal guaranty from Brooks enabled Niantic to obtain the credit agreement (this only came to light from the post-sale investigation). Each of the defendants had to know of the personal guaranty and that it was signed while Brooks was employed by the Company. There is no

legitimate basis for Brooks to have personally guaranteed the payment obligations of

Convergen's counterparty. The conflict of interest could not have been more pronounced and yet

not one of the defendants raised the issue with the Company - presumably because to do so

would have revealed and undone the fraudulent scheme and the opportunity to "buy" an asset for

many million dollars less than what it was worth.

### E.  Misappropriation of Convergen's Trade Secrets

55.     Prior to the fraudulent acquisition, Convergen personnel based in

Wisconsin at the Power Plant, including Hansen and Mikkelson, had managed the Office 365

accounts for Convergen and all of its entities, including the Power Plant, the Pellet Plant and

Biogas Latvia, a subsidiary of Convergen with assets and operations in the Republic of Latvia (in

Northern Europe). Those Convergen personnel remained in Wisconsin working with the new

Pellet Plant ownership and ceased working for Convergen. As part of the Pellet Plant transaction,

Brooks, Hansen and Mikkelson should have segregated and relinquished control of the Office

365 accounts of Convergen and its other entities like the Power Plant and Biogas Latvia, and

should have maintained access to only a limited number of the Pellet Plant's emails necessary for

operations. Plaintiffs recently learned that this did not happen.

56.     In late April 2020, the email account of a Convergen senior manager in

Latvia was hacked, which resulted in Convergen's Chief Accountant in Latvia receiving an

unauthorized request to pay an unknown party somewhere in Europe. As per Group protocol, this

cybersecurity breach was immediately reported to the Group's Chief Information Officer, whose

responsibility it is to ensure that the highest level of cybersecurity is maintained across all of the

Group's businesses. When the Group's Chief Information Officer contacted Convergen's senior

manager in Latvia to access the Office 365 account to assess the extent of the cyberattack and

install countermeasures, he discovered that he lacked access because Brooks and the former

Convergen employees (notably Mikkelson) still controlled the Office 365 accounts for

Convergen and its subsidiaries Biogas Latvia, the Power Plant, the Pellet Plant and other

Convergen entities. In other words, Brooks and his minions failed to segregate the electronic

files as part of the Pellet Plant transaction.

57.     The Group's Chief Information Officer immediately contacted Mikkelson

to gain access to Convergen's emails and remove any unlawful access by the defendants. His

requests went unheeded. More senior Group personnel reached out directly to Merle, pointing

out that, among other things, access was needed immediately to address the illegal hacking and

long term for audit and compliance purposes. Merle rebuffed these requests as well.

58.     Separately, Brooks, Mikkelson, and Hansen's company-owned devices

containing confidential information and trade secrets of the Company, Convergen, Biogas

Latvia, and the Power Plant have not been returned. Despite Brooks' agreement to the

Company's demands on at least six occasions to return the devices, he has failed to do so.

59.     The trade secrets on the Office 365 accounts and the devices not only

include client contracts, market analysis, potential transactions, investor lists, and strategic

discussions, but also unique methods of optimally operating an array of energy assets, a unique

and proprietary fuel mix and sophisticated and energy industry specific legal agreements and

work product.

60.     The irreparable harm to the Company is obvious. Without any basis in fact

or law, the defendants are depriving Convergen of the ability to protect its own data, especially

from unknown hackers. The defendants are also unlawfully granting themselves continued

access to the Company, Convergen, Biogas Latvia, and the Power Plant's proprietary and

confidential information and trade secrets (all contained within the email files located on the Office 365 accounts). In addition to engaging in misappropriation, defendants are denying Convergen access to the email files of the Pellet Plant prior to the sale, which, as stated above, are needed for future compliance requirements. Defendants' motive for denying access is also obvious: presumably among those files are incriminating emails about defendants' fraudulent scheme.

## FIRST CAUSE OF ACTION: FRAUD
### (Brooks)

61.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs of this Complaint.

62.     As set forth in detail above, Brooks engaged in a fraudulent scheme to acquire the Pellet Plant for at least $10 million less than what it was worth and loot his employer of additional monies for the benefit of his new acquisition, including the $196,420.00 in cash that went missing instead of being paid to Convergen. To accomplish this, Brooks made materially false representations to the Company about: (a) the sale price of the Pellet Plant; (b) his relationship to Merle and the other defendants; (c) the appropriateness of the new Supply Agreement between the Power Plant and the Pellet Plant; and (d) the appropriateness of Convergen funding the purchase of a new shredder for the Pellet Plant on the eve of its sale to Niantic.

63.     Brooks also intentionally hid from his employer material facts connected to the fraudulent scheme, notably his interest in Niantic and his longstanding relationship with Merle. For example, on November 13, 2019 Brooks attended a meeting that he had organized for an Executive Board member of the Group to meet Merle who had just bid on the Pellet Plant. At the choreographed meeting, Brooks represented Merle as the CEO of Niantic and failed to

disclose his own interest in Niantic and close friendship with Merle. Brooks also executed the personal guaranty discussed above on January 31, 2020 without making any disclosure to the Company. Finally, Brooks did not disclose to the Company that, at Brooks' instruction and without consulting the Company's General Counsel, Niantic's attorneys had previously represented Convergen in a substantially related matter. Niantic's attorneys did not clear conflicts or even seek Convergen's consent prior to representing Niantic in the acquisition of the Pellet Plant. When confronted with suspicions of his wrongdoing on February 3, 2020, Brooks confessed to his fraud and that he personally benefited from the sale of the Pellet Plant.

64.     Plaintiffs justifiably relied, to their detriment, upon each of the misrepresentations set forth above in entering into the Acquisition Agreement with Niantic.

65.     Plaintiffs have been injured as a proximate cause of each of these fraudulent acts and concealments in at least the following ways: (a) the Pellet Plant has been sold for millions of dollars below its value; (b) the final purchase price was reduced to account for a new expensive shredder without any basis or consideration; (c) the Power Plant is being overcharged in its supply contract with the Pellet Plant; (d) the Power Plant is being overcharged for Hansen's time to help run the Pellet Plant post-acquisition; and (e) $196,420.00 in cash went to the Pellet Plant instead of Convergen at the closing.

66.     Because Brooks' fraudulent scheme was intentional, malicious and demonstrated a wanton disregard of Plaintiffs' rights, Plaintiffs are entitled to punitive damages.

### SECOND CAUSE OF ACTION: BREACH OF FIDUCIARY DUTY
### (Brooks, Hansen and Mikkelson)

67.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs of this Complaint.

68.     As an officer of the Company, Brooks owed a fiduciary duty to his

employer. He was afforded and empowered with considerable discretionary authority to manage Convergen and its subsidiaries, including the Pellet Plant. As a senior employee of the Company, Brooks was required to manage and invest assets of Convergen and the Pellet Plant in good faith and for the benefit of his employer.

69.     Pursuant to Brooks' Employment Agreement with the Company dated January 7, 2014, Brooks agreed "not to be engaged in any other business activity without the prior written consent of the Company" or divulge the Company's confidential information. In accordance with the Employee Handbook, Brooks agreed not to engage in the "theft of money/property [of the Company]" and "any action, which can be construed as intent to defraud/deceive."

70.     Hansen and Mikkelson also served as officers of Convergen and, therefore, owed a fiduciary duty to their employer. Pursuant to their employment agreements, they agreed not to divulge the Covergen's confidential information. Both exercised considerable control over the Power Plant and the Pellet Plant, including managing the flow of information (*e.g.*, EBITDA) to the Company. Had senior members of the Group's Executive Committee been made aware that the Pellet Plant's projected EBITDA for 2020 was substantially higher than represented by Brooks, the Group would never have agreed to pursue Niantic's offer to purchase the Pellet Plant for $5.8 million.

71.     By participating in the fraudulent scheme, Brooks, Hansen and Mikkelson violated their fiduciary obligations and contractual prohibitions. Each acted as a faithless servant by self-dealing and otherwise engaging in and enabling the fraudulent scheme to the detriment of their employers. As faithless servants each must forfeit all compensation paid during their period of disloyalty.

72.     Plaintiffs have been injured as a proximate result of Brooks, Hansen, and Mikkelson's breaches of their fiduciary duties in at least the following ways: (a) the Pellet Plant has been sold many millions of dollars below its value; (b) the final purchase price was reduced to account for a new expensive shredder without any basis or consideration; (c) the Power Plant is being overcharged in its supply contract with the Pellet Plant; (d) the Power Plant is being overcharged for Hansen's time to help run the Pellet Plant post-acquisition; (e) $196,420.00 in cash went to the Pellet Plant instead of Convergen at the closing; (f) the Office 365 accounts of Convergen, Biogas Latvia, and the Power Plant that contain confidential information and trade secrets have been stolen; and (g) company-owned devices containing the confidential information and trade secrets of the Company, Convergen, Biogas Latvia, and the Power Plant have not been returned.

73.     Based on all of the above, Plaintiffs are entitled to compensatory damages in an amount to be determined at trial, together with interest at the statutory rate, plus punitive damages.

### THIRD CAUSE OF ACTION: AIDING AND ABETTING FRAUD
### (All Defendants other than Brooks)

74.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs of this Complaint.

75.     Brooks confessed on tape that he fraudulently induced the Plaintiffs into selling the Pellet Plant significantly below value in a self-dealing transaction. As set forth in detail above, Brooks engaged in an extensive fraudulent scheme to transfer profits, cash, equitable value and assets from Convergen to the Pellet Plant.

76.     As insiders, Hansen and Mikkelson knew about the fraudulent scheme and in their positions managing the Pellet Plant they substantially assisted Brooks in every facet of

the scheme by, among other things, facilitating the sale, arranging for the purchase of the shredder, not transferring the Pellet Company cash at closing to Convergen, signing off on an inflated pellet price in the Supply Agreement. They provided confidential information about the Pellet Plant to Merle and, upon information and belief, to the other defendants. Further upon information and belief, Hansen and Mikkelson assisted Brooks' efforts to fundraise from the Spanish Investors, all in an effort to better themselves financially. Brooks could not have perpetrated the fraud without the substantial assistance of Hansen and Mikkelson. There was no one left at Convergen or the Company who was in a position to question or challenge the terms of the Niantic transaction, as Brooks, Hansen and Mikkelson were the three charged with overseeing all aspects of the Pellet Plant and its sale to Niantic.

77.     The Spanish Investors, Merle and his two entities, Riverview and Niantic, knew that Brooks was using his unique position at the Company to double deal and close a fraudulent transaction to their benefit and to the detriment of Plaintiffs. Brooks could not have perpetuated the fraud without funding from the Spanish Investors, Merle and his entities.

78.     Consequently, Plaintiffs have suffered millions of dollars in losses from the fraudulent sale, the inflated supply agreement, the incurrence of Hansen's compensation, the purchase of the shredder and the theft of $196,420 in cash due to Convergen at the closing, among other things.

79.     Based on all of the above, Plaintiffs are entitled to compensatory damages in an amount to be determined at trial, together with interest at the statutory rate, plus punitive damages.

## FOURTH CAUSE OF ACTION: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (All Defendants other than Brooks)

23

80.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs of this Complaint.

81.     At all relevant times, Brooks owed fiduciary duties to Plaintiffs.

82.     Plaintiffs have been injured as a proximate result of Brook's breaches of his fiduciary duties.

83.     All of the defendants other than Brooks knew of Brooks' role and responsibilities at the Company. In fact, it was Brooks' unique position as the Company's gatekeeper of its energy assets, including the Pellet Plant, that made the opportunity to participate in the fraudulent scheme so attractive. The defendants knew of, enabled and participated in Brooks' fraudulent scheme.

84.     Plaintiffs have been injured as a result of Brooks' breaches of his fiduciary duties and the other defendants' substantial participation in those breaches.

85.     Consequently, Plaintiffs are entitled to compensatory damages in an amount to be determined at trial, together with interest at the statutory rate, plus punitive damages.

## FIFTH CAUSE OF ACTION: THEFT AND MISAPPROPRIATION OF TRADE SECRETS
### (Niantic, the Pellet Plant, Merle, Brooks, Hansen and Mikkelson)

86.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs of this Complaint.

87.     Convergen, Biogas Latvia, and the Power Plant stored their trade secrets via the Office 365 accounts that, prior to the fraudulent sale, had been overseen by Pellet Plant personnel, including Hansen and Mikkelson.

88.     The trade secrets not only include client contracts, market analysis,

potential transactions, investor lists, and strategic discussions, but also unique methods of optimally operating an array of energy assets, a unique and proprietary fuel mix and sophisticated and energy industry specific legal agreements and work product.

89.     Under strict guidelines from the Group, which places the highest possible degree of importance on securing its entities from cybersecurity breaches and threats, the Company, Convergen, Biogas Latvia, and the Power Plant had taken deliberate steps to secure the data, including, among other things, the use of unique passwords for each email account and single administrator control to prevent unauthorized access.

90.     After the sale, Hansen and Mikkelson maintained control over the Office 365 accounts of Convergen, Biogas Latvia, and the Power Plant without basis or authority; they should have only maintained access to specific email accounts for the Pellet Plant.

91.     Brooks, Hansen, and Mikkelson retained their company-owned devices containing the confidential information and trade secrets of the Company, Convergen, Biogas Latvia, and the Power Plant.

92.     Consequently, the defendants named in this claim knowingly and without authorization have ongoing access to the Company, Convergen, Biogas Latvia, and the Power Plant's trade secrets and other proprietary and confidential information and refuse to turn it over to Plaintiffs. Nor are the defendants willing to provide Plaintiffs with the Pellet Plant Office 365 accounts for the period prior to the sale.

93.     Upon information and belief, defendants are accessing Plaintiffs' data and may be using it to Plaintiffs' detriment; at a minimum, defendants are obstructing Convergen's access to Pellet Plant emails presumably to thwart efforts to further uncover the fraud.

94.     Defendants should be immediately enjoined from further accessing the

Company, Convergen, Biogas Latvia, and the Power Plant's data and should be ordered to turnover exclusive access to the Company, Convergen, Biogas Latvia, and the Power Plant to their own files.

## SIXTH CAUSE OF ACTION: RESCISSION

### (Niantic, the Pellet Plant)

95.     Plaintiff the Power Plant repeats and realleges the allegations contained in the preceding paragraphs of this Complaint.

96.     The Power Plant was fraudulently induced to enter the Pellet Supply Agreement with the Pellet Plant by Brooks who engaged in self-dealing, and Niantic and Merle who collaborated with Brooks to make the Pellet Supply Agreement a condition of the transaction.

97.     There is no complete and adequate remedy at law and damages would not be adequate because of the extended 10-year term and unfair pricing of the Pellet Supply Agreement.

98.     Rescission of the Pellet Supply Agreement would substantially restore the status quo for the Power Plant as the terms could revert to those prior to the sale of the Pellet Plant, thus restoring the Power Plant's projected EBITDA and operational flexibility.

99.     The Power Plant promptly filed this claim for rescission immediately after discovering the fraud.

## SEVENTH CAUSE OF ACTION: VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. §1836

### (Brooks, Mikkelson, and Hansen)

100.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs of this Complaint.

101.     The improper acts described above consisting of the misappropriation of

the Company, Convergen, Biogas Latvia, and the Power Plant's confidential information and trade secrets on the Office 365 accounts and company-owned devices by improper means comprises a violation of 18 U.S.C. §1836, the Defend Trade Secrets Act ("**DTSA**").

102.    The confidential information on the Office 365 accounts and company-owned devices described above comprises a formula, pattern, business data, compilation, program, device, method, technique, invention, plan, procedure and process. This unlawfully accessed information comprises "trade secrets" within the DTSA.

103.    Plaintiffs derive economic value from their confidential information and trade secrets on the Office 365 accounts and company-owned devices described above because it is not generally known to, and is not readily ascertainable through proper means by, other persons who may be able to obtain economic value from its disclosure. It is used, related to and intended for use in interstate commerce,

104.    The secrecy of the confidential information and trade secrets on the Office 365 accounts and company-owned devices described above is maintained by limiting access to the information only to persons with a need-to-know, and who agree and covenant in writing to maintain the secrecy of the information. Further, the Office 365 accounts are secured with the use of unique passwords for each email account and single administrator control to prevent unauthorized access.

105.    Brooks, Mikkelson, and Hansen agreed in writing to maintain the confidentiality of the Group and Convergen's confidential information and trade secrets. Despite their written agreements, Brooks, Mikkelson, and Hansen misappropriated Plaintiffs' confidential information and trade secrets on the Office 365 accounts and company-owned devices described above by stealing or otherwise without authorization copying, duplicating,

downloading, replicating the information, and appropriating, retaining, disclosing, transmitting delivering, or otherwise conveying the information to competitors of Plaintiff, including Niantic, Merle, Riverview, and the Pellet Plant, among other third parties, without Plaintiffs' consent.

106.    Brooks, Mikkelson, and Hansen's misappropriation of Plaintiffs' confidential information and trade secrets on the Office 365 accounts and company-owned devices described above was for improper personal gain and was willful and malicious.

107.    Brooks, Mikkelson, and Hansen knew that the retention and disclosure of Plaintiffs' confidential information and trade secrets on the Office 365 accounts and company-owned devices described above to such competitors and third-parties was in violation of their written agreements and the Group and Convergen's policy to maintain the confidentiality of information.

108.    Brooks, Mikkelson, and Hansen's misappropriation of Plaintiffs' confidential information and trade secrets on the Office 365 accounts and company-owned devices described above was done through improper means including, but not limited to, the outright theft of the information; the breach of their express written duties to maintain the secrecy of and limit the disclosure of the information; and accessing and disseminating the information without authorization.

109.    As a direct and proximate result of these wrongful actions, Plaintiffs have suffered and will suffer irreparable harm and damages.

110.    Under the DTSA, Plaintiffs are entitled to and request an award of damages in its favor for actual loss caused by the misappropriation, damages for all unjust enrichment caused by the misappropriation that is not addressed in computing damages for actual loss.

111.    Under the DTSA, Plaintiffs are entitled to and request exemplary damages in the amount of not more than two times Plaintiffs' actual damages, plus reasonable attorneys' fees.

112.    Under the DTSA, Plaintiffs are also entitled to and request the return of all property and information wrongfully converted, including but not limited to the confidential information and trade secrets on the Office 365 accounts and company-owned devices described above, as well as an injunction to prevent further unlawful dissemination of Plaintiff's property.

## EIGHTH CAUSE OF ACTION: VIOLATION OF THE STORED COMMUNICATIONS ACT, 18 U.S.C. §2701

### (Brooks, Mikkelson, Hansen, Niantic, Merle, and Pellet Plant)

113.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs of this Complaint.

114.    The improper acts described above consisting of the unlawful, unauthorized and intentional access of the Office 365 email accounts using stolen administrator rights comprises a violation of 18 U.S.C. §2701, the Stored Communications Act.

115.    Convergen, Biogas Latvia, and the Power Plant's Office 365 email and data servers are used in interstate commerce to conduct business in many different states.

116.    Brooks, Mikkelson, Hansen, Niantic, Merle and the Pellet Plant, without authorization, intentionally and improperly accessed and/or exceeded access to a facility through which an electronic communication service is provided.

117.    Specifically, without informing the Plaintiffs or seeking or obtaining their consent, Brooks, Mikkelson, Hansen, Niantic, Merle, and the Pellet Plant, upon information and belief, accessed Convergen, Biogas Latvia, and the Power Plant's Office 365 accounts using administrator rights to access Plaintiffs' password-protected email accounts, access Plaintiffs'

confidential information and trade secrets, spy on Plaintiffs, and cover up their fraud and breaches of fiduciary duties.

118.    Even after Brooks, Mikkelson, Hansen, Niantic, Merle, and the Pellet Plant's misconduct was discovered by Plaintiffs, and they were instructed to transfer the administrator rights to the Office 365 accounts, they continued their unlawful access and control and prevented Plaintiffs from accessing the Office 365 accounts and emails stored on them.

119.    Brooks, Mikkelson, Hansen, Niantic, Merle, and the Pellet Plant's purpose in accessing the Office 365 accounts is to benefit themselves at the expense of Plaintiffs.

120.    Brooks, Mikkelson, Hansen, Niantic, Merle, and the Pellet Plant accessed Convergen, Biogas Latvia, and the Power Plant's email communications, upon information and belief, with the intent to defraud, to obtain leverage over the Plaintiffs in the litigation and their management of Convergen, extract more value from the Power Plant, obtain confidential information about other Convergen assets in order to also purchase them at below-market prices.

121.    Brooks, Mikkelson, Hansen, Niantic, Merle, and the Pellet Plant are also causing Plaintiffs costs to re-secure the Office 365 accounts and otherwise repair the damage they caused to the integrity and availability of Plaintifs documents, information, and systems.

122.    Brooks, Mikkelson, Hansen, Niantic, Merle, and the Pellet Plant engaged in all of the above-described acts with a knowing or intentional state of mind.

123.    As a result of Brooks, Mikkelson, Hansen, Niantic, Merle, and the Pellet Plant's conduct, Plaintiffs have incurred substantial damages.

124.    In addition to actual and/or statutory damages, the Plaintiffs are entitled to recover their attorneys' fees and punitive damages for defendants' unlawful and egregious conduct.

**WHEREFORE**, Plaintiffs demand that judgment be entered in its favor and against defendants as follows:

1.      Compensatory damages in excess of $10 million.

2.      Forfeiture of compensation earned during their period of disloyalty.

3.      Disgorgement of any profits resulting from their disloyalty.

4.      Rescission of the Pellet Supply Agreement.

5.      Punitive damages to be determined at trial.

6.      All damages, injunctive relief, and/or other relief available under the Defend Trade Secrets Act.

7.      All damages and/or other relief available under the Stored Communications Act.

8.      Injunctive relief.

9.      Attorneys' fees, costs of suit, interest and such other relief as the Court deems fair and equitable.

10.     That Plaintiffs be awarded such other and further relief as the Court may deem just and proper.


## JURY DEMAND

Plaintiffs demand a trial by jury on all issues in this action.

DATED:  New York, New York          Respectfully submitted,
        May 14, 2020

                                    /s/ Michael Stolper
                                    _____
                                    Michael Stolper
                                    Dov Byron Gold
                                    SEIDEN LAW GROUP LLP
                                    469 7th Avenue, Suite 502
                                    New York, NY 10018
                                    (212) 337-3502

                                    *Attorneys for Plaintiffs*