

Exhibit 1

# Engineered Fuel Pellet Supply Agreement

# January 31, 2020

Buyer agrees to purchase Pellets from Seller, and Seller agrees to deliver Pellets to Buyer in accordance with terms and conditions in this Pellet Supply Agreement ("Agreement").

---

**Buyer:**    L'Anse Warden Electric Company, LLC    **Seller:**    Convergen Energy WI, LLC

---

**Commodity:**    The engineered fuel pellets (the "Pellets") sold and delivered to Buyer hereunder from Seller's facility located in Green Bay, WI ("Facility"), and shall generally satisfy the Typical Specifications, as set forth herein.

**Contract Term:**    The term of this Agreement shall commence on January 31, 2020 (the "Effective Date") and continue for a period of ten (10) years (the "Term"), subject to early termination of this Agreement as set forth in this Section below.  Subject to the rights of the Bank (as defined below) under the Collateral Assignments (as defined below) and the Bank's rights set forth below, this Agreement may be terminated (each, a "Default"): (a) By either party, effective immediately upon written notice to the other party, if such other party: (i) becomes insolvent or is generally unable to pay, or fails to pay, its debts as they become due; (ii) files or has filed against it, a petition for voluntary or involuntary bankruptcy, or otherwise becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (iii) seeks reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts; (iv) makes or seeks to make a general assignment for the benefit of its creditors; or (v) applies for or has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business, or (b) By either party if the other party is in material breach of, or threatens to breach, this Agreement and either the breach cannot be cured or, if the breach can be cured, it is not cured by such other party within a commercially reasonable period of time under the circumstances, in no case exceeding thirty (30) days following such other party's receipt of written notice of such breach or threatened breach from the non-breaching party.

The parties hereby acknowledge that each party has entered into a Collateral Assignment, dated January 31, 2020, with BMO Harris Bank N.A. (the "Bank"), pursuant to which each party has (A) collaterally assigned to the Bank all of its right, title and interest of, in and to this Agreement and any extensions or renewals of this Agreement, and (B) granted to Bank a security interest in and to all rights and remedies of such party arising under this Agreement (each, a "Collateral Assignment", and collectively, the "Collateral Assignments").  Each party hereby consents to the Collateral Assignment entered into by the other party and hereby acknowledges and agrees to the terms thereof.   Neither party shall terminate this Agreement by reason of the occurrence of any Default, unless and until the party seeking to terminate this Agreement (the "Terminating Party") shall have given Bank a copy of the notice of Default delivered to the other party (the "Defaulting Party").  Each party agrees that the Bank shall have the right to cure such Default within forty-five (45) days of Bank's receipt of such notice (or, if such Default cannot reasonably be cured within such forty-five (45) day period, Bank shall have such longer time as may be necessary to cure such Default; provided that Bank commences the cure within such period and diligently pursues the cure thereafter).  The Bank's right to cure under this Agreement shall not be construed as a requirement or affirmative duty to take such action.  Upon Bank succeeding to a

party's interest under this Agreement pursuant to the Collateral Assignment of such party, the other party acknowledges and agrees to recognize Bank (and its successors and assigns) as party to this Agreement and to be bound by and perform all of the obligations and conditions imposed upon such other party under this Agreement.

**Base Price:** Subject to adjustment as provided below, the initial price for the Pellets shall be $50 per ton at Delivery Point (the "Base Price"). Commencing on the first anniversary of the Effective Date, and thereafter on each subsequent anniversary thereof during the Term, the Base Price shall increase by 1.5% on a cumulative basis (i.e., to $50.75 after the first anniversary date, $51.51_after the second anniversary date, etc.). Seller will arrange for transportation of the Pellets based on a mutually agreed upon delivery schedule. Transportation of the Pellets will be arranged and paid for by Seller. Buyer will reimburse Seller for transportation at cost based on invoices sent by Seller. Seller will negotiate with transportation providers on a commercial best efforts basis.

**Contract Quantity** Subject only to Force Majeure, Seller shall ship and Buyer shall accept for purchase a minimum of 40,000 total tons per year (the "Minimum Amount"). In order to account for scheduled power plant outages and other situations that could substantially reduce deliveries in any given month, the parties agree to target regular monthly shipments of approximately 4,500 tons per month. Buyer and Seller shall provide each other with advance notice of any scheduled power plant outages or other circumstances that would result in a material deviation from the agreed regular monthly shipping schedule.

**Delivery Point:** Buyer's Facility in L'Anse, MI, or any other location mutually agreed in writing by the parties. Seller shall be responsible for arranging all shipments of Pellets to Buyer.

**Specifications:** As used herein, the following capitalized terms shall have the meanings set forth herein: (i) "Shipments" means a shipment of Pellets loaded by Seller into one or more trucks for transportation to Buyer; and (ii) "Typical Specifications" means a set of specifications representing the general quality (subject to the acceptable variations as set forth herein) of the Pellets sold to Buyer from time to time; with the understanding that "Typical Specifications" are not to be considered guaranteed specifications and any given Shipment of Pellets may vary from the Typical Specifications and shall be accepted by the Buyer so long as such Pellets do not exceed the maximum sulfur, maximum chlorine, or ash content or fall below the minimum BTU/lb level, as the case may be, as set forth in the following Rejection Limits:

| | Typical-Dry Basis | Rejection Limits-Dry Basis |
|---|---|---|
| Sulfur Content (% by weight) | 0.17 | 0.5 Max |
| BTU/lb | 11,250 | 8,500 Min |
| Moisture (% by weight) | 5.5% | 14 Max |
| Ash Content (% by weight) | 6.5 | 16 Max |
| Chlorine Content (ppm) | 1,000 | 1,800 Max |

**Epa Alternative Fuels Designation** Convergen Energy WI LLC was previously granted by U.S.EPA Alternative Fuels designation for the fuel pellets to be supplied from its Green Bay fuel production facility. This EPA designation or "comfort letter" indicates that the CE engineered fuel pellets are classified as a "non-waste", non-hazardous secondary material under 40 CFR 112. This alternative fuel designation is important in that solid fuel production of steam and power authorized under an applicable Federal or State permit will not be subject to the Commercial and Industrial Solid Waste Incinerator (CISWI) rules, i.e. the CE fuel pellets can be used similar to traditional fuels such as coal, tire-derived fuel, railroad ties, construction demolition material, traditional biomass, etc. While "comfort letters" are no longer issued under the more recent

changes to the U.S. EPA Alternative Fuels Program they are still approved as an Alternative Fuel on a case by case basis during the applicable Federal and/or State Air Permitting process.

**BTU Adjustment:** If the actual Btu of the Pellets **varies** from the Typical 11,250 BTU/lb +/- 250 BTU/lb level, there will be a per ton price adjustment (increase or reduction) for each ton of Pellets determined as follows:

*BTU Price Adjustment* = [ (*Act Btu* − 11,250) ÷ 11,250] * Contract Price

Where: Act Btu = Actual average BTU content of the Pellets for deliveries made during any given month. If the pellets are between the 11,250 +/- 250 BTU/lb range, no BTU adjustment will be made.

**BTU Quality Determination:** BTU quality to be tested, at Seller's cost, at Seller's in-house laboratory based on representative samples collected by Seller from daily production at the Facility. Seller will prepare a monthly composite sample by combining daily representative samples. Seller, at Seller's cost, will test monthly composite sample at a certified third-party laboratory. These tests will consist of short proximate analysis (BTU/lg., Moisture, Ash, Chlorine and Sulfur). The results of the monthly composite test shall be provided to Buyer on a periodic basis. If Buyer requires a split test independently, Seller shall provide Buyer with the samples necessary to perform such tests. Buyer shall pay the cost of such split tests and any other additional sample testing performed by an outside laboratory.

**Weights:** The weight of all Pellets purchased and sold pursuant to this Agreement shall be determined by certified truck scales at the Delivery Point. Seller shall provide notice of such weights to Buyer within 48 hours of truck loading.

**Rejection:** Buyer may reject any Shipment of Pellets that fails to conform to any one of the Rejection Limits. Rejection of such non-conforming Pellets shall be Buyer's sole and exclusive remedy for Seller's failure to deliver conforming Pellets under this Agreement. Disposal of rejected Pellets, including all transportation charges associated with the rejected Pellets, shall be for Seller's account. Buyer and Seller shall cooperate to minimize Seller's cost of disposal.

**Invoices and Payment Terms:** Seller will invoice Buyer for Pellets delivered and corresponding transportation costs, promptly at the end of each week for Pellets loaded on trucks during the immediately prior week. Invoices shall be mailed to:

L'Anse Warden Electric Company LLC
157 S. Main Street
L'Anse, MI 49946
Attn: Plant Manager

Buyer shall pay invoices no later than thirty (30) days following receipt of Seller's invoice, based on weights of Pellets and Adjustments as determined in this Agreement. Payment shall be remitted to Seller at the address provided in the invoice. Late payment shall be subject to interest at the rate of 0.75% per month of amount due.

BTU adjustments will be calculated based on the monthly composite average and billed on a separate invoice at the end of each month.

**Additional Conditions:** The attached document entitled "Convergen – Additional Terms and Conditions" shall be part of this Agreement.

**Convergen Energy WI LLC**

By: _____

Name: Gregory Merle

Title: President

**L'Anse Warden Electric Company, LLC**

By: _____

Name: FIDEL ANDUEZA

Title: _____

**CONVERGEN ENERGY WI LLC**
**ADDITIONAL TERMS AND CONDITIONS**

1.  **LIMITATION ON WARRANTY**.  EXCEPT AS EXPRESSLY SET FORTH HEREIN, SELLER EXPRESSLY DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES, WRITTEN OR ORAL, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY WITH RESPECT TO CONFORMITY TO SAMPLES, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE.

2.  **FORCE MAJEURE**.  If, by reason of: (i) strikes or other labor troubles, (ii) governmental prohibitions, preemptions, restrictions or other controls, (iii) shortages of fuel, supplies or labor, (iv) acts of God or the elements (such as tornado, hurricane, flood, or abnormally inclement weather for the season), (v) civil commotion, acts of war, terrorism or the public enemy, (vi) fire or other casualty or catastrophe, (vii) accidents or mechanical breakdowns, (viii) any other cause beyond an affected party's reasonable control (excluding, however, any financial inability), or (ix) the making of alterations, installations, improvements, repairs, additions or other physical change in, to or about an affected party's premises (the events described in the preceding clauses being herein referred to as "Force Majeure"), the observance, performance or compliance with, any non-monetary obligation (i.e., any obligation other than the obligation to pay a sum of money) on the part of an affected party to observe, perform or comply with, is prevented or delayed, including the inability to supply, provide or furnish, or a delay in supplying, providing or furnishing, any product expressly or implicitly to be supplied, provided or furnished, or the inability to make, or a delay in making, any alteration, installation, improvement, repair, addition or other physical change in, to or about such affected party's premises or any other portion thereof, or the inability to supply, or a delay in supplying, any equipment, fixtures or other materials, then, for so long as such affected party shall be unable to observe, perform or comply with, or shall be delayed in the observance, performance or compliance with, any such non-monetary obligation, this Agreement and such affected party's obligation to observe, perform and comply with any such non-monetary obligation shall be excused for the period during which the Force Majeure prevents or delays such observance, performance or compliance.  The party claiming suspension of performance by reason of Force Majeure shall notify the other party as soon as practicable but no later than ten (10) days after the commencement of the event of Force Majeure.  During such event of Force Majeure, the affected party shall use reasonable commercial efforts to remedy or eliminate such Force Majeure.  .  Any deficiencies in deliveries or acceptance of delivery caused by Force Majeure shall not be taken into consideration for purposes of calculating damages suffered by a party as a result of the other party not shipping or accepting shipment of the Minimum Amount.  In no event shall a Force Majeure be construed to relieve a party of any obligations under this Agreement solely because of increased costs or other adverse economic consequences that may be incurred by such party through performance of such obligations.

3.  **LIMITATION ON LIABILITY**.  Neither Seller nor Buyer shall be liable to the other for consequential, incidental, punitive, exemplary or indirect damages, lost profits, or business interruption damages, whether by statute, in tort or in contract, under any indemnity provision or otherwise.

4.  **TITLE/RISK OF LOSS**.  Seller warrants good title to all Pellets delivered hereunder free and clear of all claims and encumbrances.  Title and risk of loss shall pass from Seller to Buyer upon delivery at the specified Delivery Point.

5.  **ASSIGNMENT**.  Neither party shall assign this Agreement without the prior written consent of the other party, which consent may not be unreasonably withheld or delayed.

5

6. **NO WAIVER**. Waiver of any breach of this Agreement shall not be construed as a waiver of any other breach.

7. **GOVERNING LAW**. THIS AGREEMENT SHALL BE CONSTRUED AND GOVERNED BY THE LAWS OF THE STATE OF WISCONSIN, WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OF LAW.

8. **CONFIDENTIALITY**. Each party acknowledges that this Agreement contains confidential information which would put them at a competitive disadvantage if disclosed to the public. Therefore, the terms of this Agreement shall be kept confidential by the parties, except to the extent disclosure may be required by law, regulation, or judicial or an administrative order, or to affiliated companies as necessary for the administration of this Agreement. Notwithstanding the above, in connection with the sale, disposition or financing of the Facility, Seller may disclose this Agreement to any lender, potential lender or any investor or potential investor, provided in each case that the party to whom the information is to be disclosed agrees in writing to be bound by confidentiality provisions at least as restrictive as those in this Agreement.

9. **NOTICES TO BUYER**. Notices required to be sent under this Agreement shall be in writing, shall be sent to Buyer, and shall be effective when received by mail, email or via facsimile at the address shown below:

**10. FORWARD CONTRACT. The parties agree that this transaction constitutes a "forward contract" and that the parties shall constitute "forward contract merchants" within the meaning of the United States Bankruptcy Code 11 U.S.C. Section 101 (25) and (26) respectively.**

**11. ARBITRATION**. All Disputes shall be exclusively, finally and conclusively settled by binding arbitration under the Rules of Arbitration of the American Arbitration Association in accordance with its Commercial Arbitration Rules (the "Arbitration Agency") then in effect (the "Rules") (except as specifically modified by this Agreement). The parties shall continue to perform their respective obligations under this Agreement pending conclusion of the arbitration. As used herein, Dispute means any disagreement, controversy or claim that arises between Vendor and Customer regarding the interpretation, fulfillment, or implementation of any provision of this Agreement, or regarding the rights and obligations of the parties (including, without limitation, the validity of the agreement of the parties to arbitrate, the arbitrability of the issues submitted to arbitration hereunder, and any conflict of laws issues in connection with this Agreement).

The arbitration shall be conducted by a single independent and impartial arbitrator (the "Arbitral Tribunal") to be appointed by the Arbitration Authority. Unless as otherwise required hereunder for a particular Dispute, the Arbitration Authority shall appoint an independent arbitrator that is generally familiar with the business which is the subject of this Agreement, and preferably has no fewer than five years of practical experience in the relevant field that is implicated by the Dispute in issue in accordance herewith. No more than 30 days after the Request for Arbitration has been delivered to the Arbitration Authority, the Arbitration Authority shall submit a list of at least five potential arbitrators to each party. Each party shall have a period of no more than 15 business days in which to register objections to any of the proposed arbitrators based upon lack of independence, lack of qualification or any other material factor which would substantially impair the arbitrator's effectiveness for the Dispute in issue. The Arbitration Authority shall then consider such objections, if any, and shall then appoint the Arbitral Tribunal no more than 60 days after the Request for Arbitration has been delivered to the Arbitration Authority. The appointment of the Arbitral Tribunal by the Arbitration Authority shall be final and binding on the parties.

Each party acknowledges and agrees that the other party would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms. Accordingly, pending completion of arbitration pursuant to this provision, either party shall have the right to seek a temporary restraining order, injunctive relief or other interim or provisional relief on the grounds that such relief would otherwise be available at law or in equity. If any such relief is obtained, the arbitrator will address the continuance, modification or termination of such relief, and the decision regarding such relief shall be binding on the parties.

The arbitration shall be conducted in the English language in Madison, Wisconsin. The Arbitral Tribunal conduct a hearing no later than 90 days after delivery of the Request for Arbitration, and a decision shall be rendered by the Arbitral Tribunal within 30 days after the final hearing.

At the hearing, the parties shall present such evidence and witnesses as they may choose, with or without counsel. Adherence to formal rules of evidence shall not be required, and the Arbitral Tribunal shall consider any evidence and testimony that it determines to be relevant, in accordance with procedures that it determines to be appropriate.

The arbitration award shall be in writing and shall specify the factual and legal bases for the award. Except with respect to (i) Seller's failure to ship the Minimum Amount (absent Force Majeure applicable to Seller) or (ii) Buyer's failure to pay for conforming Pellets actually received by Buyer up to the Minimum Amount (absent Force Majeure applicable to Buyer), neither party shall be entitled to, and no award shall include, any amount for, lost profits or revenues, lost business opportunities, business interruption, or punitive or exemplary damages for any claim arbitrated pursuant to this Agreement.

The Arbitral Tribunal shall be entitled to a fee commensurate with fees for professional services requiring similar time and effort in the location where the arbitration takes place. The fees of the Arbitral Tribunal and other costs of the arbitration shall be borne equally by the parties, except when the arbitrator decides to impose the total cost on the defeated party.

All decisions of the Arbitral Tribunal shall be final and binding on the parties and may be entered against them in any court of competent jurisdiction. Any judgment rendered by the Arbitral Tribunal against a party may be executed against such party's assets in any jurisdiction where the party has assets.

Each of the parties irrevocably submits to the non-exclusive jurisdiction of the appropriate courts in the country in which it has assets and in the United States in any legal action or proceeding relating to such execution of judgment.

Any Dispute brought pursuant to the terms of this provision must be brought within two years of the date that the party aggrieved by the event or condition, or notice of such event or condition giving rise to the dispute, becomes aware of the same.