# ACQUISITION AGREEMENT

This ACQUISITION AGREEMENT (this "**Agreement**") is effective between the parties as of January 29, 2020, by and among **NIANTICVISTA ENERGY, LLC**, a Delaware limited liability company ("**NVE**"), **CONVERGEN ENERGY WI, LLC,** a Delaware limited liability company ("**CEW**"), and **CONVERGEN ENERGY, LLC,** a Delaware limited liability company ("**CE**").  Each of the parties to this Agreement is individually referred to herein as a "**Party**" and collectively as the "**Parties**".

## <u>Background</u>

WHEREAS, the Parties desire to enter into this Agreement pursuant to which NVE will acquire CEW, with CEW continuing as a wholly-owned subsidiary of NVE (the "**Acquisition**"), in accordance with this Agreement and the applicable provisions of the Delaware Limited Liability Company Act, codified in Chapter 18 of Title 6 of the Delaware Code, as the same may be amended from time to time (the "<u>Act</u>*").*

WHEREAS, the Manager and Member of NVE have unanimously approved and declared advisable the Acquisition, upon the terms and subject to the conditions set forth herein, and has determined that the Acquisition and the other transactions contemplated by this Agreement (collectively, the "**Contemplated Transactions**") are fair to, and in the best interests of, NVE and its shareholders.

WHEREAS, the members of the Management Committee of CE have unanimously approved and declared advisable the Acquisition, upon the terms and subject to the conditions set forth herein, and have determined that the Acquisition and the Contemplated Transactions are fair to, and in the best interest of CE.

WHEREAS, the parties intend that the Acquisition shall, through the binding commitments set forth in this Agreement, be effected immediately following the Closing Date (as defined below), on the terms and subject to the conditions of this Agreement and in accordance with the Act, without further approval, authorization or direction from or by any of the parties hereto;

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and intending to be legally bound hereby, the parties agree that they will carry out and consummate this Agreement pursuant to the following terms:

# ARTICLE I

PLAN OF ACQUISITION

1.1.  <u>The Acquisition</u>.

On the Closing Date, as defined in Section 1.3(b) below, and subject to and upon the terms and conditions of this Agreement and the applicable provisions of the Acts, NVE will acquire all (100%) of membership interest of CEW and CEW will become a wholly owned subsidiary of NVE.

1.2.  <u>Consideration</u>.

(a)   <u>Sale and Purchase of the CEW Membership Interest</u>.  In accordance with the provisions of this Agreement, on the Closing Date, (i) CE shall sell, transfer, assign and deliver to NVE all (100%) of the membership interest of CEW (the "**CEW Interest**") in exchange for the Acquisition Consideration in accordance with Sections 1.2(b), and (ii) NVE shall purchase and acquire from CE, all (100%) of the CEW Interest.

(b)   <u>Acquisition Consideration</u>.  The purchase price to be paid by NVE for the CEW Interest (the "**Acquisition Consideration**") will be an amount equal to (i) $5,500,000, <u>minus</u> (ii) the Closing Indebtedness (as defined below), <u>minus</u> (iii) $377,850, the capital expenditures deduction hereby stipulated by the Parties, <u>minus</u> (iv) the CEW's receivables from Affiliates of CE, if any, at the Closing Date, <u>minus</u> (v) $50,000 for NVE's due diligence costs and expenses, <u>plus</u> or <u>minus</u>, as applicable (vi) the Working Capital Payment (as defined in Section 1.2(c)(iii) below).  NVE will pay the Acquisition Consideration in cash or other immediately available funds on the Closing Date.  For purposes of this Section 1.2(b), the term "**Closing Indebtedness**" means the sum of the outstanding principal amounts, at the Closing Date, owed by the Company under the following credit arrangements: (a) the "Term Note" in the original principal amount of $1,800,000 referenced in the Credit Agreement, dated as of January 24, 2019 (as amended on the Closing Date), entered into between the CEW, L'Anse Warden Electric Company, LLC and BMO Harris Bank N.A., (b) the State Energy Program Agreement, dated as of October 22, 2010 (as amended on November 4, 2011, December 7, 2012, January 14, 2013, January 10, 2014, March 10, 2015, September 12, 2016, October 25, 2016, May 27, 2019), entered into between the CEW and the Wisconsin Department of Commerce/Wisconsin Economic Development Corporation (which arrangement is subject to the Selective Business Security Agreement, dated May 23, 2012, entered into between the CEW and the Wisconsin Department of Commerce/Wisconsin Economic Development Corporation), (c) the Master Lease Agreement, dated November 7, 2016, between the CEW and Conger Industries Inc., (d) the Commercial Retail Installment Sale Contract, dated April 22, 2016, between the CEW and Conger Industries Inc., (e) the Loan Contract, dated April 26, 2019, between the CEW and

Brooks Tractor Incorporated, and (f) the Equipment Finance Agreement, dated March 16, 2018, between the CEW and Huntington Technology Finance, Inc.

(c)    Working Capital Adjustment.  CEW's Target Net Working Capital shall be an amount equal to the Net Working Capital of CEW on the Base Balance Sheet of August 31, 2019 (the "**Target Net Working Capital**"). On or about January 28, 2020, but no later than close of business on January 29, 2020, CEW's financial staff shall prepare an updated balance sheet showing the **Almost Actual Closing Date Net Working Capital**, which amount will be used to adjust the Acquisition Consideration payable at Closing when compared to the Target Net Working Capital. If on the Closing Date CEW's actual Closing Date Net Working Capital (as defined below) is more or less than the Almost Actual Closing Date Net Working Capital by an amount greater than $10,000, an adjustment shall be made to the Acquisition Consideration in accordance with the following provisions:

(i)    NVE shall prepare, on an Accrual Basis consistent with CEW's past practices, a report containing a balance sheet of CEW as of the close of business on the day prior to the Closing Date (the "**Closing Balance Sheet**"), together with a statement based upon such report which: (x) states that it was prepared in accordance with this Agreement; (y) sets forth the Closing Date Net Working Capital; and (z) sets forth the Working Capital Payment (as defined below) required to be made to make the Closing Date Net Working Capital equal the Almost Actual Closing Date Net Working Capital as required under this Section  (the "**Special Determination**"). NVE shall deliver a copy of the Special Determination to CE no later than six (6) months after the Closing Date.

(ii)    If CE does not agree that the Special Determination correctly states the Working Capital Payment calculation, CE shall promptly (but not later than 45 days after the delivery to CE of the Special Determination) give written notice to NVE of any exceptions thereto (in reasonable detail describing the nature of the disagreement asserted).  If CE and NVE reconcile their differences, the Working Capital Payment calculation shall be adjusted accordingly and shall thereupon become binding, final and conclusive upon all of the parties hereto.  If the dispute relates to an accounting issue, and if CE and NVE are unable to reconcile their differences in writing within 20 days after written notice of exceptions is delivered to NVE (the "**Reconciliation Period**"), the accounting item(s) in dispute shall be submitted to a mutually acceptable accounting firm (the "**Independent Auditors**") for final determination.  The Working Capital Payment calculation shall be deemed adjusted in accordance with the determination of the Independent Auditors and shall become binding, final and conclusive upon all of the parties hereto. The Independent Auditors shall consider only the accounting item(s) in dispute and shall be instructed to act within 20 days (or such longer period as CE and NVE may agree) to resolve all accounting item(s) in dispute.  If the dispute involves a non-accounting issue and such dispute is not reconciled within the Reconciliation Period, the dispute shall be settled by arbitration in accordance with Section 9.7 of this Agreement.  If CE does not give written notice of any exception within 45 days after the delivery to CE of the Special Determination or if CE gives written notification of their acceptance of the Working Capital Payment prior to the end of such

45-day period, the Working Capital Payment calculation set forth in the Special Determination shall thereupon become binding, final and conclusive upon all the parties hereto.

(iii)     If the Special Determination reveals that the Closing Date Net Working Capital was less than the Almost Actual Closing Date Net Working Capital by more than $10,000, as finally determined pursuant to the procedures set forth above, CE shall pay NVE the amount by which the Closing Date Net Working Capital is less than the Almost Actual Closing Date Net Working Capital.  If the Closing Date Net Working Capital is greater than the Almost Actual Closing Date Net Working Capital by more than $10,000, as finally determined pursuant to the procedures set forth above, NVE shall pay CE the difference between the Closing Date Net Working Capital and the Almost Actual Closing Date Net Working Capital.  Any amount paid pursuant to this Section shall be referred to as the "**Working Capital Payment**".

The term "**Closing Date Net Working Capital**" shall mean CEW's actual current assets (including, accounts receivable and prepaid current expenses but excluding cash and cash equivalents), less current liabilities (including, but not limited to, accounts payable, accrued credit card debt, accrued lease expenses and deferred revenue but excluding interest-bearing debt) as of the effective date of the Acquisition immediately prior to the Closing, which determination shall be made within 120 days thereafter, as set forth in the following paragraphs.

1.3.   Timing.

(a)     Member Approval. The Manager and Members of NVE and the management committee of CE have unanimously approved and consented to the execution of, this Agreement and the Contemplated Transactions, as conclusively evidenced by their execution hereof.

(b)     Closing Date. The parties shall hold a closing (the "**Closing**") on a mutually agreeable date (the "**Closing Date**") no later than the fifth business day after the satisfaction or waiver of the conditions set forth in Article V and Article VI of this Agreement, at 10:00 A.M., local time, at the offices of Clemente Mueller P.A., 222 Ridgedale Avenue, Cedar Knolls, NJ 07927, or at such other place or time as the Parties agree upon.  The legal effective date of the Acquisition shall be the Closing Date, which is targeted to be on or about January 31, 2020.

1.4.   Certificate of Formation, Operating Agreement, and Officers of CEW.

(a)     The Certificate of Formation of CEW in effect immediately prior to the Closing Date shall remain in effect as the Certificate of Formation of CEW after the Closing Date. The Operating Agreement of CEW after the Closing Date shall be in the form attached hereto as Exhibit E.

(b)     The Manager and Sole Officer of CEW after the Closing Date shall be Gregory Merle.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES OF THE CE

In order to induce NVE to enter into this Agreement and consummate the Contemplated Transactions, CE hereby make to NVE the representations and warranties contained in this Article II. Such representations and warranties are subject to the qualifications and exceptions set forth in the disclosure schedule delivered to NVE pursuant to this Agreement (the "**Disclosure Schedule**"). The Disclosure Schedule will be arranged to correspond to the representations and warranties in Article II of this Agreement, and the disclosure in any portion of the Disclosure Schedule will qualify the corresponding provision in Article II and any other provision of Article II to which it is reasonably apparent on its face that such disclosure relates**.**

2.1     <u>Organization, Powers and Qualifications</u>. CEW is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and is duly qualified as a foreign entity in the State of Wisconsin; and (ii) in each jurisdiction in which the failure to be so duly qualified or registered has had, or could reasonably be expected to have, an CEW Material Adverse Effect, as such term is defined in <u>Exhibit A</u>. CEW has all required corporate power and authority to carry on its Business as presently conducted, to enter into and perform this Agreement and the agreements contemplated hereby to which it is a party and to carry out the Contemplated Transactions. The copies of the Certificate of Formation, certified by the Secretary of State of the State of Delaware, and the Operating Agreement of CEW, certified by CE, have been furnished to NVE by CE, are correct and complete as of the date hereof, and CEW is not in violation of any material term of its Certificate of Formation or Operating Agreement (together, the "**Organizational Documents**").

2.2     <u>Authorization and Non-Contravention</u>.

(a)     This Agreement and all agreements, documents and instruments executed and delivered by CE pursuant hereto are valid and binding obligations of CE, enforceable in accordance with their respective terms. The execution, delivery and performance of this Agreement by CE and all agreements, documents and instruments executed and delivered by CE pursuant hereto, have been duly authorized by all necessary corporate or other action of CE.

(b)     Except as set forth in Section 2.2(b) of the Disclosure Schedule, the execution and delivery of this Agreement and all agreements, documents and instruments executed and delivered by CEW and CE pursuant hereto, and the performance of the Contemplated Transactions, do not and will not: (i) violate or result in a violation of, conflict with or constitute or result in a default (whether after the giving of notice, lapse of time or both) or loss of benefit under any contract or obligation to which CEW is a party or by which its assets are bound, or any provision of the Organizational Documents, or cause the creation of any all liens, claims, options, charges, pledges, security interests, deeds of trust, voting agreements, voting trusts, encumbrances, rights or restrictions of any nature upon any of the assets of CEW; (ii) to the best of CE's Knowledge violate, conflict with or result in a violation of, or constitute a default

5

(whether after the giving of notice, lapse of time or both) under, any provision of any law, regulation or rule, or any order of, or any restriction imposed by, any court or Government Authority applicable to CEW; (iii) require from CEW any notice to, declaration or filing with, or consent or approval of any Government Authority or other third party; or (iv) violate or result in a violation of, or constitute a default (whether after the giving of notice, lapse of time or both) under, accelerate any obligation under, or give rise to a right of termination of, any agreement, permit, license or authorization to which CEW is a party or by which CEW is bound, which has not been waived in writing.

2.3   <u>Corporate Authority and Records</u>. As of the Closing Date, the corporate records of CEW will accurately reflect proper authority for all corporate actions taken by its Member and Manager.  The corporate records of CEW, as delivered to NVE, are either originals or true and complete copies of the originals of such documents.

2.4   <u>Capitalization</u>.

(a)   As of the date hereof, CE owns the CEW Interest.  The CEW Interest represents one-hundred (100%) percent of membership interest of CEW.  Except as otherwise set forth in Section 2.4 of the Disclosure Schedule, the CEW Interest is owned by CE free and clear of all encumbrances whatsoever.  The CEW Interest was issued in compliance with Applicable Laws.  The CEW Interest was not issued in violation of the Organizational Documents, or any other agreement, arrangement or commitment to which CEW is a party or is otherwise bound.

(b)   Except as otherwise set forth in Section 2.4 of the Disclosure Schedule, there are no existing voting trusts, proxies, subscriptions, options, warrants, calls, commitments, agreements, plans, conversion rights or other rights of any character (contingent or otherwise) providing for the issuance, sale, purchase, redemption, transfer, voting or registration, at any time, or upon the happening of any stated event, of any CEW Interest, whether or not presently issued or outstanding.

2.5   <u>Subsidiaries; Investments</u>.   CEW does not own or control, directly or indirectly, any interest in any other corporation, partnership, limited liability company, association or other business entity that materially affects the Business.  Except as disclosed in Section 2.5 of the Disclosure Schedule, CEW does not have any outstanding loan or advance to or from, any Person including, without limitation, any Manager, Officer or CE.

2.6   <u>Financial Statements; Projections</u>.

(a)   CEW has previously furnished to NVE copies of the following financial statements: (i) CEW's unaudited balance sheets as of August 31, 2019 (the "**Base Balance Sheet**"), December 31, 2019, December 31, 2018 and December 31, 2017 and the related unaudited statements of income, retained earnings and cash flows for the fiscal years then ended, and (ii) CEW's projected budget for 2020.  Such financial statements were prepared on an accrual basis method of accounting ("**Accrual Basis**" applied on a consistent basis, and are

consistent in all material respects with the books and records of CEW and fairly present in all material respects the financial position of CEW as of the dates thereof and the results of operations and cash flows of CEW for the periods shown therein, subject to normal and recurring year-end adjustments in the case of any such financial statements that are unaudited; provided, however, that any such normal and recurring year-end adjustments will not result in a material adverse effect on the financial results, results of operations and/or cash flows reported in such unaudited financial statements.  Nothing has come to the attention of CE since such respective dates that would indicate that such financial statements are not true and correct in all material respects as of the date thereof.

(b)     The 24-month projections provided by CE are reasonable good faith estimates of the performance of CEW for the periods stated therein based upon assumptions which were believed to be reasonable when made and continue to be reasonable as of the date hereof; provided, however, that the foregoing is not a guarantee that such projections will be achieved.

(c)     CEW maintains a system of accounting controls sufficient to provide reasonable assurances that: (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary to permit preparation of financial statements on an Accrual Basis and to maintain accountability for assets; and (iii) access to assets is permitted only in accordance with management's specific or general authorization.

(d)     CEW has not received any written correspondence from any independent accounting firm that has conducted a review of the financial statements for CEW that identifies any "material weakness" or "significant deficiency" with respect to the accounting practices, procedures or policies of, or internal accounting controls employed by CEW.

2.7     <u>Absence of Undisclosed Liabilities</u>.   CEW does not have any material debts or obligations of any nature, whether accrued, absolute, contingent, asserted, un-asserted or otherwise, except liabilities or obligations: (i) stated or adequately reserved against in the Base Balance Sheet or the notes to the related financial statements; or (ii) as set forth in Section 2.7 of the Disclosure Schedule.

2.8     <u>Absence of Certain Developments</u>.  Since the date of the Base Balance Sheet, CEW has conducted its business only in the ordinary course consistent with past practice and, except as set forth in Section 2.8 of the Disclosure Schedule, there has not been:

(a)     any change in the assets, liabilities, condition (financial or other), properties, business, operations or prospects of CEW, which change by itself or in conjunction with other such changes, whether or not arising in the ordinary course of business, has had or could be reasonably expected to have an CEW Material Adverse Effect;

(b)     any mortgage, lien or other encumbrance placed on any of the properties of CEW, other than purchase money liens and liens for Taxes not yet due and payable;

(c)      any purchase, sale or other disposition, or any agreement or other arrangement for the purchase, sale or other disposition, of any properties or assets by CEW, including any CEW Intellectual Property Assets (as defined below), involving the payment or receipt of more than $10,000;

(d)      any damage, destruction or loss, whether or not covered by insurance, that has had or could be reasonably expected to have a CEW Material Adverse Effect;

(e)      any direct or indirect redemption, purchase or other acquisition by CEW of any of CEW Interest;

(f)      any claim of unfair labor practices involving CEW, any change in the compensation payable or to become payable by CEW to any of its officers or employees other than normal merit increases to employees consistent with past practices, or any bonus payment or arrangement made to or with any of such officers or employees or any establishment or creation of any employment, deferred compensation or severance arrangement or employee benefit plan with respect to such persons or the amendment of any of the foregoing;

(g)      any resignation, termination or removal of any officer of CEW or material loss of personnel of CEW or material change in the terms and conditions of the employment of CEW's officers or key personnel;

(h)      any payment or discharge of a material lien or liability of CEW which was not shown on the unaudited balance sheet of CEW as of the date of the Base Balance Sheet or incurred in the ordinary course of business thereafter;

(i)      any contingent liability incurred by CEW as guarantor or otherwise with respect to the obligations of others or any cancellation of any material debt or claim owing to, or waiver of any material right of CEW, including any write-off or compromise of any accounts receivable other than in the ordinary course of business consistent with past practice;

(j)      any obligation or liability incurred by CEW to CE or CE's employees, or any loans or advances made by CEW to CE or CE's employees, except normal compensation and expense allowances payable to CE or employees in the ordinary course of business;

(k)      any change in accounting methods or practices, collection policies, pricing policies or payment policies of CEW;

(l)      to the best of CE's Knowledge, there are no known losses, or any known development that could reasonably be expected to result in a loss, of any significant supplier, customer, distributor or account of CEW; and neither CEW nor CE has received written notice from such supplier, customer, distributor or account of its intention to terminate, or change in a material and negative way, its relationship with CEW;

(m)     any amendment or termination of any Material Contract or agreement to which CEW is a party or by which it is bound, other than any expiration of any such contract or agreement in accordance with its terms;

(n)     any arrangements relating to any royalty or similar payment based on the revenues, profits or sales volume of CEW, whether as part of the terms of CEW's capital structure or by any separate agreement;

(o)     any transaction or agreement involving fixed price terms or fixed volume arrangements other than in the ordinary course of business;

(p)     any other material transaction entered into by CEW other than transactions in the ordinary course of business;

(q)     any amendment to CEW's Organizational Documents;

(r)     Except as otherwise set forth in Section 2.8 of the Disclosure Schedule, any agreement or understanding whether in writing or otherwise, for CEW to take any of the actions specified in paragraphs (a) through (q) above.

Notwithstanding the foregoing, the Parties acknowledge that, on or before the Closing Date, CEW anticipates making distributions to CE representing all cash and cash equivalents available to CEW prior to the Closing Date.  For purposes of computing CEW's Closing Date Net Working Capital, such distributions shall be deemed to have been made prior to the Closing Date.

2.9     <u>Accounts Receivable; Accounts Payable.</u>

(a)     To CE's Knowledge all of the accounts receivable of CEW are valid and enforceable claims, are subject to no set-off or counterclaim other than in the ordinary course of business, and are fully collectible in the ordinary course of business, after deducting the reserve for doubtful accounts stated in the Base Balance Sheet.  Since the date of the Base Balance Sheet, CEW has collected its accounts receivable in the ordinary course of its business consistent with past practices and has not accelerated any such collections.  CEW does not have any accounts receivable or loans receivable from CE or CE's employees.

(b)     To CE's Knowledge, all accounts payable and notes payable of CEW arose in bona fide arm's length transactions in the ordinary course of business and no such account payable or note payable is delinquent in its payment.  Since the date of the Base Balance Sheet, CEW has paid its accounts payable in the ordinary course of its business consistent with its past practices.  CEW has no account payable to any Person which is affiliated with it or any of its CE or CE's employees that are outside the ordinary course of business or inconsistent with past practices.

2.10   <u>Transactions with Affiliates</u>.   There are no loans, leases or other agreements or transactions between CEW and: (a) any present or former member, director, officer or employee of CEW; (b) to CE's Actual Knowledge, any Affiliate of such member, director, officer, or employee; or (c) to CE's Actual Knowledge, any person controlled by such member, director, officer, or employee, or Affiliate of the foregoing. No Member or employee of CEW, or, to CE's Actual Knowledge, any of their respective Affiliates, owns directly or indirectly, on an individual or joint basis, any interest in, or serves as an officer or director or in another similar capacity of, any competitor, customer or supplier of CEW, or any organization which has a Material Contract or arrangement with CEW.

2.11.   <u>Supply Agreement and Transition Services Agreement</u>.   Except as set forth in the Supply Agreement and Transition Services Agreement (as such terms are defined in Section 5.9 hereof), there shall be no intercompany transactions after the Closing Date between CEW and CE or any Affiliate of CE.

2.12   <u>Properties</u>.   Except as otherwise reflected in Section 2.12 of the Disclosure Schedule, CEW has good, valid and (if applicable) marketable title to, or a valid leasehold in, all assets material to the Business and to those assets reflected on the Base Balance Sheet or acquired by it after the date thereof (except for properties disposed of since that date in the ordinary course of business), in each case free and clear of encumbrances, except for liens for Taxes (as hereinafter defined) not yet due and payable, and minor liens and encumbrances that do not materially detract from the value of the property subject thereto or impair the operations of CEW.

2.13   <u>Tax Matters</u>.

(a)      CEW is a disregarded entity. As such, prior to the Closing Date income tax returns relating to CEW's Business have been included as part of the consolidated tax return filed by CEW's indirect parent, First North American Holdings II, Inc.  CEW has timely and properly filed all federal, state, local and foreign Tax Returns required to be filed by it through the date hereof, and all such Tax Returns are true, correct and complete in all material respects. CEW has paid or caused to be paid all federal, state, local, foreign and other taxes, including without limitation, income taxes, estimated taxes, alternative minimum taxes, excise taxes, sales and use taxes, franchise taxes, employment and payroll related taxes, withholding taxes, transfer taxes, and all deficiencies or other additions to tax, interest, fines and penalties owed by it (collectively, "**Taxes**"), required to be paid by it through the date hereof whether disputed or not and whether or not on an Tax Return, except Taxes which have not yet accrued or otherwise become due.  Since the date of the Base Balance Sheet, CEW has not, to CE's Knowledge, incurred any Taxes other than in the ordinary course of business.   All Taxes and other assessments and levies which CEW was or is required to withhold or collect have been withheld and collected and have been paid over to the proper Government Authorities.  CEW has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to any Tax payment, assessment, deficiency or collection.

(b)     (i) during the period CE has owned CEW, CEW has not received notice of any audit or of any proposed deficiencies from the Internal Revenue Service (the "**IRS**") or any other taxing authority (other than routine audits undertaken in the ordinary course and which have been resolved on or prior to the date hereof); (ii) to CE's Knowledge, neither the IRS nor any other taxing authority is now asserting or threatening to assert against CEW any deficiency or claim for additional Taxes or interest thereon or penalties in connection therewith; (iii) CEW does not have any liability for Taxes of any other Person under Treasury Regulations § 1.1502-6 (or any similar provision of foreign, state or local law) as a transferee or successor, by contract or otherwise; and (iv) CEW has not filed a consent under Section 341(f) of the Code concerning collapsible corporations.

(c)     During the period CE has owned CEW, CEW has not been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

(d)     The taxable year of CEW for federal and state income tax purposes is the calendar year ending December 31st.

(e)     During the period CE has owned CEW, CEW has not been (i) a passive foreign investment company, (ii) a foreign personal holding company, (iii) a foreign sales corporation, (iv) a foreign investment company, or (v) a person other than a United States person, each within the meaning of the Code.

(f)     No claim has been made by a Government Authority in a jurisdiction where CEW does not currently file Tax Returns that such filings may be required or that CEW is or may be subject to taxation by that jurisdiction.

(g)     CEW has been an accrual method taxpayer for all tax purposes during the period CE has owned CEW.

(h)     To CE's Knowledge, there is no power of attorney in effect or binding upon CEW with respect to Taxes for any period for which the statute of limitations (including any waivers or extensions) has not yet expired.

(i)     During the period CE has owned CEW, CEW has not been a party to any "tax shelter" within the meaning of Section 6662(d)(2)(C)(ii) of the Code or any "reportable transaction" within the meaning of Treasury Regulations Section 1.6011 4(b), or has otherwise made or been required to make a filing with respect to any such transaction.

(j)     There are no private letter rulings, determination letters, closing agreements, assessments, notices of deficiency and any other similar correspondence issued by or received from the IRS or any other Government Authority with respect to Tax matters relating to the Business, except as set forth in Section 2.13(j) of the Disclosure Schedule.

(k)     All material transactions entered into by CEW with Affiliates reflect arm's length terms.

(l)     To CE's Knowledge, CEW will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any:

(i)     change in method of accounting for a taxable period ending on or prior to the Closing Date;

(ii)     "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or foreign income Tax law) executed on or prior to the Closing Date;

(iii)     intercompany transactions, except as otherwise set forth in Section 2.12(l)(iii) of the Disclosure Schedule;

(iv)     installment sale or open transaction disposition made on or prior to the Closing Date;

(v)     prepaid amount received on or prior to the Closing Date; or

(vi)     any similar election, action, or agreement that would have the effect of deferring any liability for Taxes of CEW or any Subsidiary, if any, from any taxable period ending on or before the Closing Date to any taxable period ending after such date.

(m)     Since the date of the Base Balance Sheet, CEW has not: (i) made, changed, or revoked any Tax or accounting election (including any change to the annual accounting period or any change or adoption of any accounting method); (ii) settled any action in respect of Taxes; (iii) entered into any contractual obligation in respect of Taxes with any taxing authority; (iv) surrendered any right to claim a Tax refund; or (v) agreed, committed, arranged or entered into any contract to do any of the foregoing.

(n)     For purposes of this Agreement, "**Tax Return**" (and, with correlative meaning, "**Tax Returns**") means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(o)     If any realty transfer tax in connection with this transaction, such taxes shall be paid for or provided for at Closing by CE.

2.14     <u>Certain Contracts and Arrangements</u>.

Ex A to Hansen Dec

(a)      Except as set forth in Section 2.14 of the Disclosure Schedule (with true and correct copies of each agreement referred to therein provided to and made available for review by NVE), CEW is not currently a party or subject to or bound by:

(i)      any contract or agreement under which the aggregate payments or receipts for the past twelve (12) months, or for the following twelve (12) months is expected to exceed, $25,000 (a "**Material Contract**");

(ii)      any Material Contract which is not cancelable by CEW without penalty on not less than ninety (90) days' notice;

(iii)      any contract containing covenants directly or explicitly limiting in any respect the right of CEW to compete in any line of business or with any Person;

(iv)      any contract or agreement relating to the licensing, distribution, development, purchase, sale or servicing of its Products except in the ordinary course of business consistent with past practices or relating to any CEW Intellectual Property Assets;

(v)      any indenture, mortgage, promissory note, loan agreement, guaranty or other agreement or commitment for borrowing or any pledge or security arrangement;

(vi)      any membership redemption or purchase agreements or other agreements affecting or relating to membership interest of CEW, including, without limitation, any agreement with any member which includes voting arrangements, operating covenants or similar provisions;

(vii)      any pension, profit sharing, retirement or stock option plans;

(viii)      any royalty, dividend or similar arrangement based on the revenues or profits of CEW or any contract or agreement involving so called "most favored customer" arrangements;

(ix)      any joint venture, partnership, manufacturer, development or supply agreement or other agreement which involves a sharing by CEW of revenues or profits or losses, costs or liabilities with any other Person;

(x)      any acquisition, merger or similar agreement;

(xi)      any collective bargaining agreement or other agreement with any labor union or other employee representative of a group of employees;

(xii)      any contract with any Government Authority;

(xiii)      any contract relating to the guarantee (whether absolute or contingent) by CEW of (i) the performance of any other Person (other than CEW) or (ii) the whole or any part of the indebtedness or liabilities of any other Person (other than CEW);

(xiv) any contract that provides for post-employment or post-consulting liabilities or obligations, including severance pay;

(xv)   any contract under which payments or obligations will be increased, accelerated or vested by occurrence (whether alone or in conjunction with any other event) of any of the Contemplated Transactions, including the Acquisition, or under which the value of the payments or obligations will be calculated on the basis of any of the Contemplated Transactions, including the Acquisition, whether pursuant to a change in control or otherwise;

(xvi)  any contract relating to the indemnification by CEW of CE, managers or agents;

(xvii)  any Material Contract of indemnification or guaranty;

(xviii)  any power of attorney authorizing the incurrence of an obligation on the part of CEW; or

(xix)  any contract not executed in the ordinary course of business

Each contract of the type described in this Section 2.14(a) is referred to herein as a "**CEW Contract**".

(b)      An accurate and complete copy of each CEW Contract (including all amendments thereto) has been made available to NVE.

(c)      Neither CEW nor, to CE's Knowledge, any other party to an CEW Contract is in material breach, violation or default thereunder, or has received written notice that it has breached, violated or defaulted under (nor, to the Knowledge of CE, does there exist any condition under which, with the passage of time or the giving of notice or both, would reasonably be expected to cause such a breach, violation or default under), any CEW Contract material to the operation of the Business.

(d)      Each CEW Contract is a valid, binding and enforceable obligation of CEW and, to the Knowledge of CE, of the other party or parties thereto, in accordance with its terms and is in full force and effect, in each case except to the extent enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or by general equitable principles or by principles of good faith and fair dealing (regardless of whether enforcement is sought in equity or at law).

2.15   Intellectual Property.

(a)      Section 2.15 of the Disclosure Schedule contains a complete and accurate list of all: (i) Patents owned by CEW or otherwise used or held for use by CEW in the Business ("**CEW Patents**"), registered and material unregistered Marks owned by CEW or otherwise used or held for use by CEW in the Business ("**CEW Marks**") and registered and material

14

unregistered copyrights owned by CEW or otherwise used or held for use by CEW in the Business ("**CEW Copyrights**"), (ii) **Proprietary Software**, (iii) licenses, sublicenses or other agreements under which CEW is granted rights by others in CEW Intellectual Property Assets (other than commercial off-the-shelf software which is made available for a total cost of less than $2,000) ("**Licenses In**"), (iv) licenses, sublicenses or other agreements under which CEW has granted rights to others in CEW Intellectual Property Assets ("**Licenses Out**"); (v) **Products**; and (vi) social media accounts, websites, portals, and databases ("**CEW Accounts**").

(b)      Except as set forth on Section 2.15 of the Disclosure Schedule:

(i)      CEW exclusively owns or possesses adequate and enforceable rights to use, without payment to a third party, all of the Intellectual Property Assets necessary for the operation of the Business, free and clear of all mortgages, pledges, charges, liens, equities, security interests, or other encumbrances or similar agreements. CEW has the right, power and authority to grant rights, title and interest in CEW Intellectual Property Assets granted in this Agreement. CEW exclusively owns the "Convergen Energy" name, and convergenenergy.com domain, which will transfer with it as part of this transaction. CE can continue to use the Convergen Energy name (but not domain) for 6 months after Closing at which point it will to cease using the name.

(ii)      all CEW Patents, CEW Marks and CEW Copyrights which have been issued by or registered with, as applicable, the U.S. Patent and Trademark Office, the U.S. Copyright Office or in any similar office or agency anywhere in the world, are currently in compliance with formal legal requirements (including without limitation, as applicable, payment of filing, examination and maintenance fees, proofs of working or use, timely post-registration filing of affidavits of use and incontestability and renewal applications) and, to CE's Knowledge, are valid and enforceable;

(iii)      there are no pending, or, to CE's Knowledge, threatened claims against CEW or any of its CE, managers, officers or employees alleging that any use of CEW Intellectual Property Assets or the operation of the Business, infringes or conflicts with the rights of others ("**Third Party IP**") or constitutes a misappropriation of any subject matter of any Third Party IP or that any of CEW Intellectual Property Assets is invalid or unenforceable;

(iv)      to CE's Knowledge, neither the operation of the Business, nor any activity by CEW, nor manufacture, use, importation, offer for sale and/or sale of any Intellectual Property Assets infringes or violates (or in the past infringed or violated) any Third Party IP or constitutes a misappropriation of (or in the past constituted a misappropriation of) any subject matter of any Third Party Right;

(v)      CEW does not have any obligation to compensate any person for the use of any Intellectual Property Assets; CEW has not entered into any agreement to indemnify any other person against any claim of infringement or misappropriation of any Intellectual Property Assets; there are no settlements, covenants not to sue, consents, judgments, or orders or similar

obligations that: (A) restrict CEW's rights to use any Intellectual Property Asset; (B) restrict the Business, in order to accommodate any Third Party IP; or (C) permit third parties to use any CEW Intellectual Property Assets(s) other than in the ordinary course of the Business;

(vi)    all former and current employees, consultants, and independent contractors of CEW that have invented or created any CEW Intellectual Property Assets have executed written instruments with CEW that assign to CEW all rights, title and interest in and to any and all: (A) inventions, improvements, discoveries, writings, and other works of authorship, and information developed or conceived in the course of their employment or engagement with CEW, except to the extent any such failure to so perform would not reasonably be expected to have an CEW Material Adverse Effect; and (B) applicable Intellectual Property Assets relating thereto, and in each case where an CEW Patent is held by CEW by assignment, the assignment has been duly recorded with the U.S. Patent and Trademark Office and all similar offices and agencies anywhere in the world in which foreign counterparts are registered or issued;

(vii)   to CE's Actual Knowledge, there is not, nor has there been any, infringement, violation or misappropriation by any Person of any of CEW Intellectual Property Assets or the subject matter thereof or CEW's rights therein;

(viii)  CEW has taken commercially reasonable steps and security measures to protect the secrecy, confidentiality and value of all Trade Secrets used in the Business (the "**CEW Trade Secrets**") and Intellectual Property Assets, including but not limited to, ensuring that all employees, contractors and agents and other persons having access to CEW Trade Secrets and Intellectual Property Assets have executed valid confidentiality and assignment of invention agreements or similar agreements or contracts, copies or forms of which have been provided to NVE, and (A) there has been no misappropriation of any material trade secrets or other material confidential CEW Intellectual Property Assets by any Person; (B) no employee, independent contractor or agent of any of the Sellers has misappropriated any trade secrets of any other Person in the course of his performance as an employee, independent contractor or agent of CEW; and (C) no current or former employee, independent contractor or agent of CEW is in default or breach of any term of any employment agreement, non-disclosure agreement, non-compete obligation, assignment of invention agreement or similar agreement or contract relating in any way to the protection, ownership, development, use or transfer of CEW Intellectual Property Assets;

(ix)    the Proprietary Software and each Product perform in accordance with its documented specifications, except to the extent any such failure to so perform would not reasonably be expected to have a CEW Material Adverse Effect;

(x)     (A) CEW is in actual possession of and has exclusive control over a complete and correct copy of the source code for all proprietary components of the Proprietary Software and the Products, including all previous major releases; (B) the source code for all software developed by CEW has been documented; (C) CEW has not granted to any Person, directly or indirectly, any current or contingent rights, licenses or interests in or to the source

code of any of the software created by CEW or used by CEW in the conduct of the Business; (D) since the time of development of such source code, CEW has not provided or disclosed such source code to any Person; (E) Section 2.14(b)(x) of the Disclosure Schedule identifies each agreement pursuant to which CEW is or may be required to deposit, with an escrow agent or any other Person any Proprietary Software or Product source code, and further describes whether the execution of this Agreement or the consummation of the Contemplated Transactions, in and of itself, would reasonably be expected to result in the release from escrow of any such source code; (F) to CE's Knowledge, as of the date hereof, there has been no unauthorized theft, reverse engineering, decompiling, disassembling, or other unauthorized disclosure of or access to any source code; (G) none of the Proprietary Software nor Products contain, incorporate, link or call to or otherwise use any software (in source or object code form) licensed from another party under a license commonly referred to as an open source, free software, copyleft or community source code license (including but not limited to any library or code licensed under the GNU General Public License, GNU Lesser General Public License, Apache Software License, or any other public source code license arrangement) (collectively "**Open Source**"); and (H) CEW has not embedded any Open Source, copy left or community source code in any of its Proprietary Software or Products, including but not limited to any license arrangement that would require CEW to (xx) make any public disclosure or to make available any source code or other Intellectual Property Assets either used, developed, or modified by CEW or (yy) grant licensees rights under the Proprietary Software or other CEW Intellectual Property Assets or that contains other provisions that relinquish or compromise any Intellectual Property Assets or (zz) violates any Intellectual Property Agreements.

(xi)  all Proprietary Software and Products: (A) comply with all Applicable Laws and industry standards, including with respect to security; and (B) conform to all applicable contractual commitments, express and implied warranties (to the extent not subject to legally effective express exclusions thereof), representations and claims in packaging, labeling, advertising, and marketing materials, and applicable specifications, user manuals, training materials and other documentation.

(xii)  neither the Proprietary Software nor the Products contain any substantial bug, defect, or error that materially adversely affects, or could reasonably be expected to adversely affect, the value, functionality, or performance of such Proprietary Software or Products.

(xiii)  neither the Proprietary Software nor the Products or any other software used in or in connection with the operation of the Business, contain any, and CEW has taken commercially reasonable steps to prevent the introduction of, a "time bomb," "Trojan horse," "back door," "worm," virus, malware, spyware, or other device or code (collectively, "**Malicious Code**") into the Proprietary Software or Products.

(xiv) (A) the IT Systems are reasonably sufficient for the immediate needs of the Business, including as to capacity, scalability, and ability to process current and anticipated peak volumes in a timely manner; (B) the IT Systems are in sufficiently good working condition to

17

perform all information technology operations, include sufficient licensed capacity (whether in terms of authorized sites, units, users, seats, or otherwise) for all software, in each case as necessary for the conduct of the Business as currently conducted, and have been used and maintained substantially in accordance with their manufacturer's requirements, if any, as specified in the documentation for same and applicable insurance policies; (C) without limiting the foregoing, CEW owns or licenses the right to use all software development tools, library functions, or compilers used by CEW to provide, create, modify, compile, or support any Proprietary Software or Products; and (D) without limiting the foregoing, as of the Closing Date, CEW will own or license the right to use all software used in connection with the Proprietary Software and Products.

(xv)    in the last thirty-six (36) months, there has been no known or suspected unauthorized access, use, intrusion, or breach of security, or material failure, breakdown, performance reduction or other adverse event affecting the IT Systems, that has caused or could reasonably be expected to cause any: (A) substantial disruption of or interruption in or to the use of such IT Systems or the conduct of the Business; (B) loss, destruction, damage, or harm of or to CEW or its operations, personnel, property, or other assets; or (C) liability of any kind to CEW. CEW has taken all reasonable actions, consistent with applicable industry best practices, to protect the integrity and security of the IT Systems and the data and other information stored or processed thereon.

(xvi)    CEW has delivered or made available to NVE correct and complete copies of all agreements relating to Licenses In or Licenses Out (together, "**Intellectual Property Agreements**") to which CEW or CE is a party, except "shrink-wrapped" or "off-the-shelf" software that is readily available to the public. With respect to each such Intellectual Property Agreement: (A) such Intellectual Property Agreement is valid and binding on CEW, is in full force and effect and, together with the related invoices, represent the entire agreement between the respective parties with respect to the subject matter of such Intellectual Property Agreement; (B) assuming the receipt or making of all necessary consents, approvals, waivers, authorizations, novations, notices and filings in connection with the Contemplated Transactions, such Intellectual Property Agreement will not cease to be valid and binding and in full force and effect on terms identical to those currently in effect as a result of the consummation of the Contemplated Transactions, nor will the consummation of the Contemplated Transactions constitute a breach or default under such Intellectual Property Agreement or otherwise give a party a right to terminate such Intellectual Property Agreement; (C) CEW has not (i) received any notice of termination or cancellation under such Intellectual Property Agreement, (ii) received any notice of a breach or default under such Intellectual Property Agreement, which breach has not been cured, or (iii) granted to any other third party any rights, adverse or otherwise, under such Intellectual Property Agreement that would constitute a breach of such Intellectual Property Agreement; and (D) assuming the receipt or making of all necessary consents, approvals, waivers, authorizations, novations, notices and filings in connection with the Contemplated Transactions, neither CEW nor, to CE's Knowledge, any other party to such Intellectual Property Agreement is in breach or default in any material respect under an

Intellectual Property Agreement and, to CE's Knowledge, no event has occurred that, with notice or lapse of time would constitute such a breach or default or permit termination, modification or acceleration under such Intellectual Property Agreement.

(xvii)   CEW has not entered into any agreements with the United States government (or any of its agencies) pursuant to which CEW or any its employees are required to assign any CEW Intellectual Property Assets rights in favor of such government or agency.

(xviii)  (A) CEW maintains commercially reasonable backup and data recovery, disaster recovery, and business continuity plans, procedures, and facilities; (B) acts in compliance therewith; and (C) tests such plans and procedures on a regular basis, and such plans and procedures have been proven reasonably effective by such tests.

(c)      For purposes of this Agreement,

(i)      "**Business**" means the business of CEW as conducted immediately prior to the Closing Date.

(ii)     "**CEW Intellectual Property Assets**" means all Intellectual Property Assets owned by CEW or used or held for use by CEW in the Business, including without limitation CEW Patents, CEW Marks, CEW Copyrights, CEW Trade Secrets, CEW Accounts, Proprietary Software and Products.

(iii)    "**Intellectual Property Assets**" means any and all of the following, as they exist throughout the world: (A) patents, patent applications of any kind, patent rights, inventions, discoveries and invention disclosures (whether or not patented) (collectively, "**Patents**"); (B) rights in registered and unregistered trademarks, service marks, trade names, trade dress, logos, packaging design, slogans and Internet domain names, and registrations and applications for registration of any of the foregoing (collectively, "**Marks**"); (C) copyrights in both published and unpublished works, including without limitation all compilations, databases and computer programs, software, manuals and other documentation and all copyright registrations and applications, and all derivatives, translations, adaptations and combinations of the above (collectively, "**Copyrights**"); (D) rights in know-how, trade secrets, confidential or proprietary information, research in progress, algorithms, data, designs, processes, formulae, drawings, schematics, blueprints, flow charts, models, strategies, prototypes, techniques, Beta testing procedures and Beta testing results (collectively, "**Trade Secrets**"); (E) any and all other intellectual property rights and/or proprietary rights relating to any of the foregoing; and (F) goodwill, franchises, licenses, permits, consents, approvals, and claims of infringement and misappropriation against third parties.

(iv)     "**IT Systems**" means all personal property, equipment and physical or electronic media relating to communications and computer systems, including computer hardware, networks and peripherals.

(v)    "**Products**" means those services and hardware and software products, including related documentation, currently or previously researched, designed, developed, manufactured, marketed, sold, distributed, licensed, performed or otherwise made available by CEW in connection with the Business.

(vi)    "**Proprietary Software**" means all proprietary software developed and owned CEW, including all new versions, updates, revisions, improvements, and modifications thereof, whether in source code, object code, or executable code format, including systems software, application software (including mobile apps), firmware, middleware, programming tools, scripts, routines, interfaces, libraries, and databases, and all related specifications and documentation, including developer notes, comments and annotations, user manuals, and training materials relating to any of the foregoing.

2.16    Litigation. CEW has not received notice of any pending litigation or governmental or administrative proceeding or investigation.  To CE's Knowledge, no litigation or governmental or administrative proceeding or investigation has been threatened: (a) against CEW; (b) affecting the property or assets of CEW; or (c) as to matters related to CEW, against any manager, Member or key employee of CEW in their respective capacities in such positions.  To CE's Knowledge, there has not occurred any event, and there does not exist any condition, on the basis of which any litigation or governmental or administrative proceeding or investigation may reasonably be asserted.   There has been no litigation, governmental or administrative proceedings or, to CE's Knowledge, investigations involving CEW or any of its managers, CE or key employees in connection with the Business, occurring, arising or existing during the past five (5) years.

2.17    Labor Matters.  CEW employs approximately twenty-six (26) full-time and no (0) part-time employees. In addition, Ted Hansen, Dennis Conn, Brian Mikkelson, and Randall Parmentier will be transferred to CEW under current employment terms immediately prior to Closing. CEW is not delinquent in payments to any of its employees for any wages, salaries, commissions, bonuses or other direct compensation for any services performed for CEW as of the date hereof or amounts required to be reimbursed to such employees. CEW is and heretofore has been in compliance in all material respects with all applicable laws and regulations respecting labor, employment, fair employment practices, terms and conditions of employment, occupational safety and health, and wages and hours. There are no charges of employment discrimination, harassment or unfair labor practices or strikes, slowdowns, stoppages of work, or any other concerted interference with normal operations existing, pending or, to the Knowledge of CE, threatened against or involving CEW. CEW is, and during the period CE has owned CEW, CEW has been, in compliance in all material respects with the requirements of the Immigration Reform Control Act of 1986.  CEW has not received notice of any changes pending or threatened with respect to (including, without limitation, the resignation of) the key employees or key independent contractors of CEW.  During the period CE has owned CEW, CEW has not implemented any plant closing or mass layoff of employees as those terms are defined in the Worker Adjustment Retraining and Notification Act of 1988, amended, or any similar state or

local law or regulation, and no layoffs that could implicate such laws or regulations are currently contemplated. To CE's Actual Knowledge, none of CEW's employees is obligated under any contract (including licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that would materially interfere with such employee's ability to fulfill their job responsibilities or that would conflict with the Business.   Neither the execution or delivery of this Agreement or the agreements contemplated hereby, nor the carrying on of the Business by the employees of CEW, nor the conduct of the Business as now conducted, will, to CE's Knowledge, conflict with or result in a breach of the terms, conditions, or provisions of, or constitute a default under, any contract, covenant or instrument under which any such employee is now obligated. CEW is not bound by or subject to (and none of its assets or properties is bound by or subject to) any written or oral, express or implied, contract, covenant, commitment or arrangement with any labor union, and no labor union has requested or, to CE's Actual Knowledge, has sought to represent any of the employees, representatives or agents of CEW. There is no strike or other labor dispute involving CEW pending, or to CE's Actual Knowledge, threatened, which could reasonably be expected to have a CEW Material Adverse Effect, nor are CE aware of any labor organization activity involving CEW's employees.

2.18    Permits; Compliance with Laws.    CEW has all franchises, authorizations, approvals, orders, consents, licenses, certificates, permits, registrations, qualifications or other rights and privileges (collectively "**Permits**") necessary to permit it to own its property and to conduct its Business as it is presently conducted, and all such Permits are valid and in full force and effect. Section 2.18 of the Disclosure Schedule sets forth a list of all Permits obtained or otherwise held by CEW. No Permit that CEW has is subject to termination as a result of the execution of this Agreement or consummation of the Contemplated Transactions.  To CEW's Knowledge, CEW is now and has heretofore been in compliance in all material respects with all applicable statutes, ordinances, orders, rules and regulations promulgated by any U.S. federal, state, municipal, non-U.S. or other Government Authority, which apply to the conduct of its Business.   During the period CE has owned CEW, CEW has not entered into or been subject to any judgment, consent decree, compliance order or administrative order with respect to any aspect of the Business, affairs, properties or assets of CEW or received any request for information, notice, demand letter, administrative inquiry or formal or informal complaint or claim from any regulatory agency with respect to any aspect of the Business, affairs, properties or assets of CEW.  To CE's Knowledge, there are no pending or threatened filings against CEW of an action relating to CEW under any foreign, federal, or state whistleblower statute.

2.19    Employee Benefit Programs.    Section 2.19 of the Disclosure Schedule describes all Employee Benefit Programs (as such term is defined in Exhibit A) maintained by CEW.

2.20    Insurance Coverage.    Section 2.20 of the Disclosure Schedule contains a list of the insurance policies currently maintained by CEW. There are currently no claims pending against CEW under any insurance policies currently in effect and covering the property, Business or employees of CEW, and all premiums due and payable with respect to the policies maintained by

CEW have been paid to date. To CE's Knowledge, there is no threatened termination of any such policies or arrangements.

2.21    Investment Banking; Brokerage.   There are no claims for investment banking fees, brokerage commissions, broker's or finder's fees or similar compensation in connection with the Contemplated Transactions payable by CEW or based on any arrangement or agreement made by or on behalf of CEW.

2.22    Environmental Matters. CEW is, and has been during the period CE has owned CEW, in compliance in all material respects with all applicable environmental, health and safety laws, rules, ordinances, by-laws and regulations, and with all permits, registrations and approvals required under such laws, rules, ordinances, by-laws and regulations (collectively, "**Environmental Laws**").  CE is not aware of any fact or circumstance that could reasonably be expected to involve CEW in any litigation, or impose upon CEW any liability, arising under any Environmental Law.

2.23    Customers, Distributors and Partners.  Section 2.23 of the Disclosure Schedule sets forth the name of each customer of CEW who accounted for more than five percent (5%) of the revenues of CEW for any of the fiscal years ended December 31, 2017 and December 31, 2018 and December 31, 2019 (the "**Customers**") together with the names of any persons or entities with which CEW has a material strategic partnership or similar relationship ("**Partners**"). Except as set forth in Section 2.22 of the Disclosure Schedule, no Customer or Partner of CEW has canceled or otherwise terminated its relationship with CEW or has materially decreased its usage or purchase of the services or products of CEW in the last twelve (12) months.  No Customer or Partner has, to CE's Actual Knowledge, any plan or intention to terminate, cancel or otherwise materially and adversely modify its relationship with CEW or to decrease materially or limit its usage, purchase or distribution of the services or products of CEW.

2.24    Suppliers.  CEW's relationships with its major suppliers are good commercial working relationships.  Within the last twelve (12) months, no supplier that CEW has paid, or is under contract to pay, $25,000.00 or more has canceled, materially modified, or otherwise terminated its relationship with CEW, or materially decreased its services, supplies or materials to CEW, nor to the Actual Knowledge of CE, does any supplier have any plan or intention to do any of the foregoing.

2.25    Warranty and Related Matters.  There are no existing or, to the Actual Knowledge of CE, threatened, claims against CEW relating to any work performed by CEW, product liability, warranty or other similar claims against CEW alleging that any CEW Product (as defined below) is defective or fails to meet any product or service warranties.  To CE's Knowledge, there are: (a) no inherent design defects or systemic or chronic problems in any CEW Product; and (b) no claims relating to any defects or problems with a CEW Product which could reasonably be expected to have a CEW Material Adverse Effect.  The term "**CEW Product**" means products or services that CEW distributes, services, markets, sells or produces for itself, a customer or a third party.

2.26    Money Laundering.  The operations of CEW are and, during the period CE has owned CEW, have been conducted at all times in compliance with the money laundering statutes of applicable jurisdictions, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any applicable governmental agency (collectively, the "**Money Laundering Laws**").  To CE's Knowledge, no action, suit or proceeding by or before any court, Government Authority, or any arbitrator involving CEW with respect to the Money Laundering Laws, is pending or threatened.

2.27    Illegal Payments.  During the period CE has owned CEW, neither CEW nor, to CE's Actual Knowledge any Affiliate of CEW, has offered, made or received on behalf of CEW any illegal payment or contribution of any kind, directly or indirectly, including, without limitation, payments, gifts or gratuities, to any person, entity, or United States or foreign national, state or local government officials, employees or agents or candidates therefor or other Persons.

2.28    Government Contracts.   CEW has (a) no contractual obligation to renegotiate government, quasi-government, sovereign or quasi-sovereign contracts or subcontracts, (b) not been suspended or debarred from bidding on contracts or subcontracts with any federal, state or local agency or governmental or sovereign authority, (c) not been audited or investigated by any such agency or authority with respect to contracts entered into or goods and services provided by CEW or any of its Affiliates or (d) not had a contract terminated by any such agency or authority for default or failure to perform in accordance with applicable standards. During the period CE has owned CEW, CEW has not had any outstanding agreements, contracts or commitments that require it to obtain or maintain a United States government security clearance or a foreign government security clearance. CEW has no government contracts.

2.29    Regulatory Authorities.  Neither CEW, nor, to CE's Actual Knowledge, any Member, manager, agent, employee, Affiliate or Person acting on behalf of CEW, is currently subject to any U.S. sanctions administered by any applicable regulatory authorities.

2.30    Security Program; Privacy. (a) To CE's Knowledge, CEW has in all material respects complied at all times with all Applicable Laws regarding the collection, use, storage, transfer, or disposal of personal information in connection with the operation of the Business; (b) CEW is in material compliance with the terms of all contracts to which it is a party relating to data privacy, security, or breach notification (including provisions that impose conditions or restrictions on the collection, use, storage, transfer, or disposal of personal information); (c) no Person (including any Government Authority) has commenced any action relating to CEW's information privacy or data security practices, including with respect to the collection, use, transfer, storage, or disposal of personal information maintained by or on behalf of CEW, or, to CE's Knowledge, threatened any such action or made any complaint, investigation, or inquiry relating to such practices; (d) CEW has established and implemented policies, programs, and procedures that are in compliance with applicable industry practices, including administrative, technical, and physical safeguards, to protect the confidentiality, integrity, and security of personal information in its possession, custody, or control against unauthorized access, use, modification, disclosure, or other misuse of any personal information in CEW's possession, custody, or control, or

otherwise held or processed on its behalf, and (e) to CE's Knowledge, CEW has not experienced any loss, damage, or unauthorized access, disclosure, use, or breach of security of any personal information in CEW's possession, custody, or control, or otherwise held or processed on its behalf.

2.31     Disclosure.  The representations and warranties made or contained in this Agreement, the Disclosure Schedule and exhibits hereto and the certificates and statements executed or delivered in connection herewith and all other information provided in writing by CEW and CE to NVE in connection with the Contemplated Transactions, when taken together, do not and shall not contain any untrue statement of a material fact and do not and shall not omit to state a material fact required to be stated herein or therein or necessary in order to make such representations, warranties or other material not misleading in the light of the circumstances in which they were made or delivered.  No Member or manager of CEW has been: (a) convicted in a criminal proceeding or named as a subject of a pending criminal proceeding (excluding traffic violations and other minor offenses) or been otherwise accused of any act of moral turpitude; (b) the subject of any order, judgment, or decree (not subsequently reversed, suspended or vacated) of any court of competent jurisdiction permanently or temporarily enjoining him or her from, or otherwise imposing limits or conditions on his or her ability to engage in any Securities, investment advisory, banking, insurance or other type of business or acting as an officer or director of a public company; or (c) has engaged in other conduct that would be required to be disclosed in a prospectus under Item 401(f) of Regulation S-K promulgated by the Securities and Exchange Commission.

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF NVE

NVE represents and warrants to CE as follows, except as set forth in a disclosure schedule (the "**NVE Schedule**") delivered by NVE contemporaneously with the execution of this Agreement:

3.1.     Organization, Powers and Qualifications.  NVE is a corporation duly organized and validly existing and in good standing under the laws of the State of Delaware.  NVE has all requisite corporate power and authority to carry on its business as it has been and is now being conducted and to own, lease and operate the properties and assets used in connection therewith.  NVE is duly qualified as a foreign corporation authorized to do business and is in good standing in every jurisdiction in which such qualification is required, other than such jurisdictions where the failure so to qualify would not have a NVE Material Adverse Effect, as such term is defined in Exhibit A.

3.2.     Authority.  The execution and delivery of this Agreement and the consummation of the Contemplated Transactions have been authorized by all necessary corporate action on the part of the Board of Directors of NVE and by those shareholders of NVE holding voting common stock

and no other corporate proceedings on the part of NVE are necessary to authorize this Agreement or to carry out the Contemplated Transactions. This Agreement is binding and enforceable upon NVE in accordance with its terms, subject to any bankruptcy, insolvency, moratorium or other laws affecting the enforcement of creditors' rights.

3.3.    Conflict with Other Agreements; Consents and Approvals.

With respect to the following: (a) the Certificate of Formation and Operating Agreement of NVE; (b) any law, statute, rule or regulation applicable to NVE; (c) any contract to which NVE is a party or may be bound or any Permit held by NVE; and (d) any judgment, order, injunction, decree or ruling of any court, arbitrator or governmental or regulatory official, body or authority applicable to NVE; the execution, delivery and performance by NVE of this Agreement and the Contemplated Transactions will not (i) result in any violation, conflict or default, or give to others any interest or rights, including rights of termination, cancellation or acceleration which would have a NVE Material Adverse Effect, or (ii) require any authorization, consent, approval or exemption by any person, the failure to obtain which would have a NVE Material Adverse Effect, which has not been obtained, or any notice to or filing which has not been given or done, other than filings pursuant to applicable state and federal securities laws, and the filing of appropriate Acquisition documentation under the Acts.

3.4.    Brokerage.   In connection with the Contemplated Transactions, no broker, finder or similar agent has been employed by or on behalf of NVE, and no person with which NVE has had dealings or communications of any kind is entitled to any brokerage or finder's fee or other commission in connection with the transactions.

3.5.    Disclosure. The representations and warranties made or contained in this Agreement, the Disclosure Schedule and exhibits hereto and the certificates and statements executed or delivered in connection herewith and all other information provided in writing by NVE to CE in connection with the Contemplated Transactions, when taken together, do not and shall not contain any untrue statement of a material fact and do not and shall not omit to state a material fact required to be stated herein or therein or necessary in order to make such representations, warranties or other material not misleading in the light of the circumstances in which they were made or delivered.   No officer or director of NVE has been: (a) convicted in a criminal proceeding or named as a subject of a pending criminal proceeding (excluding traffic violations and other minor offenses) or been otherwise accused of any act of moral turpitude; (b) the subject of any order, judgment, or decree (not subsequently reversed, suspended or vacated) of any court of competent jurisdiction permanently or temporarily enjoining him or her from, or otherwise imposing limits or conditions on his or her ability to engage in any Securities, investment advisory, banking, insurance or other type of business or acting as an officer or director of a public company; or (c) has engaged in other conduct that would be required to be disclosed in a prospectus under Item 401(f) of Regulation S-K promulgated by the Securities and Exchange Commission.

**ARTICLE IV**

COVENANTS

4.1.  <u>Conduct of Business Prior to Closing</u>.

From the date of this Agreement to the Closing Date, CEW (except as expressly contemplated or permitted by this Agreement, or to the extent that NVE shall otherwise consent in writing) agrees that it:

(a)  will conduct and operate its Business only in the ordinary course consistent with past practice;

(b)  will not conduct its Business in such a manner so as to purposely cause the representations and warranties made by it herein not to be true on the Closing Date as though such representations and warranties were made on and as of such date;

(c)  will use its reasonable best efforts to keep available the services of its present employees and agents and to maintain its current business relationships and goodwill;

(d)  will not modify or amend its Organizational Documents or Bylaws;

(e)  will not enter into or amend any employment contracts or any employee benefit plan or arrangement, increase the rate of compensation (or other bonus or benefit) payable or to become payable by it to any officer or any other executive employee, extend any credit or make any loans to any employee, make any general increase in compensation or rate of compensation (or other bonus or benefit) payable or to become payable to hourly employees or except in the ordinary course of business consistent with past practice, or make any material increase in the contributions to any employee benefit program or arrangement;

(f)  will not incur or guarantee any debt in excess of $10,000.00 except in the ordinary course of business consistent with past practice;

(g)  will not sell or dispose of any assets (tangible or intangible) except for sales in the ordinary course of business consistent with past practice;

(h)  will not transfer, assign, license or encumber, or permit any of its employees or agents to transfer, assign, license or encumber, in whole or in part, any proprietary right owned or held by it, including but not limited to any rights to or interest in CEW Intellectual Assets;

(i)  will not change in any material respect its accounting and tax practices, policies or principles;

26

(j)      will not cancel or waive any debts or claims having a value of $10,000.00 in the aggregate, except for such cancellations and waivers which will not cause an CEW Material Adverse Effect;

(k)      will pay all Taxes as they become due, file all federal, state, local and foreign tax returns, reports and statements required to be filed by CEW within the time and in the manner prescribed by Applicable Law, and collect or withhold all Taxes required to be collected or withheld from employees, independent consultants or other third parties;

(l)      will not enter into any (or modify any existing) lease, contract, commitment or agreement or engage in any transaction (including without limitation any borrowing, capital expenditure, capital financing, leasing arrangement or purchase commitment) except in the ordinary course of business consistent with past practice (other than special arrangements with brokers, attorneys, and accountants to consummate a fundamental transaction).

Notwithstanding the foregoing, the Parties acknowledge that, on or before the Closing Date, CEW anticipates making distributions to CE representing all available cash and cash equivalents prior to the Closing Date.   For purposes of computing CEW's Closing Date Net Working Capital, such distributions shall be deemed to have been made prior to the Closing Date.

4.2.    Updating of Schedules.  From the date of this Agreement to the Closing Date, each of CEW and NVE agrees that it will promptly inform the other Party in writing if any information set forth in a Schedule provided hereunder is not accurate and complete in all material respects as of such later date and will promptly disclose to the other Party in writing any information which arises after the date hereof and which would have been required to be included in its Schedule to make such Schedule accurate and complete in all material respects as of such later date; provided, however, that none of such disclosures shall be deemed to modify, amend or supplement its representations and warranties or its Schedule for purposes of any provision hereof unless the other shall have consented thereto in writing.

4.3.    Access.  From the date of this Agreement to the Closing Date, each of the Parties hereto agrees that it will give to the other Party hereto and its respective financial advisers, counsel, accountants and other representatives full access, during normal business hours upon reasonable advance notice, to all personnel, properties, books, contracts, documents and records with respect to its affairs as such requesting party may reasonably request, including without limitation all work papers, schedules and calculations relating to financial statements, and any other information that may be necessary for such requesting party to conduct an audit of the books and records of such other party. Any such information shall be delivered subject to the provisions regarding confidentiality set forth in the Confidentiality Agreement between the Parties, dated September 6, 2019, shall be deemed to be Confidential Information as defined therein, and NVE and CEW shall be bound by the provisions of the Confidentiality Agreement which are incorporated herein by this reference.

4.4.    Member and Manager Approvals. The Parties acknowledge and agree that Contemplated Transactions and the execution of this Agreement have been approved by the Managers of CE and NVE.

4.5.    Third Party Consents.  Prior to the Closing Date, each of NVE and CEW shall make commercially reasonable efforts to obtain all consents, approvals or authorizations of third parties which are required to be obtained by each of them in order to effect the Contemplated Transactions and such other consents, approvals or authorizations the absence of which would have an CEW Material Adverse Effect or a NVE Material Adverse Effect, as applicable.

4.6.    Satisfaction of Conditions.  Each Party hereto will use its reasonable best efforts to satisfy all the conditions to be satisfied by it to effect the Contemplated Transactions.

4.7.    Public Announcements.  The Parties acknowledge and agree that the terms of this Agreement and the Acquisition are strictly confidential and that significant damages may result if either Party improperly discloses such terms to anyone without the need to know. Neither CE, CEW nor NVE will make, issue or release any oral or written public announcement or statement concerning, or acknowledgment of the existence of, or reveal the terms, conditions and status of, the Contemplated Transactions (other than to their respective shareholders and CE), or issue any other communications to the public, directly or indirectly (including, without limitation, press releases), without first obtaining the written consent and authorization of the other Party.

4.8.   Other Proposals.  CE hereby agrees that it shall not nor shall it authorize or permit any managers, employees, Affiliates, or other representatives or agents (collectively, the "**CE Representatives**") to, directly or indirectly, solicit, encourage (including by way of furnishing non-public information), initiate discussions or negotiations relating to or take any other action to facilitate, any inquiries or the making of any proposal for an Acquisition Transaction.  As used herein, the term "**Acquisition Transaction**" shall mean the occurrence of any of the following events: (i) all or any part of CEW is acquired by Acquisition or otherwise by any Person, other than NVE or any of NVE's Affiliates (a "**Third Party**"); (ii) a Third Party acquires all or any part of the assets of CEW other than in the ordinary course of business; or (iii) CEW enters into a preliminary or definitive agreement with a Third Party relating to any of the transactions referred to in clauses (i) through (ii) above. CEW agrees that it shall promptly notify NVE in writing of any such inquiries or proposals relating to an Acquisition Transaction, which notification shall include the identity of the Person making such proposal or request, the terms thereof, and any other information with respect thereto as NVE may reasonably request.

4.9.   Assurances.  CE shall use its reasonable best efforts to obtain reasonable assurances that all material contractual rights of CEW will survive the Acquisition, except where the failure to do so will not cause a CEW Material Adverse Effect.

4.10.   CEW's Employees. CEW shall use its reasonable best efforts to retain all of CEW's employees through Closing.

**ARTICLE V**

CONDITIONS TO OBLIGATIONS OF NVE

The obligations of NVE to consummate the Acquisition provided for in this Agreement shall be subject to satisfaction, on or before the Closing Date, of the following conditions:

5.1.    Due Diligence Investigation.  NVE shall have completed its due diligence investigation of the assets, properties, Business and operations of CEW to its sole satisfaction.

5.2.    Representations, Warranties, and Covenants of CEW.  The representations and warranties of CEW herein contained and the information contained in CEW Disclosure Schedule and other documents delivered by CEW in connection with this Agreement shall be true and correct at the Closing Date with the same effect as though made at such time, except to the extent waived hereunder or affected by the Contemplated Transactions; CEW shall have performed in all material respects all obligations and complied in all material respects with all agreements, undertakings, covenants and conditions required by this Agreement to be performed or complied with by CEW prior to the Closing Date.

5.3.    Reserved.

5.4.    Reserved.

5.5.    No Injunctions.  No preliminary or permanent injunction or other order, decree or ruling by any federal, state or provincial court in the United States or by any United States governmental, regulatory or administrative agency which prevents the consummation of the Contemplated Transactions (including the Acquisition) shall have been issued and remain in effect.

5.6.    Consents.  All consents of third parties reasonably necessary to the consummation of the Contemplated Transactions, including but not limited to those set forth in CEW's Disclosure Schedule, shall have been obtained.

5.7.    Securities Laws.  All approvals, consents, permits, licenses or qualifications from authorities administering the securities laws of any state having jurisdiction, required in the reasonable judgment of NVE for the consummation of this Agreement and the Acquisition, shall have been obtained and shall be in full force and effect.

5.8.    Reserved.

5.9    Supply Contract and Transition Services Agreement.  CE shall have executed and delivered the Supply Contract and a Transition Services Agreement in the form attached hereto as Exhibit I and J ("**Supply Contract" and "Transition Services Agreement**" respectively) on terms acceptable to the Parties.

5.10    CEW Material Adverse Effect.  There shall not have occurred after the date of this Agreement, and be continuing as of the Closing Date, any CEW Material Adverse Effect, except where such CEW Material Adverse Effect is due to any negligence or willful act or omission on the part of NVE.

## ARTICLE VI

## CONDITIONS TO OBLIGATION OF CE

The obligations of CE to consummate the Acquisition provided for in this Agreement shall be subject to satisfaction, on or before the Closing Date, of the following conditions:

6.1.   <u>Due Diligence Investigation</u>.  CE shall have completed its due diligence investigation of the assets, properties, business and operations of NVE to its sole satisfaction.

6.2.   <u>Representations, Warranties, and Covenants of NVE</u>.  The representations and warranties of NVE herein contained and the information contained in NVE's Disclosure Schedule and other documents delivered by NVE in connection with this Agreement shall be true and correct at the Closing Date with the same effect as though made at such time, except to the extent waived hereunder or affected by the Contemplated Transactions; NVE shall have performed in all material respects all obligations and complied in all material respects with all agreements, undertakings, covenants and conditions required by this Agreement to be performed or complied with by them at or prior to the Closing Date; and NVE shall have delivered to CEW a certificate in form and substance satisfactory to CEW dated the Closing Date and signed by the President and Chief Executive Officer of NVE to such effect.

6.3.   <u>Approvals</u>.  The requisite approval of this Agreement and the Contemplated Transactions shall have been given by Board of Directors of NVE. Additionally, the consent of the holders of the Voting Common Stock of NVE shall have been given.

6.4.   <u>Consents</u>.  All consents of third parties necessary or appropriate to the consummation of the Contemplated Transactions, including but not limited to those set forth in CEW Disclosure Schedule, shall have been obtained.

6.5.   <u>NVE Material Adverse Effect</u>. There shall not have occurred after the date of this Agreement, and be continuing as of the Closing Date, any NVE Material Adverse Effect, except where such NVE Material Adverse Effect is due to any negligence or willful act or omission on the part of CEW or a Member.

6.6   <u>Employee Transfer.</u> Ted Hansen, Dennis Conn, Brian Mikkelson, and Randall Parmentier will be transferred to CEW as employees under current employment terms immediately prior to Closing.

## ARTICLE VII

## TERMINATION, WAIVER AND AMENDMENT

7.1.   Termination.  This Agreement may be terminated by written notice of termination at any time before the Closing Date (whether before or after action by CE or Managers of CE or NVE) only as follows:

(a)   by mutual consent of NVE and CE;

(b)   by NVE:

(i)   upon written notice to CE given prior to the Closing Date, if the representations and warranties of CEW contained in Article II hereof were not true and correct when made or if CE fails to perform in all material respects all obligations and comply in all material respects with all agreements, undertakings, covenants and conditions required by this Agreement to be performed or complied with by it at or prior to the Closing Date, unless CE cures the same prior to the Closing Date; or

(ii)   upon written notice to CE given prior to the Closing Date, if the Closing Date shall not have occurred on or before April 1, 2020 unless the absence of such occurrence shall be due to the failure of NVE to perform in all material respects each of its obligations under this Agreement required to be performed by it at or prior to the Closing Date (except to the extent such performance or compliance is qualified by materiality in which event such performance or compliance shall have failed to occur); and

(c)   By CE:

(i)   upon written notice given to NVE prior to the Closing Date, if the representations and warranties of NVE contained in Article III hereof were not true and correct when made or as of the Closing Date or if NVE fails to perform in all material respects all obligations and comply in all material respects with all agreements, undertakings, covenants and conditions required by this Agreement to be performed or complied with by it at or prior to the Closing Date, unless NVE cures the same prior to the Closing Date; or

(ii)   upon written notice to NVE given prior to the Closing Date, if the Closing Date shall not have occurred on or before April 1, 2020 unless the absence of such occurrence shall be due to the failure of CE to perform each of its obligations under this Agreement required to be performed by it at or prior to the Closing Date (except to the extent such performance or compliance is qualified by materiality in which event such performance or compliance shall have failed to occur).

7.2.   Effect of Termination. In the event of the termination of this Agreement and the abandonment of the Acquisition, the provisions of this Agreement shall thereafter become void and have no effect, and no Party hereto shall have any liability to any other Party hereto or its Affiliates, directors or officers in respect thereof, except that nothing herein shall relieve any Party from liability for any willful breach thereof or from its obligations under the confidentiality

provisions of the Confidentiality Agreement between the Parties, referred to and incorporated by reference in Section 4.3.

7.3     Waiver of Terms.  Any of the terms or conditions of this Agreement may be waived at any time prior to the Closing Date by the Party which is, or whose Affiliates are, entitled to the benefit thereof, by action taken by the Managers or Affiliates of such party, or by its chairman, president or any officer authorized to act for such party; provided, however, that such waiver shall be in writing and shall be taken only if, in the judgment of such Managers or Affiliates or officer taking such action, such waiver will not have a materially adverse effect on the benefits intended hereunder to the shareholders of such corporation, or Affiliates of such limited liability company, and the other Parties hereto may rely on the delivery of such a waiver as conclusive evidence of such judgment and the validity of the waiver.

7.4     Amendment of Agreement.  Anything herein or elsewhere to the contrary notwithstanding, to the extent permitted by law, this Agreement may be amended, supplemented or interpreted at any time prior to the Closing Date only by written instrument duly authorized and executed by each of the Parties hereto.

7.5     Fees and Expenses.  All costs and expenses incurred in connection with this Agreement and the Contemplated Transactions shall be paid by the Party incurring such expenses.

## ARTICLE VIII

## POST-CLOSING OBLIGATIONS

8.1.    Survival of Representations.  All representations, warranties, covenants, indemnities and other agreements made by any Party to this Agreement herein or pursuant hereto shall also be deemed made on and as of the Closing Date as though such representations, warranties, covenants, indemnities and other agreements were made on and as of such date, and all such representations, warranties, covenants, indemnities and other agreements shall survive the Closing for a period of twelve (12) months after the Closing Date, except to the extent that the applicable statute of limitation for claims relating to such representations, warranties, covenants, indemnities and other agreements expires earlier or later than twelve (12) months after the Closing Date.

8.2.    Indemnification Agreement

(a)     Indemnification by CE

(i)     Subject to the conditions and provisions of this Section 8.2, CE (the "**Indemnifying Party**") hereby agree to indemnify, defend and hold harmless NVE, and its officers, directors, shareholders, employees, representatives, agents, predecessors, successors, subsidiaries, Affiliates and assigns (collectively, the "**NVE Indemnified Persons**") in proportion to their post-Closing ownership interests in CEW from and against and in respect of all claims,

losses, damages, judgments, penalties, deficiencies, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and costs of litigation), including but not limited to responsibility for payments of any amounts due in connection with an audit by the IRS or the State of Delaware (collectively, "**Claims**") asserted against, resulting to, imposed upon or incurred by the NVE Indemnified Persons, directly or indirectly, by reason of or resulting from any misrepresentation or breach of any representation or warranty, or noncompliance with conditions, covenants or other agreements, given or made by CE in this Agreement or in the Schedules or Exhibits attached hereto or in any document furnished by or on behalf of CEW or the Indemnifying Party pursuant hereto or thereto; and (ii) all liability for Taxes of CEW with respect to any taxable period (or portion thereof) ending on or before 11:59 p.m. on the day prior to the Closing Date ("**Pre-Closing Tax Period**").  The Parties agree that CE's obligation to defend and indemnify under this Section shall not apply to the extent that there is insurance coverage with respect to such Claim and its defense.

(ii)     Notwithstanding the foregoing: (A) CE shall not have any obligation to indemnify the NVE Indemnified Persons in accordance with subparagraph (i) above unless and until the NVE Indemnified Persons have suffered damages arising from Claims in excess of Ten Thousand ($10,000.00) Dollars in the aggregate (at which point CE will be obligated to indemnify the NVE Indemnified Persons from and against all such damage relating back to the first dollar); (B) the aggregate amount of indemnifiable damages which may be sought, claimed and/or recovered by the NVE Indemnified Persons (collectively) from CE on account of Claims arising from breaches of any Non-Fundamental Representations shall not exceed two percent (2%) of the Acquisition Consideration; and (C) the aggregate amount of indemnifiable damages which may be sought, claimed and/or recovered by the NVE Indemnified Persons (collectively) from CE on account of Claims arising from breaches of any Fundamental Representations shall not exceed seven and one-half percent (7.5%) of the Acquisition Consideration; provided, however, the limitations on indemnifiable damages set forth in clause (B) and (C) of this Section 8.2(a)(ii) shall not apply with respect to any damages incurred by the NVE Indemnified Persons as a result of fraud committed by CE.

(b)     <u>Indemnification by NVE.</u>

(i)     Subject to the conditions and provisions of this Section 8.2, NVE hereby agrees to indemnify, defend and hold harmless CE and its officers, directors, shareholders, employees, representatives, agents, predecessors, successors, subsidiaries, Affiliates and assigns (collectively, the "**CEW Indemnified Persons**") from and against and in respect of all Claims asserted against, resulting to, imposed upon or incurred by CEW Indemnified Persons, directly or indirectly, by reason of or resulting from: (i) any misrepresentation or breach of any representation or warranty, or noncompliance with conditions, covenants or other agreements, given or made by NVE in this Agreement or in the Schedules or Exhibits attached hereto or in any document furnished by or on behalf of NVE pursuant hereto or thereto; and (ii) all liability for Taxes of CEW with respect to any taxable period (or portion thereof) ending after the Pre-Closing Tax Period.  The Parties agree that NVE's obligation to defend and indemnify under this

Section shall not apply to the extent that there is insurance coverage with respect to such Claim and its defense.

(ii)　　Notwithstanding the foregoing: (A) NVE shall not have any obligation to indemnify CEW Indemnified Persons in accordance with subparagraph (i) above unless and until CEW Indemnified Persons have suffered damages arising from Claims in excess of Ten Thousand ($10,000.00) Dollars in the aggregate (at which point NVE will be obligated to indemnify CEW Indemnified Persons from and against all such damage relating back to the first dollar); (B) the aggregate amount of indemnifiable damages which may be sought, claimed and/or recovered by CEW Indemnified Persons (collectively) from NVE on account of Claims arising from breaches of any Non-Fundamental Representations shall not exceed two (2%) percent of the Acquisition Consideration; and (C) the aggregate amount of indemnifiable damages which may be sought, claimed and/or recovered by CEW Indemnified Persons (collectively) from NVE on account of Claims arising from breaches of any Fundamental Representations shall not exceed even and one-half percent (7.5%) of the Acquisition Consideration; provided, however, the limitations on indemnifiable damages set forth in clause (B) and (C) of this Section 8.2(b)(ii) shall not apply with respect to any damages incurred by CEW Indemnified Persons as a result of fraud committed by NVE.

(c)　　<u>Definitions</u>.

(i)　　"**Fundamental Representations**" shall mean, collectively, the representations and warranties of CE set forth in Section 2.1, Section 2.2, Section 2.3, Section 2.4, Section 2.5, Section 2.7, Section 2.12, Section 2.14, Section 2.15, Section 2.16, Section 2.18, Section 2.26, Section 2.27, Section 2.29, and Section 2.30; and of NVE set forth in Section 3.1, Section 3.2, Section 3.3, Section 3.4, Section 3.5, and Section 3.6.

(ii)　　"**Non-Fundamental Representations**" shall mean all of the representations and warranties of CE and NVE set forth in this Agreement other than the Fundamental Representations.

(d)　　<u>Indemnification Procedure</u>

(i)　　In the event that any claim or demand for indemnification is brought by NVE Indemnified Persons or CEW Indemnified Persons (together, the "**Indemnified Persons**"), the Person from whom indemnification is claimed shall be called an "**Indemnifying Party**". In the event that any claim or demand for which the Indemnifying Party would be liable to an Indemnified Person hereunder is asserted against or sought to be collected from an Indemnified Person by a third party, the Indemnified Person shall promptly notify the Indemnifying Party of such claim or demand and the amount or the estimated amount thereof to the extent then feasible (which estimate shall not be conclusive of the final amount of such claim and demand (the "**Claim Notice**").  The Indemnifying Party shall have thirty (30) days from the personal delivery or mailing of the Claim Notice (the "**Notice Period**") to notify the Indemnified Person: (i) whether or not the Indemnifying Party disputes his liability to the Indemnified Person hereunder

with respect to such claim or demand, and (ii) notwithstanding any such dispute, whether or not the Indemnifying Party desires, at his sole cost and expense, to defend the Indemnified Party against such claim or demand; provided, however, that no delay on the part of the Indemnified Party in giving the Claim Notice shall relieve the Indemnifying Party from any obligation hereunder unless (and solely to the extent) the Indemnifying Party is prejudiced thereby.

(ii)      If the Indemnifying Party disputes his liability with respect to such claim or demand or the amount thereof (whether or not the Indemnifying Party desires to defend the Indemnified Person against such claim or demand as provided in subparagraphs (iii) and (iv) below), such dispute shall be resolved in accordance with Section 8.2(d) hereof. Pending the resolution of any dispute by the Indemnifying Party of his liability with respect to any claim or demand, such claim or demand shall not be settled without the prior written consent of the Indemnified Person and the Indemnifying Party.

(iii)      In the event that the Indemnifying Party notifies the Indemnified Person within the Notice Period that he desires to defend the Indemnified Person against such claim or demand then, except as hereinafter provided, the Indemnifying Party shall have the right to defend the Indemnified Person by appropriate proceedings, which proceedings shall be promptly settled or prosecuted by the Indemnifying Party to a final conclusion in such a manner as to avoid any risk of any Indemnified Person becoming subject to liability for any other matter; provided, however, the Indemnifying Party shall not, without the prior written consent of the Indemnified Person, consent to the entry of any judgment against the Indemnified Person or enter into any settlement or compromise which does not include, as an unconditional term thereof, the giving by the claimant or plaintiff to the Indemnified Person of a release, in form and substance satisfactory to the Indemnified Person, as the case may be, from all liability in respect of such claim or litigation.  If any Indemnified Person desires to participate in, but not control, any such defense or settlement, it may do so at its sole cost and expense.  If, in the reasonable opinion of the Indemnified Person, any such claim or demand or the litigation or resolution of any such claim or demand involves an issue or matter which could have a materially adverse effect on the business, operations, assets, properties or prospects of the Indemnified Person, including without limitation the administration of the tax returns and responsibilities under the tax laws of any Indemnified Person, then the Indemnified Person shall have the right to control the defense or settlement of any such claim or demand and its reasonable costs and expenses shall be included as part of the indemnification obligation of the Indemnifying Party hereunder; provided, however, that the Indemnified Person shall not settle any such claim or demand without the prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld or delayed.  If the Indemnified Person should elect to exercise such right, the Indemnifying Party shall have the right to participate in, but not control, the defense or settlement of such claim or demand at his sole cost and expense.

(iv)      If the Indemnifying Party elects not to defend the Indemnified Person against such claim or demand, whether by not giving the Indemnified Person timely notice as provided above or otherwise, then the amount of any such claim or demand, or if the same be

defended by the Indemnifying Party or by the Indemnified Person (but the Indemnified Person shall not have any obligation to defend any such claim or demand), then that portion thereof as to which such defense is unsuccessful, in each case shall be conclusively deemed to be a liability of the Indemnifying Party hereunder, unless the Indemnifying Party shall have disputed his liability to the Indemnified Person hereunder, as provided in (b) above, in which event such dispute shall be resolved as provided in Section 8.2(d) hereof.

(v)    In the event any Indemnified Person should have a claim against the Indemnifying Party hereunder that does not involve a claim or demand being asserted against or sought to be collected from it by a third party, the Indemnified Person shall promptly send a Claim Notice with respect to such claim to the Indemnifying Party.  If the Indemnifying Party disputes his liability with respect to such claim or demand, such dispute shall be resolved in accordance with Section 8.2(d) hereof; if the Indemnifying Party does not notify the Indemnified Person within the Notice Period that the Indemnifying Party disputes such claim, the amount of such claim shall be conclusively deemed a liability of the Indemnifying Party hereunder.

(vi)    Any dispute by the Indemnifying Party of his obligations pursuant to this Section 8.2 shall be submitted to arbitration in accordance with Section 9.7 hereof.

8.3.    <u>Tax Matters</u>;  <u>Audits</u>**.** The following provisions shall govern the allocation of responsibility as between NVE, CEW and CE, for certain tax matters following the Closing Date:

(a)    CE covenants and agrees that it will cause outside accountants ("**Outside Accountants**") of its indirect parent, First North American Holdings II, Inc.("**FNA**"), to prepare, at FNA's or CE's expense, and will file or cause to be filed, within the time and in the manner provided by law, and will pay all amounts owed with respect to, all Tax Returns not already filed on behalf of CEW by FNA for all tax periods ended or ending on or before the end of the taxable year immediately prior to the Closing Date (the "**Unfiled Tax Returns**"). CE covenants and agrees that it will send or cause to be sent a copy of all Unfiled Tax Returns to NVE for its review and comments and, if required, appropriate execution, at least fifteen (15) days prior to the filing thereof.

(b)    The Unfiled Tax Returns shall be prepared in a manner consistent with Tax Returns previously filed by FNA on behalf of CEW. Notwithstanding the foregoing, if NVE's accountants believe that there is not a reasonable basis for any position that FNA directs be taken in connection with any Unfiled Tax Return, Outside Accountants, NVE's accountants, NVE and CE shall confer with respect to the matter and if they are unable to resolve their differences, the matter will be referred to arbitration in accordance with the procedure set forth in Section 9.7 and the decision of the arbitrator shall be final and binding.

(c)    Except with respect to the Unfiled Tax Returns, NVE shall be responsible for the preparation and timely filing of all Tax Returns due with respect to CEW after the Closing Date and shall timely pay all amounts owed with respect to such returns.  NVE will provide CEW

with all information available to NVE to assist FNA to fulfill its obligations with respect to the Unfiled Tax Returns, and CE will provide NVE with all information available to CE to assist NVE to fulfill its obligations with respect to all Tax Returns of CEW other than the Unfiled Tax Returns.

(d)　　NVE, on one hand, and CE, on the other hand, shall: (i) cooperate fully, as reasonably requested, in connection with the preparation and filing of Tax Returns pursuant to this Section 8.3 and any audit, litigation or other proceeding with respect to Taxes; (ii) make available to the other, as reasonably requested, all information, records or documents with respect to Tax matters pertinent to CEW for all periods ending prior to or including the Closing Date; and (iii) preserve information, records or documents relating to Tax matters pertinent to CEW that are in their possession or under their control for the longer period of: (x) seven (7) years; or (y) the expiration of any applicable statute of limitations or extensions thereof.  NVE and CE shall notify the other of any audit by any regulatory agency, which may result in an assessment for which CE may be liable under this Agreement and shall not consent to any such actual or proposed assessment without the prior written consent of CE, which shall not be unreasonably withheld.

(e)　　Notwithstanding anything to the contrary contained in this Agreement, NVE shall have no obligation to pay or make any provision for the payment of, by indemnification or otherwise, and CE shall be solely responsible for all, Taxes of CEW for periods ending on or before the Closing Date, and CE will be liable directly to the applicable regulatory authorities for all such Taxes; and, if CE is not directly liable, such Taxes must be accrued under the Closing Balance Sheet.

(f)　　All tax sharing agreements or similar agreements with respect to or involving CEW shall be terminated as of the Closing Date and, after the Closing Date, NVE shall not be bound thereby or have any liability thereunder.

(g)　　After the Closing Date, NVE shall permit CE and their representatives reasonable access to such books and records of CEW as may be necessary for the purpose of preparing CEW's final Tax Return for the period up to and including the Closing Date.

8.3　　<u>Convergen Energy Name and Domain Name</u>.  On or before the six (6) month anniversary of the Closing Date, CE shall, and shall cause its Affiliates to, (i) discontinue the use of the corporate name "Convergen Energy" in connection with CE's and its Affiliates' business and operations, including, without limitation, discontinuing the use of the name "Convergen Energy" with respect to any website or letterhead of CE or its Affiliates and removing any placard or sign containing the name "Convergen Energy" located in or around the offices or facilities of CE or its Affiliates, and (ii) transfer and assign to CEW, at actual cost, any domain name owned by CE or its Affiliates containing the term "Convergen Energy."

**ARTICLE IX**

Ex A to Hansen Dec

GENERAL PROVISIONS

9.1.   <u>Cooperation</u>.   Subject to the terms and conditions herein provided, each Party shall cooperate with the other Party in carrying out the provisions of this Agreement and shall execute and deliver, or cause to be executed and delivered, such governmental notifications and additional documents and instruments and do, or cause to be done, all additional things necessary, proper or advisable under applicable law to consummate and make effective the Contemplated Transactions.

9.2.   <u>Assignment; Third Party Beneficiaries</u>. Neither this Agreement nor any right, interest or obligation hereunder shall be assigned by any of the Parties hereto without the prior written consent of the other Parties hereto.  This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.   This Agreement is not intended to confer any rights or remedies upon any Person other than (i) the Parties hereto; and (ii) the Indemnified Persons only after the Closing Date and only with respect to Section 8.2.

9.3.   <u>Contents of Agreement</u>. This Agreement and the Confidentiality Agreement, including the exhibits hereto and the documents and instruments referred to herein (including the Disclosure Schedule) embody the entire agreement and understanding of the Parties with respect to the subject matter hereof. Any previous agreements or understandings between the Parties regarding the subject matter hereof. There are no representations, promises, warranties, covenants, or undertakings, other than those expressly set forth or referred to herein and therein.

9.4.   <u>Section Headings, Gender.</u>   The Section headings herein have been inserted for convenience of reference only and shall in no way modify or restrict any of the terms or provisions hereof.  The use of the masculine or any other pronoun herein when referring to any person has been for convenience only and shall be deemed to refer to the particular person intended regardless of the actual gender of such person.  Each Party has been participated in the drafting of this Agreement, which each Party hereto acknowledges is the result of extensive negotiations among the Parties hereto.  Consequently, this Agreement will be interpreted without reference to any rule or precept of Applicable Law that states that any ambiguity in a document be construed against the drafter.

9.5.   <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, and by facsimile signature, any one of which need not contain the signatures of more than one Party and each of which shall be an original, but all such counterparts taken together shall constitute one and the same instrument.  The exchange of copies of this Agreement or amendments thereto and of signature pages by facsimile transmission or by e-mail transmission in portable digital format (or similar format) shall constitute effective execution and delivery of such instrument(s) as to the Parties and may be used in lieu of the original Agreement or amendment for all purposes. Signatures of the Parties transmitted by facsimile or e-mail transmission in portable digital format (or similar format) shall be deemed to be their original signatures for all purposes.

Ex A to Hansen Dec

9.6     <u>Notices</u>. All notices, consents, waivers or other communications which are required or permitted hereunder shall be sufficient if given in writing and delivered personally, by overnight mail service, by facsimile transmission (which is confirmed) or by registered or certified mail, return receipt requested, postage prepaid, as follows (or to such other addressee or address as shall be set forth in a notice given in the same manner):

If to NVE:

NianticVista Energy, LLC
222 Ridgedale Ave., Suite 302
Cedar Knolls, NJ 07927
Attention:  _____
Facsimile_____


With a required copy to:

Clemente, Mueller P.A.
PO Box 1296
Morristown, NJ 07962-1296
Attention:  Jonathan D. Clemente, Esq.
Facsimile:  (973) 455-8118
jclemente@cm-legal.com

With a required copy to:

Joseph F Andolino Esq.
Andolino & Associates
110 Nativa Circle
North Palm Beach Florida 33410
joe@andolinoassociates.com


With a required copy to:

Ted Hansen
Convergen Energy WI LLC
600 Liberty Street
Green Bay, WI  54304
ted.hansen@convergenergy.com

If to CEW and CE:

Convergen Energy, LLC
c/o Libra Capital US, Inc.

134 E. 40th Street
New York, NY 10016
Steven.brooks@libra.com

With a required copy to:

Libra Capital US, Inc.
134 E. 40th Street
New York, NY 10016
bert.diaz@libra.com

All such notices shall be deemed to have been given three business days after mailing if sent by registered or certified mail, one business day after mailing if sent by overnight courier service or on the date delivered or transmitted if delivered personally or sent by facsimile transmission.

9.7    <u>Arbitration</u>.

(a)    Any dispute arising between the Parties in connection with this Agreement, which cannot be resolved by the Parties themselves, shall be submitted to binding arbitration.  Either Party may initiate arbitration by giving written notice to that effect to the other Party.  Within ten (10) days after service of such written notice, each Party shall designate one arbitrator.  If either Party fails to designate its arbitrator in a timely fashion, the other Party may designate an arbitrator on behalf of that Party.  The two arbitrators so named shall designate a third arbitrator, who shall be an attorney licensed to practice law in the State of Delaware, to act as the head arbitrator; provided, however, that should the partisan arbitrators be unable to agree upon a third arbitrator, then the third arbitrator shall be named pursuant to the applicable rules of the American Arbitration Association upon the application of either Party.

(b)    Except as modified herein, the arbitration shall be conducted in accordance with the then-prevailing Commercial Rules of the American Arbitration Association. In connection with the arbitration, the arbitrators shall, at the request of either Party, direct that discovery be provided.  In rendering their decision and award, the arbitrators shall not add to, subtract from or otherwise modify the provisions of this Agreement, but rather shall be bound thereby.  Each Party shall bear its own costs and expenses in connection with the arbitration and the costs and expenses of the arbitrators shall be borne equally; provided, however, that if the arbitrators determine that either party has intentionally breached his or its obligations under this Agreement, the arbitrators shall assess all costs and expenses of the prevailing Party against the Party found to have intentionally breached its obligations.

(c)    Judgment upon the award rendered by the arbitrators may be entered by any court having jurisdiction thereof.

Ex A to Hansen Dec

9.8.    <u>Governing Law</u>. This Agreement shall be governed by and interpreted and enforced in accordance with the laws of the State of Delaware without giving effect to any conflicts of law provisions.

*[The Remainder of this Page Has Been Intentionally Left Blank]*

Ex A to Hansen Dec

IN WITNESS WHEREOF, the Parties have executed this Agreement and Plan of Acquisition as of the date first above written.

**NIANTICVISTA ENERGY, LLC**

By: _____

Title: CEO


**CONVERGEN ENERGY WI, LLC**

By: _____

FIDEL ANDUEZA
President

**CONVERGEN ENERGY, LLC**

By: _____

FIDEL ANDUEZA
President

43

_____

_____

ACQUISITION AGREEMENT

Among

NIANTICVISTA ENERGY, LLC,

CONVERGEN ENERGY WI, LLC,

and

CONVERGEN ENERGY, LLC,

Dated as of January 29, 2020

_____

_____