UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CONVERGEN ENERGY LLC, et al.,

                Plaintiffs,

-v-

STEVEN J. BROOKS, et al.,

                Defendants.

Civil Action No. 20-cv-3746 (LJL)

## BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION TO STAY ARBITRATION

Specially appearing defendant Convergen Energy WI, LLC ("CE-Wisconsin") respectfully submits this brief in opposition to Plaintiffs' Motion to Stay Arbitration. This brief is supported by the Declaration of Theodore J. Hansen ("Hansen Dec") and the Declaration of Benjamin D. LaFrombois ("LaFrombois Dec"), filed herewith.

## INTRODUCTION

Plaintiffs' motion to stay the Wisconsin arbitration relies upon two faulty presumptions. First, Plaintiffs' motion presumes that this Court even has jurisdiction over the question of arbitrability as to the Supply Agreement. This presumption is unwarranted and wrong. According to the explicit language of the arbitration clause in the Supply Agreement—which Plaintiffs quote but fail to analyze—questions of arbitrability are exclusively limited to the arbitrator. The U.S. Supreme Court has been explicit in stating that, in the presence of such a clause, district courts must not interfere in the process of the arbitration.

Second, Plaintiffs depend on the notion that their allegations of fraud in their complaint allow that the entirety of the Supply Agreement—including its binding arbitration clause—should be thrown out *a priori*. Obviously, this puts the "cart before the horse," and is not the way justice works. This Court should not disregard the mandate of the Federal Arbitration Act (FAA) and

ignore the terms of the parties' binding arbitration agreement solely on the basis of Plaintiffs' conjecture.

Underlying Plaintiffs' motion is the equally faulty presumption that **any** portion of this case is properly before the Court. Plaintiffs argue that, because the action before this Court is comprehensive of the issues between the parties, CE-Wisconsin's arbitration demand risks fragmenting this case, and therefore the Court has license to ignore the arbitration clause in the Supply Agreement. What Plaintiffs conveniently forget to mention is that, like the Supply Agreement, **the Acquisition Agreement also contains a comprehensive, binding arbitration clause**.

It is undeniable that **all** of the issues raised by the Plaintiffs in their complaint have arisen in connection with the Acquisition Agreement.[1] In part on the basis of that clause, as well as the arbitration clause in the Supply Agreement, Defendants intend to seek dismissal of this case for lack of jurisdiction when they respond to the Complaint. The fact of the matter is that this entire case—including disputes arising under the Supply Agreement—belongs in arbitration. Since the whole case should go to arbitration, there is no risk of inconsistent decisions. For these reasons, and as further set forth below, CE-Wisconsin respectfully submits that, because Plaintiffs improperly ask the Court to overstep its authority, the motion to stay should be denied.

## **RELEVANT FACTS AND PROCEDURAL HISTORY**

CE-Wisconsin makes engineered sold fuel pellet pellets from recycled materials which are sold to power plants to generate electricity. (Hansen Dec., ¶ 7.). L'Anse Warden Electric Company, LLC ("**LWEC**") is permitted to use biomass to produce electric power. CE-

---

[1] Even the claims that Plaintiffs use as their "hook" for federal jurisdiction—the DTSA (18 U.S.C. § 1836) and SCA (18 U.S.C. § 2701) claims—are subject to arbitration as arising out of the Acquisition Agreement, which includes six pages of comprehensive discussion regarding the comprehensive sale of CE-Wisconsin's trade secrets and other confidential information.

2

Wisconsin's engineered sold fuel pellet is one of the few types of fuel LEWC is regulatorily permitted to burn. LWEC sells the generated electricity to primarily to DTE Electric Company. (*Id.*, ¶ 8.). On January 31, 2020, the pellet business of Convergen Energy LLC, through the entity Convergen Energy Wisconsin LLC, was sold. On January 31, 2020, CE-Wisconsin and LWEC entered into the Engineered Fuel Pellet Supply Agreement (the "Supply Agreement"). (Doc. 64-1). On February 21, 2020 partiesentered into an Amended and Restated Closing Statementwhich did notreferto theSupply Agreement.(Doc. 64-2). The Supply Agreement is a "take or pay" structure typically used as collateral in loans where the certainty of supply and payment is mission critical to the parties and their lender.

On May 11, 2020, LWEC and its parent company, Libra Capital US, LLC ("Libra") demanded that CE-Wisconsin and others pay Libra $10 million in three days, or Libra would file a lawsuit. (LaFrombois Dec., Exh. A.). Along with that threat, Libra sent a draft of a New York state court complaint levelling several causes of action against CE-Wisconsin, certain of its officers and other third-parties, including allegations that the Supply Agreement between CE-Wisconsin and LWEC should be rescinded. (*See id.*).

CE-Wisconsin responded on May 14, 2020, with a declaratory judgment action in Brown County, Wisconsin, Circuit Court, asking that court to clarify the rights and obligations between CE-Wisconsin and its officers and Libra and LWEC under various agreements, including the Supply Agreement. (*Id.*, ¶ 4.). Libra and LWEC have since removed the Brown County case to the Eastern District of Wisconsin. (*Id.*, ¶ 5.)

Unbeknownst to CE-Wisconsin at the time, Libra and LWEC filed the SDNY action within hours of CE-Wisconsin's Brown County complaint on May 14, 2020. (*Id.*, ¶ 6, Exh. B.). Libra's SDNY complaint largely mimics its prior draft complaint, except that, in order to create federal

3

question jurisdiction under 28 U.S.C. § 1331, it includedtrade secret and confidential information claims pursuant to 18 U.S.C. § 1836 and 18 U.S.C. § 2701. (*Id*.,Exh. B., ¶¶ 24, 101-124.). Libra asserts supplemental jurisdiction over the remainder of the dispute—including issues relating to the Supply Agreement—pursuant to 28 U.S.D. § 1367.[2](*Id*., Exh. B, ¶ 24.).

At the same time, Libra applied for a temporary restraining order and preliminary injunction, relating **exclusively** to its demands for the preservation and production of trade secret and confidential information claims pursuant to 18 U.S.C. § 1836 and 18 U.S.C. § 2701. (*Id.*, ¶ 7.). After a preliminary hearing on May 19, 2020, the court entered a temporary restraining order to ensure preservation of records, ordered limited expedited discovery relating only to Libra's trade secret and confidential information claims, (*Id*., ¶ 8, Exh. C.). Since the TRO was entered, the parties have engaged in extensive meet and confer sessions in order to resolve the remaining issues raised by Libra's preliminary injunction motion. (*Id*., ¶ 9.).

While the dispute raged in SDNY, LWEC continued to request pellets under the Supply Agreement but refused to pay for them. (Hansen Dec., ¶6).

The Supply Agreement was drafted by the general counsel for Libra, Bert Diaz, as evidenced by the email chain attached to the declaration of Ted Hansen. (*Id.*, ¶4). Attorney Diaz initiated and supplied the arbitration clause found in the first draft (and final draft) of the Supply Agreement. (*Id*., ¶ 4.).

The Supply Agreement includes a mandatory arbitration provision which says in part:

> "**All Disputes shall be exclusively, finally and conclusively settled by binding arbitration** under the Rules of Arbitration of the American Arbitration Association in accordance with its CAR(AA) (R) (specifically modified by this Agreement). The parties shall continue to perform their respective obligations under this Agreement pending conclusion of the arbitration. As used herein, Dispute means any disagreement,

---

[2]Libra was forced to concoct grounds for federal question jurisdiction because there is not complete diversity between the parties and, at the time, New York state courts were not accepting new commercial filings due to the COVID-19 health crisis.

controversy or claim that arises between Vendor and Customer regarding the interpretation, fulfillment, or implementation of any provision of this Agreement, or regarding the rights and obligations of the parties (including, without limitation, the validity of the agreement of the parties to arbitrate, the arbitrability of the issues submitted to arbitration hereunder, and any conflict of laws issues in connection with this Agreement)." Supply Agreement, Section 11, Paragraph 1 [emphasis added].

Further, the Supply Agreement states that respecting the continued performance during arbitration:

"Each party acknowledges and agrees that the other party would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms. Accordingly, pending completion of arbitration pursuant to this provision, either party shall have the right to seek a temporary restraining order, injunctive relief or other interim or provisional relief on the grounds that such relief would otherwise be available at law or in equity." Supply Agreement, Section 11, Paragraph 3.

Further, the Supply Agreement states that arbitration shall be held in Madison, Wisconsin. (Supply Agreement, Doc. 64-1, Section 11, ¶ 4.).

At approximately the same time LWEC filed suit in the Southern District of New York, it ceased paying for the pellets it requested and received. CE-Wisconsin continues to supply pellets, the amount of unpaid invoices new exceeds $500,000. (Hansen Dec., ¶ 5).

Accordingly, on June 4, 2020, CE-Wisconsin filed a Demand for Arbitration with the American Arbitration Association.

Shortly thereafter, as expressly permitted by the Supply Agreement, CE-Wisconsin brought a limited action in Wisconsin state court (which L'Anse then removed to the Western District of Wisconsin), seeking a preliminary injunction requiring LWEC to pay for the pellets it is receiving and consuming from CE-Wisconsin in the interim period while an arbitrator is appointed by the AAA. The clear and unambiguous language of the Supply Agreement directs that such preliminary injunctive relief will be temporary—lasting only until an arbitrator appointed by the American Arbitration Association has the ability to take up the issue of whether to continue the injunction. Once AAA appoints an arbitrator, the arbitrator will take over the

5

substantive merits of the dispute between CE-Wisconsin and L'Anse under the Supply Agreement.

LWEC has not responded to the American Arbitration Association's requests to facilitate the selection of an arbitrator, or any of the AAA's inquiries. (LaFrombois Dec., ¶ 15). To further delay matters, Plaintiffs have filed this motion, seeking to disregard the arbitration clause of the Supply Agreement.

In the midst of these stall tactics, LWEC has taken and burned over $500,000 in fuel pellets from CE-Wisconsin without paying for them, and it intends to keep taking and burning CE-Wisconsin's fuel pellets without paying for them for the foreseeable future.

## ARGUMENT

**I. PLAINTIFFS' MOTION SHOULD BE DENIED, BECAUSE THE ARBITRATION CLAUSE IN THE SUPPLY AGREEMENT REQUIRES QUESTIONS OF ARBITRABILITY TO BE DECIDED BY THE ARBITRATOR.**

Boiled down to its essence, Plaintiffs' argument in support of a stay of the Wisconsin arbitration is premised on the assertion that it is up to this Court to decide whether disputes arising under the Supply Agreement are arbitrable.

Plaintiffs' argument fails. Under the clear language of the arbitration clause—which Plaintiffs quote but fail to acknowledge—much less analyze—**all** questions of arbitrability and conflicts of law shall be referred to the arbitrator itself:

> All Disputes shall be exclusively, finally and conclusively settled by binding arbitration … . The parties shall continue to perform their respective obligations under this Agreement pending conclusion of the arbitration. As used herein, Dispute means any disagreement, controversy or claim that arises between Vendor and Customer regarding the interpretation, fulfillment, or implementation of any provision of this Agreement, or regarding the rights and obligations of the parties (**including, without limitation, the validity of the agreement of the parties to arbitrate, the arbitrability of the issues submitted to arbitration hereunder, and any conflict of laws issues in connection with this Agreement**).

(Supply Agreement, Doc. No. 64-1, p. 6, § 11 (emphasis added)). Under binding law, where a contractual arbitration clause refers questions of arbitrability to an arbitrator, a court must not interfere:

> Applying the [Federal Arbitration] Act, we have held that parties may agree to have an arbitrator decide not only the merits of a particular dispute but also gateway questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy. We have explained that an agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other.
>
> … **When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue**."

*Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529, 202 L. Ed. 2d 480 (2019) (emphasis added) (internal quotations omitted). The Second Circuit concurs. *Metropolitan Life Ins. Co. v. Bucsek*, 919 F.3d 184, 190 (2d Cir. 2019) (if the parties' contract demonstrates that they "clearly and unmistakably agreed" to have the question of arbitrability decided by the arbitrator, "it is the obligation of the court to enforce their agreement.").

Under this precedent and the unambiguous language of the Supply Agreement, this Court is prohibited from deciding whether the dispute under the Supply Agreement should be arbitrated. Instead, the parties expressly delegated that question to arbitration, and the Court may not interfere with the arbitrator's decision.[2]

While Plaintiffs cite numerous cases in support of the proposition that a court may, as a general matter, decide gateway issues of arbitrability in certain circumstances, none of those cases dealt with arbitration clauses such as the one at bar, clearly and unmistakably reserving such

---

[2] Plaintiffs not only question the arbitrability of CE-Wisconsin's dispute under the Supply Agreement, they question the validity of the agreement itself.

decisions to the arbitrator. *See, e.g., Wachovia Bank, N.A. v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, (2d Cir. 2011) (no requirement that an arbitrator decide arbitrability, and observing "**In the absence of an agreement by the parties to submit the matter of arbitrability to the arbitrator**, the question of whether or not a dispute is arbitrable is one for the court." (emphasis added)); *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 116 (2d Cir. 2012) (no requirement that an arbitrator decide arbitrability); *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) (holding that the district court erred in deferring question of arbitrability to the arbitrator, because the contract contained no requirement that an arbitrator decide arbitrability.); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220 (2d Cir. 2016) (no requirement that an arbitrator decide arbitrability).

Because the clear and unmistakable language of the Supply Agreement directs questions of arbitrability to the arbitrator, this Court may not decide the question of arbitrability. As a result, there is no reason for the Court to stay the arbitration pending any determination of arbitrability, a determination this Court is not permitted to make.

## II. PLAINTIFFS' UNPROVEN ALLEGATIONS OF FRAUD ARE NOT A SUFFICIENT BASIS FOR THIS COURT TO INTERFERE WITH THE ARBITRATION.

Plaintiffs argue that this Court may interfere with the Wisconsin arbitration because Plaintiffs have alleged in their complaint that the Supply Agreement—and by extension the arbitration clause contained therein—was induced by fraud. Plaintiffs reason that, since the Supply Agreement was induced by fraud, its arbitration clause cannot be binding, and thus all disputes under the Supply Agreement are properly before this Court. This argument fails for multiple reasons.

As a preliminary matter, Plaintiffs' argument goes to the validity of the arbitration clause itself. However, just as the Supply Agreement reserves the question of arbitrability to the arbitrator, it also explicitly reserves questions as to the validity of the arbitration clause to the arbitrator. Under blackletter law, confirmed as recently as last year by the U.S. Supreme Court in *Henry Schein*, because the parties' agreement demonstrates a clear and unmistakable desire to send the question of validity to the arbitrator, this Court may not interfere.

Even absent this explicit provision sending questions regarding validity to the arbitrator, Plaintiffs have not overcome the presumption in favor of arbitration under the Federal Arbitration Act.[3] The Federal Arbitration Act, 9 U.S.C.A. § 1, *et seq.*, "embod[ies] a national policy favoring arbitration." *Schnabel*, 697 F.3d at 118. It is axiomatic that, "[u]nder the [Federal Arbitration] Act, arbitration is a matter of contract, and courts **must** enforce arbitration contracts according to their terms." *Henry Schein, Inc.* 139 S. Ct. at 529 (emphasis added); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-24 (1983) ("any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration"); *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985) (courts must "rigorously enforce agreements to arbitrate"); *see also id.* at 218 (the Federal Arbitration Act "leaves no place for the exercise of discretion by a district court, but instead mandates that the district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."); *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582–83 (1960) ("An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the

---

[3] While Plaintiffs (without explanation) invoke New York law throughout their brief, it is not the correct law to be applied to disputes regarding arbitrability. Rather, as discussed *infra*, the Federal Arbitration Act controls. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445-446 (2006).

arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.").

Plaintiffs attempt to circumvent the strong presumption in favor of arbitration by arguing that the arbitration clause is void, because the entire Supply Agreement is void due to fraud. This argument fails. Under governing law, Plaintiffs must show that the arbitration agreement **itself,** as opposed to the contract in general, was induced by fraud. A party may not avoid an otherwise valid arbitration clause, merely by arguing that the contract **in general** was fraudulently induced. This is the "severability doctrine" introduced by the Supreme Court in *Prima Paint v. Flood & Conklin Mfg. Co.*:

> [A]rbitration clauses as a matter of federal law are 'separable' from the contracts in which they are embedded, and that where no claim is made that fraud was directed to the arbitration clause itself, a broad arbitration clause will be held to encompass arbitration of the claim that the contract itself was induced by fraud.

388 U.S. 395, 402 (1967); *see also Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 449 (2006) ("We reaffirm today that, regardless of whether the challenge is brought in federal or state court, a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator."); *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010) ("There are two types of validity challenges under § 2 [of the Federal Arbitration Act]]: One type challenges specifically the validity of the agreement to arbitrate, and [t]he other challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.,* the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid. … [O]nly the first type of challenge is relevant to a court's determination whether the arbitration agreement at issue is enforceable." (internal quotation omitted)).

Plaintiffs do not even attempt to demonstrate that the arbitration clause itself is fraudulent, instead relying on the notion that an arbitration agreement may be invalidated along with the rest of a contract, where there exists "a [fraudulent] grand scheme that permeated the entire contract." In support of this "grand scheme" theory, Plaintiffs cite exclusively to New York law. However, New York law does not govern the question of arbitrability, or of the validity of the arbitration clause itself. Rather, as explicated by the court in *Buckeye*, substantive federal arbitration law requires that an arbitration provision be deemed "severable from the remainder of the contract," and that "this arbitration law applies in state as well as federal courts." 546 U.S. at 445-446. As such, Plaintiffs' New York precedents have no applicability.

Importantly, the arbitration clause here was proposed and drafted by the Libra Group's General Counsel, Bert Diaz. (Hansen Dec. ¶ 4). As the arbitration clause under the federal severability principle is considered a stand-alone contract, to prevail the Libra Group would have to convince the Court that the Libra Group was fraudulently induced to enter into an arbitration contract that was suggested, proposed and approved by their own General Counsel. Even if Plaintiffs had any evidence of fraudulent inducement with respect to the arbitration clause itself (and Plaintiffs offer none in support of their Motion to Stay), such an argument is destined to fail.

Further, even if state law were to apply, it would be Wisconsin law, not New York; the Supply Agreement **requires** Wisconsin law to be applied. Wisconsin law contains no such "grand scheme" exception to the general rule of severability. Wisconsin courts follow FAA decisions in general,[4] and *Prima Paint* specifically, in concluding that a challenge to the validity of the contract as a whole must be made in arbitration. *Wisconsin Auto Title Loans, Inc. v. Jones*, 2006 WI 53, ¶ 6, 290 Wis. 2d 514, 522, 714 N.W.2d 155; *see also Building Werks Holdings, LLC v. Paul Davis*

---

[4] Because the Wisconsin Arbitration Act is "nearly identical" to the FAA, Wisconsin courts follow federal precedents in interpreting its arbitration law. *Sands v. Menard, Inc.*, 2010 WI 96, ¶ 55 n.27, 328 Wis. 2d 647, 787 N.W.2d 384.

11

*Restoration, Inc.*, 2015 WL 5684227, *6 (Wis. Ct. App. Sept. 26 2015) ("[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance.").

Regardless, even under New York law, Plaintiffs lose. The "grand scheme" theory is the exception to the rule that "an arbitration clause is generally separable from substantive provisions of a contract, so that an agreement to arbitrate is valid even if the substantive provisions of the contract are induced by fraud." *Anderson St. Realty Corp. v. New Rochelle Revitalization, LLC*, 78 A.D.3d 972, 974 (2010). Even in cases recognizing this concept of a "grand scheme" exception, a party must still provide some sort of actual evidence of the "grand fraudulent scheme" beyond the allegations of the complaint. *See, e.g., 332 E. 66th St., Inc. v. Walker,* 59 Misc. 3d 1216(A), 106 N.Y.S.3d 727 (N.Y. Sup. Ct. 2018) (New York law) (refusing to invalidate an arbitration provision without a developed record).

Here, Plaintiffs have submitted no actual evidence of fraud. Instead, as they have throughout these proceedings, Plaintiffs simply rely on their rhetoric and the bare allegations in their complaint to "substantiate" their assertion that there was some sort of fraudulent "grand scheme that permeated the entire contract." (Pl. Brief, Doc No. 65, pp.8-9.). As admitted by the Plaintiffs in their brief, however, some proof beyond mere allegations is required for a court to even consider ignoring an arbitration clause: "[A] party alleging that a contract is void—**and providing some evidence in support**—is entitled to a trial on the contract's arbitrability." (Pl. Brief, Doc No. 65, p.8 (emphasis added).). However, in contrast to their own admission, Plaintiffs provide **no** evidence in support—instead relying solely on the unproven allegations in their complaint.

Plaintiffs assert that (again under inapplicable New York law), where there are disputed facts, the question of arbitrability must go to trial. However, in the cases Plaintiffs cite, a party must make some evidentiary showing to force trial on the issue.

> If the making of the agreement to arbitrate is placed in issue—as Sphere Drake attempts to do by alleging that the contracts in which the arbitration provisions are found never came into existence—the court must set the issue for trial. **However, the party putting the agreement to arbitrate in issue must present "some evidence" in support of its claim before a trial is warranted.** *See Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.,* 462 F.2d 673, 676 (2d Cir.1972); *Almacenes Fernandez, S.A. v. Golodetz,* 148 F.2d 625, 628 (2d Cir.1945) ("To make a genuine issue entitling the plaintiff to a trial by jury, an unequivocal denial that the agreement had been made was needed, and some evidence should have been produced to substantiate the denial.").

*Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.*, 263 F.3d 26, 30 (2d Cir. 2001) (emphasis added).[5] Here, Plaintiffs rely on **nothing** more than the unproven allegations of fraud set forth in their complaint. Even assuming that New York law applies (which it does not), Plaintiffs' reliance on the bare allegations of their complaint is simply not enough for this Court to ignore the arbitration clause and the mandate of the FAA. For all of these reasons, Plaintiffs' motion to stay the arbitration should be denied.

### III. IN THE ALTERNATIVE, THE COURT SHOULD WAIT TO DECIDE PLAINTIFFS' MOTION TO STAY, BECAUSE THE MOTION RAISES LARGER ISSUES OF WHETHER THE COURT HAS JURISDICTION OVER THIS ENTIRE ACTION.

As the Court is aware, Defendants (including CE-Wisconsin) have appeared in this matter specially so as to contest Plaintiffs' preliminary injunction motion, and have explicitly reserved their rights to contest the Court's jurisdiction. One basis for the Defendants' jurisdictional challenge is the fact that the entirety of this case belongs in arbitration. Not only does the Supply Agreement contain a binding arbitration clause, but the Acquisition Agreement—around which

---

[5] Plaintiffs wrongly state that *Sphere Drake* was decided under New York law. It was not; instead it was decided under the FAA and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. 263 F.3d at 29.

this entire dispute revolves—also contains a mandatory provision broadly requiring arbitration of "Any dispute arising between the Parties in connection with this Agreement." (Hansen Dec., Exh. A, p. 41, § 9.7(a)).[6]

Given that many of the issues raised by Plaintiffs' motion to stay the Wisconsin arbitration will again be raised in connection with the larger arbitration question, principles of judicial economy and efficiency[7] suggest that the Court should not decide the instant motion until the entire issue has been put before the Court.

## **CONCLUSION**

For the reasons set forth herein, Plaintiffs' motion to stay the Wisconsin arbitration should be denied.

Dated this 7th day of July, 2020.　　　　　　　　　von BRIESEN & ROPER, s.c.,

　　　　　　　　　　　　　　　　　　　　　　　*s/Benjamin LaFrombois, Esq.*
　　　　　　　　　　　　　　　　　　　　　　　Benjamin D. LaFrombois, Esq.
　　　　　　　　　　　　　　　　　　　　　　　WI State Bar No. 1027910

　　　　　　　　　　　　　　　　　　　　　　　William E. Fischer
　　　　　　　　　　　　　　　　　　　　　　　WI State Bar No. 1045725
　　　　　　　　　　　　　　　　　　　　　　　*Attorneys for Defendants, Theodore John Hansen,*
　　　　　　　　　　　　　　　　　　　　　　　*Brian R. Mikkelson and Convergen Energy WI, LLC*

---

[6] In their brief, Plaintiffs quote but do not otherwise rely upon the permissive venue provision in the amended closing statement that allows an action under that agreement to be brought in this Court. Plaintiffs clearly intend to rely upon this provision to counter the Defendants' assertion that this case should be arbitrated. Such an argument is unavailing. First, that clause is limited to disputes under the amended closing statement, and does not supersede the binding arbitration provision in the Acquisition Agreement. Plaintiffs cannot seriously assert that any of their disputes actually arise out of the amended closing statement—they do not even mention it in their complaint.

[7] While Plaintiffs appeal to judicial economy in support of their Motion, arguing that requiring arbitration of claims relating to the Supply Agreement would be inefficient and split the dispute into multiple forums, this puts the cart before the horse, as the issue of whether the global dispute or significant parts of it must be arbitrated is not yet before the Court. Moreover, the law is clear that if ultimately claims relating to the Supply Agreement are arbitrable, and other claims are not, the Court must send the arbitrable claims to arbitration, regardless of any resulting inefficiency. *KPMG LLP v. Cocchi*, 565 U.S. 18, 22 (2011) ("when a complaint contains both arbitrable and nonarbitrable claims," the court can only require arbitration of the arbitrable claims, "even where the result would be the possibly inefficient maintenance of separate proceedings in different forums." (internal quotation omitted)). The threshold question is whether some or all of the claims raised in Plaintiffs' Complaint must be arbitrated.

Direct contact information:
Benjamin D. LaFrombois, Esq.
2905 Universal Street, Suite 2
Oshkosh, WI 54904
920.233.4704 direct dial
[blafrombois@vonbriesen.com](mailto:blafrombois@vonbriesen.com)

William E. Fischer
920.232.4843 direct dial
[wfischer@vonbriesen.com](mailto:wfischer@vonbriesen.com)