K5JPCONO

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CONVERGEN ENERGY LLC, ET AL.,

4                   Plaintiffs,

5           v.                              20 CV 3746 (LJL)
                                            TRO Telephone Conference
6   STEVEN J. BROOKS, ET AL.,

7                   Defendants.

8   ------------------------------x
                                            New York, N.Y.
9                                           May 19, 2020
                                            4:04 p.m.
10
    Before:
11
                        HON. LEWIS J. LIMAN,
12
                                            District Judge
13
                    APPEARANCES VIA TELEPHONE
14
    SEIDEN LAW GROUP, LLP
15       Attorneys for Plaintiffs
    BY:  MICHAEL STOLPER
16       DOV B. GOLD

17  VON BRIESEN & ROPER S.C.
         Attorneys for Defendants Convergen Energy Wisconsin LLC,
18  Theodore John Hansen and Brian R. Mikkelson
    BY:  BENJAMIN LaFROMBOIS
19       WILLIAM FISCHER
         PATRICK WELLS
20       MELANIE PERSICH

21  KOHNER, MANN & KAILAS S.C.
         Attorneys for Defendants Steven J. Brooks, Gregory Merle,
22  Nianticvista Energy LLC and Riverview Energy Corporation.
    BY:  RYAN M. BILLINGS

23

24

25

# EXHIBIT 3

1          (The Court and all parties appearing telephonically)

2          THE COURT:  Good afternoon.  This is Judge Liman.  Who

3    do we have on the phone for the plaintiffs?

4          MR. STOLPER:  Good afternoon, Judge.  This is Michael

5    Stolper on behalf of the plaintiffs.

6          THE COURT:  Good afternoon.

7          And who do we have -- I know there are a lot of people

8    on the phone.  I really think I just need whoever is going to

9    be speaking.  Who do we have on for defendants?  Do we have

10   anybody for defendants?

11         MR. BILLINGS:  Good afternoon, your Honor.  This is

12   Ryan Billings from Kohner, Mann & Kailas, specially appearing

13   for Steven Brooks, Gregory Merle, Nianticvista Energy LLC and

14   Riverview Energy Corporation.

15         MR. LaFROMBOIS:  This is attorney Ben LaFrombois for

16   Convergen Energy Wisconsin, Mr. Ted Hansen and Mr. Brian

17   Mikkelson.

18         THE COURT:  Now, I heard one defense counsel say you

19   were specially appearing.  Can you explain to me what that

20   means?

21         MR. BILLINGS:  Certainly, your Honor.  None of my

22   clients have been served, and we intend to contest jurisdiction

23   and venue.  So I'm appearing solely to monitor that my clients'

24   rights are not violated without due process.

25         THE COURT REPORTER:  I'm sorry, who was just speaking?

**EXHIBIT 3**

1          MR. BILLINGS:  Sorry.  That was Ryan Billings.  I have

2     already violated your rule already.  I apologize.

3          THE COURT REPORTER:  Thank you.

4          THE COURT:  So I have in front of me the plaintiff's

5     application for a TRO and a preliminary injunction.  I'm

6     prepared to hear first from plaintiff's counsel, and then I'll

7     hear from defense counsel.

8          I would ask you, first, to speak slowly, and second,

9     to identify who you are.  Assume that I have read the papers;

10    so I don't think I need you to go through in detail everything

11    that you are saying, just the high points.

12         For plaintiff's counsel, I might tell you that one of

13    the questions that I had goes to the reach of your proposed TRO

14    and whether you need anything other than what is in (a) and

15    maybe (e).  But let me hear first from plaintiff's counsel, and

16    then I'll hear from defense counsel.

17         MR. STOLPER:  Good afternoon, your Honor.  This is

18    Michael Stolper on behalf of the plaintiffs, and we are

19    seeking, at the TRO stage, to cut off the defendant's access to

20    our electronic files, and I have the proposed order to show

21    cause up in front of me.  And I think certainly (a) is what we

22    are looking for.  I believe you had said -- was the other

23    letter that you had indicated was (e)?

24         THE COURT:  (e) for expedite discovery.

25         MR. STOLPER:  Okay.  And I apologize because I notice

# EXHIBIT 3

1    there are two (e)s.  But the first (e) with respect to

2    expedited discovery is certainly something we are looking for,

3    and also (d), where we're asking for equipment to be turned

4    over because it's our understanding that that equipment

5    contains our proprietary files.

6         And concerning -- in order to implement (a), we're

7    hoping to get (d), as we're referring to it.  And we're also

8    looking for -- affirmatively, we are looking for administrator

9    access to the Convergen e-mails and to the e-mails for the

10   Convergen Latvia entity so that we can put an end to the cyber

11   attack and put those protections in place that we articulated

12   in our papers.

13        So I think that is what we were looking for at the TRO

14   stage.  I think, as your Honor mentioned, you've read our

15   papers.  The context of the application comes within a

16   fraudulent scheme that we've articulated in our complaint and

17   in our papers.  And what we're looking for now is to cut off

18   access that the defendants never should have had, and in

19   particular, we're talking about the defendants that are on this

20   call.

21        The only defendants that are not on this call or not

22   represented on this call are those that are in Spain, and they

23   do have counsel that has responded to me.  He's in New York,

24   but he is contesting jurisdiction.  He was provided with notice

25   of today's call, but I take it that he's chosen not to

# EXHIBIT 3

1    participate in this call.

2            But everyone else, all the other defendants and in

3    particular the ones that would be impacted by the relief that

4    we are seeking, are on this call, both directly as defendants

5    and also by counsel.  And so that's what we are seeking at the

6    TRO stage.

7            I should say that we appreciate, on the plaintiffs'

8    side, the promptness and the availability of the Court today at

9    4:00 for something that we filed just this morning.  And with

10   that, I'm open to any other questions you may have.

11           THE COURT:  Yes.  Let me ask you a question about the

12   proposed relief.  You'll correct me if I'm wrong, but as I

13   understand (a), all that that would do, but it does seem to do

14   a lot, is it protects your electronic files and your

15   proprietary data or trade secrets from use by the defendants.

16   Is that right, it's limited to your electronic files and your

17   proprietary data and your trade secrets?

18           MR. STOLPER:  Correct.

19           THE COURT:  But if I go to (b) and (c), what is to

20   assure me that that account and that domain will not be

21   over-inclusive, and won't those materials include material that

22   either belongs to the defendants or is not a trade secret of

23   the plaintiff?

24           MR. STOLPER:  That's a good question.  Let me --

25   there's a very big distinction between (b), as in boy, and (c),

# EXHIBIT 3

1    as in Charlie.

2          Let me start with (b).  That's easy.  That's referring

3    to the Latvia entity, EuroenergyBiogas.com, that domain, and

4    the Office 365 account associated with that domain.  That has

5    to do with Convergen Latvia's entity.  That has nothing to do

6    with the defendant's business, the pellet plant in Wisconsin.

7          They should have never had access to that.  They had

8    no basis for having access to that, and they don't have any of

9    their information, or shouldn't have any of their information,

10   intermingled with Latvia's Office 365 account and domain.  So

11   there, there's absolutely no risk of their information coming

12   our way.  That one is very straightforward and just sort of

13   highlights sort of the egregious nature of what's taken place

14   here.

15         (c), Romanette letter (c) in our proposed order to

16   show cause, C as in Charlie, that one, ConvergenEnergy.com,

17   that Office 365 account, as I understand it, contains

18   information both of the defendant, the Wisconsin pellet plant,

19   and those on the plaintiffs' side that have a

20   ConvergenEnergy.com e-mail.  So there is some confluence there

21   under ConvergenEnergy.com.

22         So we had asked for -- prior to filing the suit, we

23   had asked for access to that account because we needed it for a

24   couple of reasons.  One, to ward off the cyber attack and to

25   see what accounts are there and what's being accessed

**EXHIBIT 3**

1    independent of the pellet plant personnel account, e-mail

2    accounts that are there, and that was denied.

3         So there, there needs to be some segregation.  Now,

4    that's complicated but that complication is by their own doing.

5    We should never be in the position that we are in today.  That

6    type of segregation should have been done prior to January 31,

7    2020.  And the reason we're in this position, as articulated in

8    our papers, is because the very person and people who were

9    responsible for plaintiffs' side, for representing the seller

10   entity and protecting seller's assets that are now part of this

11   ConvergenEnergy.com Office 365 account, are the very people

12   that were double dealing and, in particular, Mr. Brooks; the

13   defendant, Steven Brooks.

14        And so I acknowledge that that account is probably

15   complicated, but as I indicated, that's a problem of their own

16   doing.  And so we think that the Court should grant us that

17   access so that we can fix a problem that they've created, and

18   it's a problem that they've created in terms of their --

19        THE COURT:  Let me interrupt you for a second, and let

20   me just treat these separately.  Maybe you can tell me I

21   shouldn't treat them separately but they are both points with

22   respect to (c).

23        With respect to migrating the plaintiffs' e-mail and

24   data back to you and to your clients, why do you need that on

25   an emergency basis if I were to restrain the defendants from

**EXHIBIT 3**

1    accessing that information or using it during the pendency of

2    the action?

3         MR. STOLPER:  That's actually the point I was just

4    about to make.  There's two sort of points of access that we

5    have articulated in our papers.  One is access by the

6    defendants as the administrator, and if you're ordering them

7    not to access it, presumably if they follow your order, that

8    would address part of the concern.

9         The other part is that there is an unknown third-party

10   hacker who has conducted some type of cyber attack and may have

11   accessed Convergen Energy e-mail accounts that still belong to

12   us, still belong to plaintiff entities.  We don't know, and so

13   we need access, and that's what the chief information officer

14   from our side had asked for prior to the suit, in order to just

15   see what's happened and put protections in the place to prevent

16   any further attack.  And that's what we were rebuffed with.

17        So I think just telling the defendants not to access

18   this information, I don't know how practical that is, but it

19   still presents a problem from this unknown third party that's

20   presented a hack, and that's why we needed it.  We're not

21   looking to probe, at this point, into their proprietary files

22   or their e-mails.  You know, what we're trying to do is protect

23   our own at the TRO stage.

24        THE COURT:  All right.  Why don't you address (d) for

25   me.  Are you asking for that at the TRO stage?  It is, to me,

**EXHIBIT 3**

1    rather aggressive.

2         MR. STOLPER:  Well, this equipment -- it is

3    aggressive, your Honor, because it's mandatory.  It's not

4    reactive.  It's not asking them to maintain the status quo.

5    We're asking for mandatory relief, and I recognize that we're

6    doing it at the TRO stage, but the reason we're doing this is

7    they have no right to it.  They are holding onto equipment that

8    belongs to us, that contains our files, that they should have

9    returned at the end of their employment, that they didn't.  And

10   so they have no basis for holding onto it.

11        THE COURT:  I'm going to hear from defense counsel in

12   a moment, but on the assumption that there are going to be some

13   disputed issues, why do you need that, again, at the TRO stage

14   rather than at a preliminary injunction stage?  The purpose of

15   a TRO usually is to preserve the status quo, as I think about

16   it.

17        MR. STOLPER:  It is to preserve the status quo, but

18   there is law that allows us to, you know, seek what they refer

19   to as some type of mandatory relief, an affirmative step, and

20   the is the one affirmative step, aside from the administrator

21   access that we were just talking about actually handing over.

22        They can hand it over to the Court.  They don't need

23   to hand it over to us, but they have hardware that doesn't

24   belong to them that they could access and that we'd have to

25   trust them at their word that they're not deleting things on

**EXHIBIT 3**

1    there.

2         It's cell phones and laptops.  I don't know

3    forensically how much we can recreate from a cell phone.  I

4    know we can go pretty deeply on the laptop, if somebody

5    violated the order, violated an order and deleted files.  But

6    these -- as I say, these are our assets that we own.  They

7    should be turned over, taken away from the actors, from the bad

8    actors here.

9         And they've gone -- we've got in our complaint and

10   we've articulated in our papers, they took affirmative steps to

11   use cloak and dagger methods here.  Mr. Brooks communicated

12   through a Gmail account, not through his corporate account.

13   They took steps in the electronic media front to hide and cover

14   up what they'd done.

15        It would be asking a lot for all of us to then trust

16   that today that they're not going to take -- continue to take

17   steps to try to cover up what they've done.  It seems pretty

18   simple to hand over equipment that they have no business

19   holding onto, or any justification for having.  And if there's

20   concern about turning it over to us, turn it over to the Court.

21        THE COURT:  All right.  Let me hear from defense

22   counsel, unless there's anything else you want me to know.

23        MR. STOLPER:  No, no.  That's good.  Thank you, your

24   Honor.

25        MR. LaFROMBOIS:  Thank you, your Honor.  This is

**EXHIBIT 3**

1   attorney Ben LaFrombois.  I want to make note that we are

2   appearing subject to jurisdictional objections.  Depending on

3   the outcome of this hearing, that will be the next step, most

4   likely, that the Court would be hearing would be jurisdictional

5   matters regarding the case.

6       I would like to be responsive and concise.  I'd like

7   to make just a few points to the Court.  One, the data and

8   product, the assets that are being requested were transferred

9   to Convergen Wisconsin in the transaction that occurred

10  January 31, 2020.  The transaction occurred arising from

11  negotiations and involvement of -- between Libra and Steve

12  Brooks and others.

13      Mr. Fidel Andueza is an employee, the chief investment

14  officer, of Libra, and plaintiffs' counsel referred to e-mail,

15  an e-mail account that was used.  Well, the e-mail account was

16  used at the request of the employee of Libra, who was fully

17  aware of the structure of this transaction.  And the fanciful

18  case of fraud is exactly that.

19      I want to point out to the Court that there really is

20  no emergency here, and the plaintiffs have failed to disclose

21  that there is an emergency.  This transaction closed on

22  January 31.  In the plaintiffs' complaint you will see that

23  they allege there that they became aware of this fraud the day

24  after, in contrast to the supporting documents submitted to the

25  Court today, where they say that they became aware sometime in

**EXHIBIT 3**

1  April.  I think we have a very significant factual discrepancy

2  within the plaintiffs' pleadings.

3          So back to the acquisition agreement.  In that

4  acquisition agreement there's six pages that addresses the

5  transfer of intellectual property.  Prior to the sale of -- the

6  transfer of the company and the sale of the assets, Libra had

7  unfettered and unrestricted access to this intellectual

8  property that now they would like to acquire today under

9  so-called emergency.  And the true value to them is shown by

10  the fact that they didn't acquire it prior to the close of the

11  transaction.

12          So other events have arisen, and I think this whole

13  question of fraud is rather spurious.  And as we litigate this

14  matter, the truth will come forward.

15          The Court should be aware also, you know, today's

16  motion was brought on four hours' notice.  Similarly, a week

17  ago yesterday we received a demand from plaintiffs' counsel

18  explaining that if they didn't receive the remedy that is

19  sought in the complaint filed in Federal Court, that they would

20  file a state court claim.

21          Now, we responded by filing a declaratory judgment

22  action in the State of Wisconsin, Brown County, and we filed --

23  each of these cases were filed, I would imagine, within hours

24  of each other this past Thursday.  And so then here we are,

25  probably essentially starting discovery, which because no

# EXHIBIT 3

1  emergency has been established, probably what they're looking

2  for, I would suggest to this Court.

3      To get into the (a) and (b), the questions the Court

4  is asking, we have two datasets.  Interesting discussion on

5  what we call the Latvian e-mails or the Euroenergy Biogas

6  e-mails.  We, at Convergen, have no desire to retain those.  In

7  fact, some time ago we started the process to transfer them.

8      I'm not going to take time today to go through the

9  technical aspects of that, but we've been working with our

10  normal, third-party IT consultant to makes sure those e-mails

11  were and are transferred out.  There was a delay -- I shouldn't

12  say a delay.  The process required a new domain name to be

13  established.  My understanding is that that has been and that

14  the migration is scheduled to take place in the next day or

15  two.  And so with respect to that aspect of the data, we have

16  no desire to keep it and are willingly transferring it.

17      Certainly there is no need to bring a motion to

18  acquire that.  My understanding is the communication has been

19  consistent as to how, what that process is going to be and how

20  it's running.  And so from our point of view, that within a day

21  or two will be a moot point.

22      With respect to the broader set of data, this is the

23  data that was transferred at the sale January 31, and it

24  includes very sensitive --

25      THE COURT:  Are you now talking about all of the data

**EXHIBIT 3**

1    that is in the ConvergenEnergy.com Office 365 account?

2              MR. LaFROMBOIS:  Yes, sir.

3              THE COURT:  Okay.  Thank you.

4              MR. LaFROMBOIS:  So there is, as anybody can imagine,

5    when you buy a company and substantially all of the assets of

6    the company, all of the intellectual property comes with it.

7    And inside the database of the e-mail is -- the e-mail and

8    attachments, are probably -- all of these most likely, nearly

9    all of the intellectual property of the company.  That if

10   somebody acquired all of those e-mails, they certainly could be

11   a fierce competitor to Convergen Energy Wisconsin.

12              And that's the subject of the complaint that was filed

13   in Wisconsin.  It's the subject of the complaint filed in the

14   Southern District of New York, and there is no emergency.  So

15   we need to use the legal process in a reasonable way, not in a

16   way that says this is a fire that we need to put out.  It's

17   really not.  And we have an opportunity to have that litigated,

18   for the parties to determine their respective rights, and we're

19   looking forward to doing that.

20              With respect to this order, today what we request is

21   that the Court deny the temporary restraining order.  They'll

22   get part of their remedy regardless because of the Latvian

23   e-mails being transferred in the very near future.

24              And then these issues, because they are complicated

25   and there's multiple agreements and we see factual

EXHIBIT 3

1    inconsistencies in the plaintiffs' pleadings, that we would

2    request two weeks to brief this issue and would hold and

3    request a hearing because there's a factual question whether

4    there's an emergency, and then there are factual questions of

5    what is the basis for their request.

6         THE COURT:  Let me ask you a couple of questions.  I

7    noticed that you did not address (a), and I do need to think

8    about balance of hardships.  Is there any hardship to you with

9    respect to an order that you not access, disclose, copy or

10   convey plaintiffs' electronic files, or engage in activity that

11   uses plaintiffs' proprietary data or trade secrets?

12        I mean, there may ultimately be a fact issue down the

13   line as to what belongs to plaintiff and what doesn't.  But are

14   you really going to suffer any hardship from an order that goes

15   to (a)?

16        MR. LaFROMBOIS:  Yes, your Honor.  Your Honor, I think

17   the issue with (a) is that it's a narrow -- to think about this

18   narrowly, we fully intend to retain the data as it is today.

19   I'm not saying today to suggest that there has been any

20   manipulation of the data.  The dataset is what it is.  The

21   company was bought.  It continued to use the same system going

22   forward, and they would intend to do so.

23        But as far as purging or modifying or in any way

24   compromising the data so that an accurate picture of what has

25   occurred between all of the parties can be discovered and

# EXHIBIT 3

1  discerned, we have no objection to that.

2       Getting into questions of use, of whose property is

3  what gets into a very complicated question.  Maybe we

4  achieve -- I would suggest to the Court that we achieve what we

5  need to if we had a very narrow order or agreement that the

6  data would not be deleted, purged or modified outside the

7  normal course.  Beyond --

8       THE COURT:  Don't they also have a right to -- if it's

9  their data, aren't they entitled to know that your client's not

10 going to be disclosing it or using it, or engaging in activity

11 that uses it?

12      MR. LaFROMBOIS:  Well, we certainly won't knowingly do

13 that.  We wouldn't knowingly do that, but they're asserting

14 that they own data that we would assert that they do not.  So

15 we get into a factual conundrum.  If we're working with a

16 vendor and we need to disclose to that vendor certain

17 specifications that they claim is their data, but that's in the

18 normal course of business.

19      I think it would be an overbroad order at this point,

20 but we would -- hard to believe, in a temporary restraining

21 order, that we should be -- it would almost effectually cause

22 us to -- put a real chilling effect on our business.

23      And the data, from our point of view, should be just

24 retained so that it can, in the normal course and through the

25 judicial process, be discerned what is the truth here.  I don't

**EXHIBIT 3**

1    see an emergency.  Even if they did have such an interest, what

2    is the emergency in requiring that order today?  There's no

3    allegation that we have disclosed this to a third party

4    inappropriately or in any way.  There's just no showing of

5    that.

6              THE COURT:  What do you say about the risk of a cyber

7    attack on the entity?

8              MR. LaFROMBOIS:  My understanding, your Honor, was

9    that there was a cyber attack to their Latvian organization.

10   In response to that, they quickly moved their e-mail accounts

11   to Convergen to protect them.  So it's another element of the

12   story.

13             We've had an operating agreement where Convergen has

14   really been helping manage one of the Libra companies, and so

15   the e-mails they're requesting back, my understanding is

16   they're really brought over to Convergen to protect them.  So

17   there's been a significant change of perspective on their part

18   in the better part of a month regarding whether they're safe or

19   not.

20             In today's digital trail, everything is going to be --

21   whatever they do is going to be discoverable.  There's no

22   interest on our part to somehow use this data inappropriately.

23   So from our point of view, we, just a little over a month ago,

24   were used as a safe harbor for these e-mails.  It's just taken

25   a month to get them transferred back out so that they can

# EXHIBIT 3

1    respond.

2        I don't believe there's any allegation that the

3    setting of those e-mails at this point in time are at risk of

4    some type of cyber attack.  And as I said, the e-mails are set

5    to be moved, migrated out to the new domain name as early as

6    tomorrow.

7        THE COURT:  You made a suggestion about when we would

8    have a hearing, and I can't read my notes on that.  What did

9    you say?

10        MR. LaFROMBOIS:  Two weeks, your Honor.

11        THE COURT:  Let me turn back to plaintiffs' counsel.

12        What is your evidence that there is a risk that

13    defendants will use or disclose your electronic files or your

14    proprietary data?

15        There is something to the defendants' point that

16    you've known that they've had this data for quite some time.

17        MR. STOLPER:  Actually, no, your Honor.  I'm glad you

18    raised that.  I wanted to clear that up.

19        And for the court reporter, this is Michael Stolper on

20    behalf of the plaintiffs.

21        When counsel mentioned dates, I don't know if this was

22    intentionally -- if it was done intentionally to confuse you,

23    but our complaint made it clear that we found out about the

24    fraud around February 1, shortly after the closing on the

25    transaction.  We didn't find out about the data breach until

**EXHIBIT 3**

1    mid to late April, when we started reaching out, and that was

2    in response to a cyber attack.  So those two dates are two

3    different things.

4            So there could be absolutely no accusation that we sat

5    on our hands somehow and that there isn't an emergency.  I

6    mean, it's pretty black letter law, especially in this circuit.

7    If somebody has access to somebody else's electronic files,

8    e-mails, data storage or otherwise, that's a problem.  That's

9    an emergency.  They have our data on their phones, on their

10   laptops, and they have access to it through this administrator

11   access.

12           So you asked me the question of what evidence do I

13   have?  They used our data secretly to raise money to buy a

14   business secretly and covertly to double deal, you know, at a

15   price that's at least $10 million less than what it's worth.

16   So they took our data already.  That's what we've complained

17   about.

18           They took our data and they used it to, as part of

19   this fraudulent scheme, and then when we asked for the data

20   back -- data that when we raised the issue in April,

21   particularly with Latvia, because Latvia has nothing to do with

22   their business in Wisconsin.  And when we asked for it back,

23   they didn't give it to us.

24           Now, they have no reason not to give it to us unless

25   there's something to hide, but in terms of what evidence we

**EXHIBIT 3**

1  have, it's all in the complaint; it's all in that affidavit

2  from Phaedra, our client, articulating all that they did as

3  part of disclosing our data to perpetuate their scheme.

4  They're continuing to do it.

5          And counsel indicated that this fraud claim is

6  spurious, but we have a recorded confession that we've quoted

7  in our complaint, and that's also referenced in our client

8  declaration, from Mr. Brooks, the man who orchestrated it.

9          And what counsel says to you, your Honor, part of

10  their defense is Libra knew, but the problem with that

11  statement is that Libra, here in this case, is in the form of

12  Mr. Brooks.  That's the person who was trusted with carrying

13  this out on behalf of Libra, but it turns out he was

14  compromised, unbeknownst to everybody else at Libra.

15          So we do have an emergency.  We do need relief today,

16  and I think that what we've articulated in (a) -- certainly

17  what counsel was doing was conflating (b) and (c), because (b)

18  is Latvia and (c) is Convergen.

19          THE COURT:  So would you tell me what parts of the

20  declaration you want me to focus on in terms of when you

21  learned about the use and the risk of misuse?

22          MR. STOLPER:  Sure.  There is a -- are you asking for

23  a particular paragraph number?

24          THE COURT:  Yes.  I've now got the emergency

25  declaration of Phaedra -- I can't pronounce it.

**EXHIBIT 3**

K5JPCONO

1     MR. STOLPER:  Chrousos.  I may have said it wrong, but

2  she's not on the line to correct me.  It is -- I'll give you

3  the exact paragraph number.  I'm just scrolling through.  Here,

4  it's on paragraph 9.  It talks about when we found out about

5  the unlawful access that was triggered by the cyber attack.

6     And the fraudulent scheme, the disclosure of the

7  fraudulent scheme is articulated in the paragraphs that

8  preceded that.  And it talks about finding out in paragraph 6,

9  7 and 8.  But the scheme is laid out in greater detail in the

10  complaint.

11     This declaration was intended to articulate why we

12  needed this emergency relief, and that's really triggered by

13  what we learned in April, and that's starting at paragraph 9

14  under the heading, Cyber Tech Uncovered Defendants' Unlawful

15  Access.

16     THE COURT:  Okay.  Give me one moment, counsel --

17     MR. STOLPER:  Sure.

18     THE COURT:  -- to review this.

19     (Pause)

20     MR. BILLINGS:  While you're doing that, your Honor,

21  this is Ryan Billings, I just want to note I'd like to be heard

22  on behalf of the defendants that I represent.

23     THE COURT:  Okay.  You will be.  Just give me a

24  moment.

25     MR. BILLINGS:  Thank you, your Honor.

**EXHIBIT 3**

1          (Pause)

2          THE COURT:  So you'll have to correct me if I'm wrong

3     with respect to this, but the way that I read paragraphs 9

4     through 14 is that that's how you discovered that they had your

5     information.  It doesn't contain evidence with respect to their

6     misuse of your information.

7          MR. STOLPER:  The misuse of the information comes from

8     the complaint, where we talk about how they used our

9     information to conduct this fraudulent scheme, but in this

10    declaration, it also, in the subsequent paragraphs, where their

11    efforts -- where it talks about the efforts to deny access for

12    no reason, and then it talks about the failure to return

13    equipment even though the equipment was promised, that's in

14    the -- let me see here.

15         This was in paragraphs -- yes, in paragraphs 15 on

16    talks about all of the sort of obfuscating that was going on,

17    and then the equipment, the, yes, we'll turn over the equipment

18    and then not turning over the equipment, all that conduct --

19    you know, the inference from that conduct is there's a coverup

20    here and there's mal intent going on.

21         I mean, I don't have -- at least not yet, I don't have

22    an e-mail that shows that last week they sent our data off to

23    some third party or they're using it to price something to hurt

24    us.  I wouldn't have that visibility, nor is that the burden or

25    the standard I'm up against.  What we've articulated is a

**EXHIBIT 3**

1    fraudulent scheme that they did, in part, by using our data

2    that they shouldn't have had and by sharing it with third

3    parties, the Spanish investors, the prospective purchasers of

4    the business who ultimately purchased the business, that's

5    defendant Merle, Greg Merle who's represented on this call.

6         These are people who are all given insider access to

7    information based d on double-dealing executives, three of

8    them, and so that's what's articulated in the complaint and

9    referenced in summary fashion in this declaration.

10        And then in this declaration we talk about now that

11   they've been caught, how have they behaved in response to that?

12   And all of that paints a very, very negative picture of what

13   they've done, what they're trying to do.  And the Latvian

14   e-mails are really the best example of that because counsel is

15   talking about transferring tomorrow, but in this declaration we

16   point out that they've been proposing this transfer.  But why

17   the transfer?  It isn't really giving us what we need.  Those

18   are our files.

19        Transferring it to another domain cuts off the history

20   of those files and the electronic fingerprints associated with

21   those files.  It's like they stole the car, but they want to

22   give me back the bumper.  You know, they're not giving me back

23   my car, and so -- and they're saying, well, we're going to

24   transfer the wheels or we'll give you some parts.  But I need

25   the whole car, and I need to look at where this car has been.

# EXHIBIT 3

1    I need my car back, and that's not what they're giving us.

2         And they were proposing that through stall tactics

3    over the last couple of weeks, and in our declaration we point

4    out that that -- we explained to them why that wasn't

5    acceptable, but yet, to you, now that we've called them on it,

6    they're trying to put that up as somehow that that's

7    satisfactory but it's not.

8         THE COURT:  Okay.  Let me hear from Mr. Billings.

9         MR. BILLINGS:  Thank you, your Honor.  I don't want to

10   repeat anything that Mr. LaFrombois said, but I do want to make

11   four very quick points.

12        The first is that it is plaintiffs' burden on this

13   motion, under Rule 65(b)(1)(B), to set forth specific facts in

14   an affidavit that clearly show that immediate irreparable

15   injury will result before defendants can be heard.  The only

16   evidence put forth before the Court is the declaration of Ms.

17   Chrousos.

18        Allegations in the complaint are just that.  They are

19   not facts; so only the declaration is evidentiary.  And it's

20   very clearly not based on personal knowledge.  Ms. Chrousos

21   doesn't even infer that it's under personal knowledge.  It's

22   littered with hearsay, double hearsay, speculation, conjecture,

23   conclusory statements.  It provides no basis to establish that,

24   as a chief strategy officer, not an IT person, she has any

25   background to confidently testify as to the IT risk posed by

**EXHIBIT 3**

1    the status quo.

2          With respect to the records and who owns what, that is

3    set forth in the sale documents, which the plaintiffs have not

4    put before the Court.  As Mr. LaFrombois said, there are six

5    pages in those documents that govern who owns what and that's

6    not before your Honor.  They're asking for this relief without

7    putting forth the documents that establish the ownership

8    rights.  So that's point No. 1.  There is no specific evidence,

9    based on personal knowledge, that is competent before this

10   Court to establish irreparable injury.

11         The second point is that granting the order, in terms

12   of balancing the hardships, would cause irreparable harm to our

13   clients.  The order to show cause is vastly overbroad, and I

14   think your Honor picked up on this.  Gaining administrative

15   access to Convergen Wisconsin's Office 365 account would give

16   plaintiff control over all e-mails of Convergen Wisconsin,

17   including e-mails after the sale, such as privileged

18   communications between client and counsel about this lawsuit.

19   Obviously, that can't be turned over.

20         And just as plaintiffs allege that the e-mail

21   communications of Convergen Wisconsin prior to the sale involve

22   trade secrets and highly sensitive information, so too do the

23   communications after the sale.  And the rights to these e-mails

24   are establishing contracts that plaintiffs did not provide to

25   the Court or describe.

# EXHIBIT 3

1        Another specific element to Mr. Brooks is that if you

2   look at what devices they're asking to be turned over, the

3   order is vague on that point.  They say devices that have been

4   used in the course of employment.  Does that mean ever?  A

5   personal cell phone that took one call, does Mr. Brooks have to

6   turn over?  Because in Ms. Chrousos' affidavit there's an

7   iPhone 11 mentioned, which is Mr. Brooks' personal phone.  The

8   plaintiffs have no claim of right to that whatsoever.

9        The iPhone 8 that they describe is in Mr. Brooks'

10  New York apartment.  He's in Connecticut sheltering in place.

11  He would have to travel to New York to pick up the phone and

12  breach quarantine.  He lives with his elderly mother, who's an

13  at-risk person.  There's no reason to do that.

14       The third point is that there are threshold

15  jurisdictional and venue issues here.  There are many documents

16  associated with the sale.  At least two of the documents

17  have -- agreements have mandatory arbitration clauses.  At

18  least two of the agreements provide for exclusive jurisdiction

19  in Wisconsin, and in addition, there are questions of personal

20  jurisdiction and over two Spanish nationals and Spanish

21  entities who invested in the sale and whose rights would be

22  impacted by any TRO.

23       And lastly, the plaintiffs' motion papers don't

24  address the bond required under Federal Rule of Civil Procedure

25  65(c):  No TRO or preliminary injunction can be granted unless

# EXHIBIT 3

1    a security in an amount the Court considers proper to pay the

2    costs and damages sustained by any party found to have been

3    wrongfully enjoined or restrained is posted.  Plaintiffs don't

4    address that at all.

5            And these are just the four points that came up in the

6    two hours since I represented -- been retained by two of my

7    clients.  The overall point is this is incredibly complicated.

8    The parties are a mile apart on the facts, and the Court

9    deserves to hear from both sides fully in briefing before any

10   decision is made.

11           THE COURT:  Thank you very much.  I'm going to ask all

12   of the parties to hold on for a moment while I consider the

13   papers.  It will give the court reporter a break, and I also

14   want to consult with my chambers staff.  So why don't you all

15   hold for a moment.

16           (Pause)

17           THE COURT:  Good afternoon again.  This is Judge

18   Liman.  So I've got a question for defense counsel, and then

19   I'll turn back to plaintiffs' counsel.  It's with respect to

20   (b) of the TRO, with respect to the EuroenergyBiogas.com Office

21   365 accounts and domain.

22           Did you tell me that your client is in the process of

23   doing exactly what is requested in (b)?

24           MR. BILLINGS:  This is Ryan Billings.  That was a

25   statement by Mr. LaFrombois.  I believe he might be on might

**EXHIBIT 3**

1  mute.  But yes, it is in process and we understand it will be

2  completed in a day or two.

3          THE COURT:  Okay.  And --

4          MR. LaFROMBOIS:  This is attorney Ben LaFrombois.  I'm

5  sorry, if I may.  I was talking.  I had my phone on mute to be

6  respectful of the Court.

7          The answer is yes, as Ryan pointed out.  I do believe

8  that, technically speaking, that was an allegation raised from

9  the plaintiff that these would not be the complete accounts and

10  the complete information on these accounts.  My understanding

11  is that it would be.  Now, that may be a technical question, if

12  the Court deems it appropriate to dig into that question.  But

13  we have no interest in this data, and we would just as soon not

14  have it in our possession, and that is in the process of being

15  transferred as early as tomorrow.

16          THE COURT:  Let me turn back to the plaintiff.  Is it,

17  in fact, consistent with your understanding?

18          MR. STOLPER:  No, your Honor.  At paragraph 18 of the

19  Chrousos declaration, the one I was referring to earlier, and

20  it enumerates why this proposed transfer is insufficient, and

21  that's why we included that in our application.  If it were

22  sufficient and it were fine, we wouldn't have an issue with it.

23          We have plenty to -- we have plenty in our complaint.

24  We don't need to add allegations and claims if unnecessary, but

25  in this instance, what they're proposing was unsatisfactory to

**EXHIBIT 3**

1     my clients, to their IT personnel, who are certainly more

2     well-versed than I am in the technicalities of what they were

3     proposing, which is why she wrote what she wrote here in this

4     statement.

5          THE COURT:  And let me tell you what --

6          MR. LaFROMBOIS:  This is attorney Ben LaFrombois.  May

7     I respond, your Honor?

8          THE COURT:  Yes.

9          MR. LaFROMBOIS:  The issue of why these accounts need

10    to be moved into a separate domain is because within the

11    Convergen Energy account, we kind of distinguish between

12    administrator rights for the Latvian accounts and administrator

13    rights for all of the other Convergen accounts.

14          So to give access to the Latvian accounts means you

15    have access to all of the intellectual property whose ownership

16    is in dispute here; so those two can't be divided.  The way to

17    divide it is to take the new domain name, which has been

18    created, and transfer those Latvian accounts out.

19          So to give administrator rights for the Latvian

20    accounts is just the back door -- actually, it's the front door

21    to all the other e-mail accounts that are in dispute.

22          THE COURT:  Okay.  I think I understand the

23    disagreement between the parties.  Let me tell you what I'd

24    like to do, and my hope is that the defendants will consent to

25    this because it's only going to be short term, for two weeks.

**EXHIBIT 3**

1        But it seems to me, without addressing everything in

2   the order to show cause, that with respect to (a), the

3   plaintiffs are entitled to that, and the defendants are not

4   going to suffer any prejudice from that.  There will be a time

5   period for sorting out what actually is plaintiffs' and what

6   actually is defendants'.

7        If the defendants were to knowingly access and use or

8   disclose plaintiffs' electronic files, that would be wrong, and

9   the plaintiffs are entitled to an order of the Court with

10  respect to (a).

11       With respect to (b), these are complicated issues, and

12  it seems to me that the right answer is that for the two-week

13  period of the TRO, that the order that I should enter, it's not

14  quite what the plaintiffs want me to do or what the defendants

15  want me to do.  It would be an order that would prevent the

16  defendants from accessing, disclosing, copying or otherwise

17  using, destroying or impairing any of the data in the

18  EuroenergyBiogas.com Office 365 accounts or in the

19  EuroenergyBiogas.com domain, or in any way preventing the

20  plaintiffs from ultimately being able to acquire the administer

21  rights.

22       So in other words, what I'm asking for is a standstill

23  with respect to (b), but that if it is determined ultimately,

24  at a preliminary injunction hearing, that the plaintiffs are

25  entitled that it's requested in (b), that can be given.  If

# EXHIBIT 3

1    they're not entitled to it, the defendants will not be any the

2    worse off because the defendants have said they don't want any

3    of that data and that information.

4            With respect to (c), I would just enter an order that

5    would restrain the defendants, in any way, from destroying,

6    deleting, altering, or making any changes to any of the

7    historical e-mails, data, audit logs, or any other data or

8    e-mails that belong to the plaintiffs, and that would restrain

9    the plaintiffs from viewing the e-mails and data, period,

10   period.  In other words, the defendants can't destroy, delete

11   or the like any of the data that belongs to the plaintiffs on

12   the Office 365 account.

13           With respect to (d), the defendants would be ordered

14   to retain all of the computer, cells phones and other hardware

15   utilized during their employment with respective plaintiff

16   entities, and not to delete or destroy or alter any of the data

17   that belongs to plaintiff on those computers, cell phones and

18   hardware.

19           With respect to (e), it seems to me that it does make

20   sense for there to be expedited discovery and for us to have a

21   hearing in two weeks' time, if that's what the parties want.  I

22   can set aside time two weeks from today, or you might decide

23   that you can live with this restraining order for a little bit

24   longer and you want a little bit more time to do discovery.

25   What I would ask is for the parties to meet and confer with

# EXHIBIT 3

1   respect to how much time they need, if they need time, more

2   time beyond the two weeks.  Period, that's it.

3       Let me address defendants.  Why shouldn't I enter an

4   order to that effect, and are you comfortable with it,

5   recognizing you don't want it, you don't want any order?

6       MR. LaFROMBOIS:  Your Honor, I would -- recognizing

7   that we would not want any order, to be clear, with respect to

8   (b), that my understanding is the EuroenergyBiogas.com account

9   is now established, that your order would permit us to provide

10  the administrator rights to that account and not retain any

11  rights to it, if that would be permitted?

12      THE COURT:  I think with respect to that -- and it's

13  useful clarification -- you can provide the administrator

14  rights with the consent of the plaintiffs.  So if all of you

15  agree that what you are providing is what the plaintiffs want,

16  just having the effect of eliminating a trail of information,

17  or giving the plaintiffs the hubcaps and not the car, to use

18  the plaintiffs' analogy, and plaintiffs object, then you're not

19  going to do that.  You're just going to have a standstill and

20  we can sort it all out in two weeks.

21      MR. LaFROMBOIS:  Other than that clarification, your

22  Honor, that was the clarification that I was seeking as I was

23  listening to your proposed order.

24      THE COURT:  Okay.  Let me turn to Mr. Billings.  Do

25  you have something to say?  Then I'm going to turn to

**EXHIBIT 3**

K5JPCONO

1    plaintiffs' counsel.

2         MR. BILLINGS:  Thank you, your Honor.  And, you know,

3    I think that everybody, plaintiffs and defendants, have been

4    under a preservation obligation since they reasonably

5    anticipated suit.  So I'm not certain that we necessarily need

6    an injunction to establish that; it attaches by operation of

7    law.

8         My only concern is that there's a disagreement on (a)

9    between the parties as to what belongs to the plaintiffs and

10   what doesn't.  And for instance, let's say that to continue to

11   operate the business they bought, one, a party needs to look at

12   an e-mail from January 30th of 2020 or a contract signed on

13   January 4th of 2020, I don't want to suddenly run afoul of the

14   Court order in the course of normal operations of the business.

15   That's the only ambiguity I'm concerned about.

16        Otherwise, being in the same position as Mr.

17   LaFrombois, I don't want any order, but I guess I can live with

18   one along those lines.

19        THE COURT:  Well, listen, with respect to that, I

20   understand there may be disagreements on the margin, and if

21   there's a disagreement in the margin and it can't wait two

22   weeks to bring it to the Court, you're going to bring it to the

23   Court earlier, or else you'll proceed at your own peril.

24        Let me turn to plaintiffs' counsel.

25        MR. STOLPER:  Thank you, your Honor.  This is Michael

**EXHIBIT 3**

1  Stolper on behalf of the plaintiffs and I, as the recipient of

2  your proposed order, I'm appreciative of it.  And I have only

3  two comments or two concerns with two pieces of it.

4       One has to do with audit logs that are referenced in

5  the order, in our proposed order to showcase, and also in the

6  declaration.  My understanding is that audit logs are sort of

7  the electronic fingerprints of what's transpired with respect

8  to an Office 365 account, and they have -- audit logs are

9  maintained for a set period of time, and there's usually a

10  default period of time for those things to remain in place.

11       What we would ask for is that the audit logs -- and

12  they control the administrator rights, you need the

13  administrator rights to modify the period in which the audit

14  logs are maintained.  We'd like, as part of your order, to

15  instruct the defendants that are in control of the

16  administrator rights of the various accounts that are in issue,

17  that they extend the audit logs for as long as possible under

18  the Office 365 platform.  That was one issue, your Honor.

19       The second is my concern about the cyber attacks.  So

20  if we put everything on hold for two weeks with respect to the

21  Latvia account, my understanding is that transferring what the

22  defendants had proposed about creating this new domain and

23  giving us administrator rights to this new account, to which

24  our old files would be transferred, my understanding is that

25  that will not forestall or protect us against cyber attacks and

**EXHIBIT 3**

1  now if we're talking about a two-week period.

2       So I think we have exposure under what's being

3  proposed.  Even if we were to consent to it offline with

4  counsel, and they said, over the next two weeks, why don't we

5  just do this transfer and to the extent you have issues, we'll

6  deal with it in two weeks at a hearing, that would be fine

7  except I think that also leaves us exposed to cyber attack,

8  which is some of the relief that we're seeking.

9       I have no problem if -- if the only objection that is

10  heard is -- because this is Latvia.  This has nothing to do

11  with the Wisconsin plant.  If the issue is that access to

12  Latvia somehow gives, whomever is given access to Latvia, some

13  visibility into the defendant's files on a going concern, then

14  we have no problem putting it in the hands of a third party,

15  you know, computer consultant to execute what's instructed.  In

16  other words, to put whatever protections are in place, do

17  whatever transfers of our data and our files, you know, have a

18  third party do it so that we don't have visibility into what

19  they're concerned about.  But let's not lose sight of the fact

20  that for Latvia, these are our files, our assets, and they have

21  no rights to them.

22       THE COURT:  With respect to the second point, it very

23  well may make sense for two of you, after this conference is

24  over and in the next couple of days, to have a conversation

25  about whether there is a way to accommodate your respective

**EXHIBIT 3**

K5JPCONO

1    interests.  And I'm sure that the defendants don't have a

2    desire to be in possession of information that may be the

3    subject of a cyber attack for which they might have liability

4    if they permit the cyber attack and that is of no value to

5    them.

6        So I don't think today I can sort out the technical

7    issues that you've raised.  In fact, I know I can't.  I might

8    be able to and will sort them out in two weeks' time, if I have

9    to, but you may be better off if you are able to work that out

10   yourselves.

11       With respect to the audit logs, from the defendants'

12   perspective, I would think that you would have to do something

13   like that anyway in terms of document preservation.  So any

14   objection to that being part of the order?

15       MR. LaFROMBOIS:  Your Honor, we think that there's

16   good reason to meet and confer on these technical issues, and

17   there is a third-party consultant that's addressing this matter

18   for us.  So I think it would helpful to have that meeting to

19   confer with counsel on the technical issues.  This is attorney

20   Ben LaFrombois.

21       THE COURT:  For defense counsel, do you have an

22   objection to including in the order that you will instruct the

23   administrator to extend the audit logs for as far as possible

24   so as to retain the record of activity within the accounts?

25       MR. LaFROMBOIS:  We have no objection to giving that

**EXHIBIT 3**

1    instruction to our consultant.

2         THE COURT:  All right.  So, listen, I'm going to talk

3    about scheduling in a moment, but we are going to enter a

4    revised TRO that will attempt to capture what I have just laid

5    out.  What I may ask the two of you to do is to meet and confer

6    and see if it is clear and if you would suggest any revisions,

7    but you have the gist of my thinking and you'll have it in the

8    TRO that I'm going to issue.  The TRO will be effective, but

9    I'll also entertain an application to revise it to make it

10   clearer.

11        With respect to, did you all want a hearing in two

12   weeks' time?

13        MR. STOLPER:  Yes, your Honor.  This is Michael

14   Stolper on behalf of the plaintiffs.  The answer would be yes.

15        THE COURT:  That is June 2nd, and I'm just looking at

16   my calendar.  We can do it June 2nd at 2:00 p.m.  It will be

17   done remotely, either telephonically or with video, and I'm not

18   sure yet.  I'll entertain suggestions by the parties as to how

19   they want to do it, and I'm also going to permit expedited

20   discovery.

21        With respect to briefing on the application for the

22   preliminary injunction, I would like it to be completed by

23   May 29th.  Then I've got the weekend with the papers.  Why

24   don't you meet and confer with respect to a schedule for papers

25   on a preliminary injunction.  If you're not able to come up

**EXHIBIT 3**

1  with a joint proposal, you can each make separate proposals.  I

2  think for some order around this, why don't you make the

3  proposals by Thursday at 5:00 p.m.

4          MR. STOLPER:  That sounds like a reasonable plan, your

5  Honor.

6          In terms of a schedule –– this is Michael Stolper on

7  behalf of the plaintiffs.  I just wanted to mention, your

8  Honor, that I welcome the meet-and-confer concept to try to

9  work through some of these technical issues.  What I just want

10  to do, the Court's been gracious with it's time so far and its

11  availability.  I don't want to offend the Court's sensibility.

12          If, for some reason, that we're unable to, and I don't

13  want to jinx us, but if we are unable to work through the

14  concerns I have about a cyber attack, pending our June 2nd

15  conference, I just want the ability to come back to the Court

16  if we do need some type of relief that we couldn't work out on

17  our own prior to June 2nd.

18          THE COURT:  That's okay.

19          MR. STOLPER:  Thank you, your Honor.

20          THE COURT:  You've got that permission.

21          MR. STOLPER:  Thank you.

22          THE COURT:  Anything else from defense counsel?

23          MR. BILLINGS:  Your Honor, this is Ryan Billings.  My

24  only, I guess, caveat is that none of my clients have been

25  served yet, and so we're not even in this lawsuit.  So we will

**EXHIBIT 3**

1   do our best to incorporate ourselves into this plan, but it's

2   going to be a little bit complicated for us; so we'd appreciate

3   your Honor's patience in sorting out that issue.

4          MR. STOLPER:  I thought you had waived service, Ryan,

5   and you were just looking for a waiver form from us.  Are you

6   withdrawing that?  Because I thought you said you did want

7   service.  We had process served everyone else, but you had said

8   in your e-mail to me, you said that you were agreeing to a

9   waiver, that we didn't have to deal with process servers, and

10  so we pulled back the process server from serving your client

11  based on that e-mail.  Are you changing your position?

12         MR. BILLINGS:  My position was and remains that I will

13  sign an FRCP4(d) waiver, if you send it to me, and then we'll

14  go from there.

15         MR. STOLPER:  That's what we'll do.

16         MR. BILLINGS:  Thank you.

17         THE COURT:  Okay.  Good.  Listen, if there are good

18  objections to my jurisdiction, I am sure I will hear that from

19  the parties.

20         MR. BILLINGS:  Thank you, your Honor.

21         THE COURT:  All right.  Thank you, everybody.

22         Thank you to the court reporter.

23         Let me ask, before we all get off the phone, since

24  this is the plaintiffs' application, for the plaintiff to order

25  a copy of this transcript on an expedited basis, and if you've

# EXHIBIT 3

1 | got questions about how to do that, you can stay on with the

2 | court reporter after I hang up from this call.

3 | MR. STOLPER:  Thank you, your Honor.  Will do.

4 | THE COURT:  Thank you, all.

5 | (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 3**