## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

---

CONVERGEN ENERGY LLC, et al.,

        Plaintiffs,

v.

STEVEN J. BROOKS, et al.,

        Defendants.

CASE NO.: 1:20-CV-03746 (LJL)

---

## SPECIALLY APPEARING DEFENDANTS' BRIEF
## IN SUPPORT OF MOTION TO DISMISS

---

Ryan. M. Billings
S.D.N.Y. Bar No. RB0378
Kohner, Mann & Kailas, S.C.
4650 N. Port Washington Road
Milwaukee, WI 53212

*Attorneys for Steven J. Brooks,*
*Gregory Merle, NianticVista Energy, LLC,*
*and Riverview Energy Corporation*

Benjamin LaFrombois, P.H.V.
William E. Fischer, P.H.V.
Von Briesen & Roper, s.c.
2905 Universal Street, Suite 2
Oshkosh, WI 54094

*Attorneys for Convergen Energy WI,*
*LLC, Theodore J. Hansen and*
*Brian R. Mikkelson*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION……………………………………………………………………...1

ALLEGED FACTS…………………………………………………………………...2

    A.    The Parties and Related Entities. ………………………………………….2

        1.    Plaintiffs and related parties. ……………………………………….2

        2.    Defendants and related parties. ……………………………………..3

    B.    The Complaint Alleges Fraud, Breaches of Fiduciary Duty and Theft of Intellectual Property, Primarily Against Brooks. …………………………….4

        1.    The purported "fraud." ………………………………………………5

        2.    The alleged breaches of fiduciary duty. ……………………………..6

        3.    Alleged wrongdoing concerning Plaintiffs' intellectual property. ………...6

    C.    The Complaint Makes Only Passing Reference to Riverview, and Only a Handful of Non-Conclusory Allegations Concerning Mikkelson, Hansen and the Post-Sale Conduct of Convergen Energy WI. …………………………………………..7

        1.    The Complaint makes no specific allegation of wrongdoing against Riverview. ……………………………………………..7

        2.    The Complaint largely lumps Hansen and Mikkelson together, making conclusory allegations about their joint conduct…….…………….8

        3.    The Complaint makes few allegations about post-sale Convergen Energy WI……………………………………………………………10

    D.    Under a Detailed Set of Contracts, Convergen Energy LLC Sold Convergen Energy WI, LLC, to NianticVista Energy, LLC (Twice). ………………………….10

    E.    The Sales Contracts Detail the Extensive Intellectual Property and Trade Secrets that Convergen Energy LLC Sold to NianticVista Energy, LLC. ………………13

    F.    The Controlling Contracts Require Mandatory Arbitration and Also Contain Numerous Wisconsin Forum-Selection Clauses. ……………………………...15

    G.    This Dispute Has Already Involved Five Courts and an Arbitration. ……………18

ARGUMENT…………………………………………………………………………..19

I.      TO SURVIVE THIS MOTION TO DISMISS, PLAINTIFFS MUST SHOW
        A PLAUSIBLE CLAIM FOR RELIEF. …………………………………………19

II.     THE COMPLAINT SHOULD BE DISMISSED BECAUSE THIS DISPUTE
        MUST BE ARBITRATED IN WISCONSIN. …………………………………...21

        A.      The Federal Arbitration Act created a national policy
                in favor of arbitration…………………………………………………..22

        B.      This dispute must be arbitrated under the many arbitration agreements the
                parties entered into with respect to this dispute. …………………………23

III.    ALTERNATIVELY, THE COURT SHOULD TRANSFER VENUE TO
        WISCONSIN OR STAY THIS ACTION. ………………………………………25

IV.     PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY
        FOR FAILURE TO STATE A CLAIM. …………………………………………28

        A.      Counts I, III and VI should be dismissed for failure to plead fraud with
                particularity. …………………………………………………….......28

        B.      Counts II and IV should be dismissed because Plaintiffs cannot establish
                that any Defendant owed Convergen Energy LLC or L'Anse
                a Fiduciary Duty. ……..………………………………………………..30

        C.      Counts V, VII and VIII fail to state a claim because Plaintiffs cannot
                establish a claim of right as to the trade secrets and stored communications
                in question. …………………………………………………………33

V.      THE CLAIMS AGAINST RIVERVIEW SHOULD BE DISMISSED FOR
        FAILURE TO STATE A CLAIM AND LACK OF
        PERSONAL JURISDICTION…………………………………………………...35

        A.      Plaintiffs make no specific allegations against Riverview, and fail to
                state a claim. …..………………………………………………………35

        B.      In addition and independently, this Court lacks personal jurisdiction
                over Riverview. …..……………………………………………………37

VI.     PLAINTIFFS FAIL TO STATE A CLAIM AGAINST MIKKELSON, HANSEN
        AND CONVERGEN ENERGY WI. …………………………………………38

        A.    Plaintiffs fail to make sufficient allegations against Mikkelson or Hansen
              to show a plausible claim for relief. ……………………………………...38

        B.    Plaintiffs fail to state a claim against Convergen Energy WI. ……..……39

VII.    IF THE COURT PERMITS PLAINTIFFS TO REPLEAD, THEY SHOULD
        BE DIRECTED TO MAKE A MORE DEFINITE STATEMENT. …..…………40

CONCLUSION………………………………………………………………………..40

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Achtman v. Kirby, Mcinerney & Squire, LLP*,
    464 F.3d 328 (2d Cir. 2006)…………………………………………………………20

*Aleynikov v. The Goldman Sachs Group, Inc.*
    2016 WL 3763246 (Del. Ch. July 13, 2016)……………………………………………...33

*Andrews v. Modell*,
    84 A.D.3d 843 (N.Y. 2011)……………………………………………………...37, 38

*Application of Whitehaven S.F., LLC v. Spangler*,
    45 F. Supp. 3d 333 (S.D.N.Y. 2014)……………………………………………22, 23

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)……………………………………………………………...19, 20

*Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*,
    571 U.S. 49 (2013)…………………………………………………………………... 25, 26

*ATSI Commc'ns, Inc. v. Shaar Fund*,
    493 F.3d 87 (2d Cir. 2007)…………………………………………………………..19

*Atuahene v. City of Hartford*,
    10 Fed. App'x 33 (2d Cir. 2001)……………………………………………………36

*BankUnited, N.A. v. Merritt Envtl. Consulting Corp.*,
    360 F. Supp. 3d 172 (S.D.N.Y. 2018)…………………………………………… 34, 35

*Beard Research, Inc. v. Kates*,
    8 A.3d 573, 601 (Del. Ch.)…………………………………………………………..31

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 554 (2007)……………………………………………………………19, 20

*Cardiocall, Inc. v. Serling*,
    492 F. Supp. 2d 139 (E.D.N.Y. 2007)…………………………………………… 36, 37

*Collins & Aikman Prod. Co. v. Bldg. Sys., Inc.*,
    58 F.3d 16 (2d Cir. 1995)……………………………………………………………... 22

*Connolly v. Wood-Smith*,
No. 11 CIV. 8801 DAB JCF, 2013 WL 1285168 (S.D.N.Y. Mar. 28, 2013)................34

*Converting/Biophile Labs., Inc. v. Ludlow Composites Corp.*,
722 N.W.2d 633 (Wis. Ct. App. 2006)...................................................26, 27

*Davis v. Fed. Election Comm'n*,
554 U.S. 724, 734 (2008).............................................................31

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213 (1985)...................................................................21

*Dougherty v. Town of North Hempstead Bd. of Zoning Appeals*,
282 F.3d 83 (2d Cir. 2002)............................................................35

*Dove v. Fordham Univ.*,
56 F. Supp. 2d 330 (S.D.N.Y. 1999)....................................................20

*Dowe v. Leeds Brown Law, P.C.*,
419 F. Supp. 3d 748 (S.D.N.Y. 2019)..................................................16

*Duran v. Henkel of Am., Inc.*,
No. 19 CIV. 2794 (PAE), 2020 WL 1503456 (S.D.N.Y. Mar. 30, 2020)....................30

*Elsevier Inc. v. Doctor Evidence, LLC*,
No. 17 Civ. 5540 (KBF), 2018 WL 557906 (S.D.N.Y. Jan. 23, 2018)......................34

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
559 F.3d 110 (2d Cir. 2009)...........................................................34

*Feeley v. NHAOCG, LLC*,
62 A.3d 649 (Del. Ch. 2012)...........................................................32

*Green Tree Fin. Corp.-Ala. v. Randolph*,
531 U.S. 79 (2000).....................................................................22

*Hadid v. City of New York*,
No. 15-CV-19 (WFK) (RER), 2015 WL 7734098 (E.D.N.Y. Nov. 30, 2015)..............20

*Health–Chem Corp. v. Baker*,
915 F.2d 805 (2d Cir. 1990)...........................................................35

*Iacovacci v. Brevet Holdings, LLC*,
437 F. Supp. 3d 367 (S.D.N.Y. 2020)..................................................37

*In re Fyre Festival Litig.*,
   399 F. Supp. 3d 203 (S.D.N.Y. 2019)……………………………………………29

*In re Hydrogen, L.L.C.*,
   431 B.R. 337 (Bankr. S.D.N.Y. 2010)……………………………………………31

*In re Sabine Oil & Gas Corp.*,
   547 B.R. 503 (Bankr. S.D.N.Y.)……………………………………………………32

*Int'l Audiotext Network, Inc. v. AT & T*,
   62 F.3d 69 (2d Cir.1995)……………………………………………………………19

*Integrated Cash Management Services, Inc. v. Digital Transactions, Inc.*,
   920 F.2d 171 (2d Cir.1990)…………………………………………………………36

*John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*,
   22 F.3d 458 (2d Cir. 1994)…………………………………………………………35

*Kohler Co. v. Wixen*,
   555 N.W.2d 640 (Wis. Ct. App. 1996)……………………………………………27

*Kramer v. Time Warner Inc.*,
   937 F.2d 767 (2d Cir. 1991)………………………………………………………19

*Lama Holding Co. v. Smith Barney, Inc.*,
   668 N.E.2d 1370 (N.Y. 1996)……………………………………………………30

*Lerner v. Fleet Bank, N.A.*,
   459 F.3d 273 (2d Cir. 2006)………………………………………………………28

*Malpiede v. Townson*,
   780 A.2d 1075 (Del. 2001)…………………………………………………………31

*Marino v. Grupo Mundial Tenedora, S.A.*,
   810 F. Supp. 2d 601 (S.D.N.Y. 2011)…………………………………………… 31

*Marmet Health Care Ctr., Inc. v. Brown*,
   565 U.S. 530 (2012)……………………………………………………………...22

*Morpurgo v. Incorporated Village of Sag Harbor*,
   697 F.Supp.2d 309 (E.D.N.Y.2010)……………………………………………...21

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983)……………………………………………………………………... 22

*Nick v. Schneider*,
    56 N.Y.S.3d 210 (N.Y. 2017)…………………………………………………………38

*Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*,
    No. 03 CIV.0613 GBD, 2004 WL 112948 (S.D.N.Y. Jan. 22, 2004)………………...35, 36

*Ochre LLC v. Rockwell Architecture Planning & Design, P.C.*,
    No. 12 CIV. 2837 KBF, 2012 WL 6082387 (S.D.N.Y. Dec. 3, 2012)…………………...36

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc*.,
    712 F.3d 705 (2d Cir. 2013)……………………………………………………………20

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
    No. 08-CV-42 JG VVP, 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011)………………..20, 36

*Preston v. Ferrer*,
    522 U.S. 346 (2008)………………………………………………………………... 22

*Sea Spray Holdings, Ltd. v. Pali Fin. Grp., Inc.*,
    269 F. Supp. 2d 356 (S.D.N.Y. 2003)………………………………………………...23, 24

*Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.*,
    263 F.3d 26 (2d Cir. 2001)……………………………………………………………..23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)…………………………………………………………………... 19

*Town & Country Linen Corp. v. Ingenious Designs LLC*,
    No. 18-CV-5075 (LJL), 2020 WL 3472597 (S.D.N.Y. June 25, 2020)……………... 19-20

*United States v. Szur*,
    289 F.3d 200 (2d Cir. 2002)…………………………………………………………..29

*United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*,
    363 U.S. 574 (1960)…………………………………………………………………...22

## **Rules & Statutes**

18 U.S.C. § 1836…………………………………………………………………...33, 34

28 U.S.C. § 1404…………………………………………………………………….25, 26, 27

6 Del. C. § 18–1101…………………………………………………………………………32

CPLR 302………………………………………………………………………………...38

Del. Code tit. 6, § 18-301, *et seq*. …………………………………………………...32

Del. Code tit. 6, § 18-401, *et seq*…………………………………………………………32

Del. Code tit. 6, § 18-407. ……...…………………………………………………...32

Del. Code tit. 10, § 3114. …………………………………………...................33

Fed. R. Civ. P. 9……………………………………………………………………19, 28

Fed. R. Civ. P. 12………………………………………………………………...19, 38

## <u>LIST OF EXHIBITS</u>

Exhibit 1              Chart of Parties and Claims

Exhibit 2              Chart of Arbitration Agreement + Wisconsin Forum Clauses

Exhibit 3              Acquisition Agreement (Jan. 29, 2020)

Exhibit 4              Waiver Notice (Jan. 31, 2020)

Exhibit 5              Closing Statement (Jan. 31, 2020)

Exhibit 6              Supply Agreement (Jan. 31, 2020)

Exhibit 7              Services Agreement (Jan. 31, 2020)

Exhibit 8              Amended and Restated Closing Statement

Exhibit 9              Credit Agreement (CEW) (Jan. 31, 2020) (Excerpts)

Exhibit 10             Credit Agreement (L'Anse) (Jan. 31, 2020) (Excerpts)

Exhibit 11             Employment Agreement (Mikkelson) (Apr. 25, 2017)

Exhibit 12             Employment Agreement (Hansen) (Jan. 31, 2020)

Exhibit 13             Employment Agreement (Mikkelson) (Jan. 31, 2020)

Exhibit 14             Proprietary Information and Inventions Agreement (Hansen) (Jan. 31, 2020)

Exhibit 15             Proprietary Information and Inventions Agreement (Mikkelson) (Jan. 31, 2020)

Exhibit 16             Email from Mikkelson to Brooks (Dec. 17, 2019)

Exhibit 17             Declaration of Dov Gold (June 23, 2020)

Exhibit 18             Declaration of Michael T. Stolper (June 2, 2020)

Exhibit 19             Operating Agreement (Convergen Energy LLC)

Exhibit 20             Operating Agreement (L'Anse Warden Electric Co., LLC)

Specially Appearing Defendants Steven J. Brooks, NianticVista Energy, LLC, Convergen Energy WI, LLC, Gregory Merle, Theodore J. Hansen, Brian R. Mikkelson, and Riverview Energy Corporation (collectively, "Defendants") respectfully submit this brief[1] in support of their motion to dismiss Plaintiffs' ("Libra" or the "Libra Group") Complaint.

## INTRODUCTION

Plaintiffs' Complaint is based on inflammatory rhetoric and the conscious withholding of material information from the Court. The crux of the Complaint is that Libra sold Convergen-WI without knowledge of several important facts. What Libra omits from this false narrative is that it confronted Brooks and fully investigated the "fraud" about which it now complains. Then, Libra entered into a *second closing that ratified and affirmed the original sale*. Plaintiffs' core allegation, that they entered into this deal without full knowledge of the facts, is utterly meritless.

Libra also neglects to mention that their General Counsel drafted, negotiated or approved six contracts with mandatory arbitration provisions, and five contracts requiring exclusive venue in Wisconsin. This case should never have been filed in this Court. Libra knowingly filed a Complaint in an improper forum, and then rushed into Court demanding *ex parte* emergency relief. The Complaint should be dismissed in favor of arbitration. Failing that, this action should be transferred to the Eastern or Western District Courts in Wisconsin.

Either action should end proceedings here. If the Court nevertheless decides to analyze the substance of Plaintiffs' allegations, the Complaint should be dismissed for failure to state a claim. Plaintiffs do not plead any actual fraud with particularity, bring breach of fiduciary duty claims against individuals who do not owe such duties under the applicable Delaware-governed operating

---

[1] The parties have agreed to 40 pages for briefs in support of or opposition to this Motion, and 20 pages for reply.

agreements, and allege misappropriation of intellectual property that Plaintiffs sold to Defendants—closing twice on the transaction.

Further, while the Complaint focuses heavily on the alleged wrongdoing of Brooks, it barely mentions other Defendants such as Riverview, Mikkelson, and Hansen, and fails to state a claim against them or Convergen-WI for wrongdoing. This Court also lacks personal jurisdiction over Riverview, a Delaware company that is based in Florida and has no meaningful ties to New York or the allegations of this suit. None of the Complaint's failings are curable, and the Court should either send this case to arbitration, transfer it to Wisconsin, or dismiss all claims with prejudice and award costs to Defendants for having to defend against a patently frivolous lawsuit.

## **ALLEGED FACTS**

The following allegations and documents referenced or relied upon in the Complaint are pertinent to this Motion.[2]

### A.   **The Parties and Related Entities.**

#### 1.   *Plaintiffs and related parties.*

Plaintiff Convergen Energy LLC ("CE") is a Delaware limited liability company and the former owner of Defendant Convergen Energy WI, LLC ("CEW"). (Complaint, ¶ 8.) CEW is a Delaware limited liability company that owns and operates a plant in Green Bay, Wisconsin, which manufactures renewable fuel pellets that can be burned to create energy. (*Id.* ¶¶ 2, 8, 13.) Plaintiff L'Anse Warden Electric Company, LLC ("L'Anse"), a subsidiary of CE, is a Delaware limited liability company that owns and operates a power plant in Michigan. (*Id.* ¶ 9.) L'Anse purchases

---

[2] Defendants dispute nearly all of these allegations, but assume them to be true for purposes of this Motion.

fuel pellets from CEW that are burned to produce energy. (*Id.*) Plaintiff EuroEnergy Biogas Latvia Limited ("EuroEnergy"), a subsidiary of CE, is a Cyprus company that owns and operates biogas facilities in the Republic of Latvia. (*Id.* ¶ 10.) Plaintiff Libra Capital US, Inc. ("Libra Capital"), is a Delaware corporation that provides management and consulting services to other Libra entities. (*Id.* ¶¶ 11, 15.) As a services company that holds no assets, Libra Capital is not in the chain of ownership with CE, CEW, L'Anse or EuroEnergy. (Declaration of Michael Stolper, in Case No. 1:20-CV-00823 (E.D. Wis.) (June 2, 2020), ECF No. 3, Ex. 18, at ¶¶ 2-6.)

Fidel Andueza, Libra's Chief Investment officer, was a Manager of CEW, CE, and L'Anse until the CEW transaction closed. (Exs. 3, 5-7.) Bert Diaz, Libra's General Counsel, was the other Manager of CE, CEW, and L'Anse, and remained a Manager of CE and L'Anse after the CEW transaction closed. (Exs. 4, 8.) Non-party BMO Harris Bank N.A. ("BMO") is a secured lender to both CEW and L'Anse. (Exs. 9 & 10.[3])

> 2.   *Defendants and related parties.*

Defendant Steven J. Brooks was formerly employed by Libra Capital as a Senior Vice President, Investments, and Brooks was also an "officer" (a contractual position created by the operating agreements) of CE and L'Anse before CEW was sold. (Complaint, ¶¶ 3, 29, 30-31, 51.) Brooks reported to Manager Andueza. (*Id.*, ¶ 32.) Defendant Theodore J. Hansen was formerly a CE employee and an "officer" (a contractual position created by the operating agreements) of CEW and L'Anse before CEW was sold. (*Id.* ¶ 22.) Hansen is currently CEW's CEO. (*Id.*) Defendant Brian R. Mikkelson was an "officer" (Vice President and Controller, a contractual

---

[3] The credit agreements contain financial disclosures that may be sensitive and are not pertinent to this Motion, so only the cover, signature and venue pages are attached to this brief.

position created by the operating agreements) of CE, CEW and L'Anse before CEW was sold. (*Id.* ¶ 23.) Mikkelsen is currently CEW's Controller. (*Id.*)

Defendant NianticVista Energy, LLC ("Niantic"), is a Delaware limited liability company with its principal place of business in New Jersey. (*Id.* ¶ 14.) Niantic was the entity that purchased CEW from CE. (*Id.* ¶ 28.) Defendant Riverview Energy Corporation ("Riverview") is a Delaware corporation with its principal place of business in Florida. (*Id.* ¶ 16.) The Complaint alleges that Riverview is a "special purpose entity" and "affiliate" of Niantic. (*Id.* ¶¶ 16, 33.) Defendant Merle is the sole member and CEO of Niantic, as well as the President of Riverview. (*Id.* ¶¶ 15-16.) The Complaint also brings claims against two Spanish nationals and two Spanish companies (the "Spanish Investors"), but they have not yet appeared and intend to challenge the Court's personal jurisdiction over them. (*Id.* ¶¶ 17-20; ECF No. 66, at 6.)

**B.    The Complaint Alleges Fraud, Breaches of Fiduciary Duty and Theft of Intellectual Property, Primarily Against Brooks.**

The gravamen of Plaintiffs' Complaint is that CE got a "raw deal" in its sale of CEW to Niantic. First, Plaintiffs complain that the agreed purchase price Niantic paid CE for CEW was too low. (Complaint, ¶ 45.) Second, Plaintiffs complain that the price of fuel pellets in a supply contract (the "Supply Agreement") between CEW and L'Anse is too high. (*Id.* ¶ 47.) Third, Plaintiffs complain that CEW purchased a $350,000 shredder just prior to the sale, which allegedly benefitted Niantic and reduced the net proceeds to CE in connection with the sale. (*Id.* ¶ 48.) Fourth, Plaintiffs complain that the cost of Hansen's and Mikkelson's post-sale transitional management services to L'Anse, that Libra insisted they provide in a services contract accompanying the sale ("Services Agreement"), is too high. (*Id.* ¶ 49.) Fifth, Plaintiffs allege that CEW had $196,420 in cash as of the Closing Date of January 31, 2020, and that this cash should

-4-

have been provided to CE, but was not. (*Id.* ¶ 50.) Lastly, Plaintiffs complain that certain intellectual property and electronic communications relating to the Plaintiffs resides on CEW's server, in Office 365 accounts maintained by CEW and Defendants' devices, and this property has not been returned to the Plaintiffs. (*See, e.g.*, *id.* ¶¶ 86-94.)

Focusing heavily on Brooks' behavior, the Complaint alleges that three types of wrongdoing caused Plaintiffs' injuries: (1) fraud; (2) breaches of fiduciary duty; and (3) theft of intellectual property.

### 1. The purported "fraud."

Count I of the Complaint alleges fraud, which must be plead with particularity. Fed. R. Civ. P. 9(b). The Complaint alleges that Brooks made material misrepresentations about:

- The sale price of CEW;

- Brooks' relationship to Merle and the other defendants;

- The "appropriateness" of the Supply Agreement; and

- The "appropriateness" of CEW buying a new shredder before the sale.

(Complaint, ¶ 62.) While the Complaint describes the purported subject-matters of these misrepresentations, it does not explain the substance of the alleged misrepresentations or describe what Brooks allegedly said, when it was said, or to whom it was said. Further, Libra ignores that the Acquisition Agreement, negotiated and approved by Libra's General Counsel and CE's Managers, affirmatively disclaims all representations and warranties except as expressly provided therein, and the Agreement makes no representations on these subjects. (Ex. 3, at § 9.3.)

The Complaint further alleges that Brooks failed to disclose several material facts, including:

- •    That Brooks had a prior personal relationship with Merle;

- •    That Brooks had an "interest" in Niantic because Brooks executed a personal guarantee of some of Niantic's debts; and

- •    That Niantic's counsel had previously represented CE in "a substantially related matter."

(*Id.* ¶¶ 54, 63.) In Count III, the Complaint alleges that all Defendants other than Brooks aided and abetted this fraudulent conduct. (*Id.* ¶¶ 74-79.) In addition, Count VI of the Complaint alleges that the Supply Agreement was induced by this fraud, and asks the Court to exercise the equitable remedy of rescission and undo the Supply Agreement. (*Id.* ¶¶ 95-99.)

### 2. The alleged breaches of fiduciary duty.

The Complaint alleges that Brooks owed fiduciary duties as an "officer" of Libra Capital (as Senior Vice President, Investments). (Complaint, ¶¶ 29, 68.) Significantly, the Complaint does *not* allege that Brooks owed fiduciary duties to any other Plaintiff. Further, the Complaint alleges that Hansen and Mikkelsen owed fiduciary duties as "officers" of CE (a Delaware limited liability company). (*Id.* ¶ 70.) The Complaint alleges that Brooks, Hansen and Mikkelson breached their duties by "participating in the fraudulent scheme." (*Id.* ¶ 71.) In addition, the Complaint alleges that all the other Defendants aided and abetted Brooks' breaches of fiduciary duty. (*Id.* ¶¶ 80-85.)

### 3. Alleged wrongdoing concerning Plaintiffs' intellectual property.

The Complaint further alleges that certain unspecified trade secrets of CE, EuroEnergy and L'Anse were contained in emails located on CEW's server and related Office 365 accounts. (*Id.* ¶ 87.) Plaintiffs allege that Niantic, CEW, Merle, Brooks, Hansen and Mikkelsen have misappropriated Plaintiffs' (unspecified) trade secrets by failing to provide these emails to Plaintiffs after the sale closed (and then deleting CEW's own copies of them). (*Id.* ¶ 90.) The

Complaint further alleges that Brooks, Hansen, and Mikkelson have retained certain "company-owned" devices that allegedly contain the unspecified trade secrets belonging to the Plaintiffs. (*Id.* ¶ 91.) On this basis, Plaintiffs bring claims for misappropriation of trade secrets under New York (Count V) and federal law (Count VII), and violation of the Stored Communications Act (Count VIII). (*Id.* ¶¶ 86-94, 100-124.) The attached Exhibit 1 lists the claims and the parties against whom the claims are brought (the Complaint does not specify which Plaintiffs bring which claims).

### C.   The Complaint Makes Only Passing Reference to Riverview, and Only a Handful of Non-Conclusory Allegations Concerning Mikkelson, Hansen and the Post-Sale Conduct of Convergen Energy WI.

While the Complaint focuses heavily on Brooks, it makes only passing reference to Riverview, and only a few non-conclusory allegations concerning Mikkelson, Hansen and CEW.

### 1.   The Complaint makes no specific allegation of wrongdoing against Riverview.

Plaintiffs make only passing reference to Riverview, mentioning it in a cursory fashion in only five of the 124 paragraphs of their Complaint. First, Plaintiffs claim that Niantic is "a special purpose entity and instrument of Riverview and Merle." (Complaint, ¶ 16.) The Complaint next stresses that Defendant Niantic "was an affiliate of Defendant Riverview," and that Defendant Merle sent one email from his Riverview email address that confirmed that Niantic is "an affiliate of Riverview." (*Id.*, ¶¶ 33, 35.)

Thirteen pages later, the Complaint alleges that Riverview was one of several entities who were aware that Brooks was "double-dealing," and makes the conclusory and unsupported statement that "Brooks could not have perpetrated the fraud without funding from the Spanish Investors, Merle and his entities," possibly including Riverview in the undefined phrase "Merle and his entities." (*Id.* ¶ 77.) Five pages after that, the Complaint alleges that Riverview was a

recipient of information through "copying, duplicating, downloading, replicating the information, and appropriating, retaining, disclosing, transmitting, delivering or otherwise conveying the information to competitors of Plaintiff, including Niantic, Merle, Riverview, and the Pellet Plant, among other third parties." (*Id.* ¶ 105.)

And that's it. The Complaint does not allege that Riverview actually made any use of whatever unarticulated trade secrets were allegedly provided to it, nor do Plaintiffs assert any good-faith basis for making such an allegation.

### 2. The Complaint largely lumps Hansen and Mikkelson together, making conclusory allegations about their joint conduct.

The Complaint spends little time addressing Hansen and Mikkelson, and mostly lumps them together. It alleges that Hansen and Mikkelson jointly:

- "[U]nder Brooks' direction, prepared and provided complete disclosure of the Pellet Plant [CEW] to Niantic" (Complaint, ¶ 34);

- Went to work for Niantic after the sale of CEW (*id.* ¶ 38);

- Together with Brooks, purchased a new shredder for CEW at the cost of $350,000 (*id.* ¶ 48);

- Were Brooks' "underlings," providing "knowing assistance" to Brooks (*id.* ¶ 51);

- Are guilty of "participating in" and "otherwise enabling the fraudulent scheme" (*id.* ¶¶ 70-71);

- "[S]ubstantially assisted Brooks in every facet of the scheme" by "facilitating the sale, arranging for the purchase of the shredder, not transferring the Pellet Company [CEW] cash at closing to Convergen [CE], signing off on an inflated pellet price in the Supply Agreement" (*id.* ¶¶ 76.);

- Were (with Brooks) "charged with overseeing all aspects" of CEW "and its sale to Niantic," and Brooks "could not have perpetrated the fraud without the substantial assistance of Hansen and Mikkelson" (*id.*); and

- Failed to turn over emails on CEW's server and Office 365 accounts to Plaintiffs after the sale, failed to return work devices, and engaged in "copying, duplicating, downloading, replicating the information, and appropriating, retaining, disclosing, transmitting, delivering or otherwise conveying the information to competitors of Plaintiff, including Niantic, Merle, Riverview, and the Pellet Plant, among other third parties" (*id.* ¶¶ 105-107).

Stripped of conclusory allegations about the joint conduct of "Hansen and Mikkelson," the Complaint makes only two allegations about conduct in which Mikkelson engaged. The first is that Mikkelsen sent an email to Brooks on December 17, 2019, discussing the purchase of the new shredder for CEW, and purportedly stating that the purchase should be postponed until early 2020 "since it would reduce sale proceeds to Libra." (*Id.* ¶ 48.) To prove this allegation, Plaintiffs would have to produce the email, so it is incorporated and necessary to the Complaint, and may be considered on this Motion to Dismiss (*see infra* Argument § I). Review of the email reveals how grossly Libra misrepresents its contents. The actual email (attached as Exhibit 16) notes that "We should also communicate to Bert [Diaz, Libra's General Counsel] about the timing," and that financing documentation concerning the purchase of the shredder was being sent to Diaz.[4]

The second allegation is that Mikkelsen, on September 12, 2019, sent an email in which Mikkelsen references that Hansen told Mikkelson that Brooks happened to be in Spain. (*Id.* ¶ 51 (reading "Hello Uncle Steve, [Hansen] mentioned that you are in Spain.").) Plaintiffs offer this vanilla email as proof that Mikkelson provided "knowing assistance" to Brooks, and that it "unequivocally confirms Hansen and Mikkelson's knowledge of and roles in the fraudulent scheme." (*Id.*) These are the kinds of woefully inadequate "facts" that Plaintiffs offer in support

---

[4] Although the allegations of the Complaint are deemed true for purposes of this Motion, Plaintiffs also grossly distort the context of the email. At the time it was sent, the parties anticipated a 2019 close. "Early 2020" would have been *after* the anticipated close.

of their conclusory claims, and these two emails are the only actual facts Plaintiffs allege with respect to Mikkelsen.

Similarly, stripped of conclusory statements about the conduct of "Hansen and Mikkelson," the Complaint makes only two allegations that are particular to Hansen, asserting that Hansen:

- Managed the day-to-day operations of CEW and reported to Brooks, and (with Brooks) "oversaw" L'Anse. (Complaint, ¶¶ 30-31); and

- Was selected by Brooks to continue to oversee L'Anse for 12 months after the sale of CEW (*id.* ¶¶ 38, 49).

That is the sum total of specific factual allegations made about Hansen in the Complaint.

### 3. The Complaint makes few allegations about post-sale Convergen Energy WI.

CEW belonged to Plaintiffs before January 31, 2020, and could only have engaged in wrongdoing after the sale. The only specific allegation of wrongdoing that Plaintiffs level at CEW after January 31, 2020, is that CEW purportedly has unauthorized access to emails and Office 365 accounts belonging to the Plaintiffs. (*Id.* ¶ 116; *see also id.* ¶¶ 86-94 (bringing a New York (but not federal) misappropriation of trade secrets claim against CEW, without mentioning CEW anywhere in the claim).) CEW of course would only have access if Libra failed to retain its claimed trade secrets prior to the January 31 closing.

### D. Under a Detailed Set of Contracts, Convergen Energy LLC Sold Convergen Energy WI, LLC, to NianticVista Energy, LLC (Twice).

All of Plaintiffs' claims center around the sale of CEW, which was consummated on January 31, 2020, through numerous contracts that are necessary to Plaintiffs' claims and relied upon heavily by Plaintiffs in the Complaint (including the Supply Agreement, which Plaintiffs ask

the Court to rescind). As such, the sale documents may be considered on this Motion to Dismiss.

(*See infra* Argument § I.) These sale documents include:

- An Acquisition Agreement (Ex. 3), dated January 29, 2020 (the "Acquisition Agreement"), under which CE sold 100% of CE's membership interest in CEW to Niantic;

- A Waiver Notice—Conditions Precedent (Ex. 4), dated January 31, 2020 (the "Waiver Notice"), under which CE and Niantic agreed that the conditions for sale under the Acquisition Agreement had been satisfied;

- A Closing Statement (Ex. 5), dated January 31, 2020 (the "Closing Statement"), specifying the final accounting of amounts owed by Niantic to CE in connection with the sale, as amended and restated by the Amended and Restated Closing Statement (Ex. 8), dated February 21, 2020 (the "Amended Closing Statement");

- An Engineered Fuel Pellet Supply Agreement (Ex. 6), dated January 31, 2020 ("Supply Agreement"), under which CEW agreed to provide pellet fuel to Plaintiff L'Anse;

- An Operations and Management Services Agreement (Ex. 7), dated January 31, 2020 ("Services Agreement"), under which CEW's CEO, Hansen, agreed to provide transitional management services to L'Anse until the end of 2020.

Bert Diaz, Libra's General Counsel and Manager of CE, CEW and L'Anse, executed the Waiver Notice of behalf of CE. (Ex. 4, at 2.) Fidel Andueza (Brooks' direct supervisor), Libra's Chief Investment Officer and the other Manager and President of CE, CEW and L'Anse, executed the Acquisition Agreement on behalf of CEW and CE, the Closing Statement on behalf of CE, and the Supply Agreement and Services Agreement on behalf of L'Anse. (*Id.*, Exs. 3 at 43, 5 at 1, 7 at 4,

8 at 11.[5]) Plaintiffs have admitted in the related Supply Agreement litigation before this Court that

Manager Andueza was aware of the "fraud" about which they now complain.[6]

The Complaint alleges that Plaintiffs "fortuitously" learned on the day after the January 31

closing that Brooks had an economic interest in Niantic. (Complaint, ¶ 41.) On February 3, 2020,

the first business day after the January 31 closing, Plaintiffs allege that Libra confronted Brooks

about his relationship to Niantic. (*Id.* ¶ 42.) Plaintiffs allege that they recorded this conversation.[7]

(*Id.*) During this meeting, Plaintiffs allege that Brooks admitted his role in the purported fraud and

expressed remorse. (*Id.* ¶ 43.) Plaintiffs allege that they "immediately" launched an investigation,

which analyzed the purported wrongdoing about which Plaintiffs complain. (*Id.* ¶ 44.)

A few weeks later, CE, L'Anse, Niantic and CEW entered into an Amended and Restated

Closing Statement, dated February 21, 2020 ("Amended Closing Statement"). (Ex. 8.) Diaz,

Libra's General Counsel, executed the Amended Closing Statement on behalf of CE and L'Anse.

(*Id.* at 3.) The Amended Closing Statement increased the price Niantic paid for CEW by

$618,359.91, and added Mikkelsen as an additional party to provide transitional management

services to L'Anse under the Services Agreement. (*Id.* at 1-2.) The parties also agreed in the

Amended Closing Statement that:

> By signing this Amended and Restated Closing Statement each
> Party confirms and ratifies that the Closing was completed on the
> Closing Date. The Buyer and Seller agree that there will be no

---

[5] Diaz and Andueza were the only Managers of CE, CEW, and L'Anse until after the Closing Date.
[6] In a Declaration submitted in the Supply Agreement litigation, Plaintiffs' counsel referred to Andueza as an "unnamed co-conspirator." (*See* Gold Decl. (June 23, 2020), ECF No. 21 in Case No: 1:20-CV-05240-LJL, Ex. 17, ¶ 11 (claiming that of the two signatories to the Supply Agreement, one was a Defendant (Merle) and the other (Andueza) was an unnamed co-conspirator.).) A co-conspirator by definition is someone who has knowledge of and agrees to an unlawful plan (here, the alleged "fraud").
[7] Defendants requested a copy of the recording, but Plaintiffs have not provided it during the expedited discovery permitted by the Court.

> further adjustments or changes to this Amended and Restated
> Closing Statement after the date hereof, as both Parties have
> confirmed that this document is now complete and accurate in all
> regards.

(*Id.* at 2.) CE also reaffirmed in the Amended Closing Statement the terms of the Acquisition

Agreement, including CE's representation that CE was unaware of any basis for a claim, litigation

or any investigation concerning the activities of CE, CEW, or any of their managers or key

employees. (*Id.* (ratifying all terms of the Acquisition Agreement unless expressly modified);

Acquisition Agreement, Ex. 3, § 2.16 (representation of no litigation).)

Neither Plaintiffs' Complaint nor their *ex parte* emergency TRO motion papers mention or

acknowledge the Amended Closing Statement, which was executed weeks *after* Libra alleges it

discovered and "immediately" investigated the "fraud" on which Plaintiffs base their Complaint.

### E.    The Sales Contracts Detail the Extensive Intellectual Property and Trade Secrets that Convergen Energy LLC Sold to NianticVista Energy, LLC.

The Acquisition Agreement has about 40 pages of substantive text. (Ex. 3.) Nearly six of

those pages are devoted exclusively to the intellectual property CE sold to Niantic. (*Id.* at 14-20.)

The basic structure of the Acquisition Agreement was the sale and transfer of 100% of CE's

membership interest in CEW to Niantic. (*Id.* § 1.2(a).) Through this mechanism, as of the Closing

Date of January 31, 2020, Niantic acquired ownership of CEW and control of its assets. (*Id.* §

1.3(b)[8].) Section 2.15 of the Acquisition Agreement devotes nearly six pages to explaining and

making representations and warranties about the intellectual property assets that CE is selling to

Niantic as part of the 100% sale of CEW's membership interest to Niantic. (*Id.* § 2.15.)

---

[8] As part of the sale of 100% of CEW, all CE employees became CEW employees. (*See, e.g.*, Exs. 12-15.)

Specifically, CE sold to Niantic all of CEW's "Intellectual Property Assets," defined as all intellectual property that is either: (1) owned by CEW; or (2) used or held by CEW in the course of its business immediately prior to the Closing Date. (*Id.* § 2.15(c)(ii).) The Acquisition Agreement further defines "Intellectual Property Assets" as "any and all of the following, as they exist throughout the world," and goes on to describe broadly the intellectual property included in "Intellectual Property Assets," including "Patents," "Marks" (trademarks and trade names), "Copyrights," "Trade Secrets," "any and all other intellectual property rights and/or proprietary rights related to the foregoing," and any "goodwill, franchises, licenses, permits, consents, approvals, and claims of infringement and misappropriation against third parties." (*Id.* § 2.15(c)(iii).)

"Trade Secrets" are defined in the Acquisition Agreement as:

> [R]ights in know-how, trade secrets, confidential or proprietary information, research in progress, algorithms, data, designs, processes, formulae, drawings, schematics, blueprints, flow charts, models, strategies, protypes, techniques, Beta testing procedures and Beta testing results.

(*Id.*) The Acquisition Agreement provides that CE is selling all of CEW's "IT Systems," defined as "all personal property, equipment and physical or electronic media relating to communications and computer systems, including computer hardware, networks and peripherals," as well as all "Products," defined as "those services and hardware and software products including related documentation, currently or previously researched, designed, developed, manufactured, marketed, sold, distributed, licensed, performed or otherwise made available by CEW in connection with the Business." (*Id.* § 2.15(c)(iv), (v).) The agreement further provides that "CEW exclusively owns

the 'Convergen Energy' name, and convergenenergy.com domain, which will transfer with it as part of this transaction." (*Id.* § 2.15(b)(i).)

To demonstrate to Niantic that the intellectual property CE was selling has value, CE goes on in the Acquisition Agreement to make elaborate representations and warranties about the intellectual property CE is selling to Niantic, including that it is free and clear of all encumbrances, there are no known claims against it, CEW's employees had entered into non-disclosure agreements regarding the intellectual property, it had not been misappropriated, CEW had taken reasonable steps to secure is privacy, the systems in question were in good working order and CEW had implemented reasonable backup and data-recovery systems to ensure the intellectual property was safe from hardware or software failures. (*Id.* §§ 2.15(b)(i)-(xvii).)

In short, CE sold to Niantic all intellectual property and related software and hardware owned or possessed by CEW as of the closing date of January 31, 2020, and made extensive representations to Niantic that the intellectual property CE sold was of good commercial value. Included in the property sold were: (a) all of the CEW Office 365 accounts; (b) all CEW hardware and software; and (c) all of the CE, Latvian, and L'Anse emails, which were located on CEW's server or in CEW's Office 365 accounts on the Closing Date. (Complaint, ¶ 87.)

### F.   The Controlling Contracts Require Mandatory Arbitration and Also Contain Numerous Wisconsin Forum-Selection Clauses.

The contracts under which CEW was sold, and the employment agreements executed by Defendants Brooks, Hansen and Mikkelsen all contain mandatory arbitration clauses (*see* Ex. 2

(summarizing arbitration and forum-selection contracts.[9])). In the Acquisition Agreement, the parties agreed: "Any dispute arising between the Parties in connection with this Agreement, which cannot be resolved by the Parties themselves, shall be submitted to binding arbitration." (Acquisition Agreement, §§ 9.7(a)-(c); *see also id.* § 9.8 (Delaware choice-of-law).) Similarly, in the Supply Agreement, the parties agreed:

> All Disputes shall be exclusively, finally and conclusively settled by binding arbitration…. As used herein, Dispute means any disagreement, controversy or claim that arises between Vendor and Customer regarding the interpretation, fulfillment, or implementation of any provision of this Agreement, or regarding the rights and obligations of the parties (including, without limitation, the validity of the agreement of the parties to arbitrate, the arbitrability of the issues submitted to arbitration hereunder, and any conflict of laws issues in connection with this Agreement).[10]

(Supply Agreement, Ex. 6, § 11; *see also id.* § 7 (Wisconsin choice-of-law).) The Amended Closing Statement provides for *permissive* venue in New York state or federal courts for disputes relating specifically to the few terms of that two-page agreement, but also specifies that "Other than as expressly modified pursuant to this Amended and Restated Closing Statement, all of the terms, conditions and other provisions of the Acquisition Agreement and The O&M Agreement [Services Agreement] are hereby ratified and confirmed and shall continue to be in full force and effect in accordance with their respective terms." (Amended Closing Statement, Ex. 8, at 2.)

---

[9] While these documents are necessary to Plaintiffs' claims and may be considered on a motion to dismiss for failure to state a claim, documents establishing mandatory arbitration or venue outside this forum may also be considered in the context of a motion to dismiss for improper venue or motion to transfer. *See, e.g., Dowe v. Leeds Brown Law, P.C.*, 419 F. Supp. 3d 748, 755 (S.D.N.Y. 2019) (considering arbitration agreement on motion to compel arbitration and motion to dismiss for failure to state a claim).

[10] Diaz has admitted in a sworn statement that he provided the first draft of this contract, including its arbitration clause. (ECF No. 85, ¶¶ 4-5.)

In addition, Plaintiffs allege in their Complaint that Defendants Brooks, Hansen and Mikkelson behaved inappropriately in connection with their employment with Libra Group entities. (Complaint, ¶¶ 67-73.) All three Defendants entered into employment agreements with Libra Group companies providing for mandatory arbitration of any dispute related to their employment. As part of the sale of CEW, the Libra Group insisted that Hansen and Mikkelsen sign new employment agreements with CEW. These agreements provide, under a heading called "Arbitration":

> The Company and the Employee agree that any claim, dispute or controversy arising under or in connection with this Agreement, or otherwise in connection with the Employee's employment by the company or termination of the Employee's employment (including, without limitation, any such claim, dispute or controversy arising under any federal, state or local statute, regulation or ordinance or any of the company's employee benefit plans, policies, or programs) [sic]. The arbitration shall be held in Wisconsin. The Arbitration shall be conducted in accordance with the National Rules for the Resolution of Employment Disputes (the "Rules") of the American Arbitration Association ("the AAA").

(Mikkelson CEW Employment Agreement, Ex. 13, § 9; *see also id.* § 10(a) (Wisconsin choice-of-law); Hansen Employment agreement, Ex. 12, §§ 9, 10(a) (same).) Mikkelson in 2017 signed an additional employment agreement with CE that also requires arbitration of any claim, dispute or controversy arising in connection with Mikkelson's employment with CE. (Mikkelson CE Employment Agreement, Ex. 11, § 11; *see also id.* § 12(a) (New York choice-of-law).) While Defendants do not have a copy of Brooks' employment agreement, Plaintiffs submitted a sworn statement averring that Brooks', Hansen's and Mikkelson's employment agreements are substantively identical, indicating that Brooks' agreement also contains a mandatory arbitration clause. (Declaration of Phaedra Chrousos (May 18, 2020), ECF No. 26, ¶ 24 n.1.)

Further, the Services Agreement provides that all disputes concerning that agreement must be exclusively resolved in the federal or state courts in Madison, Wisconsin. (Services Agreement, Ex. 7, § 6.08; *see also id.* (Wisconsin choice-of-law).) The non-disclosure agreements the Libra Group insisted that Hansen and Mikkelson sign in connection with the sale also specify Wisconsin law and require litigation in Wisconsin. (Hansen Employee Proprietary Information and Inventions Agreement, Ex. 14, § 10.1; Mikkelsen Employee Proprietary Information and Inventions Agreement, Ex. 15, § 10.1.)

Moreover, separate credit agreements that CEW and L'Anse executed with BMO in connection with the sale provide for exclusive jurisdiction in Wisconsin as well. (BMO Credit Agreement (CEW), Ex. 9, § 9.17(a); *see also id.* § 11(j) (Wisconsin choice-of-law); BMO Credit Agreement (L'Anse), Ex. 10, § 9.17(a), 9.13 (same).) This is significant because, under the terms of the Supply Agreement, both CEW and L'Anse pledged the Supply Agreement itself as collateral to BMO, and granted BMO rights under the Supply Agreement (*see infra* Facts § G). (Supply Agreement, Ex. 6, at 1-2.) *None* of these agreements provide for exclusive venue in New York.

### G.    This Dispute Has Already Involved Five Courts and an Arbitration.

Before Libra filed this suit, CEW and Hansen filed a lawsuit in Brown County, Wisconsin (which Libra removed to the Eastern District of Wisconsin) for a declaration of rights that the dispute with Libra must be resolved in Wisconsin, and that in any event Libra has fully released all claims it may have against Defendants.[11] Because L'Anse continues to take CEW's fuel pellets under the Supply Agreement (but stopped paying for them), CEW initiated an arbitration with the

---

[11] Case No. 2020-CV-000495 (Brown Cty., Wis.) and Case No. 1:20-CV-00823 (E.D. Wis.).

American Arbitration Association, and also sought interim injunctive relief (expressly permitted by the Supply Agreement) by initiating an action in the Circuit Court of Dane County, Wisconsin (which Libra removed to the Western District of Wisconsin, and the Western District of Wisconsin subsequently transferred to this Court).[12] This dispute has already involved five separate courts and the AAA. In addition, Brooks, Merle and Niantic intend to bring their own claims against Libra and its executives and agents in arbitration at an appropriate time.

## ARGUMENT

### I.   TO SURVIVE THIS MOTION TO DISMISS, PLAINTIFFS MUST SHOW A PLAUSIBLE CLAIM FOR RELIEF.

A motion to dismiss should be granted when a plaintiff fails to state a claim or there is some other threshold pleading defect such as failure to plead fraud with particularity, lack of personal jurisdiction, or improper venue. Fed. R. Civ. P. 9(b), 12(b)(2), (3), (6), 12(e). The Court evaluates the motion based on the factual allegations of the Complaint, but may also consider documentary exhibits or written instruments annexed to the complaint, documents integral to the parties' case and on which the complaint relies heavily, and matters subject to judicial notice. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322, (2007).[13]

To survive a motion to dismiss:

> "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint must offer more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Bell Atlantic Corp. v.*

---

[12] Case No. 2020-CV-001199 (Dane Cty., Wis.), Case No. 3:20-CV-00543-WMC (W.D. Wis.), Case No. 01-20-0005-5043 (Am. Arb. Ass'n.); Case No. 1:20-CV-05240-LJL (S.D.N.Y. Supply Agreement Action).

[13] *See also ATSI Commc'ns, Inc. v. Shaar Fund,* 493 F.3d 87, 98 (2d Cir. 2007) (same); *Int'l Audiotext Network, Inc. v. AT&T,* 62 F.3d 69, 72 (2d Cir. 1995) (same); *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir. 1991) (same).

*Twombly*, 550 U.S. 554, 555, 557 (2007). The ultimate question is whether "[a] claim has facial plausibility, [i.e.] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556.

*Town & Country Linen Corp. v. Ingenious Designs LLC*, No. 18-CV-5075 (LJL), 2020 WL 3472597, at *4 (S.D.N.Y. June 25, 2020).[14]

Moreover, a plaintiff must make allegations particular to each defendant, and cannot define all the parties under a group heading such as "defendants" in the beginning of the complaint, and use grouped discussion to avoid that obligation. *See Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08-CV-42 JG VVP, 2011 WL 7053807, at *17 (E.D.N.Y. Jan. 4, 2011), *report and recommendation adopted,* No. 08-CV-00042 JG VVP, 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012); *see also Dove v. Fordham Univ.*, 56 F. Supp. 2d 330, 335 (S.D.N.Y. 1999), ("It is well-settled that where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted." (internal quotation omitted)),

_____

[14] *See also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (internal quotation marks and citation omitted)); *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717 (2d Cir. 2013) ("A sufficiently pled complaint "must provide 'more than an unadorned, the-defendant-unlawfully-harmed-me accusation.'" (quoting *Iqbal*, 556 U.S. at 678)); *Hadid v. City of New York*, No. 15-CV-19 (WFK) (RER), 2015 WL 7734098, at *10 (E.D.N.Y. Nov. 30, 2015) ("conclusory statements" are "insufficient to survive a motion to dismiss"), *aff'd*, 730 F. App'x 68 (2d Cir. 2018), *aff'd*, 730 F. App'x 68 (2d Cir. 2018); *Achtman v. Kirby, Mcinerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) ("[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss." (citations omitted)).

*aff'd sub nom. Dove v. O'Hare*, 210 F.3d 354 (2d Cir. 2000); *Morpurgo v. Incorporated Village of Sag Harbor,* 697 F.Supp.2d 309, 338 (E.D.N.Y. 2010) (same).

Under these standards, Plaintiffs' Complaint fails on many levels. First, this dispute is subject to mandatory arbitration, and the Complaint should be dismissed in favor of arbitration in Wisconsin. Second, if the Court determines that some aspect of this dispute can be litigated, the parties agreed in multiple contracts that any such litigation must be brought in Wisconsin, and the Court should transfer any non-arbitrable claim to the Eastern or Western Districts of Wisconsin. Third, while the Court need not reach the merits of this dispute, the Complaint should be dismissed as it fails to state a claim. Fourth, Plaintiffs do not state a claim against Riverview, and the Court lacks personal jurisdiction over Riverview. Fifth, the Complaint does not state a claim against Mikkelson, Hansen, or CEW, and the claims against these three Defendants should be dismissed. Lastly, while the defects in Plaintiffs' claims are not curable and amendment is futile, if the Court deems that some claim can be repled in this Court, the Court should Order Plaintiffs to plead fraud with particularity, including an explanation of how any of the Defendants could be liable for fraud or related wrongdoing that was discovered prior to the second consummation of this deal.

## II.     THE COMPLAINT SHOULD BE DISMISSED BECAUSE THIS DISPUTE MUST BE ARBITRATED IN WISCONSIN.

Plaintiffs entered into no less than six contracts that require arbitration of this dispute. The Court should dismiss this action in favor of arbitration in Wisconsin. Alternatively, if the Court determines that this dispute can be arbitrated in this District, the Court should compel arbitration.

### A.     The Federal Arbitration Act created a national policy in favor of arbitration.

As the United States Supreme Court has repeatedly recognized, the Federal Arbitration Act (the "FAA" or the "Act") "establishes a national policy favoring arbitration when the parties contract for that mode of dispute resolution." *Preston v. Ferrer*, 522 U.S. 346, 349 (2008); *see also Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530, 533 (2012) (explaining the Act "reflects an emphatic federal policy in favor of arbitral dispute resolution.").

Because the FAA requires strict enforcement of arbitration clauses, federal courts must "rigorously enforce agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-24 (1983). The Act "leaves no place for the exercise of discretion by a district court, but instead mandates that the district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." (emphasis in original)); *see also United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582–83 (1960) ("An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."); *Collins & Aikman Prod. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 19 (2d Cir. 1995) (same).

Given the strong public policy favoring arbitration, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91-92 (2000); *see also Application of Whitehaven S.F., LLC v. Spangler*, 45 F. Supp. 3d 333, 342–43 (S.D.N.Y. 2014) ("Whether it argues that arbitration is

improper because the arbitration agreement is invalid under a defense to contract formation, or asserts that the arbitration contract does not encompass the claims at issue, either way, the resisting party shoulders the burden of proving its defense." (internal quotation omitted)), *aff'd sub nom. Whitehaven S.F., LLC v. Spangler*, 633 F. App'x 544 (2d Cir. 2015); *Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.*, 263 F.3d 26, 30 (2d Cir. 2001) ("To make a genuine issue entitling the plaintiff to a trial by jury, an unequivocal denial that the agreement had been made was needed, and some evidence should have been produced to substantiate the denial.").

> ### B.  This dispute must be arbitrated under the many arbitration agreements the parties entered into with respect to this dispute.

The parties entered into numerous agreements requiring arbitration of any dispute concerning the sale of CEW. First, the Acquisition Agreement itself provides that "Any dispute arising between the Parties in connection with this Agreement" must be arbitrated. (*See supra* Facts § F.) Similarly, the Supply Agreement entered into as a condition of the sale and financing requires that "any disagreement, controversy or claim that arises between Vendor and Customer regarding the interpretation, fulfillment, or implementation of any provision of this Agreement" must be arbitrated. (*Id.*) Further, two separate employment agreements that Libra insisted Defendants Hansen and Mikkelson execute in connection with the sale provide for mandatory arbitration in Wisconsin of "any claim, dispute or controversy arising under or in connection with this Agreement, or otherwise in connection with the Employee's employment." (*Id.*) Earlier agreements Libra executed with Defendants Brooks and Mikkelson contain the same arbitration requirement. (*Id.*)

All of Plaintiffs' claims fall under these agreements. Count One alleges that Brooks made materially false representations concerning the price of the sale, the identity of the purchasers, the

appropriateness of the Supply Agreement entered into as part of the sale, and the purchase by CEW of a piece of equipment "on the eve of its sale." (Complaint ¶¶ 62.) Count II alleges that Defendants Brooks, Hansen and Mikkelsen breached duties to Plaintiffs in connection with their employment, including by violating their employment contracts. (*Id.* ¶¶ 69-70.) Counts III and IV respectively allege that all Defendants other than Brooks aided and abetted the fraud and fiduciary duty breaches identified in Counts I and II. (*Id.* ¶¶ 76-77.) Counts V, VII and VIII allege that Defendants improperly handled the transition of the ownership of CEW when it transferred from CE to Niantic, retaining intellectual property that should have been returned to CE (property that is extensively discussed in the Acquisition Agreement). (*Id.* ¶¶ 89-91, 105-108, 118-121.) Count VI seeks rescission of the Supply Agreement. (*Id.* ¶¶ 96-99.) All of these claims relate to events associated with the sale of CEW, contracts executed in connection with the sale, or Brooks', Hansen's and Mikkelsen's employment with Plaintiffs. And all of these disputes are governed by contracts requiring arbitration of any dispute, claim or controversy relating to the sale, the Supply Agreement, or Brooks', Hansen's and Mikkelsen's employment.

Accordingly, every aspect of this dispute is subject to mandatory arbitration, and the Court should dismiss this action without prejudice or stay the action pending the result of the arbitration. *See, e.g.*, *Sea Spray Holdings, Ltd. v. Pali Fin. Grp., Inc.*, 269 F. Supp. 2d 356, 363–64, 366-67 (S.D.N.Y. 2003) ("As no useful purpose exists for directing a stay of this litigation where all of the issues in dispute are subject to arbitration, the Court will dismiss the action rather than issue a

stay."). If the Court determines that the arbitration can occur in this district,[15] it should compel

arbitration. *See id.* (explaining that a district court does not have the power to compel arbitration

outside its district, but may enter an order holding that the dispute is subject to arbitration and

dismissing or staying the action, or may enter an order compelling arbitration if the arbitration is

to occur within the court's district.).

### III.   ALTERNATIVELY, THE COURT SHOULD TRANSFER VENUE TO WISCONSIN OR STAY THIS ACTION.

Alternatively, if the Court should determine despite the above that some or all of Plaintiffs'

claims can be litigated, the Court should respect the forum-selection clauses to which the parties

agreed, and transfer this action to the United States District Court for the Eastern or Western

Districts of Wisconsin under 28 U.S.C. § 1404(a), or stay this action in favor of the Eastern District

of Wisconsin action that remains pending. (*See supra* Facts § G.)

As the Supreme Court has made clear:

> When the parties have agreed to a valid forum-selection clause, a
> district court should ordinarily transfer the case to the forum
> specified in that clause. Only under extraordinary circumstances
> unrelated to the convenience of the parties should a § 1404(a)
> motion be denied.

*Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 62 (2013); *see also*

*id.* at 63 ("a valid forum-selection clause… represents the parties' agreement as to the most proper

forum," and "The enforcement of valid forum-selection clauses, bargained for by the parties,

---

[15] Three of the agreements require arbitration in Wisconsin. (*See* Ex. 2 (Supply Agreement, and Hansen's and Mikkelson's 2020 employment contract).) Mikkelson's 2017 employment agreement provides for arbitration in New York. The Acquisition Agreement (affirmed in the Amended Closing Statement) is silent as to location. Defendants do not know if venue is specified in Brooks' 2014 employment contract.

protects their legitimate expectations and furthers vital interests of the justice system." (internal quotations omitted)).

When a valid forum-selection clause is present, the Court's analysis of transfer of venue under 28 U.S.C. § 1404(a) changes in three significant ways: (1) the plaintiff's choice of forum merits no weight; (2) the parties' private interests, such as convenience, are ignored, as "A court accordingly must deem the private-interest factors to weigh entirely in favor of the preselected forum"; and (3) a court may ignore a forum-selection clause only on the basis of "public-interest factors," which should be considered according to the laws of the state of the forum-selection clause, not the state in which the court sits. *Id.* at 64.

Here, the contracts with an exclusive forum-selection clause all specify that litigation must occur in Wisconsin. The Services Agreement, Hansen's and Mikkelson's non-disclosure agreements and the credit agreements that CEW and L'Anse respectively have with BMO require litigation in the state or federal courts in Wisconsin. (*See supra* Facts § G.) This is particularly significant because both CEW and L'Anse pledged the Supply Agreement as collateral to BMO in their respective agreements, and granted BMO rights under its credit agreements in the event of a breach. (*Id.*) The Services Agreement, Supply Agreement, and credit agreements also specify that Wisconsin law controls, and the Supply Agreement and Hansen's and Mikkelson's 2020 employment agreements require that the arbitration take place in Wisconsin. (*Id.*) None of these contracts require litigation in New York.

Under Wisconsin law, forum-selection clauses are "presumptively valid," and when the parties agree to litigate in a particular forum, "there is a strong presumption favoring venue in that forum" which will be respected unless the venue clause is substantively unreasonable given the

bargaining power of the parties, or the agreement violates public policy. *See, e.g.*, *Converting/Biophile Labs., Inc. v. Ludlow Composites Corp.*, 722 N.W.2d 633, 640 (Wis. Ct. App. 2006); *Kohler Co. v. Wixen*, 555 N.W.2d 640, 645 (Wis. Ct. App. 1996).

Here, any disparity in bargaining power would be on Libra's side, as it is a multi-billion-dollar conglomerate and CEW is just one tiny subsidiary. Further, the dispute involves the sale of a Wisconsin company, three of the Defendants are Wisconsin residents, the assets that were sold under the Acquisition Agreement are located in Wisconsin, the product at issue in the Supply Agreement is manufactured in and shipped from Wisconsin, the Services Agreement involves the services of two Wisconsin residents, and the "trade secrets" and other electronically stored information in dispute are largely stored on a server in Wisconsin. Wisconsin is a sensible choice of venue, and Wisconsin law would not disturb the parties' agreements to litigate in Wisconsin. Certainly there is no public policy reason to disregard the parties' choice of venue.

If the Court declines to enforce the parties' multiple arbitration agreements, the Court should transfer this action under 28 U.S.C. § 1404(a) to the Eastern or Western Districts of Wisconsin.[16]

---

[16] The Services Agreement and Hansen's non-disclosure agreement specify Dane County (Madison), Wisconsin (in the Western District of Wisconsin), the credit agreements with BMO require Brown County, Wisconsin (in the Eastern District), and Mikkelson's non-disclosure agreement permits suit in any Wisconsin state or federal court. On balance, the contracts favor the Western District of Wisconsin.

IV.   **PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY FOR FAILURE TO STATE A CLAIM.**

A.   **Counts I, III and VI should be dismissed for failure to plead fraud with particularity.**

In addition to Plaintiffs' general obligation to plead particularized facts showing a plausible claim, Plaintiffs are required to plead fraud with particularity. Fed. R. Civ. P. 9(b). Courts in this circuit have explained that:

> [I]n order to comply with Rule 9(b), the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 291 (2d Cir. 2006); *see also id.* (plaintiffs must also "allege facts that give rise to a strong inference of fraudulent intent."). Plaintiffs fail to meet this burden, and all the allegations Plaintiffs do make concerning fraud fail as a matter of law.

As noted (*see supra* Facts § B(1)), Plaintiffs allege in Count I (fraud, brought only against Brooks) that Brooks made material misrepresentations about the sale price of CEW, Brooks' relationship with Merle, and the "appropriateness" of the Supply Agreement and CEW buying a shredder before the sale. (*See supra* Facts § B(1).) None of these claims is sufficient.

First, the sale price for CEW is specified in the Acquisition Agreement and Closing Statements. (Acquisition Agreement, Ex. 3, § 1.2(b), Closing Statement, Ex. 5, at 1; Amended Closing Statement, Ex. 8, at 1.) How could Brooks possibly make a misrepresentation about a number that is provided in documents that CE's Managers, including its General Counsel, drafted, negotiated, approved and signed? The claim is nonsensical.[17]

---

[17] As noted, Plaintiffs subsequently admitted that the Manager for CE who executed the Acquisition Agreement on behalf of CE (Fidel Andueza) had full knowledge of the supposed fraud. *See supra* n.5.

Second, Plaintiffs do not allege that Brooks made false statements about his relationship with Merle, only that he failed to disclose prior to the sale that Brooks and Merle knew each other. (Complaint, ¶ 63.) Fraud by material omission requires a duty to speak, and Plaintiffs do not allege that Brooks had a duty to disclose his social relationship with Merle, or allege facts that would establish such a duty. *See United States v. Szur,* 289 F.3d 200, 211 (2d Cir. 2002) (fraud by omission requires proof of a duty to disclose); *In re Fyre Festival Litig.*, 399 F. Supp. 3d 203, 217 (S.D.N.Y. 2019) (same), *reconsideration denied*, No. 17-CV-3296 (PKC), 2019 WL 5799762 (S.D.N.Y. Nov. 7, 2019). For similar reasons, Plaintiffs' claims that Brooks failed to disclose Brooks' alleged financial interest in Niantic, or the fact that Niantic's attorneys had previously represented CE, fail because Plaintiffs do not plead facts establishing that Brooks had a duty to disclose that information.[18]

Third, Plaintiffs do not explain what statements Brooks actually made about the "appropriateness" of the Supply Agreement and CEW's purchase of a shredder, to whom they were made or where and when they were made, and thus Plaintiffs fail to meet their burden to plead fraud with particularity.

Further, and independently, the gaping hole in Plaintiffs' Complaint is the Amended Closing. (*See supra* Facts § D.) The Amended Closing was executed February 21, 2020, weeks *after* Plaintiffs alleged that they became aware of the "fraud" on which they base their Complaint. With full knowledge of the alleged "fraud," Plaintiffs ratified the original agreement in its entirety (except for requiring Niantic to pay an additional $618,359.91). (*Id.*) Libra cannot plausibly allege

---

[18] The Acquisition Agreement contains a merger clause providing that the parties were not relying on any "representations, promises, warranties, covenants, or undertakings, other than those expressly set forth or referred to herein and therein." (Ex. 3, at § 9.3.) The Agreement makes no representation as to Niantic's owners or affiliates.

that they reasonably relied on any misrepresentation in connection with the sale of CEW, when, after the alleged misrepresentations became known to Libra, Plaintiffs closed again (in a document approved and executed by Libra's General Counsel). *Duran v. Henkel of Am., Inc.*, No. 19 CIV. 2794 (PAE), 2020 WL 1503456, at *10 (S.D.N.Y. Mar. 30, 2020) (justifiable reliance is a required element of fraud); *Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370, 1373 (N.Y. 1996) (same); *see also* Acquisition Agreement, Ex. 3, § 9.3 (merger clause in Acquisition Agreement); Amended Closing Statement, Ex. 8, at 2 (affirming terms of Acquisition Agreement).

This terminal flaw cannot be cured by artful pleading, making amendment futile. Count I of the Complaint should be dismissed with prejudice. Count III (aiding and abetting fraud) falls with Count I, and it should be dismissed with prejudice as well. Count VI alleges that the Supply Agreement was induced by the same fraud, and falls for the same reason (it also must be arbitrated under the express terms of the Supply Agreement). Failing that, the Court should require Plaintiffs to replead to allege whatever fraud they are complaining of with particularity, so that the Court and the Defendants can scrutinize how Libra can possibly state a claim.

### B.    Counts II and IV should be dismissed because Plaintiffs cannot establish that any Defendant owed Convergen Energy LLC or L'Anse a fiduciary duty.

Further, Counts II and IV should be dismissed because Plaintiffs cannot establish that any Defendant owed CE (the selling company) or L'Anse (Libra counterparty to the Supply and Services Agreements) a fiduciary duty.

The necessary elements of a breach of fiduciary duty claim are establishing that: (1) a defendant owed a fiduciary duty; (2) that defendant breached the fiduciary duty; and (3) the

plaintiff suffered damages as a result of the breach. *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch.), *aff'd sub nom.*, *ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010). A claim for aiding and abetting breach of fiduciary duty requires all three elements plus a showing that the defendant provided "knowing participation" in the breach. *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (quotation and citation omitted). Plaintiffs cannot establish that any defendant owed CE or L'Anse a fiduciary duty, and therefore they fail to state a claim.

First, while Libra lumps together and does not specify which Plaintiffs bring which claims, the only parties who could claim injury in connection with the events about which Plaintiffs complain would be CE or L'Anse. Plaintiffs allege that: (1) the price for which CE sold CEW to Niantic was too low; (2) CEW retained cash after closing that was owed to CE; (3) CE paid for a shredder that it should not have; (4) L'Anse is paying too much for pellets under the Supply Agreement; and (5) L'Anse is required (but did not) pay too much to Hansen and Mikkelson for their consulting services. (*See supra* Facts § B.) Neither Libra Capital (a company not in the CE ownership chain) nor EuroEnergy have standing to bring claims regarding such injuries. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (a plaintiff has standing only if they suffered a "concrete and particularized, "actual or imminent, not conjectural or hypothetical" "injury in fact," which is "real, immediate, and direct.").

Both CE and L'Anse are Delaware limited liability companies, and therefore Delaware law controls.[19] Under Delaware law, only "Managers" and "Members" owe fiduciary duties by

---

[19] *See Marino v. Grupo Mundial Tenedora*, S.A., 810 F. Supp. 2d 601, 607 (S.D.N.Y. 2011) ("New York applies the internal affairs doctrine to claims for breach of fiduciary duty and, thus, applies the law of the state of incorporation to such claims."); *In re Hydrogen, L.L.C.*, 431 B.R. 337, 347 (Bankr. S.D.N.Y. 2010) (same rule for LLCs).

default.[20] A Manager or Member can appoint "officers" (a corporate concept) if permitted by the operating agreement, but such "officers" are classified as "other persons"[21] and do not owe fiduciary duties unless the operating agreement expressly imposes such duties on officers.[22]

Plaintiffs do not allege that Brooks, Hansen or Mikkelson were ever Managers or Members of CE or L'Anse. Rather, Plaintiffs allege that all three were "officers," meaning they are "other persons" under Delaware law. Thus, for Brooks, Hansen or Mikkelson to owe fiduciary duties to CE or L'Anse, the operating agreements of CE or L'Anse would have to impose fiduciary duties on "officers."

Plaintiffs do not allege that the operating agreement of either company imposes fiduciary duties on officers. Because establishing that the operating agreements require officers to comply with fiduciary duties would be necessary to Plaintiffs' claims, the Court can consider the actual operating agreements of CE and L'Anse on a motion to dismiss. (*See supra* Argument § I.) Neither operating agreement provides that officers owe fiduciary duties. (Exs. 19-20.[23])

---

[20] *See, e.g., Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661 (Del. Ch. 2012) (noting that "the LLC Act contemplates that equitable fiduciary duties will apply by default to a manager or managing member of a Delaware LLC," but without mentioning officers); *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 561 (Bankr. S.D.N.Y.), ("Under Delaware law, only directors and managing members of an LLC (and not parties to whom such managing members delegate authority…) owe fiduciary duties, if any, to the LLC."), *aff'd*, 562 B.R. 211 (S.D.N.Y. 2016).

[21] Delaware law recognizes only: (1) Managers and (2) Members as statutory positions for Delaware LLCs. *See* Del. Code tit. 6, § 18-301, *et seq.*; Del. Code tit. 6, § 18-401, *et seq.* "Officers" are "other persons." Del. Code tit. 6, § 18-407

[22] 6 Del. C. § 18–1101(c) (the operating agreement may impose, expand, or restrict fiduciary duties on an "other person").

[23] *Cf.* Ex. 19, §§ 4.5, 4.6 (waiving Managers' duties of care and loyalty, respectively.)

Because Plaintiffs cannot establish that Brooks,[24] Hansen or Mikkelson owed fiduciary duties to CE or L'Anse, they fail to establish a necessary element of their fiduciary duty claims, and thus fail to state a claim for breach of fiduciary duty under Count II. Because Count IV (aiding and abetting fiduciary duties) is derivative of the underlying claim for breach for fiduciary duties (and presumes that fiduciary duties were owed), Plaintiffs fail to state a claim in Count IV as well.

### C.   Counts V, VII and VIII fail to state a claim because Plaintiffs cannot establish a claim of right as to the trade secrets and stored communications in question.

In addition, Plaintiffs fail to state a claim under Count V, VII or VIII of the Complaint, because all of the trade secrets and stored communications in question were unambiguously sold to Niantic in the Acquisition Agreement (and confirmed in the Amended Closing Statement after full disclosure of the alleged "fraud"). (*See supra* Facts § E.)

Under their trade secret misappropriation claims (Counts V and VII), Plaintiffs must establish that they owned the trade secrets in question. But CE sold any such trade secrets to Niantic. Because Plaintiffs cannot establish ownership, a necessary element of their claims, they fail to state a claim for misappropriation, and Counts V and VII should be dismissed. *See* 18 U.S.C. § 1836(b)(1) (providing that, under federal law, only an "owner" of a trade secret may bring a

---

[24] As noted, the Complaint does not even allege that Brooks owed fiduciary duties to CE or L'Anse. (*See supra* Facts § B(2).) Instead, it makes the conclusory statement that Brooks owed fiduciary duties to Libra Capital as its Senior Vice President, Investments. That is not a statutory position under Delaware law, so Plaintiffs would need to allege specific facts establishing that Brooks owed fiduciary duties to Libra Capital. *See* Del. Code. tit. 10, § 3114 (explaining that corporate officers under Delaware law are the President, CEO, COO, CFO, Chief Legal Officer, Controller, and Chief Accounting Officer, as well persons identified in SEC filings, and persons agreeing to be corporate officers by written contract specifically referencing § 3114); *see also Aleynikov v. The Goldman Sachs Group, Inc.* 2016 WL 3763246, at *7 (Del. Ch. July 13, 2016) (explaining that a Delaware corporation's bylaws can identify additional officer positions for purposes of § 3114). The Complaint contains no allegation that Brooks meets any of these criteria. While Libra Capital lacks standing to bring claims for injury suffered by CE or L'Anse, any fiduciary duty claim by Libra Capital would also fail because the Complaint does not establish that Brooks owed duties to Libra Capital.

claim); *Elsevier Inc. v. Doctor Evidence, LLC*, No. 17 Civ. 5540 (KBF), 2018 WL 557906, at *4 (S.D.N.Y. Jan. 23, 2018) ("[T]o survive a motion to dismiss, a party alleging that it owns a trade secret must put forth specific allegations as to the information owned and its value."); *see also Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009) (under New York law, a plaintiff must show lawful possession via ownership, license or similar right). Plaintiffs cannot get around this issue by artful pleading, and the dismissal should be with prejudice.

Similarly, a Plaintiff must establish a claim of right to the electronic information in question for a claim under the Stored Communications Act. *See Connolly v. Wood-Smith*, No. 11 CIV. 8801 DAB JCF, 2013 WL 1285168, at *4 (S.D.N.Y. Mar. 28, 2013). Conversely, authorization to access the information is a complete defense. *Id.* As demonstrated, Plaintiffs sold all electronic information on CEW's server as of the Closing Date, so Plaintiffs have no right in the information, and Defendants have full authority to it. As Plaintiffs cannot establish a necessary element of their Stored Communications Act Claim, the Court should dismiss Count VIII for failure to state a claim.

In sum, Plaintiffs fail to state a claim for fraud, aiding and abetting fraud or fraudulently inducing the Supply Agreement, and do not plead any of the three claims with particularity. Plaintiffs cannot establish that any Defendant owed fiduciary duties to the allegedly injured parties, and thus the fiduciary duty and aiding and abetting fiduciary duty claims fail as well. Plaintiffs further cannot establish a legal claim on the trade secrets and stored communications that CE sold to Niantic, so those claims fail as well.

None of these problems can be fixed through repleading, and the Complaint in its entirety should be dismissed with prejudice. *See BankUnited, N.A. v. Merritt Envtl. Consulting Corp.*, 360

F. Supp. 3d 172, 191–92 (S.D.N.Y. 2018) (the Court has discretion to deny leave to amend, and should exercise that discretion when the defects in the claim against a defendant are substantive, or the plaintiff cannot explain how it would cure those defects with amended claims); *see also John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir. 1994) ("[u]ndue delay and futility of the amendment, among other factors, are reasons to deny leave"); *Health– Chem Corp. v. Baker,* 915 F.2d 805, 810 (2d Cir. 1990) ("where ... there is no merit in the proposed amendments, leave to amend should be denied"); *Dougherty v. Town of North Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 88 (2d Cir. 2002); (an amendment is considered futile if the amended pleading fails to state a claim or would be subject to a motion to dismiss on some other basis).

## V.   THE CLAIMS AGAINST RIVERVIEW SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM AND LACK OF PERSONAL JURISDICTION.

Beyond all the fundamental threshold issues discussed above, Plaintiffs fail to state a claim against Riverview, and the Court also lacks personal jurisdiction over Riverview.

### A.   Plaintiffs make no specific allegations of wrongdoing against Riverview and fail to state a claim.

As noted, Riverview is barely mentioned in the Complaint, and Plaintiffs allege only that Riverview is affiliated with Niantic, had some unspecified "knowledge" of the wrongdoing and was somehow a "recipient" of Plaintiffs' trade secrets. (*See supra* Facts § (C)(1).) None of Plaintiffs' allegations (most of which are not even allegations of fact) are actionable.

First, being a "special purpose entity," or "affiliate" of another party is not actionable, particularly when Plaintiffs make no allegation that Riverview engaged in any wrongdoing as an affiliate of Niantic or Merle. *See Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*, No. 03 CIV.0613 GBD, 2004 WL 112948, at *3 (S.D.N.Y. Jan. 22, 2004) (dismissing complaint in its

entirety because the plaintiff had tried to establish liability by alleging little more than that the defendants were affiliated with a wrongdoer); *see Ochre LLC v. Rockwell Architecture Planning & Design, P.C.*, No. 12 CIV. 2837 KBF, 2012 WL 6082387, at *6 (S.D.N.Y. Dec. 3, 2012) ("Where a complaint names multiple defendants, that complaint must provide a plausible factual basis to distinguish the conduct of each of the defendants… A plaintiff cannot merely 'lump[ ] all the defendants together in each claim and provid[e] no factual basis to distinguish their conduct.'" (quoting *Atuahene v. City of Hartford*, 10 Fed. App'x 33, 34 (2d Cir. 2001))); *Precision Assocs.*, 2011 WL 7053807, at *15 (explaining that "group pleading" in a complaint is insufficient to survive a motion to dismiss when a plaintiff alleges merely that a defendant is merely affiliated with a wrongdoer, and collecting cases).

Second, alleged awareness of wrongdoing is not actionable, particularly because Plaintiffs' claim is that Riverview somehow aided and abetted other Defendants' fraud or breaches of fiduciary duty, but Plaintiffs never allege *how* Riverview supposedly assisted other Defendants. Plaintiffs indirectly suggest that Riverview provided funding to the sale of CEW (it did not), but Plaintiffs cannot even make that allegation directly, because they have no good faith basis to suggest that Riverview was a source of funding.

Finally, mere (alleged) receipt of a trade secret is not actionable, as Plaintiffs must show under both federal and New York law that Riverview is "*using* the trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Integrated Cash Management Services, Inc. v. Digital Transactions, Inc.,* 920 F.2d 171, 173 (2d Cir.1990) (emphasis added); *Cardiocall, Inc. v. Serling*, 492 F. Supp. 2d 139, 148 (E.D.N.Y. 2007) ("A claim for misappropriation of trade secrets under New York law requires plaintiff to show: (1) that it

possessed a trade secret and (2) that defendant used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means."); *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) ("The elements for a misappropriation claim under New York law are fundamentally the same [as those under the Defend Trade Secrets Act].").

The simple fact is that Riverview had nothing to do with this deal. It is not a party to any of the agreements, nor is it an owner of or lender to any of the companies involved. Riverview was mentioned in the parties' discussions only because Merle worked for Riverview, and that fact came up in a social context when Merle was introducing himself to Plaintiffs and explaining who he is (*e.g.*, "Hi, I'm Greg. I work for Riverview.") None of that is actionable, Plaintiffs have no good-faith basis to maintain claims against Riverview, and the court should dismiss Riverview from this lawsuit for failure to state a claim. Further, the dismissal should be with prejudice, as Plaintiffs have no evidence to suggest that Riverview had any substantive involvement in this deal.

**B.    In addition and independently, this Court lacks personal jurisdiction over Riverview.**

Beyond the fact that Plaintiffs do not allege a plausible claim against Riverview (a stranger to this transaction), this Court lacks personal jurisdiction over Riverview, and the claims against Riverview should be dismissed.

Riverview is a Delaware corporation with its principal place of business in Florida. It does not conduct business in New York, and is not a New York resident. (Declaration of Gregory Merle (July 16, 2020), ¶ 3.) Further, Riverview has not engaged in "sufficient purposeful activities in New York, which bore a substantial relationship to the subject matter of this action, so as to avail [himself] of the benefits and protections of New York's laws." *Andrews v. Modell*, 84 A.D.3d 843,

844 (N.Y. 2011). Plaintiffs do not make allegations concerning any activity Riverview engaged in within New York, nor can they, as Riverview has conducted no such activity. (Merle Decl. ¶ 3.) This Court therefore lacks long-arm jurisdiction over Riverview. *Id.* (citing CPLR 302(a)(1).) Further, Riverview lacks minimum contacts "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice," and exercising personal jurisdiction over Riverview would violate federal constitutional due process requirements. *Nick v. Schneider*, 56 N.Y.S.3d 210, 214 (N.Y. 2017). Therefore, the Court should independently dismiss Plaintiffs' claims against Riverview under Rule 12(b)(2).

## VI.   PLAINTIFFS FAIL TO STATE A CLAIM AGAINST MIKKELSON, HANSEN AND CONVERGEN ENERGY WI.

In addition, all of Plaintiffs' claims against Mikkelson, Hansen and CEW should be dismissed for failure to state a claim.

### A.   Plaintiffs fail to make sufficient allegations against Mikkelson or Hansen to show a plausible claim for relief.

Plaintiffs' accusations against Mikkelson and Hansen are long on conclusory statements of law, and short on allegations of actual facts. (*See supra* Facts § C(2).) Stripped of conclusory statements, Plaintiffs only describe two actions in which Mikkelson engaged: (1) he sent one email about a shredder (which Plaintiffs cherry-pick and misrepresent); and (2) he sent a second email indicating that Hansen had told him that on September 12, 2019, Brooks was in Spain. (*Id.*) Concerning Hansen, all Plaintiffs can say is that he was formerly in charge of CEW and L'Anse, and was selected by Libra to provide transitional consulting services to L'Anse after the sale. (*Id.*) That is the sum total of actual factual allegations the Complaint makes against Mikkelsen and Hansen. (*Id.*) Everything else is just conclusory claims that Mikkelson and Hansen facilitated,

knew about, or were "key" to wrongdoing committed by others. (*Id.*) Those sorts of conclusory statements do not state a claim of actionable wrongdoing against Mikkelsen or Hansen.

Concerning the claim that Mikkelsen and Hansen aided and abetted Brooks' alleged fraud or Brooks' breach of fiduciary duty, Plaintiffs allege no particularized facts as to what Mikkelsen or Hansen did that provided substantial assistance to Brooks. The assertions are limited to a claim that they provided financial information to Merle (part of the contractual representations Libra made to Merle, Niantic's signatory, in the Acquisition Agreement). (Acquisition Agreement, Ex. 3, at § 2.6 (detailing the many financial disclosures, warranties and representations CE made to Niantic about the finances of CEW).) Everything else Plaintiffs allege is either conclusory or describes something Mikkelson or Hansen did *not* do, without alleging facts establishing that Mikkelson or Hansen had any duty to perform the acts Libra complains about. This fails to state a claim. Further, Plaintiffs do not allege that Mikkelsen or Hansen *used* any of the unspecified trade secrets that CE sold to Niantic, and thus Plaintiffs fail to state a claim for misappropriation of trade secrets or violation of the Stored Communications Act.

Alleging that Mikkelson or Hansen sent a couple of emails or were "day-to-day" with two of the companies involved does not constitute sufficient allegations of fact to state a claim against them. The Court should dismiss the claims against Mikkelsen and Hansen, and should do so with prejudice, as Plaintiffs have no good-faith basis to allege particularized facts indicating that Mikkelson or Hansen engaged in wrongdoing.

### B.    Plaintiffs fail to state a claim against Convergen Energy WI.

In addition, the Complaint fails to state a claim against CEW. Significantly, control of CEW did not pass to Defendants until the Closing on January 31, 2020. (*See supra* Facts § D.) So

any claims Plaintiffs may have against the sold company could only have arisen after Closing. Thus, the fraud, fiduciary duty and aiding and abetting claims are inapplicable to CEW. Further, any information on CEW's server was expressly sold to Niantic in the Acquisition Agreement and confirmed in the Amended Closing, so Plaintiffs cannot establish ownership or claim of right to the trade secret or stored communications at issue in their misappropriation and Stored Communications Act claims. (*See supra* Facts § E.) That leaves only Plaintiffs' request to rescind the Supply Agreement, which is based on failed claims of "fraud" and must be arbitrated. (*See supra* Argument § IV(A).) The claims against CEW should be dismissed, and as the claims' deficiencies are not curable, the dismissal should be with prejudice.

## VII.   IF THE COURT PERMITS PLAINTIFFS TO REPLEAD, THEY SHOULD BE DIRECTED TO MAKE A MORE DEFINITE STATEMENT.

If the Court permits Plaintiffs to replead any claim, it should direct them to make a more definite statement as to the "fraud" that allegedly occurred here, who made the statements in question, to whom they were made, what they were and when and where they were made, as well as how any other Defendant aided and abetted the "fraud." Fed. R. Civ. P. 9(b), 12(e); *see also supra* Argument § IV(A). In addition, Plaintiffs should be directed to explain how any of their claims could possibly survive the second closing. Without knowing Plaintiffs' position on this dispositive issue, Defendants cannot reasonably provide a response.

## <u>CONCLUSION</u>

For the foregoing reasons and in the interests of justice, the SA Defendants respectfully ask the Court to deny dismiss Plaintiffs' complaint with prejudice.

Dated this 17th day of July, 2020

By:     <u>s/ Ryan M. Billings</u>

-40-

Ryan M. Billings
S.D.N.Y. Bar No. RB0378
**KOHNER, MANN & KAILAS, S.C.**
4650 N. Port Washington Road
Milwaukee, WI 53212-1059
Telephone:    (414) 962-5110
Facsimile:    (414) 962-8725
Email:        rbillings@kmksc.com

*Attorneys for Defendants Steven J. Brooks,*
*NianticVista Energy, LLC, Gregory Merle,*
*and Riverview Energy Corporation*

-AND-

Benjamin LaFrombois, *pro hac vice*
William E. Fischer, *pro hac vice*
**VON BRIESEN & ROPER, S.C.**
2905 Universal Street, Suite 2
Oshkosh, WI 54904
Telephone:    (920) 233-4704
Facsimile:    (920) 233-6055
Email:        blafrombois@vonbriesen.com
              wfischer@vonbriesen.com

*Attorneys for Convergen Energy WI, LLC,*
*Theodore J. Hansen, and Brian R. Mikkelson*