UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CONVERGEN ENERGY LLC, L'ANSE WARDEN
ELECTRIC COMPANY, LLC, EUROENERGY
BIOGAS LATVIA LIMITED, and LIBRA CAPITAL
US, INC.

       Plaintiffs,

-against-

STEVEN J. BROOKS, NIANTICVISTA ENERGY
LLC, GREGORY MERLE, RIVERVIEW ENERGY
CORPORATION, DANIEL ESCANDON GARCIA,
RAMON URIARTE INCHAUSTI, CHIPPER
INVESTMENT SCR, SA, URINCHA SL, THEODORE
JOHN HANSEN, BRIAN R. MIKKELSON, and
CONVERGEN ENERGY WI, LLC,

       Defendants.

Index No. **1:20-cv-03746** (LJL)

## PLAINTIFFS' OPPOSITION
## TO SPECIALLY APPEARING DEFENDANTS' MOTION TO DISMISS

Dated: July 31, 2020
New York, New York

SEIDEN LAW GROUP LLP

Michael Stolper
Dov B. Gold
469 Seventh Avenue, Fifth Fl.
New York, NY 10018
(646) 766-1703

*Counsel for Plaintiffs*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

I.      Defendants Submit Inappropriate Evidence to Falsely Claim Ratification .................... 2

II.     Fraud Is Pled with Particularity ..................................................................................... 3

III.    Breach of Fiduciary Duty is Adequately Pled ............................................................... 6

IV.   Plaintiffs Did Not Transfer the Contested Intellectual Property and Data .................. 10

V.     Riverview is Liable for Merle's Substantial Assistance ............................................... 11

VI.    The Arbitration Should be Stayed .................................................................................. 13

VII.   Hansen and Mikkelson Are Key Participants to the Fraud ........................................... 14

VIII.   Hansen and Mikkelson Are Liable Under the Trade Secret Claims ............................ 15

CONCLUSION .................................................................................................................... 17

# TABLE OF AUTHORITIES

**Cases**

*Cammeby's Mgmt., Co., LLC v. Affiliated FM Ins. Co.*,

    152 F. Supp. 3d 159, 165 (S.D.N.Y. 2016) ............................................................ 2

*Chambers v. Time Warner, Inc.*,

    282 F.3d 147, 153 (2d Cir. 2002)....................................................................... 2, 11

*CMS Inv. Holdings, LLC v. Castle*,

    No. CV 9468-VCP, 2015 WL 3894021(Del. Ch. June 23, 2015) ........................... 6

*De Sole v. Knoedler Gallery, LLC*,

    137 F. Supp. 3d 387, 419 (S.D.N.Y. 2015) ........................................................ 13

*DiBlasio v. Novello*,

    344 F.3d 292, 304 (2d Cir. 2003)......................................................................... 11

*ExpertConnect, L.L.C. v. Fowler*,

    2019 WL 3004161, at *6 (S.D.N.Y. July 10, 2019). ............................................ 16

*Feeley v. NHAOCG, LLC*,

    62 A.3d 649, 661 (Del. Ch. 2012).......................................................................... 9

*Gantler v Stephens*,

    965 A2d 695, 708-09 (Del. 2009).......................................................................... 6

*Glidepath Holding B.V. v. Spherion Corp.*,

    590 F. Supp. 2d 435, 453 (S.D.N.Y. 2007) ........................................................ 12

*Helprin v. Harcourt, Inc.*,

    277 F. Supp. 2d 327, 331 (S.D.N.Y. 2003) ........................................................ 11

*In re NYSE Specialists Sec. Litig.*,

    503 F.3d 89, 95 (2d Cir. 2007)............................................................................. 15

*In re Our Alchemy, LLC*,

2019 WL 4447519 (Bankr. D. Del. Sept. 16, 2019) ........................................................... 6, 7

*In re Sabine Oil & Gas Corp.*,

547 B.R. 503, 561 (Bankr. S.D.N.Y. 2016) ........................................................... 10

*Medtech Prod. Inc. v. Ranir, LLC*,

596 F. Supp. 2d 778, 789 (S.D.N.Y. 2008) ........................................................... 16

*Merrill Lynch, Pierce Fenner & Smith, Inc.*,

No. 96 Civ. 6224, 1997 WL 328068 (S.D.N.Y. June 16, 1997) ............................................ 12

*Permatex, Inc. v. Loctite Corp.*,

No. 03 CIV.943 LAK GWG, 2004 WL 1354253 (S.D.N.Y. June 17, 2004) ......................... 17

*Phansalkar v. Andersen Weinroth & Co., L.P.*,

344 F.3d 184, 203 (2d Cir. 2003) ........................................................... 8

*Principal Life Ins. Co. v. Locker Grp.*,

869 F. Supp. 2d 359, 366 (E.D.N.Y. 2012) ........................................................... 3

*SPV Osus Ltd. v. UBS AG*,

882 F.3d 333, 345 (2d Cir. 2018) ........................................................... 14

*Tesla Wall Sys., LLC v. Related Companies, L.P.*,

No. 17-CV-5966 (JSR), 2017 WL 6507110 (S.D.N.Y. Dec. 18, 2017) ................................. 16

*Triple H Family Ltd. Partnership v Neal*,

CV 12294-VCMR, 2018 WL 3650242 (Del. Ch. July 31, 2018) ........................................... 7

*WaveDivision Holdings, LLC v Millennium Digital Media Sys., L.L.C.*,

C.A. 2993-VCS, 2010 WL 3706624 (Del Ch Sept. 17, 2010) ................................................ 8

**Statutes**

18 U.S.C. § 1839(6)(a) ........................................................... 16

Del. C. 6 § 18-1101(c) ........................................................... 10

Plaintiffs Convergen Energy LLC ("CE"), L'Anse Warden Electric Company, LLC ("L'Anse"), Euroenergy Biogas Latvia Limited ("Biogas Latvia"), and Libra Capital US, Inc. ("Libra") (collectively, "Plaintiffs") respectfully submit this memorandum of law, together with the Declaration of Bert Diaz ("Diaz Decl.") and the exhibits annexed thereto, in opposition to Specially Appearing Defendants Steven J. Brooks ("Brooks"), NianticVista Energy, LLC ("Niantic"), Convergen Energy WI, LLC ("CEW"), Gregory Merle ("Merle"), Theodore J. Hansen ("Hansen"), Brian R. Mikkelson ("Mikkelson"), and Riverview Energy Corporation ("Riverview") (collectively, "Defendants") motion to dismiss Plaintiffs' Complaint (the "Complaint").

## PRELIMINARY STATEMENT

Defendants seek to dismiss this fraud suit by arguing facts, mostly outside the four corners of the complaint. They inject a document – an amended closing statement – that is not even referenced or relied on in the complaint to somehow claim that Plaintiffs "ratified" the fraud. Like each of Defendants' arguments, this one does not hold up legally or factually.

Defendants also take issue with the sufficiency of the fraud pleadings. The fraud scheme is simple, and the assistance provided to accomplish the fraud even simpler. Nevertheless, Defendants attempt to complicate the fraud with all sorts of conclusory statements about what was and was not pled. Again, Defendants are wrong factually and legally.

Finally, Defendants fall back on the terms of the fraudulently procured contracts (*i.e.*, the contracts permeated by fraud) to suggest that this case belongs in another forum. As stated in Plaintiffs' motion to stay the arbitration, the fraudulent contracts do not determine the forum for addressing the tortious conduct at issue. Further confirming that this Court is the proper forum, the very document Defendants now rely on – the amended closing statement – requires disputes to be handled in this jurisdiction, not in arbitration, yet Defendants deliberately omit any mention

of this inconvenient provision. This type of gamesmanship typifies the arguments Defendants have put forth in seeking dismissal at the onset of this litigation.

## I.     <u>Defendants Submit Inappropriate Evidence to Falsely Claim Ratification</u>

Defendants rely exclusively on the Amended and Restated Closing Statement (the "amended closing statement") as conclusive proof that Plaintiffs agreed to the Acquisition Agreement and the Pellet Supply Agreement ("Supply Agreement") after they learned of the fraud.

As a threshold matter, as Defendants concede, Plaintiffs' Complaint does not even "mention or acknowledge the amended closing statement." The document is simply irrelevant to this motion. Where Plaintiffs' complaint does not reference or rely upon a document, the document cannot be considered on a motion to dismiss. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion.").

Even if the Court were to consider the amended closing statement, on its face, the document reflects post-closing adjustments; it is not a "second closing," as Defendants contend, nor is it a ratification of the fraudulently obtained sale price. *See* Diaz Decl. at 3. It does not contain any release language, address the issue of fraud, or discuss the material undervaluation of the plant. Nevertheless, Defendants contend that Plaintiffs ratified the fraudulent transaction by agreeing to the amended closing statement. "Ratification 'must be performed with full knowledge of the material facts relating to the transaction, and the assent must be clearly established and may not be inferred from doubtful or equivocal acts of language.'" *Cammeby's Mgmt., Co., LLC v. Affiliated FM Ins. Co.*, 152 F. Supp. 3d 159, 165 (S.D.N.Y. 2016) (quoting *Chemical Bank v. Affiliated FM Ins. Co., 169 F.3d 121, 128 (1999),* vacated on other grounds

sub nom.); "Ratification requires clearly established intent." *Principal Life Ins. Co. v. Locker Grp.*, 869 F. Supp. 2d 359, 366 (E.D.N.Y. 2012). The amended closing statement does not reflect any intent on the part of Plaintiffs to relinquish their fraud claims. On the contrary, when viewed in context (although it would be inappropriate to debate facts at the motion to dismiss stage), the amended closing statement reflects the opposite. At the time, Libra was seeking to require Brooks to repay the shortfall between the fraudulent purchase price and the fair market price as determined by an independent valuation of the pellet plant. *See* Diaz Decl. at 4. Libra expressly required the independent valuation to be completed before determining the amount of Brooks' liability to Libra. *See* Id. If the amended closing statement were somehow intended to relinquish Plaintiffs' stated fraud claim, the closing statement would have had to have reflected as such in the form of a release or comparable language. It does not. Nor does it mention the fairness of the purchase price.

## II.  Fraud Is Pled with Particularity

Plaintiffs pled fraud with particularity.[1] The Complaint alleges that Brooks falsely represented to Libra that Niantic had made an "*unsolicited*" offer for the Group's renewable pellet manufacturing plant. *See* Complaint at 33. Brooks falsely represented Niantic to be a third party, while concealing the material fact that he actually owned Niantic. *See* Id. The Complaint asserts that Hansen and Mikkelson, along with the Spanish Investors knew that Brooks was a senior officer of Libra, that he was overseeing the pellet plant, and that he was a financial stakeholder in Niantic. *See* Complaint at 52. The Complaint also alleges Hansen and Mikkelson enabled every aspect of the fraudulent sale. *See* Complaint at 76. Finally, Defendants ignore

---

[1] Plaintiffs distinguish between the allegations against each Defendant throughout the Complaint. Defendants' argument that allegations are not particularized to each Defendant is simply not accurate. For the same reasons, the cases cited by Defendants on this point are inapplicable.

Brooks' recorded confession where he "acknowledged the knowing participation of the other defendants." *See* Complaint at 5.

Despite these very straightforward allegations, Defendants argue that because the sale price is disclosed in the Acquisition Agreement and closing statements, such disclosure negates Plaintiffs' fraud claims. Such a "defense" disregards the allegations surrounding how the parties arrived at the purchase price, which is a direct result of Defendants' fraudulent actions.

The Complaint alleges that Brooks "made materially false representations to the Company about: (a) the sale price of the Pellet Plant; (b) his relationship to Merle and the other defendants; (c) the appropriateness of the new Supply Agreement between the Power Plant and the Pellet Plant; and (d) the appropriateness of Convergen funding the purchase of a new shredder for the Pellet Plant on the eve of its sale to Niantic." *See* Complaint at 62.  Given Brooks' misrepresentations, Plaintiffs were deceived about the manner in which the purchase price was "negotiated;" the mere disclosure of the purchase price did not alert Plaintiffs to the fraud.

Plaintiffs have also alleged fraud by omission because Brooks had a duty to disclose his relationship with Merle and interest in the transaction. *Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank*, 57 F.3d 146, 155 (2d Cir. 1995) (a duty to disclose may arise from: (a) a confidential or fiduciary relationship; (b) the need to complete a partial statement; or (c) where "(1) one party has superior knowledge of certain information; (2) that information is not readily available to the other party; and (3) the first party knows that the second party is acting on the basis of mistaken knowledge."). Brooks was charged with negotiating the entire transaction, was in a fiduciary relationship, made incomplete disclosures with regards to Merle and Niantic, and knew Plaintiffs were not aware of his relationship and

were operating with the understanding that Niantic was an unrelated party to Brooks. *See* Complaint at 37 and 63. Plaintiffs' allegations that Brooks breached his duty and defrauded Plaintiffs by not disclosing that he was the buyer and that his close friend represented Niantic is of course an allegation of a duty to disclose. The Complaint even alleges that Brooks confessed to the fraud in which he did not disclose his relationship to the transaction, Niantic, and Merle. *See Id.* Therefore, the Complaint alleges that Brooks recognized that he had a duty to disclose, which he violated.

The Complaint does attribute statements to Brooks regarding the Supply Agreement. Brooks "spearheaded" the Supply Agreement and "agreed" to the terms on behalf of CE. *See* Complaint at 39 and 40. These are allegations that Brooks misrepresented that the Supply Agreement was appropriate. The Complaint also specifically states that Brooks did not seek approval for the Supply Agreement terms so it would make sense for there to be a dearth of statement in this regard. *See Id.* Finally, it should not be forgotten that the Complaint alleges that Brooks was acting through Niantic in negotiating the Supply Agreement terms. Therefore, Brooks supplied the terms on behalf of the buyer and seller; all relevant allegations regarding the terms are attributable to him.

Defendants try to distract the Court by claiming that Libra's General Counsel, Bert Diaz, drafted the operative agreements. This is factually inaccurate and, again, it is inappropriate for Defendants to introduce unpled facts and dispute the facts pled on a motion to dismiss. Mr. Diaz did not negotiate the commercial terms and had very little input into the Acquisition Agreement overall. *See* Dkt. 85 at 3. Mr. Diaz also had little input in the Supply Agreement between CEW and L'Anse. *See* Dkt. 85 at 4. CEW had in its possession a draft pellet supply agreement with a third party from 2010 (the "Template"). *Id.* Diaz did not draft the Template; he merely had it in

his electronic files. *Id*. The Template came with an arbitration provision. *Id*. Diaz did not write it or modify that provision, except as to reflect edits suggested by Defendants Brooks and Hansen. *Id*. The Supply Agreement along with its arbitration clause is the product of fraud and void. *See* Dkt. 65 and 83.

### III.    <u>Breach of Fiduciary Duty is Adequately Pled</u>

Defendants attack the fiduciary duty claims by claiming that under Delaware law only managers and members owe fiduciary duties to limited liability companies and since none of the individual Defendants were members or managers (in title), they owed no duty to the Plaintiff entities. This, too, is wrong legally and factually.

Legally, Delaware does not limit fiduciary duties to just members and managers; officers also have fiduciary duties. *See Gantler v Stephens*, 965 A2d 695, 708-09 (Del. 2009) ("In the past, we have implied that officers of Delaware corporations, like directors, owe fiduciary duties of care and loyalty, and that the fiduciary duties of officers are the same as those of other directors. We now explicitly hold so."). Delaware imposes fiduciary duties on LLC managers because they have "more than an arms-length, contractual relationship with the members of the LLC, and [are] vested with discretionary power to manage the business of the LLC." *CMS Inv. Holdings, LLC v. Castle*, No. CV 9468-VCP, 2015 WL 3894021, at *18 (Del. Ch. June 23, 2015) (citing *Auriga Capital Corp. v Gatz Properties*, 40 A3d 839, 850-51 (Del. Ch. 2012), *judgment entered sub nom. Auriga Capital Corp. v Gatz Properties, LLC* (Del. Ch. 2012), *affd*, 59 A3d 1206 (Del. 2012)) (internal quotations omitted). Applying the same principles, Delaware courts impose officers with the same fiduciary duties. *CMS Inv. Holdings, LLC,* 2015 WL 3894021, at *18 (holding that the CEO and a high-level officer of an LLC both stood in the position of a fiduciary where "the agreement [did] not diminish the default standards of care and loyalty under Delaware law."); *In re Our Alchemy, LLC*, 2019 WL 4447519, at *6 (Bankr. D. Del. Sept. 16,

2019) ("Generally, only managers and officers of an LLC will have fiduciary duties to the LLC and those that hold a controlling interest in the entity.").

Factually, it is uncontested that Defendants Brooks, Hansen, and Mikkelson were the relevant officers who managed the pellet plant and the Plaintiff entities. The Complaint alleges that "[Brooks] was afforded and empowered with considerable discretionary authority to manage Convergen and its subsidiaries, including the Pellet Plant. As a senior employee of the Company, Brooks was required to manage and invest assets of Convergen and the Pellet Plant in good faith and for the benefit of his employer." Complaint at 68. It is also alleged that Hansen and Mikkelson were employees of CE, managed CEW and L'Anse, and reported directly to Brooks. *See* Complaint at 22, 23, 30, and 51. In these capacities, the individual Defendants have fiduciary duties to each's respective Plaintiff entities.

Further, Brooks, Hansen, and Mikkelson are also fiduciaries of CE and L'Anse because they are de facto managers. See *Triple H Family Ltd. Partnership v Neal*, CV 12294-VCMR, 2018 WL 3650242, at *14 (Del. Ch. July 31, 2018), affd, 208 A3d 703 [Del. 2019]. A de facto manager is defined as:

> "An individual who has "unfettered access" to the LLC's confidential information, helps to plan the LLC's business dealings with various outside parties on important issues, and assists in updating the LLC's lenders in conjunction with management can be a *de facto* manager owing fiduciary duties to the LLC. *Id. A* plaintiff must demonstrate that a defendant had access to the LLC's confidential information and engaged in acts on behalf of the LLC to establish the defendant's status as a *de facto* manager. *Id.* Delaware courts consistently look "to who wields control in substance and have imposed the risk of fiduciary liability on the actual controllers."

*In re* Our *Alchemy, LLC*, 2019 WL 4447519, at *6.

In *Triple H Family Ltd. Partnership*, the defendant was not a manager, but was still found to be a de facto manager who had a fiduciary duty to the LLC. *Triple H Family Ltd. Partnership,* 2018 WL 3650242, at *14. The defendant had signed the LLC's Certificate of

Formation, retained his personal attorney to set up the LLC, directed setting up a website, ledger and bank accounts, loaned money to the LLC, approved hiring, firing, and payment decisions, and therefore held a certain "degree of control[,] which made him a fiduciary. *Id*. (the non-manager defendant "was sufficiently involved in, and had sufficient control over, the management of [the LLC] to consider him a de facto manager, which makes him a fiduciary."); *see also WaveDivision Holdings, LLC v Millennium Digital Media Sys., L.L.C.*, C.A. 2993-VCS, 2010 WL 3706624, at *3 (Del Ch Sept. 17, 2010) (holding that a non-employee who "wielded great influence" was "a de facto manager.").

The Complaint alleges that Brooks' employment agreement, his status as an officer, and his discretionary authority to manage CE and its subsidiaries including CEW established a fiduciary duty.[2] *See* Complaint at 68.

> Pursuant to Brooks' Employment Agreement with the Company dated January 7, 2014, Brooks agreed "not to be engaged in any other business activity without the prior written consent of the Company" or divulge the Company's confidential information. In accordance with the Employee Handbook, Brooks agreed not to engage in the "theft of money/property [of the Company]" and "any action, which can be construed as intent to defraud/deceive.

Complaint at 69.

Hansen and Mikkelson were employed by CE and their employment agreements[3] reflected similar fiduciary duties, including the duty not to disclose confidential information. *See* Complaint at 70. Mikkelson's employment agreement also prohibits him from engaging in any

---

[2] Brooks, Hansen, and Mikkelson were faithless servants to Plaintiffs including their direct employers, Libra and CE respectively. "When an employee violates this duty, '[n]ot only must the employee or agent account to his principal for secret profits but he also forfeits his right to compensation for services rendered by him if he proves disloyal.'" *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 203 (2d Cir. 2003).
[3] Plaintiffs sued for fraud, not for breach of employment agreements.

other business activities and states in Section 5 that employees (Hansen and Mikkelson) are subject to company policies in the employee handbook. *See* Dkt. 92-11. CE's Employee Handbook[4] unambiguously creates a duty of loyalty that applies to the allegations in the Complaint. Under the title "Employee Loyalty and Conflicts of Interest" that Handbook provides,

> **Every employee owes the Company a duty of loyalty**. This means that while the employee is employed by the Company, and in the performance of his or her job, the employee must always act in the best interests of the Company. First, **every employee must not engage in any illegal or unethical conduct** in the performance of his or her job. Second, in addition to the specific policies concerning, for example, Work Outside the Company and Gifts, **each employee must not engage in any conduct or activities that create an actual, potential or apparent conflict between the employee's personal interests and the Company's interests, or which may otherwise adversely affect the employee's judgment or ability to act in the Company's best interests to perform the duties and responsibilities of his or her job**. (emphasis added)

Defendants' cited cases (in footnote 20 of the Motion to Dismiss) do not support their argument. For example, *Feeley v. NHAOCG, LLC,* 62 A.3d 649, 661 (Del. Ch. 2012), does not stand for the proposition that only managers and managing members have a fiduciary duty to a limited liability company. *Feeley v NHAOCG, LLC*, 62 A3d 649, 661 (Del. Ch. 2012) ("A fiduciary relationship is a situation where one person reposes special trust in and reliance on the judgment of another or where a special duty exists on the part of one person to protect the interests of another.") (internal quotations and citations omitted). Instead, *Feeley* states that §18-1101(c) applies default fiduciary duties to those in a fiduciary relationship with the LLC unless those duties are restricted by the operating agreement. *Id*. ("the language and drafting history of *Section 18–1101(c) support the existence of default fiduciary duties, because otherwise there*

---

[4] The Handbook is incorporated by reference in Mikkelson's employment contract that was attached to Defendants' Motion to Dismiss. *See* Diaz Decl., Ex. A.

*would be nothing for the operating company agreement to expand, restrict, or eliminate.*")
(emphasis added); Del. C. 6 § 18-1101(c) ("To the extent that, at law or in equity*, a member or
manager or other person has duties (including fiduciary duties)* to a limited liability company or
to another member or manager or to another person that is a party to or is otherwise bound by a
limited liability company agreement, *the member's or manager's or other person's duties may be
expanded or restricted or eliminated by provisions in the limited liability company
agreement*[.]") (emphasis added). *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 561 (Bankr.
S.D.N.Y. 2016) cited by Defendants is also inapposite as the court found that a member who was
"*at all times* subject to the authority of the managing member" did not owe a fiduciary duty to
the LLC.  *In re Sabine Oil & Gas Corp.*, 547 BR 503, 561 (Bankr. S.D.N.Y. 2016), *affd,* 562 BR
211 (S.D.N.Y. 2016) (emphasis added).

**IV.    Plaintiffs Did Not Transfer the Contested Intellectual Property and Data**

In its attack on Plaintiffs' trade secret and misappropriation claims, Defendants argue
(rather incredibly) that Plaintiffs sold the contested intellectual property ("IP") of other entities in
connection with the fraudulent sale of the pellet plant. Defendants cite to 2.15(c)(ii) of the
Acquisition Agreement as somehow transferring all IP on CEW servers, which included IP from
Biogas Latvia, L'Anse, and CE. There are several fatal flaws to this ridiculous argument.

First, the terms of the Acquisition Agreement are unenforceable, including 2.15(c)(ii).
That "agreement" is permeated by fraud and is subject to challenge based on that fraud. The very
people charged with protecting Plaintiffs' interests, including its IP, are the very people charged
with self-dealing and fraud.

Second, the plain meaning of the Acquisition Agreement does not confer the IP of any
entity other than the pellet plant. The cited section makes repeated references specifically and
only to CEW. Defendants also paraphrase this section as defining CEW's IP to include those

things "used or *held by* CEW *in the course of its business*." The actual language defines IP more narrowly to include only those things, "used or *held for use by CEW in the Business*." Further, the Acquisition Agreement specifically contemplated that the Plaintiffs would continue to use their email accounts. Section 8.3 of the agreement allowed Plaintiffs to continue using the Convergen Energy name and "any domain name owned by CE or its Affiliates containing the term 'Convergen Energy' for six months after the closing.

Third, there is no consideration or business purpose for transferring the IP and electronic files of other entities, particularly Biogas Latvia and L'Anse, two active operating entities with their own emails and electronic files independent of the pellet plant. In fact, post-sale, the pellet plant and L'Anse are on opposite sides of the sale of pellets. Defendants would have this Court believe that the pellet plant acquired all of the emails and electronic files of L'Anse as part of the fraudulent sale. Ridiculous.

Finally, the interpretation of the agreements and intent of the parties as to what was and was not sold is a fact issue not ripe for resolution a motion to dismiss. "[A] disputed issue of fact [ ] is inappropriate to consider in the context of a Rule 12(b)(6) motion." *DiBlasio v. Novello*, 344 F.3d 292, 304 (2d Cir. 2003).

## V.     Riverview is Liable for Merle's Substantial Assistance

Merle used Riverview's credibility to convince the Plaintiffs that the buyer was real (and not Brooks). *See* Complaint at 35 and 36. As a matter of fact, the very first sentence of the letter of intent that is alleged in the Complaint refers to Niantic "an affiliate of Riverview.[5] *See*

---

[5] The letter of intent is cited in the Complaint, was relied upon in the Complaint as the offer by Niantic, is the foundation of the sale documents, and may be considered on a motion to dismiss. It is attached as Exhibit B to the Diaz Decl. *See Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 331 (S.D.N.Y. 2003) (considering an agreement incorporated by reference where "the Complaint makes several substantial references" to the agreement and is based on specific terms of the agreement.); *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("a plaintiff's

Complaint at 35; Diaz Decl., Ex. B. The second and third paragraph are exclusively about Riverview's background and CEW's "strategic value" to Riverview. *See* Id. Merle also sent the letter of intent from his Riverview email and is Riverview's President. *See* Complaint at 16 and 35. Defendants argue that Riverview only came up in a "social context when Merle was introducing himself to Plaintiffs and explaining who he is"; the reference to Riverview in the letter of intent was certainly not "social" and Merle definitely did not adequately explain who he is.

"It is black-letter agency law in New York that an employer is liable for the representations of its agents when those representations are made within the scope of the agent's employment." *Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 453 (S.D.N.Y. 2007) (finding allegations sufficient at the motion to dismiss stage that a company officer acted within scope of employment when he made fraudulent statements because he had been instructed to help with the employer's agenda and "a rational jury could attribute those statements to employer."); *Merrill Lynch, Pierce Fenner & Smith, Inc.*, No. 96 Civ. 6224, 1997 WL 328068, at *6 (S.D.N.Y. June 16, 1997) (holding that a complaint that stated a factual basis for attributing an agent's statements to his principal was sufficient to survive the motion to dismiss "[b]ecause fictional entities such as Merrill Lynch can only act through their agents."). "An employer does not have to approve, or even be aware of, a representation made by an employee to be liable for that representation." *Id*. "An agent does not cease to act within his or her authority merely because the agent is engaged in a fraud upon a third person." *Id (quoting* 2A N.Y. Jur.2d Agency & Indep. Contractors § 290.); *see also De Sole v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 387,

---

reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion.").

419 (S.D.N.Y. 2015) (finding that because fraudulent acts by employees were "central" to their job functions, it had been sufficiently alleged that they were acting in the scope of their employment and in their employer's interests).

Merle made reference to Riverview in the letter of intent and in his conversations with Plaintiffs because this was a deal that he thought provided "strategic value" to Riverview and because Brooks needed a reputable buyer to make the unsolicited offer and set his fraudulent scheme into action. *See* Complaint at 33 and 35; Diaz Decl., Ex. B. Because Merle was acting within the scope of his employment and in Riverview's interest his statements are attributed to Riverview.[6]

## VI.    The Arbitration Should be Stayed

Arbitrable issues of contract formation are decisions for a court, not an arbitrator. A court must find that there exists a valid arbitration agreement (which there is not) before an arbitration can proceed. Additionally, the arbitration agreements were formed as a result of fraud and are entirely permeated by fraud, rendering them void. Similarly, arguments about Plaintiffs' bargaining power are irrelevant. Plaintiffs have fully briefed this issue in their Motion to Stay Arbitration and incorporate by reference Docket entries 64, 65, 83, 84, and 85.

The amended closing statement mandates that this action be brought in New York courts. Defendants seek to rely upon the amended closing statement as a purported defense to the Plaintiffs' fraud claim because it somehow ratifies the Acquisition Agreement, but then dismiss it as nothing more than a two-page agreement when it refers to jurisdiction in New York. *See* Motion at 16. The amended closing statement states that if there is an inconsistency with the

---

[6] For the same reasons, Merle's statements and acts in New York are attributed to Riverview to establish personal jurisdiction. Personal jurisdiction over Merle has not been contested. Merle also does not contest the claim for misappropriation of trade secrets, which should similarly be attributed to Riverview.

Acquisition Agreement, then the amended closing statement controls. An inconsistency arises because the Acquisition Agreement calls for disputes to be resolved in arbitration, but the amended closing statement calls for disputes to be resolved in the New York courts. Either the amended closing statement controls or the Acquisition Agreement and Supply Agreement's arbitration clauses are void for fraud; in both scenarios venue and jurisdiction are proper in this Court.[7]

### VII.    Hansen and Mikkelson Are Key Participants to the Fraud

"Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 345 (2d Cir. 2018) (citation omitted).

Hansen and Mikkelson played an instrumental role in the fraud and are at the heart of the trade secret, Stored Communications Act and intellectual property claims. Hansen and Mikkelson were charged with managing the Office 365 accounts that contained the emails, data, intellectual property, and trade secrets of Plaintiffs. *See* Complaint at 55. It was their deliberate failure to separate Plaintiffs' data that resulted in the associated claims.[8] *See* Id. Hansen and Mikkelson also worked closely with Brooks to funnel confidential information to the Defendants and act against their employer's interest when they knew Brooks was defrauding plaintiffs. *See* Complaint at 34.

Defendants fail to explain away their decision to "reduce sale proceeds to Libra" with the shredder. Defendants claim that because there are references in an email suggesting they will have some communications with Libra's General Counsel, they are off the hook. However, the

_____

[7] The forum selection clauses are likewise not triggered.
[8] The claim against CEW for retaining exclusive access to the IP only arose after the closing.

email does not make clear what exactly they planned to tell Libra's General Counsel and no further communications in this regard are alleged in the Complaint.

Plaintiffs' Complaint cites an email that establishes Hansen and Mikkelson knew Brooks was in Spain. *See* Complaint at 51. The email was sent around the time Brooks had formally initiated the sale process with Niantic. *See* Id. Plaintiffs allege this is an indication of the cozy relationship among Brooks, Hansen and Mikkelson and that they knew Brooks was fundraising from the Spanish Investors. Defendants' contention that this is "woefully inadequate" is conclusory and does not address the allegation. *See In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (citation omitted) (on a motion to dismiss, courts must accept as true all factual allegations contained in the complaint and must draw 'all inferences in the light most favorable to the non-moving party.'").

Lastly, Defendants completely ignore Brooks' recorded confession where he "acknowledged the knowing participation of the other defendants." *See* Complaint at 5. An admission by the primary actor to the fraud in which he calls out his co-conspirators is not the type of allegation that can be ignored or argued as not sufficiently particular. Ultimately, these are all fact issues not ripe for resolution on a motion to dismiss.

### VIII.    <u>Hansen and Mikkelson Are Liable Under the Trade Secret Claims</u>

Plaintiffs sufficiently allege that Hansen, and Mikkelson are liable under the Defend Trade Secrets Act (the "DTSA") and for misappropriation under New York common law. Defendants argue that Hansen and Mikkelson did not use the trade secrets, thus no liability attaches. The Complaint alleges that Hansen and Mikkelson made a "complete disclosure" of the pellet plant. *See* Complaint at 34. This was a much broader disclosure than contemplated under the NDA and before the letter of intent was signed. Therefore, Hansen and Mikkelson did *use*

Plaintiffs' trade secrets to facilitate the fraudulent transaction by disclosing them earlier than they should have been in the deal process. Even more obvious is that Brooks prepackaged the unsolicited offer, which Hansen and Mikkelson were complicit in. Therefore, the Complaint adequately alleges that Hansen and Mikkelson used the trade secrets before the NDA was signed.

Hansen and Mikkelson are liable under the DTSA for both acquiring the trade secrets improperly and disclosing them without consent, regardless whether they *used* them. Under the DTSA, a defendant has misappropriated a trade secret by "(1) acquiring the trade secret by improper means, or (2) disclosing or using the trade secret without consent." *ExpertConnect, L.L.C. v. Fowler*, 2019 WL 3004161, at *6 (S.D.N.Y. July 10, 2019). "Improper means includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.". 18 U.S.C. § 1839(6)(a) Plaintiffs have clearly alleged that Hansen and Mikkelson fraudulently stole trade secrets, IP, and emails as part of the fraudulent scheme, thus meeting the DTSA's standard.

Plaintiffs have specifically alleged what trade secrets have been misappropriated. *See* Complaint at 59, 88, 89, 103, 104,105, and 107. However, such specificity is not required to sufficiently allege misappropriation under the DTSA or New York common law. *See Tesla Wall Sys., LLC v. Related Companies, L.P.*, No. 17-CV-5966 (JSR), 2017 WL 6507110, at *10 (S.D.N.Y. Dec. 18, 2017) ("there is no heightened pleading requirement on actions brought under the DTSA," noting that trade secrets do not need to be disclosed to adequately allege misappropriation); *Medtech Prod. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 789 (S.D.N.Y. 2008) ("specificity as to the precise trade secrets misappropriated is not required in order [ ] to defeat the present Motions to Dismiss."); *Permatex, Inc. v. Loctite Corp.*, No. 03 CIV.943 LAK GWG,

2004 WL 1354253, at *4 (S.D.N.Y. June 17, 2004) (applying Federal Rule of Civil Procedure

8(a)(2) to a claim for misappropriation of trade secrets).

## **<u>CONCLUSION</u>**

Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.

Dated: July 31, 2020                    SEIDEN LAW GROUP LLP
New York, New York

By: /s/ Michael Stolper
     Michael Stolper
     Dov B. Gold
     469 Seventh Avenue, Fifth Fl.
     New York, NY 10018
     (646) 766-1703

     *Counsel for Plaintiffs*