UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

CONVERGEN ENERGY LLC, L'ANSE WARDEN
ELECTRIC COMPANY, LLC, EUROENERGY
BIOGAS LATVIA LIMITED, and LIBRA CAPITAL
US, INC.,

                                    Plaintiffs,

                   -v-

STEVEN J. BROOKS, NIANTICVISTA ENERGY LLC,
GREGORY MERLE, RIVERVIEW ENERGY
CORPORATION, DANIEL ESCANDON GARCIA,
RAMON URIARTE INCHAUSTI, CHIPPER
INVESTMENT SCR, SA, URINCHA SL, THEODORE
JOHN HANSEN, BRIAN R. MIKKELSON, and
CONVERGEN ENERGY WI, LLC,

                                  Defendants.

------------------------------------------------------------------X

20-cv-3746 (LJL)

OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__8/5/2020___

LEWIS J. LIMAN, United States District Judge:

       Plaintiffs Convergen Energy LLC ("Convergen"), L'Anse Warden Electric Company,

LLC ("L'Anse"), EuroEnergy Biogas Latvia Limited, and Libra Capital US, Inc. ("Libra")

(collectively, "Plaintiffs") move to stay an arbitration initiated by Defendant Convergen Energy

WI, LLC ("CEW") against L'Anse.

       For the following reasons, the motion is denied.

## BACKGROUND

### A.    The Complaint

       On May 14, 2020, Plaintiffs filed a complaint in this Court against Steven J. Brooks

("Brooks"), NianticVista Energy LLC ("Niantic"), Gregory Merle ("Merle"), Riverview Energy

Corporation, Theodore John Hansen, Brian R. Mikkelson, CEW, Daniel Escandon Garcia,

Ramon Uriarte Inchausti, Chipper Investment SCR, SA, and Urincha SL (collectively,

"Defendants").  Dkt. No. 1 ("Compl." or "Complaint").[1]  The Complaint lists eight counts

alleging claims for fraud, breach of fiduciary duty, aiding and abetting fraud, aiding and abetting

breach of fiduciary duty, theft and misappropriation of trade secrets, rescission, violation of the

Defend Trade Secrets Act, 18 U.S.C. § 1836, and violation of the Stored Communications Act,

18 U.S.C. § 2701.

Plaintiffs are part of an international conglomerate headquartered in New York and

known as the Libra Group (the "Group").  Compl. ¶ 2.  The Group held a number of energy

investments including an electric power plant in Michigan (the "Power Plant") and a renewable

pellet manufacturing plant in Wisconsin (the "Pellet Plant").  *Id.*  The Pellet Plant produces

cost-effective fuel alternatives that can be used as a substitute for traditional fossil fuels and

burned by the Pellet Plant's customers.  *Id.* ¶ 30.  The Power Plant, acquired by the Group in

2016 as part of a strategy of creating a customer for the Pellet Plant, uses the pellets produced by

the Pellet Plant to generate electricity in an environmentally sustainable manner.  *Id.* ¶ 31.  The

Group owned the Pellet Plant through its ownership of Convergen and Convergen's ownership

of CEW, which owned the Pellet Plant.  *Id.* ¶ 8.  The Group owns the Power Plant through its

ownership of Convergen and Convergen's ownership of L'Anse, which owns the Power Plant.

*Id.* ¶ 9.

The Complaint arises out of the sale, in 2019, of the Pellet Plant to Defendant Niantic

(the "Acquisition").  Effective January 29, 2020, Convergen, CEW, and Niantic signed an

agreement to sell CEW, and along with it, the Pellet Plant, to Niantic for $5.5 million (the

"Acquisition Agreement").  Dkt. No. 67-1 ("AA"); *see* Compl. ¶ 37.  The Acquisition

---

[1] The facts are taken from the Complaint and from the briefs and declarations submitted in
connection with the instant motion.

Agreement was signed by the CEO of Niantic and by Fidel Andueza ("Andueza") as President of

Convergen and CEW.  AA at 43.  The sale closed on January 31, 2020.  Compl. ¶ 37.

The Acquisition Agreement contains an arbitration clause.  Under the Acquisition

Agreement, "[a]ny dispute arising between the Parties in connection with this Agreement, which

cannot be resolved by the Parties themselves, shall be submitted to binding arbitration," which

"shall be conducted in accordance with the then-prevailing Commercial Rules of the American

Arbitration Association."  AA §§ 9.7(a)-(b).  The Acquisition Agreement is to be enforced in

accordance with Delaware law.  *Id.* § 9.8.  As part of, and a condition to, the Acquisition

Agreement, Convergen was to have executed and delivered to Niantic a supply contract in a form

attached to the Acquisition Agreement and "on terms acceptable to the Parties."  AA § 5.9

(stating that supply contract was attached as Exhibit I to the Acquisition Agreement).  That

agreement would become effective on January 31, 2020 with the closing of the Acquisition.

On February 21, 2020, Convergen, CEW, Niantic, and L'Anse signed an Amended and

Restated Closing Statement concerning the sale of the Pellet Plant from Convergen to Niantic

and which made adjustments to the purchase price and credits due to Niantic.  Dkt. No. 64-2.

The agreement was signed by Defendant Merle on behalf of Niantic and CEW and by Bert Diaz

("Diaz"), general counsel to Libra, on behalf of Convergen and L'Anse.  *Id.* at 3.  That

agreement "amends, restates and replaces in its entirety any prior closing statement relating to

this transaction previously signed by [Niantic] and [Convergen]."  *Id.* at 1.  It contains a forum

selection clause that states:

> Any action or proceeding seeking to enforce any provision of, or based on any right
> arising out of, this Agreement may be brought against any of the parties in the courts
> of the State of New York, County of New York, or, if it has or can acquire
> jurisdiction, in the United States District Court for the Southern District of New
> York, and each of the parties consents to the jurisdiction of such courts (and of the

appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

*Id.* at 2.

In their Complaint, Plaintiffs claim that the senior person arranging the sale on behalf of the Group, Defendant Brooks, was on both sides of the transaction and had a conflict of interest. Compl. ¶¶ 2, 4. Brooks was then Senior Vice President of Investments of the Group but his employment has since been terminated. *Id.* ¶ 2. While he was negotiating ostensibly on behalf of the Group, the Complaint alleges that he was also a secret owner of Niantic and had provided a secret personal guaranty to finance the purchase of the Pellet Plant. *Id.* ¶¶ 3-4. Plaintiffs also allege that Brooks sold the Pellet Plant for ten million dollars less than it was worth and failed to procure other competing bids. *Id.* ¶ 4. They further allege that Brooks inflated the price of the pellets in the Supply Agreement with the Power Plant, effectively shifting future profit from the Power Plant to the Pellet Plant, and had instructed Convergen to pay for hundreds of thousands of dollars of improvements to the Pellet Plant before closing. *Id.* Brooks allegedly absconded with $196,420 of cash that was due to Convergen at closing. *Id.*

**B.     The Arbitration**

On January 31, 2020, concurrent with the Acquisition, L'Anse entered into the supply agreement with CEW (the "Supply Agreement"). *See* Dkt. No. 64-1 ("SA"). The Supply Agreement provided that CEW, as the seller, would supply to L'Anse, as the buyer, a minimum quantity of 40,000 total tons per year of engineered fuel pellets in return for L'Anse's agreement to pay CEW a base price of $50 per ton, to be adjusted on each anniversary date of the effective date of the Supply Agreement. *Id.* at 2. L'Anse was required to pay invoices no later than 30 days after receipt of each weekly invoice. *Id.* at 3. The Supply Agreement was signed by Merle on behalf of CEW and by Andueza on behalf of L'Anse.

The Supply Agreement also contains an arbitration provision in the attached section on "Additional Terms and Conditions."  It requires all disputes arising out of the Supply Agreement to be settlement by arbitration.  It states in relevant part:

> All Disputes shall be exclusively, finally and conclusively settled by binding arbitration under the Rules of Arbitration of the American Arbitration Association in accordance with its Commercial Arbitration Rules . . . The parties shall continue to perform their respective obligations under this Agreement pending conclusion of the arbitration. As used herein, Dispute means any disagreement, controversy or claim that arises between [CEW] and [L'Anse] regarding the interpretation, fulfillment, or implementation of any provision of this Agreement, or regarding the rights and obligations of the parties (including, without limitation, the validity of the agreement of the parties to arbitrate, the arbitrability of the issues submitted to arbitration hereunder, and any conflict of laws issues in connection with this Agreement).

SA at 6 § 11.  The Supply Agreement is to be enforced in accordance with Wisconsin law.  *Id.* § 7.

On June 4, 2020, CEW (the owner of the Pellet Plant) filed an arbitration demand with the American Arbitration Association against L'Anse (the owner of the Power Plant) seeking to recover payments due under the agreement.  The arbitration demand claimed that L'Anse, who was named as respondent, had failed to pay invoices as required under the Supply Agreement. CEW sought $235,223.50 plus additional amounts as they become due, interest, fees, costs, and punitive damages. Dkt. No. 64-3.  CEW attached unpaid invoices from April and early May 2020.  *Id.*  According to CEW, the balance due to CEW is now in excess of $500,000 and continues to accrue, as L'Anse continues to request pellet fuel on a daily basis and CEW has not received payment since March 2020.  Dkt. No. 67 ¶¶ 5-6.

On June 23, 2020, L'Anse filed a motion to stay the arbitration.  Dkt. No. 63; *see also* Dkt. No. 65 ("Br.").  CEW opposed this motion on July 7, 2020, Dkt. No. 69 ("Opp. Br."), and

L'Anse replied on July 14, 2020, Dkt. No. 83 ("Reply").  CEW moved to file a sur-reply and

filed such sur-reply on July 21, 2020.  Dkt. Nos. 96-97.[2]

## DISCUSSION

Plaintiffs argue that the Court should stay the arbitration on two grounds: (1) the

arbitration will require resolution of the same issues that are already before this Court and thus it

raises the risk of conflicting decisions; and (2) material issues of fact exist as to whether a valid

arbitration agreement exists.  The Court takes the arguments in reverse order.

**A.      Plaintiffs Are Not Entitled to a Stay Based on Their Claim That The Supply
          Agreement Was Permeated By Fraud**

Plaintiffs argue that the arbitration should be stayed because the Supply Agreement and

the arbitration provision contained therein were procured by fraud.  They conclude that the

arbitration cannot proceed until there is a trial on the merits of their fraud claims in this case.

Plaintiffs' argument, or one akin to it, was rejected as long ago as 1967 in *Prima Paint*

*Corp. v. Flood & Conklin Mfg. Co*., 388 U.S. 395 (1967).  There, the Supreme Court confronted

the question of whether a party could be compelled to arbitrate a contractual dispute when it

---

[2] The Court denies Defendants' motion to file a sur-reply, the contents of which would not
change the result in this case.  Defendants argue that they should be afforded the opportunity to
respond to the declaration submitted by Plaintiffs, which "offers new evidence on reply" such as
"Mr. Diaz's involvement in the drafting of the Supply Agreement."  Dkt. No. 96 ¶¶ 3-4.  But the
reply merely "responded directly to the arguments advanced through [Defendants'] opposition
memorandum," which first raised the issue of whether Diaz was responsible for drafting the
arbitration clause.  *Kapiti v. Kelly*, 2008 WL 754686, at *1 n.1 (S.D.N.Y. Mar. 12, 2008)
(denying sur-reply).  Defendants admit as much.  *See* Dkt. No. 96 ¶ 2 ("[T]he Hansen
Declaration established that the Supply Agreement was drafted by Bert Diaz, Libra's general
counsel."); Dkt. No. 67 ¶ 4; Opp. Br. at 4.  Further, the proposed sur-reply addresses arguments
in Plaintiffs' reply unrelated to the declaration and repeats many of the same arguments already
present in Defendants' opposition brief.  *See Salemo v. Comm'r of Soc. Sec.*, 2012 WL 1019054,
at *2 (S.D.N.Y. Mar. 27, 2012) ("Even if the Court were to consider the sur-reply, it does not
appear to present any arguments that were not previously made."); *see also Kapiti*, 2008 WL
754686, at *1 n.1 ("Allowing parties to submit surreplies is not a regular practice that courts
follow, because such a procedure has the potential for placing a court in the position of
refereeing an endless volley of briefs.").

claimed that the contract containing the arbitration clause and that formed the basis for the arbitral claim was the product of fraud.  In particular, Prima Paint argued that if, under New York law, a contract induced by fraud is without force or effect, every part of that contract is also without force or effect, including the arbitration provision.  That notion has some common sense appeal.  One could have imagined the Supreme Court agreeing.  But it did not.  It held that federal law applies and that "arbitration clauses as a matter of federal law are 'separable' from the contracts in which they are embedded, and that where no claim is made that fraud was directed to the arbitration clause itself, a broad arbitration clause will be held to encompass arbitration of the claim that the contract itself was induced by fraud."  *Id.* at 402.

The Court thus rejected Justice Black's argument, in dissent, that the Federal Arbitration Act ("FAA") "assume[s] the existence of valid contract" between the parties, and that where a contract was procured by fraud, "unless the defrauded party elects to affirm it, there is absolutely no contract, nothing to be arbitrated."  *Id.* at 412.  Justice Black complained that the majority's interpretation perverted the FAA.  In his view, its interpretation relegated "the legal issue of a contract's voidness because of fraud [to] persons designed to arbitrate factual controversies arising out of a valid contract between the parties," *id.* at 407, and "contrary to the intention of the parties . . . elevate[d] arbitration provisions above all other contractual provisions," *id.* at 411.

Almost 40 years later in *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006), the Supreme Court extended *Prima Paint* to allegations that a contract containing an arbitration provision was void or voidable.  Respondents there had brought a state court action alleging that contracts to which they were subject violated Florida lending and consumer protection laws and were criminal and void *ab initio*.  *Id.* at 442-43.  Petitioner moved to compel arbitration and the Florida Supreme Court ultimately denied the motion; it held that there was a fundamental

difference between voidable and void contracts and enforcing the arbitration agreement "could breathe life into a contract that not only violates state law but also is criminal in nature." *Id.* at 443 (quoting *Cardegna v. Buckeye Check Cashing, Inc.*, 894 So. 2d 860, 862 (Fla. 2005)).  The United States Supreme Court rejected that distinction.  It held that where a claim challenged the contract as a whole, and not the arbitration clause in particular, the arbitration clause was enforceable apart from the contract.  *Id.* at 446; *see Rubin v. Sona Int'l Corp.*, 457 F. Supp. 2d 191, 193 (S.D.N.Y. 2006) ("*Buckeye Check Cashing* makes clear that whether [plaintiff] argues that the agreement is void or voidable, [plaintiff] may only avoid arbitration if it can successfully challenge the validity of the arbitration clause itself.").  In so holding, the Supreme Court rejected the view espoused by respondents and first articulated by Justice Black's dissent in *Prima Paint*, that Sections 2 and 3 of the FAA provide for enforcement only where a valid contract exists in the first place.  Instead, it stated that "[t]here can be no doubt that 'contract' as used [in the FAA] must include contracts that later prove to be void."  *Buckeye*, 546 U.S. at 448. The Supreme Court concluded that "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance."  *Id.* at 445-46; *see also Rent-A-Ctr., W., Inv. v. Jackson*, 561 U.S. 63, 70 (2010) (holding that "only" a "challenge[] [to] specifically the validity of the agreement to arbitrate" and not the "challenge[] [to] the contract as a whole . . . is relevant to a court's determination whether the arbitration agreement at issue is enforceable").

The Supreme Court has established only a limited carve-out to this rule.  It ruled that the issue of the validity of a contract—which does not invalidate an arbitration clause—is different from the issue of whether an agreement was actually formed between the parties.  *See Buckeye*, 546 U.S. at 444 n.1.  Formation issues may include "whether the alleged obligor ever signed the

contract, whether the signor lacked authority to commit the alleged principal, and whether the signor lacked the mental capacity to assent." *Id.* (internal citations omitted); *see also Dowe v. Leeds Brown Law, P.C.*, 419 F. Supp. 3d 748, 757 (S.D.N.Y. 2019) ("Where a party brings a challenge to the very formation of a contract containing an agreement to arbitrate, however, the court must resolve that challenge itself in order to determine whether to compel arbitration.").

*Prima Paint* and *Buckeye* dispose of this case. Plaintiffs do not challenge the arbitration clause in the Supply Agreement specifically but rather the Acquisition Agreement and the Supply Agreement as a whole. Plaintiffs contend that they were induced to sign the Acquisition Agreement, and the Supply Agreement that was a condition of the Acquisition Agreement, by the act of a faithless agent who impliedly represented that he was acting in the best interests of the corporation in negotiating the contracts but instead had secret conflicts of interest.[3]

Plaintiffs further contend that the Acquisition Agreement thereby obtained was unfair and tainted by fraud: it resulted in a below-market sale of the Pellet Plant and above-market prices the Power Plant would subsequently have to pay to CEW and the Pellet Plant under the Supply Agreement. But Plaintiffs do not challenge the arbitration clause itself, or argue that it was fraudulently induced or suffers from some other defect. *See HDI Glob. SE v. Lexington Ins. Co.*, 232 F. Supp. 3d 595, 603 (S.D.N.Y. 2017) (granting motion to compel where "there are no allegations or facts pleaded in the amended complaint challenging the validity and enforceability of the arbitration clause itself"); *see also Ipcon Collections LLC v. Costco Wholesale Corp.*, 2011 WL 3806255, at *4 (S.D.N.Y. Aug. 24, 2011), *aff'd*, 698 F.3d 58 (2d Cir. 2012)

---

[3] *See, e.g.*, Compl. ¶ 62 ("Brooks engaged in a fraudulent scheme to acquire the Pellet Plant for at least $10 million less than what it was worth" by "ma[king] materially false representations to the Company"); *id.* ¶ 96 ("The Power Plant was fraudulently induced to enter the Pellet Supply Agreement with the Pellet Plant by Brooks who engaged in self-dealing.").

("Plaintiff's arguments that there was no 'meeting of the minds' is simply irrelevant. The parties agreed on terms and signed contracts memorializing such agreement.").

Plaintiffs do argue that Brooks was a "faithless agent," Reply at 8 n.7, and that "the negotiation of the Supply Agreement itself and the terms by which the parties purportedly agreed—the formation of the Supply Agreement—were the result of fraud," Br. at 8. But those allegations do not go to the contract's formation or existence. Plaintiffs do not argue that they "did not enter into the agreement or that their principal or signatory did not possess the authority or capacity to do so." *Ipcon*, 2011 WL 3806255, at *4. The Acquisition Agreement and the Supply Agreement were signed by Andueza on behalf of Plaintiffs, not by Brooks. It is undisputed that he had authority as the President of Convergen to sign those agreements. Nor do Plaintiffs argue that the Supply Agreement that Andueza signed, and upon which Defendants base their arbitration demand, is anything other than authentic. It thus is irrelevant whether—as Defendants claim—the arbitration clause in the Supply Agreement was inserted by Plaintiff Libra's general counsel, or whether—as Plaintiffs contend—the Supply Agreement was based on an old template agreement initially provided by Defendant CEW and primarily revised by Defendants Brooks and Hansen. *Compare* Opp. Br. at 4, 11, *with* Reply at 8, 10; *see also* Dkt. No. 85 ¶¶ 4-6. Plaintiffs' complaint sounds not in whether a contract was formed but rather in whether it was fraudulently induced. *See Tyco Int'l, Ltd. v. Kozlowski*, 756 F. Supp. 2d 553, 563-64 (S.D.N.Y. 2010) (corporation "had a defense to enforcement of all [compensation] contracts entered into subsequent to the beginning of [former CEO]'s misconduct" because they were "fraudulently induced and [] therefore voidable" based on CEO's "fail[ure] to disclose his many breaches of fiduciary duty" to the corporation, including convictions for falsification of business records and grand larceny).

Assuming the truth of its allegations, L'Anse had the option to refuse or assume the Supply Agreement.  It has chosen to take delivery under the agreement.  Thus, even accepting Plaintiffs' version of events, the Supply Agreement was formed and exists.  *See, e.g.*, *Ipcon*, 698 F.3d at 62 ("The contracts are each clear on their face as to the obligations of the parties, and both parties duly executed the contracts, indicating that they understood their obligations. [Plaintiff] does not allege that the parties had differing contemplations of their obligations under the contracts, or that the parties defined key terms of the contracts in differing manners."); *Abeona Therapeutics, Inc. v. EB Research P'ship, Inc.*, 2019 WL 623864, at *5 (S.D.N.Y. Feb. 14, 2019) ("The Second Circuit has made clear that Congress enacted the FAA 'to preserve the parties' ability to agree to arbitrate, rather than litigate, disputes.' That purpose is not served by allowing parties to evade a validly executed arbitration clause by construing a challenge to the underlying contract as one going to the 'formation' of the agreement to arbitrate.") (internal citation omitted).

A court in this District confronted a similar question in *Dowe*.  There, former clients alleged that their law firm conspired with their former employer, Prudential, to settle discrimination claims for less than their true value.  *Dowe*, 419 F. Supp. 3d at 754-55.  Prudential moved to compel arbitration based on the arbitration clause in its settlement agreements with plaintiffs, and plaintiffs argued that those agreements were fraudulently induced and therefore unenforceable.  The court rejected plaintiffs' argument, holding:

> There is no dispute that the claims against Prudential fall within the broad arbitration clause contained in the settlement agreement between the plaintiffs and Prudential. The plaintiffs contend, however, that Prudential may not compel arbitration based upon the arbitration clause contained in their settlement agreements because the settlement agreements were fraudulently induced. This is not the law. A court may consider a claim of "fraud in the inducement of the arbitration clause itself," but "claims of fraud in the inducement of the contract generally" are for arbitrators to decide. The plaintiffs make no allegations targeted

at the arbitration clause itself; rather, they allege a conflict of interest that tainted the agreement as a whole. Under the Supreme Court's cases, this issue is for the arbitrator to decide.

*Id.* at 759 (quoting *Buckeye*, 546 U.S. at 445-46); *see also Morelli v. Alters*, 2020 WL 1285513, at \*11 (S.D.N.Y. Mar. 18, 2020) ("Plaintiffs do not allege that [defendant] fraudulently induced the arbitration agreement specifically" but rather "that the entire contract was the result of fraudulent inducement. Accordingly, Plaintiffs' claim of fraudulent inducement is subject to arbitration").

The cases cited by Plaintiffs are off point. They involve direct challenges to the arbitration clause itself, which Plaintiffs have not made here, or are otherwise irrelevant.[4] And Plaintiff's reliance on cases such as *Adams v. Suozzi*, 433 F.3d 220 (2d Cir. 2005) and *Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.*, 263 F.3d 26 (2d Cir. 2001) has been foreclosed by *Buckeye*. *See Ipcon*, 2011 WL 3806255, at \*3 ("Courts since *Buckeye Check Cashing* have noted the death of the void versus voidable distinction and have found that an arbitrator has the authority under the FAA to determine whether a contract is void for lack of mutual assent."); *accord Rubin*, 457 F. Supp. 2d at 195.

As a last measure, Plaintiffs rely on New York state law to argue that "fraud makes a contract and any arbitration clause contained therein void where the fraudulent conduct was 'part of a grand scheme that permeated the entire contract.'" Br. at 8 (quoting *Anderson St. Realty*

---

[4] *See, e.g.*, *Gingras v. Think Finance, Inc.*, 922 F.3d 112, 126 (2d Cir. 2019) (whether arbitration clause's delegation provision was unconscionable); *Nicosia v Amazon.com, Inc.*, 834 F.3d 220, 229, 236-37 (2d Cir. 2016) (whether arbitration agreement was formed by terms and conditions in Amazon order page); *Schnabel v. Trilegiant Cor.*, 697 F.3d 110, 116 (2d Cir. 2012) (whether arbitration agreement was formed by terms and conditions in automatic enrollment in monthly consumer subscription); *Wachovia Bank, N.A. v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164 (2d Cir. 2011) (whether dispute was subject to arbitration based on definition of "customer" under Financial Industry Regulatory Authority ("FINRA") rules, not question of whether contract as a whole was void or voidable); *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 178 (2d Cir. 2003) (same).

*Corp. v. New Rochelle Revitalization, LLC*, 78 A.D.3d 972, 974 (2d Dep't 2010)).  This Court

need not decide whether New York or Wisconsin law applies to the claims at issue in the

arbitration.  Under *Buckeye* and its progeny, "as a matter of substantive federal arbitration law,

an arbitration provision is severable from the remainder of the contract" and *Prima Paint*

"rejected application of state severability rules to the arbitration agreement without discussing

whether the challenge at issue would have rendered the contract void or voidable" and "expressly

disclaimed any need to decide what state-law remedy was available."  *Buckeye*, 546 U.S. at

445-46; *see id.* at 445 ("[T]his arbitration law applies in state as well as federal courts.").

**B.      Plaintiffs' Argument That the Arbitration Should be Stayed Because it Will Require
          Resolution of the Same Issues Already Before This Court is Meritless**

Plaintiffs argue that the arbitration should also be stayed because they plan in the

arbitration to challenge the enforceability of the Supply Agreement on the grounds of fraud,

making the same claims in the arbitration as they make in this Court.  They thus argue that the

Court should stay the arbitration because permitting it to go forward will, at a minimum, result in

wasted judicial resources litigating identical issues as well as possible inconsistent rulings.  Br. at

6-7.

The Supreme Court rejected a similar argument in *Dean Witter Reynolds, Inc. v. Byrd*,

470 U.S. 213 (1985).  There, respondent, who had brought a federal securities claim within the

exclusive jurisdiction of the federal courts, argued that honoring an arbitration clause governing

his pendent state law claims and compelling him to arbitrate those claims would result in

"piecemeal resolution" of substantially similar claims and "the possibly inefficient maintenance

of separate proceedings in different forums."  *Id.* at 217, 221.  It was also suggested that "the

findings in the arbitration proceeding might have collateral-estoppel effect in a subsequent

federal proceeding."  *Id.* at 221.  The Supreme Court would have none of it.  Courts are required

to "rigorously enforce agreements to arbitrate," *id.*, and the FAA "leaves no place for the exercise of discretion by a district court," *id.* at 218. Even if it might result in waste and piecemeal litigation, "[b]y compelling arbitration of [the arbitrable claims], a district court successfully protects the contractual rights of the parties and their rights under the [FAA]." *Id.* at 221.

The cases cited by Plaintiffs do not support the contrary broad proposition that the Court has the authority to suspend an arbitration merely because it might result in inefficiency or the risk of inconsistent judgments. In *New York Bay Capital, LLC v. Cobalt Holdings, Inc.*, 2020 WL 1989485 (S.D.N.Y. Apr. 27, 2020), the court enjoined an arbitration brought by a customer against a financial advisory firm but only because the FINRA rule upon which the customer based the arbitration demand had been superseded and replaced by a later agreement between the parties that contained a forum selection clause and required them to bring disputes to federal court in the Southern District of New York. Thus, there was no dispute subject to arbitration. The court's discussion of the risk of inconsistent rulings came in its assessment of the risk of irreparable harm and not in its discussion of likelihood of success; in fact, it found a likelihood of success on the merits because the arbitration fell within the forum selection clause. *Id.* at *7.

Likewise, the decisions in *Allstate Ins. Co. v. Elzanaty* and *Gov't Emps. Ins. Co. v. Cean* are confined to the context of no-fault collection arbitrations, which require arbitration under N.Y. Ins. Law § 5106(b) rather than private contract and which, in both instances, included a "large number of proceedings to be heard by a mix of arbitrators." *Elzanaty*, 929 F. Supp. 2d 199, 222 (E.D.N.Y. 2013) (staying 23 arbitration proceedings and enjoining future claims); *see Cean*, 2019 WL 6253804, at *5 n.4 (E.D.N.Y. Nov. 22, 2019) (staying over 220 collection arbitration proceedings). The *Elzanaty* court warned that "[i]t is no doubt unwise for a Court to

simply step in and stay a contractually deserved arbitration merely because the Court sees a potentially more efficient use of time and resources by litigants, arbitrators, and judges. This is undeniably a slippery slope." 929 F. Supp. 2d at 220. Relying on N.Y. Ins. Law § 5106(b), the court ultimately held that "[n]evertheless, under the complicated procedural facts of this case, it cannot be said that the drafters of § 5106(b) intended or that the notions underlying the FAA permit the haphazard and contradictory concurrent flow of litigation and arbitration that appear here." *Id.*[5]

Those cases all are inapposite here.[6]  Plaintiffs have not identified a forum selection clause that would supersede the Supply Agreement's arbitration clause.  Though the Amended and Restated Closing Statement contains a forum selection clause, Plaintiffs do not argue that such clause replaces the arbitration clause in the Supply Agreement. *See* Br. at 7 n.3.  Nor do they identify any other facts that render the arbitration clause infirm.

In the end, Plaintiffs' argument proves too much.  Defendants assert a simple breach of contract claim in the arbitration.  They assert that CEW shipped and continues to ship pellets to

---

[5] Another court chose to stay no-fault collection arbitrations but on the basis that "[t]he legislative history of the [FAA] is telling and favors denying application of the [FAA] in these circumstances" because "the mandatory arbitration clause . . . prescribed by Section 5106(b) does not result in arbitrations that are 'truly voluntary' because it is mandated by statute and not by voluntary agreement of the parties." *Gov't Employees Ins. Co. v. Mayzenberg*, 2018 WL 6031156, at *3 (E.D.N.Y. Nov. 16, 2018) (noting that "[g]enerally, the [FAA] prevents federal district courts from enjoining private arbitrations where an arbitration clause is present in the governing contract").

[6] *Dedon GmbH v. Janus et Cie* similarly does not support Plaintiffs' contention.  There, the court discussed the "possibility of inconsistent rulings" in the context of whether to stay the district court's decision on arbitrability in favor of ICC arbitration in London, which was already deciding that issue.  2010 WL 4227309, at *9 (S.D.N.Y. Oct. 19, 2010), *aff'd*, 411 F. App'x 361 (2d Cir. 2011).  It did not stay the district court action, even "[a]s concerned as [it] [was] about inconsistent results," because "the United States Supreme Court has ruled, again and again, that where some evidence supports the proposition that no agreement to arbitrate exists, this question is not to be submitted to arbitrators" and "[s]taying [the] action in favor of allowing the ICC to determine arbitrability would contravene that controlling authority." *Id.* at *10.

L'Anse for which it has not paid.  That issue is not presented in this case; Plaintiffs have not

asked for a declaratory judgment that they are entitled to receive the pellets without paying for

them or that they should be relieved from their obligation to pay.  The issue of fraud comes into

the arbitration only by way of defense.  Carried to its extreme, Plaintiffs' argument would permit

any party to avoid an arbitration clause to which it previously agreed and by which it is bound by

the expedient of filing a court action that seeks to hold the contract unenforceable as a whole and

by arguing that the issue before the court is identical to the issue it intends to raise in the

arbitration.  *See, e.g.*, *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 188 (2d

Cir. 2007) ("As we expressed in the arbitration context, we are concerned that deciding this issue

in favor of appellant makes it too easy for a litigant to avoid its contractual promise . . . by

alleging fraud."); *El Hoss Eng'g & Transp. Co. v. Am. Indep. Oil Co.*, 289 F.2d 346, 349 (2d Cir.

1961) (discussing problems posed by fraud in the inducement claims, including the risk of sham

litigations pursued in order to avoid arbitration).

That is precisely the result the Supreme Court in *Prima Paint* sought to avoid.

## CONCLUSION

The motion to stay the arbitration is therefore DENIED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 63 and 96.


SO ORDERED.


Dated: August 5, 2020
New York, New York                              _____
                                                            LEWIS J. LIMAN
                                                      United States District Judge