**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

---

CONVERGEN ENERGY LLC, et al.,

               Plaintiffs,

v.                                             CASE NO.: 1:20-CV-03746 (LJL)

STEVEN J. BROOKS, et al.,

               Defendants.

---

**SPECIALLY APPEARING DEFENDANTS' REPLY BRIEF**
**IN SUPPORT OF THEIR MOTION TO DISMISS**

---

Ryan. M. Billings
S.D.N.Y. Bar No. RB0378
Kohner, Mann & Kailas, S.C.
4650 N. Port Washington Road
Milwaukee, WI 53212

*Attorneys for Steven J. Brooks,*
*Gregory Merle, NianticVista Energy, LLC,*
*and Riverview Energy Corporation*

Benjamin LaFrombois, P.H.V.
William E. Fischer, P.H.V.
Von Briesen & Roper, s.c.
2905 Universal Street, Suite 2
Oshkosh, WI 54094

*Attorneys for Convergen Energy WI,*
*LLC, Theodore J. Hansen and*
*Brian R. Mikkelson*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ………………………………………………………………………...1

ARGUMENT…………………………………………………………………………...2

    I.     THIS DISPUTE CANNOT BE ADJUDICATED IN THIS COURT……………..2

         A.    The Parties Agreed to Resolve All Claims Raised in the Complaint
               Through Binding Arbitration. ………………………………………….2

         B.    The Permissive Venue Clause in the Amended Closing Statement Does
               Not Override the Mandatory Arbitration Clauses in the
               Acquisition Agreement and Other Ancillary Contracts. ………………….4

         C.    Any Claim Not Subject to Arbitration Must Be Litigated in Wisconsin. …..7

    II.    LIBRA FAILS TO STATE A CLAIM, AND OFFERS NO MEANS OF
       CURING ITS FAILURES…………………………………………………...8

         A.    Libra Fails to State Fraud Claims. ……………………………………8

              1.    The Amended Closing Statement is fatal to Libra's fraud claims…8

              2.    Libra relies on the Amended Closing Statement to
                    support its claims……………………………………………10

               3.    In any event, Libra fails to plead fraud with particularity……........11

         B.    Libra Fails to State Fiduciary Duty Claims. ……………………………...12

         C.    Libra Fails to State Misappropriation or
                Stored Communications Act Claims. …………………………………14

    III.    LIBRA FAILS TO ESTABLISH PERSONAL JURISDICTION OVER
       RIVERVIEW, AND FAILS TO STATE CLAIMS AGAINST RIVERVIEW,
       MIKKELSON, HANSEN OR CEW…………………………………………..15

          A.    Libra Fails to State a Claim or Establish Personal Jurisdiction
               Over Riverview.. …………………………………………………...16

          B.    Libra Fails to State Claims Against Mikkelson or Hansen………………..17

C.      Libra Does Not Dispute that the Complaint Fails to State a Claim
                Against CEW…………………………………………………………19

CONCLUSION……………………………………………………………………..20

# **TABLE OF AUTHORITIES**

## **Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)……………………………………………………..2, 15, 19

*Bank Julius Baer & Co. v. Waxfield Ltd.*,
    424 F.3d 278 (2d Cir. 2005)…………………………………………………..6, 7

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2d Cir. 2007)……………………………………………2, 15, 19, 20

*Blanton v. Domino's Pizza Franchising LLC*,
    962 F.3d 842 (6th Cir. 2020)……………………………………………………4

*Buckeye Check Cashing, Inc. v. Cardegna*,
    546 U.S. 440 (2006)……………………………………………………………3

*Caines v. City of New York*,
    No. 13-CV-676 (VEC), 2015 WL 13021892 (S.D.N.Y. July 8, 2015)…………………18

*CMS Investment Holdings, LLC v. Castle*,
    No. CV 9468-VCP, 2015 WL 3894021 (Del. Ch. June 23, 2015)………………………...13

*Contec Corp. v. Remote Sol., Co.*,
    398 F.3d 205 (2d Cir. 2005)……………………………………………………..4

*Dowe v. Leeds Brown Law P.C.*,
    419 F. Supp. 3d 748 (S.D.N.Y. 2019)……………………………………………...3

*Gantler v. Stephens*,
    965 A.2d 695, 708-09 (Del. 2009)……………………………………………..13

*Glob. Network Commc'ns, Inc. v. City of New York*,
    458 F.3d 150 (2d Cir. 2006)……………………………………………………10

*Green Tree Fin. Corp.-Ala. v. Randolph*,
    531 U.S. 79 (2000)…………………………………………………………...3

*Gualandi v. Adams*,
    385 F.3d 236, 241 (2d Cir. 2004)……………………………………………16

*HDI Glob. SE v. Lexington Ins. Co.*,
       223 F. Supp. 3d 595 (S.D.N.Y.2017)…………………………………………………………3

*In re Our Alchemy, LLC*,
       No. 16-11596 (KG), 2019 WL 4447519 (Bankr. D. Del. Sept. 16, 2019)………………...13

*Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*,
       252 F.3d 218 (2d Cir. 2001)………………………………………………………………3

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
       388 U.S. 395 (1967)………………………………………………………………………3

*Tolbert v. Queens Coll.*,
       242 F.3d 58, 75 (2d Cir.2001)……………………………………………………7, 17

*TravelCenters of Am., LLC v. Brog*,
       No. CIV.A. 3516-CC, 2008 WL 1746987 (Del. Ch. Apr. 3, 2008)……………………...13

*Triple H Family Ltd. P'ship v. Neal*,
       No. CV 12294-VCMR, 2018 WL 3650242 (Del. Ch. July 31, 2018)……………………13

*WaveDivision Holdings, LLC v. Millennium Digital Media Sys.*,
       *LLC*, No. C.A. 2993-VCS, 2010 WL 3706624 (Del. Ch. Sept. 17, 2010)………………..13

## Statutes & Rules

6. Decl. C. § 118-1101…………………………………………………………………………13

Fed R. Civ. P. 8……………………………………………………………………………2

Fed R. Civ. P. 9……………………………………………………………………………2

Fed. R. Civ. P. 11…………………………………………………………………………15

Fed. R. Civ. P. 12…………………………………………………………………………...2

Specially Appearing Defendants Steven J. Brooks, NianticVista Energy, LLC, Convergen Energy WI, LLC, Gregory Merle, Theodore J. Hansen, Brian R. Mikkelson, and Riverview Energy Corporation (collectively, "Defendants") respectfully submit this reply brief in in support of their motion to dismiss Plaintiffs' ("Libra") Complaint.[1]

## INTRODUCTION

Libra agreed to arbitrate this dispute. As the Court recently held with respect to the Supply Agreement action, Libra's sole argument against arbitration—that the contracts as a whole were the product of fraud—fails as a matter of law. The Court should dismiss the Complaint in favor of arbitration. While the Court need proceed no further, Libra also agreed in multiple contracts to litigate disputes exclusively in Wisconsin, and any surviving claims should be transferred to the Wisconsin courts. These forum-selection clauses are independently dispositive of this Motion.

If the Court nevertheless considers the substance of Libra's claims, the Court should dismiss the Complaint for failure to state a claim. In their opening brief, Defendants provided a thorough analysis of the Complaint's allegations in light of the contracts at issue and governing law. Libra's opposition brief presents scattershot arguments that fail to plug all the holes in the Complaint's leaky boat. Among other things, Libra fails to rebut the facts that:

- Libra pled that it discovered and investigated the alleged misrepresentations before knowingly entering into a second closing, reaffirming the sale;

---

[1] As with Defendants' Opening Brief (ECF No. 92) ("Opening Br."), "CE" means Plaintiff Convergen Energy LLC, "L'Anse" means Plaintiff L'Anse Warden Electric Company, LLC, "Libra Capital" means Plaintiff Libra Capital US, Inc., "CEW" means Defendant Convergen Energy WI, LLC, "Niantic" means Defendant NianticVista Energy, LLC, "Riverview" means Defendant Riverview Energy Corporation, "Brooks" means Defendant Steven J. Brooks, "Merle" means Defendant Gregory Merle, "Hansen" means Defendant Theodore J. Hansen, "Mikkelson" means Defendant Brian R. Mikkelson, "Andueza" means Fidel Andueza, Libra's Chief Investment Officer and CE's, L'Anse's and CEW's President and Manager and Brooks' former supervisor, "Diaz" means Ydalberto (Bert) Diaz, Libra's General Counsel and CE's, L'Anse's and CEW's other Manager (with Andueza), and "BMO" means non-party BMO Harris Bank N.A., secured lender to L'Anse and CEW. "Opp. Br." means Libra's Opposition Brief (ECF No. 107).

- Libra delegated control of the Delaware LLCs in question to Managers Andueza and Diaz, making officers like Brooks, Hansen and Mikkelson inferior and imposing no fiduciary duties on them;

- CE unambiguously sold all the intellectual property at issue to Niantic. Libra cannot establish ownership of that intellectual property unless it convinces the arbitration panel to rescind the Acquisition Agreement due to fraud, and thus Libra's intellectual property claims are derivative of its fraud claims and fall with them;

- Even ignoring Libra's core pleading failures, Libra fails to present a plausible claim against Mikkelson, Hansen, CEW or Riverview, and fails to establish that this Court has personal jurisdiction over Riverview; and

- Libra neither seeks leave to replead nor suggests how it could remedy the inherent failings of its claims.

The Complaint is comprised of a morass of half-truths, conclusory allegations and conjecture, and does not meet the requirements of Rules 8, 9 and 12, or the plausibility standard articulated in *Iqbal* and *Twombly.* Defendants respectfully ask the Court to dismiss this action.

## **ARGUMENT**

## I. **THIS DISPUTE CANNOT BE ADJUDICATED IN THIS COURT.**

### A. **The Parties Agreed to Resolve All Claims Raised in the Complaint Through Binding Arbitration.**

This dispute arises in connection with the rights and obligations established by several contracts that either contain mandatory arbitration clauses or exclusive Wisconsin forum-selection provisions. (*See* Opening Br., at 15-18, 23-25.) Of those contracts, the most central is the Acquisition Agreement itself, which is the foundation of Libra's case and the seed out of which all of Libra's causes of action grow. Libra does not contest (nor could it) that every claim it brings

arises in connection with the sale of CEW.[2]  For the same reasons the Court recently denied Libra's motion to stay the Supply Agreement arbitration (Order, ECF No. 109 (Aug. 5, 2020) (the "August 5 Order")), this action should be dismissed in favor of arbitration.

Libra attempts to resist arbitration by arguing that the Acquisition Agreement as a whole was the product of fraud. The reasoning in the August 5 Order applies equally to the mandatory arbitration clause in the Acquisition Agreement, and leads to the same result. Under the federal severability principle explained in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967), and *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006), arbitration clauses are automatically severable from the contracts in which they appear, and a party may not avoid a mandatory arbitration clause based merely on the assertion that the entire contract was induced by fraud. (August 5 Order, at 8.) Libra's argument fails as a matter of law.

Further, as the party opposing arbitration, it is Libra's "burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91-92 (2000). Libra's Complaint makes no allegation concerning the Acquisition Agreement that challenges "the arbitration clause itself, or argue[s] that it was fraudulently induced or suffers from some other defect." *See HDI Glob. SE v. Lexington Ins. Co.,* 232 F. Supp. 3d 595, 603 (S.D.N.Y. 2017) (granting motion to compel arbitration).[3] Moreover, the record contains no evidence specific

---

[2] Indeed, the Acquisition Agreement unequivocally states: "Any dispute arising between the Parties in connection with this Agreement, which cannot be resolved by the Parties themselves, shall be submitted to binding arbitration." (Opening Br., Ex. 3, ECF No. 92-3 ("Acquisition Agreement"), §§ 9.7(a)-(c).) The "presumption of arbitrability" created by this broad language covers all of Libra's claims. *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001); *see also* Opening Br., at 23-24.

[3] The Complaint also makes no allegation raising any formation issue with respect to the Acquisition Agreement. The Acquisition Agreement, like the Supply Agreement, was signed on Libra's behalf by Andueza, the President and

to the arbitration clause that shows the clause was the product of any fraud. *See Dowe v. Leeds Brown Law P.C.*, 419 F. Supp. 3d 748, 759 (S.D.N.Y. 2019) ("claims of fraud in the inducement of the contract generally are for arbitrators to decide." (internal citation omitted)). Libra has failed to meet its burden of showing that the arbitration clause of the Acquisition Agreement, as opposed to the entire contract, was procured by fraud. (*See* August 5 Order, at 9.) Thus, its arguments fail.

In addition, the Complaint alleges that former Libra employees Brooks, Hansen and Mikkelson behaved inappropriately in connection with their employment with Libra, and the 2014 Brooks Employment Agreement, the 2017 and 2020 Mikkelson Employment Agreements, and the 2020 Hansen Employment Agreement all require arbitration of any dispute related to employment. (Opening Br., at 17-18, 23-24.) Libra does not even attempt to argue, let alone present evidence to prove, that the arbitration clauses in all of these agreements were the product of fraud. This action should be dismissed in favor of arbitration.[4]

**B.    The Permissive Venue Clause in the Amended Closing Statement Does Not Override the Mandatory Arbitration Clauses in the Acquisition Agreement and Other Ancillary Contracts.**

In a further attempt to resist arbitration, Libra argues that the Amended Closing Statement's permissive New York venue clause supersedes the mandatory arbitration clause in the Acquisition

---

Manager of CE and CEW, as well as Libra's Chief Investment Officer (not by Brooks). (August 5 Order, at 3, 10.) Also, courts have routinely held that the parties' decision in an arbitration clause to utilize the American Arbitration Association's ("AAA") Rules, particular Commercial Rule 7, reflects an express delegation to the arbitrator of all questions of arbitrability. *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005); *Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 844–46 (6th Cir. 2020) (All 11 Courts of Appeal that have considered the issue agree, and the twelfth would likely concur); Acquisition Agreement, § 9.7(b) (adopting AAA's Commercial Rules; Opening Br., at 17 (Defendants' employment agreements with Libra also invoke AAA Rules).

[4] The body of the Acquisition Agreement is silent as to location for the arbitration, but the Supply Agreement (referenced in and attached as an exhibit to the Acquisition Agreement), specifies a Wisconsin arbitration. (Acquisition Agreement, § 5.9; Supply Agreement (ECF No. 92-6), § 11.) The better view is that arbitration should occur outside this District, which requires dismissing or staying this action. (Opening Br., at 25 & n.15.) Libra does not contest that dismissal is the appropriate remedy if this dispute must be arbitrated, or that the arbitration should occur in Wisconsin.

Agreement. But the venue language in the Amended Closing Statement is expressly limited to the adjustments made in that agreement (which otherwise affirms the Acquisition Agreement in every respect), and a permissive venue provision does not overcome a mandatory arbitration clause.

Libra misrepresents the venue language in the Amended Closing Statement. (Opp. Br., at 1, 13.) First, the language applies to: "Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, **this Agreement.**" (ECF No. 92-8 ("Am. Closing Statement"), at 2 (emphasis added).) The Amended Closing Statement accomplished important but limited tasks. In all other respects, other than "as expressly modified" in the Amended Closing Statement, "all of the terms, conditions and other provisions of the Acquisition Agreement…are hereby ratified and confirmed and shall continue to be in full force and effect in accordance with their respective terms." (*Id.*, at 2.)

Second, the Amended Closing Statement's forum-selection clause is expressly permissive: "Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement **may** be brought against any of the parties in the [federal or state] courts of the State of New York. . . ." (Am. Closing Statement, at 2 (emphasis added); *cf.* August 5 Order, at 3-4.) A permissive venue clause of that kind cannot overwhelm the parties' compact in the Acquisition Agreement that: "[a]ny dispute arising between the Parties in connection with this Agreement, which cannot be resolved by the Parties themselves, **shall** be submitted to binding arbitration." (Acquisition Agreement, §§ 9.7(a)-(b) (emphasis added); *cf.* August 5 Order, at 3.[5])

---

[5] Contrary to Libra's claims that "Defendants deliberately omit any mention of this inconvenient provision," and its pile-on characterization that "This type of gamesmanship typifies the arguments Defendants have put forth in seeking dismissal" (Opp. Br., at 1-2), Defendants accurately described the scope and permissive nature of the Amended Closing Statement in their opening brief (Opening Br., at 16).

Libra also tries to manufacture an inconsistency between the permissive venue language in the Amended Closing Statement and the mandatory arbitration language in the Acquisition Agreement. No such inconsistency exists. First, the Amended Closing Statement affirms all terms of the Acquisition Agreement that are not "expressly modified." When the Amended Closing Statement does expressly modify the Acquisition Agreement, it notes or names the provision of the Acquisition Agreement that is being changed.[6] The Amended Closing Statement makes no reference to the Acquisition Agreement's arbitration clause, which is not "expressly modified."

Second, the two clauses target different types of claims (claims arising in connection with the 44-page Acquisition Agreement versus claims to enforce rights created in the two-page Amended Closing Statement, respectively). To the extent there is any overlap, it is not uncommon for agreements to have both mandatory arbitration and permissive litigation venue clauses, as every arbitration requires back-end litigation to confirm the arbitral award, and there is often need for court intervention to facilitate arbitration (to appoint arbitrators, compel arbitration, or, as here, to dismiss an improperly-brought action). Courts in this Circuit have held that when both mandatory arbitration and permissive litigation venue clauses are present, the mandatory arbitration provision controls.

In *Bank Julius Baer & Co. v. Waxfield Ltd.*, the Second Circuit considered this issue, and held that when both mandatory arbitration and permissive venue clauses are at issue, the mandatory arbitration clause controls. 424 F.3d 278, 282 (2d Cir. 2005). The court determined that it could not "say that the . . . [c]lause, which does not even mention arbitration, either 'specifically

---

[6] *See* Am. Closing Statement, at 1-2 (expressly modifying §§ 1.2(b)(ii), (iii) (vi), and 12.5(b)(i) of the Acquisition Agreement, and explaining as well that it "amends, restates and replaces in its entirety" the prior Closing Statement).

precludes' arbitration or contains a 'positive assurance' that this dispute is not governed by the [a]rbitration [a]greement." *Id*., at 284. Instead, noting the strong presumption in favor of arbitration, the court held that the agreements should be read to complement each other, with the former requiring arbitration and the latter permitting enforcement of arbitral awards in New York courts. *Id*. The same reasoning applies here.

Lastly, the Amended Closing Statement does not impact the four employment agreements entered into by Libra and Brooks, Mikkelson, and Hansen. Libra's flawed claims of fraud, fiduciary duty and misappropriation arise from Brooks', Mikkelson's and Hansen's roles as Libra employees, and Libra agreed to arbitrate employment disputes as well. (Opening Br., at 24.)   For all of these reasons, the Court should dismiss this action in favor of arbitration.

### C.    Any Claim Not Subject to Arbitration Must Be Litigated in Wisconsin.

In addition, multiple forum-selection clauses throughout numerous agreements implicated in this dispute require that any litigation be brought in Wisconsin. (Opening Br., at 25-27.) Libra's opposition brief devotes only a footnote to these forum-selection agreements, making the unsupported statement that: "The forum selection clauses are likewise not triggered." (Opp. Br., at 14 n.7.) Libra's argument is conclusory, undeveloped, and waived. *See Tolbert v. Queens Coll*., 242 F.3d 58, 75 (2d Cir.2001) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (internal quotation marks omitted)). If the Court rules that any of Libra's claims can be litigated, those claims should be transferred to the Western District of Wisconsin.[7]

---

[7] *See* Opening Br., at 27 n.16. Libra does not contest that the Western District of Wisconsin, on balance, is the appropriate venue for litigation under the forum-selection clauses.

## II.   LIBRA FAILS TO STATE A CLAIM, AND OFFERS NO MEANS OF CURING ITS FAILURES.

### A.   Libra Fails to State Fraud Claims.

#### 1.   *The Amended Closing Statement is fatal to Libra's fraud claims.*

Libra alleges it "uncovered" and "immediately investigated" the "fraudulent scheme" alleged here beginning February 1, 2020, the day after the effective date of the January 31 closing. (Complaint, ¶¶ 41-44, 63.) Notwithstanding Libra's awareness of the alleged fraud and the investigation of it that Libra launched in early February, Libra willingly and knowingly executed the Amended Closing Statement on February 21, 2020. (Am. Closing Statement, at 1.)

That contract, executed by Libra's General Counsel Diaz on behalf of CE and L'Anse, expressly states:

> "The Buyer and Seller agree that there will be no further adjustments or changes to this Amended and Restated Closing Statement after the date hereof, as both Parties have confirmed that this document is now complete and accurate in all regards."

> "By signing this Amended and Restated Closing Statement, each Party confirms and ratifies that the Closing was completed on the Closing Date."

> "Other than as expressly modified pursuant to this Amended and Restated Closing Statement, all of the terms, conditions and other provisions of the Acquisition Agreement and the O&M Agreement are hereby ratified and confirmed and shall continue to be in full force and effect in accordance with their respective terms."

(*Id.*, at 2.) Thus, at a time when Libra alleges it was aware of the "double-dealing" on which Libra bases its Complaint, Libra voluntarily reaffirmed and closed the sale of CEW a second time.

Libra mischaracterizes Defendants' argument as a "ratification" defense. Ratification occurs when an agent acts without actual authority and the principal approves the agent's actions

-8-

after-the-fact. That is not what occurred here, as Andueza, CE's, L'Anse's and CEW's Manager, had full authority to enter into the agreements.[8] Rather, Defendants' point is that Libra has pled itself out of Court, by bringing claims of fraud based on conduct that Libra also pleads it was aware of and had investigated by the time this deal was ultimately consummated.

Ignoring its agreement that the sale price was "final" and "no further adjustments" would be made, Libra notes that there was no release in the Amended Closing Statement. (Opp. Br., at 3.) This is a distraction, because CE represented and warranted to Niantic in the Amended Closing Statement that there was no *basis* for any litigation or investigation of Brooks, Hansen, Mikkelson, CE or CEW. There is no call for a *release* when the party who would be providing that release represents and warrants that there is no basis for any *claim*. (Opening Br., at 13.[9])

Libra tries to inject further confusion by claiming that Libra "required" some sort of "independent valuation" to occur after the second closing. (Diaz Declaration, ECF No. 108, ¶ 4.) But Libra points to no contract in which any Defendant agreed to such an "independent valuation." The contract the parties *did* agree to unequivocally states that the price is "final" and will not be subject to "further adjustments." If Libra wanted a post-closing valuation, it should have negotiated and included language to that effect. Instead, it agreed that the price was "final" in all respects and there would be no further changes. Diaz's self-serving parol evidence cannot rewrite the contract that Diaz negotiated, agreed to, and signed on Libra's behalf as both CE's Manager and Libra's General Counsel.

---

[8] Accordingly, the ratification cases Libra cites to support its argument (Opp. Br., at 2-3) are inapposite.
[9] *See also* Acquisition Agreement, § 8.2(c)(i) (CE's representation in § 2.16 that there was no basis for litigation is classified by the parties as one of the "Fundamental Representations" of the Acquisition Agreement).)

A fraud claim arises when a party has unwittingly believed material false information and acted to its detriment on the mistaken belief that the information was true. The Complaint alleges that Libra was aware that the statements in question were untrue at the time it reaffirmed and finally consummated this deal. Justifiable reliance is an essential element of Libra's claim, Libra cannot establish it, and Libra fails to state a fraud claim. (Opening Br., at 29.)

    2.    *Libra relies on the Amended Closing Statement to support its claims.*

Given that the Amended Closing Statement is devastating to Libra's claims, Libra goes to great lengths to try to convince the Court not to consider it. (Opp. Br., at 2.) This argument fails.

First, the incorporation by reference doctrine was created to prevent plaintiffs from doing exactly what Libra has done: selectively quoting the contracts that form the basis of its claims, and carefully omitting reference to contractual language that defeats those claims. As the Second Circuit has explained:

> In most instances where this [incorporated material] exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint.

*Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006). The doctrine "prevents plaintiffs from generating complaints invulnerable to Rule 12(b)(6) simply by clever drafting." *Id.* The CEW sale is central to this dispute—Libra cannot hide from the sale documents.

    Second, Libra put the Amended Closing Statement at issue, weeks ago, in support of its motion to stay the Supply Agreement arbitration. (*See* ECF No. 64-2.) Further, in response to *this* Motion, Libra relies on the Amended Closing Statement to resist arbitration and attempt to

-10-

establish venue in this Court. (Opp. Br., at 1-2, 13-14.) Libra cannot simultaneously ask the Court to consider the Amended Closing Statement when it is convenient, and ignore the Amended Closing Statement when it is not. The Amended Closing Statement is an integral part of Libra's claims, and should be considered on this Motion. (*See also* Opening Br., at 15 n.9, 19-20.)

> 3.    *In any event, Libra fails to plead fraud with particularity.*

The interplay between the Amended Closing Statement and the allegations of the Complaint highlights why fraud must be pled with particularity, and why the Complaint's vague and unsupported fraud claims should not survive. For claims of fraud, details are essential.

For instance, "when" misrepresentations were allegedly made is a critical question here because of the second closing. As another example, the Complaint fudges the line between the legally distinct concepts of affirmative misrepresentation and fraud by omission, by loosely identifying the subject-matter of the alleged fraud, but not "what" was said or not said, to "whom" it was said or not said, the context of the statement or omission, and "how" the statement or silence related causally to the events about which Libra claims injury.[10]

Instead of explaining its fraud claims or addressing the substance of Defendants' arguments, Libra's opposition brief simply repeats the allegations of its Complaint and states in a conclusory fashion that they are sufficient. Libra fails to plead fraud with enough specificity to

---

[10] Libra's position on Andueza (CE's, CEW's and L'Anse's President and Manager) is particularly confusing because Libra accused Andueza of being an "unnamed co-conspirator" in pleadings before a Wisconsin court (Opening Br., at 12, n.6.), but in this action, Libra tries to make Andueza the "invisible man," refusing to acknowledge his existence in the Complaint and Libra's pleadings before this Court.

satisfy Rule 9, or enough factual clarity to establish a plausible clam for relief. (Opening Br., at 28-30.) The Complaint fails to state a fraud claim, and Counts I, III and VI[11] should be dismissed.

### B.    Libra Fails to State Fiduciary Duty Claims.

Concerning fiduciary duty, Libra again parrots the conclusory allegations of the Complaint, avoiding the material issues. First, Libra does not dispute that it pled that Brooks owed fiduciary duties only to Libra Capital, and that Libra Capital has no standing to bring claims on behalf of CE or L'Anse. That defect is fatal to Libra's fiduciary duty claims against Brooks, and Libra's derivative claims of aiding and abetting Brooks' alleged breaches. (Opening Br., at 6, 30-31.)

Moreover, Libra cannot establish that Brooks, Hansen or Mikkelson owed fiduciary duties to CE or L'Anse, a necessary element of Libra's claims. (*Id.*, at 30.) Delaware law affords LLCs broad freedom to write their own rules in their operating agreements, instead of imposing common-law fiduciary duties upon them.[12] Officers of LLCs do not owe fiduciary duties by default, and to show that Brooks, Hansen or Mikkelson owed fiduciary duties to CE or L'Anse, Libra would have to demonstrate that the operating agreements of CE or L'Anse imposed such duties on officers.

CE's and L'Anse's operating agreements, however, delegated "full authority" and "full control" to run the companies to Managers Andueza and Diaz, who were the only parties who

---

[11] Moreover, Libra's request in Count VI to rescind the Supply Agreement clearly falls within the Court's holding in the August 5 Order that disputes concerning the Supply Agreement must be arbitrated.
[12] *See* 6 Del. C. § 18-1101(b) (Delaware's Limited Liability Act "give[s] the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements."); *see also TravelCenters of Am., LLC v. Brog,* 2008 WL 1746987, at *1 (Del. Ch. Apr. 3, 2008) ("[L]imited liability companies are creatures of contract, designed to afford the maximum amount of freedom of contract, private ordering and flexibility to the parties involved." (citation omitted)).

Case 1:20-cv-03746-LJL   Document 111   Filed 08/07/20   Page 18 of 26


could approve the sale of CEW.[13] Officers like Brooks, Hansen and Mikkelson occupied an inferior position, expressly subordinate to Managers Diaz and Andueza.[14] Libra fails to address the management structure it created for CE and L'Anse in their operating agreements, and the cases Libra cites are inapposite, as they either involve dicta, corporations, officers who were also managers, or LLCs where officers held the top positions and were *de facto* managers.[15]

Delaware law permits sophisticated entities like Libra to write their own LLC rulebooks. The rulebooks Libra created for CE and L'Anse do not impose fiduciary duties on officers,[16] and Delaware law strictly holds CE and L'Anse to the rules they wrote. Libra cannot establish that Brooks, Hansen or Mikkelson owed fiduciary duties to CE or L'Anse, a necessary element of Libra's fiduciary duty claims, and Counts II and IV should be dismissed.

---

[13] (ECF No. 92-19 ("CE Operating Agreement"), § 4.2 (listing sale of any material asset as a major decision that requires Manager approval); ECF No. 92-20 ("L'Anse Operating Agreement"), § 4.1 (providing that Managers Andueza and Diaz "have full power and authority to do all things they deem necessary or desirable to conduct the business of the Company.").

[14] CE Operating Agreement, § 4.8, L'Anse Operating Agreement, § 4.3.

[15] *Gantler v. Stephens* addressed corporations. 965 A.2d 695, 708-09 (Del. 2009). In *CMS*, several of the officers were also managers, and whether the remaining officers owed fiduciary duties was uncontested. *CMS Investment Holdings, LLC v. Castle*, 2015 WL 3894021, at *18 (Del. Ch. June 23, 2015). *Alchemy*'s statement that officers owe fiduciary duties was dicta, and cited *Triple H* as authority, while *Triple H* held only that *managers* owe duties by default. *In re Our Alchemy, LLC*, 2019 WL 4447519, at *6 (Bankr. D. Del. Sept. 16, 2019); *Triple H Family Ltd. P'ship v. Neal*, 2018 WL 3650242, at *14 (Del. Ch. July 31, 2018), *aff'd*, 208 A.3d 703 (Del. 2019). *WaveDivision* involved an officer who had ultimate authority in the management structure, and thus the court considered the officer a *de facto* manager. *WaveDivision Holdings, LLC v. Millennium Digital Media Sys., LLC*, No. C.A. 2993-VCS, 2010 WL 3706624, at *19 (Del. Ch. Sept. 17, 2010). Here, Libra clearly put Managers Andueza and Diaz in charge of CE and L'Anse. Moreover, the operating agreements of CE and L'Anse permit managers to have competing business interests, so any argument that Brooks, Hansen and Mikkelson were *de facto* managers would be self-defeating, as that status would permit all three Defendants to compete with CE and L'Anse. (CE Operating Agreement, at § 4.6 (permitting CE's managers to have competing interests and waiving the duty of loyalty; L'Anse Operating Agreement, at § 4.4 (waiving L'Anse managers' liability to L'Anse to the full (unlimited) extent permitted by the Delaware Limited Liability Act).)

[16] Libra's employment agreements and handbook do not impose common-law fiduciary duties. Any violation of their terms would sound in breach of contract, claims that would have to be arbitrated, and have not been brought.

### C.    Libra Fails to State Misappropriation or Stored Communications Act Claims.

In defense of its intellectual property claims, Libra argues that, because the Acquisition Agreement was "permeated by fraud," CE's sale to Niantic of all the intellectual property at issue was invalid. (Opp. Br., at 10.) This argument tacitly admits that Libra's misappropriation and Stored Communications Act ("SCA") claims are derivative of Libra's fraud claims, and they fall with the failure of those claims. Indeed, analysis of the Complaint and Libra's arguments reveal that Libra is actually alleging a fraud claim where the loss of intellectual property is an alleged *injury*, suffered because Libra sold its intellectual property through a contract that was allegedly induced by fraud. This is not a misappropriation or SCA claim.

Libra also cherry-picks one sentence of the Acquisition Agreement and reads it out of context, suggesting that CE's sale of intellectual property was limited solely to information used or held by CEW for use in CEW's core business. (Opp. Br., at 10-11.) In fact, the unambiguous terms of the agreement are far more expansive. CE sold to Niantic all "property, equipment and physical or electronic media relating to communications and computer systems, including computer hardware, networks, and peripherals," all "IT Systems" and all "hardware and software products" there were "otherwise made available by CEW in connection with the Business." (Acquisition Agreement, § 2.15(c)(iv), (v).) "Business" in turn is defined as the "business of CEW as conducted immediately prior to the Closing Date." (*Id.*, § 2.15(c)(i).)

All of the intellectual property and devices CEW had at the time of sale were in CEW's possession because of how Libra chose to operate CEW just before the Closing Date, and under the clear language of the Acquisition Agreement, all of that intellectual property was sold to

Niantic.[17] Libra fails to state a separate misappropriation or SCA claim, and Counts V, VII and VIII should be dismissed. As with its fraud and fiduciary duty claims, Libra's intellectual property claims are fatally flawed, and the dismissal should be with prejudice.[18]

### III. LIBRA FAILS TO ESTABLISH PERSONAL JURISDICTION OVER RIVERVIEW, AND FAILS TO STATE CLAIMS AGAINST RIVERVIEW, MIKKELSON, HANSEN OR CEW.

Beyond the fatal flaws in all of Libra's claims, the claims Libra brings against Riverview, Mikkelson, Hansen and CEW are particularly specious, and do not satisfy the heightened pleading standards set forth in *Iqbal* and *Twombly*. (Opening Br., at 19-21.)

### A. Libra Fails to State a Claim or Establish Personal Jurisdiction Over Riverview.

Libra does not refute that mere affiliation with an alleged wrongdoer is insufficient to state a claim. Instead, Libra inaccurately suggests that the Complaint alleges facts extending beyond mere affiliation. (Opp. Br., at 11-12.) But the allegations Libra references assert only that: (1) Niantic and Riverview are affiliated in some (unclear) fashion; and (2) Merle executed a letter of intent "on behalf of Niantic" in which Merle confirmed that Niantic is "an affiliate of Riverview." (Complaint, ¶¶ 16, 35.)

---

[17] Libra further argues that the millions of dollars paid by Niantic to CE as part of the sale does not constitute sufficient consideration for the intellectual property that was transferred. This argument fails under blackletter law, as a showing of an exchange of something of value (even if only a peppercorn), is sufficient to demonstrate consideration.

[18] Tellingly, Libra does not ask the Court in its opposition brief for leave to amend its Complaint to shore up any weaknesses that are the result of careless pleading. Indeed, based on discovery exchanged since the Complaint's filing, Libra could not even replead the same allegations it originally made (such as the false allegation that Brook has an ownership interest in Niantic) without violating Rule 11. Because Libra does not demonstrate how it could cure the terminal problems with its claims through artful repleading, amendment is futile, and the Court should dismiss all claims with prejudice. (Opening Br., at 34-35.) Failing that, at minimum Libra should be required to provide a more definite statement to explain the substance of its fraud claims. (*Id.*, at 40.)

Further stretching the allegations of the Complaint beyond their breaking point, Libra suggests (although the Complaint alleges otherwise) that Merle was acting as Riverview's agent when he signed the letter of intent, making Riverview responsible for Merle's conduct. (Opp. Br., at 12-13.) But the letter, which on its face is a "non-binding indication of interest," is signed by Merle as the Chief Executive Officer of Niantic. (ECF No. 108-2, at 1, 5.) And while the first page of the letter provides some information about Riverview's (and thereby Merle's) background, and two sentences about possible synergies with CEW, the rest of the five-page letter exclusively discusses *Niantic's* intent and proposal to purchase CEW. (*Id.*, at 1-5.) Regardless, any initial statements in the November 2019 letter of intent were expressly disclaimed and superseded, both by the integrated January 2020 Acquisition Agreement (affirmed in the February 2020 Amended Closing Statement) and by operation of the parol evidence rule.[19]

The Complaint does not allege sufficient facts to create a reasonable inference that Merle was acting on Riverview's behalf during the sale transaction. On the contrary, all the sales documents expressly state that Merle was acting on behalf of Niantic, the company who bought CEW. Libra therefore fails to allege a plausible claim against Riverview and fails to state a claim.

Further, it is undisputed that Riverview does not do business in New York. Libra argues (in a footnote) that this Court has personal jurisdiction over Merle, and doubles-down on the unsupported claim that Merle's conduct is attributable to Riverview. (Opp. Br., at 13, n.6.) This argument is undeveloped and waived. *Tolbert*, 242 F.3d at 75. At best, it falls with Libra's failed

---

[19] *See* Acquisition Agreement, § 9.3; *see also Gualandi v. Adams*, 385 F.3d 236, 241 (2d Cir. 2004) ("extrinsic evidence may not be used to modify, explain, vary or supplement the written integrated contract.").

argument that Merle's conduct on behalf of Niantic is imputed to Riverview.[20] Libra's claims against Riverview should also be dismissed for lack of personal jurisdiction. (Opening Br., at 38.)

**B.      Libra Fails to State Claims Against Mikkelson or Hansen.**

Libra's efforts to rehabilitate its deficient allegations against Mikkelson and Hansen are utterly unpersuasive. Libra strains credulity by arguing that Mikkelson's December 2019 "shredder" email (ECF No. 92-16) is indicative of Defendants' conspiratorial intent against Libra, when Mikkelson expressly suggests in that email that Defendants should *run the plan by Libra's General Counsel (Diaz) for approval*.[21] It is generally not a good practice, when entering into a conspiracy, to suggest that you explain and seek approval for your plan from the general counsel of the entity against whom you are conspiring, and nothing about Mikkelson's email was secretive or suggestive of mal intent.

Similarly, Libra's attempt to explain the supposedly nefarious nature of Mikkelson's "Uncle Steve" email (Opp. Br., at 15) is absurd. Mikkelson sent an email to Brooks in September 2019 indicating that Hansen had told Mikkelson that Brooks was in Spain. That's it. Libra contends that Mikkelson's email was sent at a "critical" time (although the Complaint makes no such allegation) and that it "unequivocally" confirms that Mikkelson and Hansen knew that Brooks was in Spain soliciting investors to buy CEW in furtherance of a wrongful plot. (Complaint, ¶ 51.) Nothing in that short email suggests anything of the kind, and there are any number of reasons why Brooks, an executive of an international conglomerate, would be in Spain (such as to meet

---

[20] While Libra brings misappropriation claims against *Merle*, it brings no such claims against Riverview, and the Complaint does not allege (and Libra has no good-faith basis to contend) that Riverview used or disclosed any of Libra's trade secrets, a necessary element of any misappropriation claim. (Opening Br., at 36-37.)

[21] Mikkelson also notes in that same email that third-party BMO would be contemporaneously sending loan documents related to the shredder purchase to Diaz for Diaz's approval. (*Id.*, at 1.)

with his boss Andueza, who lives there). This email cannot possibly be enough to survive a motion to dismiss. *See Caines v. City of New York*, 2015 WL 13021892, at *4 (S.D.N.Y. July 8, 2015) (only *reasonable* inferences are drawn in plaintiff's favor), *aff'd*, 649 F. App'x 74 (2d Cir. 2016).

Libra's argument that Mikkelson and Hansen misappropriated Libra's trade secrets when they disclosed CEW's financial information to Niantic (as required by the Acquisition Agreement) is equally absurd. (Opp. Br., at 15-16.) Admitting that the terms of the Acquisition Agreement required the disclosures to Niantic, Libra argues that the scope of those required disclosures in the contract allegedly exceeds the level of disclosure initially anticipated in a previously-executed non-disclosure agreement (that Libra does not provide to the Court). In other words, Libra disingenuously argues that, although it was contractually required to provide financial information to Niantic, and Mikkelson and Hansen provided that information in compliance with Libra's contract, Hansen and Mikkelson knowingly misappropriated Libra's trade secrets in doing so. But a party cannot contractually agree to provide information to another party, and then accuse its agents, in fulfilling that contractual obligation, of misappropriating trade secrets.[22]

As a last resort, Libra insists that Brooks confessed to Hansen's and Mikkelson's wrongdoing in a recorded conversation (although the Complaint does not specifically allege that Hansen and Mikkelson were implicated). Suspiciously, Libra has refused to produce this alleged recording to Defendants (the only thing Defendants requested in expedited discovery), despite Defendants' repeated requests. (Billings 8/7/20 Decl. ¶¶ 2-4.) Beyond the law's inherent hostility

---

[22] Moreover, Libra contends that Mikkelson and Hansen disclosed this (contractually required) CEW financial information to accelerate Niantic's purchase of CEW. (Opp. Br., at 15-16.) But the Complaint alleges that Niantic was Brooks' "own entity." (Complaint, ¶ 43.) So Libra is really arguing that Brooks, through Hansen and Mikkelson, arranged to disclose financial information about CEW (that Brooks already knew) to himself for the purpose of convincing himself to buy CEW. Again, this is not a plausible claim.

to establishing conspiracy through the uncorroborated testimony of a single accomplice, if the recording is the sole piece of evidence standing in the way of dismissal of Libra's claims, then Libra should produce it, so that the Court can hear what Brooks actually said. And yet, Libra refuses to turn over the recording.

### C.    Libra Does Not Dispute that the Complaint Fails to State a Claim Against CEW.

In its opposition brief, Libra does not defend its claims against CEW or refute Defendants' showing that the Complaint makes no factual allegation to show actionable misconduct by Libra's former subsidiary CEW. Libra tacitly concedes that it fails to state a claim against CEW, and the Court should dismiss with prejudice all claims Libra brought against CEW.

Taking a step back, the Supreme Court explained in *Iqbal* and *Twombly* that district courts must have the power to insist upon specificity in pleadings, and the ability to dismiss complaints that are implausible or have no reasonable likelihood of success. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558-559 (2007). Part of the Court's motivation for establishing heightened pleading requirements was a recognition that modern litigation is incredibly expensive. *Id*. A complaint should not survive a motion to dismiss, and force opposing parties to endure costly discovery and the prolonged reputational injury of being named as defendants in a public lawsuit, through implausible allegations that are unlikely to be supported by evidence that could prevail at trial.

Here, the Complaint Libra brings is crafted through the selective quoting and mischaracterizing of contracts and other evidence, and Libra's claims against CEW, Riverview, Mikkelson and Hansen are particularly threadbare. When confronted, through this Motion, with the paucity of its allegations and its misrepresentations concerning the few facts it does discuss, Libra's response was to escalate its rhetoric and insist that two emails—which no reasonable

person would think twice about—are reflective of a dastardly conspiracy. The Court should dismiss the Complaint to end the ongoing damage that Libra's frivolous allegations have caused and are continuing to cause Defendants to suffer.

## CONCLUSION

For the foregoing reasons and in the interests of justice, the Defendants respectfully ask the Court to grant Defendants' Motion and dismiss this action in favor of arbitration. If the Court concludes that any claims can be litigated, such claims should be transferred to the Western District of Wisconsin. If the Court decides to address Libra's substantive claims, it should dismiss all Counts in the Complaint with prejudice for failure to state a claim. Moreover, beyond the fatal flaws in *all* of Libra's claims, its claims against Riverview, Mikkelson, Hansen and CEW are not well-pled even under Libra's strained theories, and should be dismissed with prejudice.

Dated this 7th day of August, 2020

By: s/ Ryan M. Billings
   Ryan M. Billings
   S.D.N.Y. Bar No. RB0378
   **KOHNER, MANN & KAILAS, S.C.**
   4650 N. Port Washington Road
   Milwaukee, WI 53212-1059
   Telephone: (414) 962-5110
   Facsimile: (414) 962-8725
   Email:  rbillings@kmksc.com

   *Attorneys for Defendants Steven J. Brooks, NianticVista Energy, LLC, Gregory Merle, and Riverview Energy Corporation*

   -AND-

   Benjamin LaFrombois, *pro hac vice*
   William E. Fischer, *pro hac vice*
   **VON BRIESEN & ROPER, S.C.**
   2905 Universal Street, Suite 2
   Oshkosh, WI 54904

-20-

Telephone:     (920) 233-4704
Facsimile:     (920) 233-6055
Email:          blafrombois@vonbriesen.com
                    wfischer@vonbriesen.com

*Attorneys for Convergen Energy WI, LLC,*
*Theodore J. Hansen, and Brian R. Mikkelson*