IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONVERGEN ENERGY LLC, L'ANSE WARDEN ELECTRIC COMPANY, LLC, EUROENERGY BIOGAS LATVIA LIMITED, and LIBRA CAPITAL US, INC.<br><br>Plaintiffs,<br><br>v.<br><br>STEVEN J. BROOKS, NIANTICVISTA ENERGY LLC, GREGORY MERLE, RIVERVIEW ENERGY CORPORATION, DANIEL ESCANDON GARCIA, RAMON URIARTE INCHAUSTI, CHIPPER INVESTMENT SCR, SA, URINCHA SL, THEODORE JOHN HANSEN, BRIAN R. MIKKELSON, and CONVERGEN ENERGY WI, LLC.,<br><br>Defendants. | Case No. 1:20-cv-03746(LJL)<br><br>**DECLARATION OF DANIEL ESCANDON GARCIA IN SUPPORT OF THE SPANISH DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND FAILURE TO STATE A CLAIM** |

I, **DANIEL ESCANDON GARCIA**, the undersigned, hereby declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I respectfully submit this declaration in support of the Spanish Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) and (6) for Lack of Personal Jurisdiction and Failure to State a Claim, respectively.[i]

2. I am a citizen of Spain and reside in Madrid, Spain. I was named as a defendant in the above-captioned action. I have personal knowledge of the facts and circumstances set forth herein, except where stated to be upon information and belief, and with respect to those, I believe

1



.

them to be true.

3. I am not, and have never been, a citizen of the State of New York or the United States, and I have never lived, worked, or resided in New York or the United States.

4. I did not travel to New York in connection with the transaction that forms the subject of the above-captioned action, and I do not regularly travel to New York or the United States.

5. In the last eleven (11) years, I have been to New York only twice. During Easter 2009, I visited New York City for a one-week holiday, and in February 2018, I stayed overnight in New York City for a connecting flight to Madrid.

6. I do not regularly conduct business in New York or the United States and I derive no revenue from New York.

7. I do not own, and have never owned, real estate or a bank account in New York or the United States.

**The Investment Opportunity**

8. I have known Ramón Uriarte Inchausti for more than twenty-one (21) years. Over the years, we and our companies have collaborated on several business opportunities.

9. On July 12, 2019, while I was in Madrid, I received an email from Mr. Uriarte summarizing an investment opportunity, of which he had learned on June 12, 2019 from Libra's Mr. Fidel Andueza.

10. Upon information and belief, Mr. Andueza is a Spanish citizen who resides and works in Madrid, Spain.

11. Between July and October 2019, Mr. Uriarte kept me apprised of his meetings with Mr. Andueza regarding the investment.

2



12. On October 2, 2019, Messrs. Andueza and Uriarte, and I met for lunch in Madrid. During this meeting, Mr. Uriarte introduced me to Mr. Andueza of Libra. This was the first time I met Mr. Andueza. Mr. Andueza discussed detailed financial information about the Pellet Plant Acquisition and provided handwritten notes to us. Additionally, upon Mr. Andueza's urging, we agreed to visit the facilities of Convergen in Wisconsin and Michigan to better understand their operations. Mr. Andueza coordinated our travel schedule and meetings with Convergen through Mr. Brooks.

13. On October 21, 2019, Mr. Uriarte and I travelled from Madrid, Spain to Green Bay, Wisconsin via Chicago to visit the Pellet Plant. Mr. Brooks met us in Green Bay and gave us a tour of the Pellet Plant. The next day, on October 22, 2019, myself, Mr. Brooks, and Mr. Uriarte travelled from Green Bay, Wisconsin, to Michigan to visit L'Anse Warden. Mr. Uriarte and I returned to Madrid via Chicago the next day on October 23, 2019.

14. On November 14, 2019, I met with Mr. Uriarte and Mr. Andueza at a restaurant near Mr. Andueza's office in Madrid to further discuss the terms of the investment in the Pellet Plant Acquisition. During this meeting, Mr. Andueza requested an increased investment in the Pellet Plant Acquisition.

15. On November 19, 2019, I discussed the terms of the investment in the Pellet Plant Acquisition with Mr. Uriarte in Madrid and we decided to reject the terms proposed to us by Mr. Andueza on November 14, 2019.

16. On November 27, 2019, upon information and belief, Mr. Uriarte called Mr. Andueza in Madrid and informed him that Mr. Uriarte and I would not continue with the transaction on the terms as proposed on November 14, 2019.

17. On November 30, 2019, upon information and belief, Mr. Brooks sent a message



by email to Mr. Uriarte proposing new terms for the investment in the Pellet Plant Acquisition.

18. On December 16, 2019, upon information and belief, Mr. Brooks sent Mr. Uriarte another message by email with a more detailed proposal of the new terms for the investment in the Pellet Plant Acquisition.

19. On December 19, 2019, Mr. Brooks sent me an email describing the terms of the investment in the Pellet Plant Acquisition that he had previously relayed to Mr. Uriarte on December 16, 2019.

20. On December 28, 2019, Mr. Uriarte called me in Madrid and explained that Mr. Andueza had asked him if we agreed with the new terms Mr. Andueza and Mr. Brooks had proposed for the investment in the Pellet Plant Acquisition. Mr. Uriarte and I decided that the terms were agreeable and that only Chipper Investment SCR S.A. ("Chipper") would move forward with the investment in the Pellet Plant Acquisition.

21. On January 27, 2020, Chipper wired USD $549,945.00 from BBVA in Madrid to an Attorney Trust Account in the name of Clemente Mueller P.A. in Morristown, NJ for the investment in the Pellet Plant Acquisition. This wire transfer was routed through a New York Citibank. Other than this payment, the Spanish Defendants wired no other money to the United States, including New York, in connection with the transaction. A true and correct copy of the wire transfer receipt is **attached hereto as Exhibit A.**

22. Without my knowledge, or Chipper's knowledge or approval, the wire transfer was routed through a New York Citibank account. Neither I nor Mr. Uriarte directed Chipper or any other entity to route the wire transfer from BBVA in Madrid to Clemente Mueller P.A. in Morristown, NJ for the investment in the Pellet Plant Acquisition through a New York Citibank account. Upon information and belief, the wire transfer was routed through New York by BBVA



at its sole discretion.

23. Since Chipper was the only Spanish Defendant investing in the Pellet Plant Acquisition, only it wired funds for the investment.

24. I did not wire any funds, including into New York or the United States, for the investment in the Pellet Plant Acquisition, and other than the aforementioned negotiations, I was not involved in the investment in the Pellet Plant Acquisition.

25. Upon information and belief, the Acquisition Agreement was executed on January 29, 2020. Upon information and belief, the Acquisition Agreement was drafted by Libra's general counsel, and agreed by its CEO.

26. Neither Mr. Uriarte nor I participated in the negotiation of, and were not parties to, the Acquisition Agreement or the Supply Agreement.

27. At no time during my meetings with Messrs. Andueza and/or Brooks did either mention to me, nor was I aware, that Mr. Brooks was an owner of Niantic. I was also unaware that: (a) the Pellet Plant was allegedly sold at a price below its market value; (b) that Mr. Brooks had purchased a shredder without consideration; (c) the Power Plant was allegedly overcharged in the Supply Agreement with the Pellet Plant; (d) the Power Plant was allegedly overcharged for Mr. Hansen's employment post-acquisition; (e) $196,420.00 in cash had been sent to the Pellet Plant at closing; (f) any Office 365 accounts, company-owned devices, or confidential information had been allegedly stolen or not returned.

## Chipper Investment SCR S.A.

28. I have been the Director of Chipper since March 19, 2014.

29. Chipper was incorporated on March 19, 2014 in Madrid, Spain.

30. Chipper's headquarters and principal place of business are located in Madrid,



Spain. It has no other offices or places of business, and no offices in New York or the United States.

31. Chipper has no bank accounts in the United States or New York.

32. Chipper has three Directors, all of whom are Spanish citizens and residents, and none of whom reside in the United States or New York or regularly conduct business there. Other than these Directors, Chipper has no other employees.

33. Chipper's primary business is investment in the share capital of unlisted non-financial corporations and is conducted in Spain. It does not regularly conduct any business outside of Spain, and it is not licensed to, nor does it conduct any business in New York or the United States and it derives no revenue from New York or the United States.

34. The investment in the Pellet Plant Acquisition was Chipper's first and only investment in a project located in the United States. Other than the aforementioned wire instruction, Chipper has not wired any other funds into the United States, including New York, in connection with the above-captioned action.

35. Chipper is not a party to the Pellet Plant Acquisition or Supply Agreement.

36. Chipper does not own, and has never owned, real estate in New York or the United States.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.



Executed this 20th day of August 2020, in Madrid, Spain

DANIEL ESCANDON GARCIA

---

[i] Unless otherwise indicated, the capitalized terms in this declaration have the same meaning as those used in the Memorandum of Law in support of the Spanish Defendants' Motion to Dismiss.