UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CONVERGEN ENERGY LLC, et al.,

                Plaintiffs,

-v-

STEVEN J. BROOKS, et al.,

                Defendants.

Civil Action No. 20-cv-3746 (LJL)

## **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR RECONSIDERATION**

Plaintiffs readily acknowledge and concede in their Motion for Reconsideration ("Motion") that they had the same facts regarding alleged "co-conspirator" Fidel Andueza (who curiously still remains as Libra's Chief Investment Officer and a member of Libra's Executive Team[1])—and could have made the same argument (*i.e.*, that Mr. Andueza lacked the authority to sign the Supply Agreement on behalf of Plaintiffs) they now set forth in their Motion for the first time—when briefing their Motion to Stay (Dkt. Nos. 63-65): "Plaintiffs acknowledge that, in their briefing on the motion to stay, they did not alert the Court to their contention (which was reflected elsewhere in the record before the Court) that Mr. Andueza was part of the conspiracy to defraud Plaintiffs" (Mot. at 1); "[t]he record before the Court in this action and the related actions reflects Plaintiffs' contention that Mr. Andueza conspired with Mr. Brooks to defraud Plaintiffs. . . Plaintiffs' briefing on their motion to stay the arbitration should have (but did not) alert the Court

---

[1] *See* Mr. Andueza's web page on Libra's website, available at https://www.libra.com/en/management/executive-team/fidel-andueza/ (last visited September 2, 2020). Rather than clearly identify Mr. Andueza as the current Chief Investment Officer of Plaintiff Libra, Plaintiffs obliquely state that "Mr. Andueza is cooperating with Plaintiffs in the investigation of this matter and thus had not been named as a defendant." Mot. 3 n. 3. This oblique phrasing presumably is designed to deflect scrutiny of the incredible argument Plaintiffs now make: Libra's current Chief Investment Officer is a co-conspirator who would be a named Defendant but for the fact he still works for Libra and is a member of its Executive Team.

to this fact" (*id*. at 2). Plaintiffs, of course, already possessed these facts months before they even filed this action on May 14, 2020, let alone before they filed their Motion to Stay on June 23, 2020. *See* Plaintiffs' Proposed Am. Compl. (Dkt. No. 117-1) at ¶ 7 ("Andueza's wrongdoing was discovered around the same time as Brooks' scheme"); *cf. id*. at ¶¶ 44-48 (alleging Plaintiffs discovered Defendant Brooks' "fraudulent scheme" on February 1, 2020, immediately after the closing on January 31, 2020).

However, Plaintiffs strategically chose not to disclose these facts and arguments for the Court's benefit when briefing its Motion to Stay (perhaps due to the perplexing circumstance that Mr. Andueza is still employed by Libra notwithstanding Plaintiffs allegation he was "part of the conspiracy to defraud Plaintiffs"). Similarly, Plaintiffs' new and unsupported argument that L'Anse had not been "taking delivery under the terms" (*see* Mot. at 2, 9-10) of the Supply Agreement also reflects an argument that Plaintiffs could have made—but chose not to do so—when briefing their Motion to Stay.

Simply put, Plaintiffs strategically chose what *not* to include in the record before the Court, at their own peril, when briefing their Motion to Stay. Accordingly, Plaintiffs' current efforts to seek a second bite at the apple are too little, too late, and Defendants respectfully request their Motion for Reconsideration be denied for these reasons and the reasons set forth below.

### RELEVANT FACTUAL & PROCEDURAL BACKGROUND

Plaintiffs filed this action on May 14, 2020. Dkt. No. 1. In their Complaint, Plaintiffs reference "co-conspirators" of Defendant Steven J. Brooks on multiple occasions but do not identify Mr. Andueza as one of them. *See* Compl. ¶¶ 4, 6-7. Plaintiffs' Motion to Stay also alleged that Defendant Brooks "colluded with accomplices," but Plaintiffs did not identify Mr. Andueza as one of those "accomplices" (Dkt. No. 65 at 3), though they easily could have.

In particular, Plaintiffs now concede that "the same day this [instant] action was filed"—May 14, 2020—Plaintiffs were made aware of "a December 15, 2019 email from Mr. Brooks' private Gmail account to Mr. Andueza's private Hotmail account, secretly confirming that Mr. Brooks and Mr. Andueza would together contribute $500,000 towards the $5.8 million purchase price for the pellet plant." Mot. at 2, (citing Decl. of D. Gold at ¶ 3). Although Plaintiffs describe this email as "extraordinary," they still chose not to mention it in support of their Motion to Stay— filed more than a month later on June 23, 2020—notwithstanding the fact that Plaintiffs referenced Mr. Andueza as an unidentified co-conspirator in another court filing Plaintiffs made the same day the Motion to Stay was filed (June 23, 2020). Mot. at 2.

It is only now, after the Court denied their Motion to Stay, that Plaintiffs throw their Hail Mary: publicly identifying Libra's own current Chief Investment Officer and Executive Team Member as Defendant Brooks' key "co-conspirator." However, the clock has already run out on Plaintiffs. Plaintiff's Complaint alleges that the fraud was discovered February 1, 2020. (Dkt. No. 1 at ¶41). Consistently, Plaintiffs' proposed Amended Complaint now alleges that Plaintiffs had already identified Mr. Andueza as a co-conspirator, at the latest, in early February 2020. *See* Plaintiffs' Proposed Am. Compl. (Dkt. No. 117-1) at ¶ 7 ("Andueza's wrongdoing was discovered around the same time as Brooks' scheme"); *cf. id.* at ¶¶ 44-48 (alleging Plaintiffs discovered Defendant Brooks' "fraudulent scheme" the day after closing, on February 1, 2020). As such, all of the facts regarding Mr. Andueza Plaintiffs now allege in their Motion and the Amended Complaint were known to Plaintiffs well before they briefed their Motion to Stay. Plaintiff's prior knowledge of the pertinent facts is demonstrated by including herein a relatively small part of their Amended Complaint. The lengthiness of the following makes the point of the deep and extensive

knowledge of Plaintiffs which reinforces their knowing and intentional decision to ignore certain material facts until now: (emphasis added):

> Brooks also conspired with another senior officer of Plaintiffs, **Fidel Andueza** ("**Andueza**"), who himself was engaged in self-dealing in this and in another transaction against the interest of his employer. Brooks and **Andueza** agreed that they would conceal their self-dealing from Plaintiffs' senior management. . . . unlike Brooks, Andueza opted to cooperate with Plaintiffs to mitigate the damage.
>
> At the Company, Brooks worked closely with **Andueza**, a senior officer at the Company's New York office who was on medical leave for a large part of 2019 after a life threatening accident. Over time, Brooks was elevated to the title of Senior Vice President, Investments, of the Group. Eventually and during the relevant time period, Brooks was directed to report directly to the Group's most senior officer and not **Andueza** with regard to Convergen.
>
> In 2019, after **Andueza** suffered a near fatal accident that required him to go on disability for a good part of the year, Brooks stood as the sole Company executive trusted with overseeing these assets and ensuring that the strategic purposes for their acquisitions were achieved.
>
> In around October 2019, Brooks organized a secret tour (from New York) for himself and his co-conspirators, including Merle and Inchausti of the Pellet Plant in Wisconsin. Brooks led the tour with Hansen and Mikkelson's assistance in furtherance of the conspiracy. Brooks, Merle, and **Andueza** concealed the tour and Inchausti's participation from Plaintiffs and the other Defendants, namely Hansen and Merle knew that both Brooks and **Andueza** were conspiring to betray and defraud their employer. **Andueza** knew of Brooks' conflicted interest but due to his own conflicts in another deal involving the Group (among other reasons) opted to maintain the secrecy of Brooks' scheme.
>
> **Andueza**, in his own confession, has admitted to introducing one or more of the Spanish Investors to Brooks in connection with the Pellet Plant acquisition.
>
> As stated above, Brooks was able to execute his fraudulent scheme (and nearly get away with it) because in 2019 he was the senior most officer charged and trusted with vetting and overseeing these kinds of transactions. He also benefitted from the knowing assistance he received from **Andueza**, his colleague at the Group, as well as Hansen and Mikkelson, effectively counter-parties to the transactions.
>
> **Andueza** had been Brooks' supervisor but on July 21, 2019, after **Andueza** had returned from his medical leave, Brooks was given autonomy and responsibility with respect to Convergen and other Group assets and agreed to report directly to the Group's most senior officer regarding Convergen. Brooks' fraudulent scheme took place during the period in which he was solely responsible for overseeing the

4

Convergen assets. Therefore, any disclosures or discussions about the transaction should have been made to the Group's most senior officer; Brooks knew that he was not following the Group's directive. Brooks was also aware and took advantage of the fact that the Group's most senior officer had suffered a traumatic brain injury and was plagued by post-concussion syndrome and was more reliant on Brooks' advice than in the past because of this medical condition.

Nevertheless, Brooks worked with **Andueza** to effectuate the fraud. **Andueza** admitted that he had an agreement with Brooks not to disclose the conflict to the Group's senior management and he kept the secret. **Andueza** also introduced Brooks to other investors, including the Spanish Defendants.

According to Brooks' own email (discovered after this lawsuit was initiated), **Andueza** also sought to financially benefit from the fraud by providing his own funding for the purchase of the Pellet Plant. Specifically, a December 15, 2019 email from Brooks' personal email to **Andueza's** personal email evidences that **Andueza** and Brooks intended to jointly contribute $500,000 in funding for the Pellet Plant. The same email indicated Merle was supposed to receive an "arrangement fee" of $50,000 presumably for pretending to be the buyer in Brooks' fraudulent scheme. None of this was disclosed to Plaintiffs; the use of personal as opposed to corporate emails highlights the secretive nature of the conspiracy. Had Plaintiffs known the truth about their employees' fraudulent self-dealing, Plaintiffs would never have agreed to sell the Pellet Plant – and certainly not under the terms of the Acquisition and Supply agreements.

As a result of their fraudulent self-dealing, with Defendants' knowledge, Brooks and **Andueza** had no authority to bind Plaintiffs to any agreement they negotiated, entered into, or signed on Plaintiffs' behalf with Defendants. Accordingly, the Supply Agreement and the Acquisition Agreement, signed by **Andueza** on behalf of L'Anse and Convergen, respectively, never came into existence and are void ab initio. L'Anse is in the process of transitioning to a new pellet supplier and, once that is accomplished, will cease any further business relationship with CEW.

The investigation uncovered emails that unequivocally confirm Hansen and Mikkelson's knowledge of and roles in the fraudulent scheme. For example, a September 12, 2019 email from Mikkelson to Brooks and copied to Hansen indicates that he and Hansen knew of Brooks' fundraising from the Spanish Investors at around the time Brooks formally initiated the sale process with Niantic: "Hola Tio Esteban ["Hello Uncle Steve], [Hansen] mentioned that you are in Spain." The above referenced email also reflects that Hansen intended to provide $100,000 to fund the fraudulent acquisition. This too was not disclosed to Plaintiffs.

The Spanish Investors knew that Brooks was a senior officer of the Company, knew that he was overseeing the sale of the Pellet Plant and was a financial stakeholder in the buyer (Niantic). During the February 3rd taped confession, Brooks admitted

that the Spanish Investors had funded the fraudulent acquisition of the Pellet Plant. Upon information and belief, Brooks solicited the Spanish Investors on the basis that his double-dealing was expected to yield the Pellet Plant at a purchase price several million dollars below its fair market value. Brooks solicited investments from the Spanish Investors in September 2019, in and around the time he introduced Niantic to the Group. Upon information and belief, the Spanish Investors had extensive contacts with Brooks while he was in New York and employed by the Company in New York, and each wired funds directly or indirectly to New York for the fraudulent purchase of the Pellet Plant.

Defendant Merle similarly knew of Brooks' duplicity and the financial windfall he would achieve as a result. Neither he nor Brooks disclosed their long-standing personal relationship to anyone at the Group. In fact, they both took deliberate steps to keep their relationship a secret. The two exchanged very few emails via Brooks' Company email account and those limited exchanges were written in an obvious formal, contrived arms' length manner. The lack of emails on a deal of this type and magnitude suggests that the parties engaged in discussions through some other clandestine means. Not surprisingly, the Company's investigation uncovered emails between the two utilizing Brooks' personal Gmail account. The Gmail account emails reflect the hidden personal relationship and stand in sharp contrast to the faux formal emails to and from Brooks' Company email account. According to a personal email between **Andueza** and Brooks, Merle apparently was supposed to receive an "arrangement fee" of $50,000 presumably for pretending to be the buyer in Brooks' fraudulent scheme. Indeed, in another recently discovered email, Brooks referred to Merle as a "close friend" in pitching an energy project of Merle's to the above-referenced investment banker. None of this was disclosed to anyone at the Group, including during the meeting at which Merle was introduced to the Group's principal in New York.

Dkt. 117-1 at ¶¶ 7, 30, 33, 36, 46, 55-58, 61-63. Plaintiffs have not identified any facts or arguments they could not have cited or made while briefing their Motion to Stay.

## APPLICABLE LEGAL STANDARD

Motions for reconsideration or reargument are governed by Local Civil Rule 6.3 and Rule 60(b) of the Federal Rules of Civil Procedure. On a motion for reconsideration, "[n]o affidavits shall be filed by any party unless directed by the Court." L. C. Rule 6.3.[2] Rule 60(b) provides as follows:

---

[2] Plaintiffs have filed two affidavits in support of their Motion (*see* Dkt. Nos. 120-121), without having been directed to do so by the Court. Accordingly, Defendants request that the Court

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).[3] Rule 60(b) affords "'extraordinary judicial relief" that "can be granted 'only upon a showing of exceptional circumstances.'" *Kubicek v. Westchester Cty.*, No. 08 Civ. 372 (ER), 2014 WL 4898479, at *1 (S.D.N.Y. Sept. 30, 2014) (quoting *Nemaizer v. Baker*, 793 F.2d 58, 61, (2d Cir. 1986)). The reconsideration standard "is strict," and reconsideration is generally only granted upon a showing of "controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).

It is well established that a motion for reconsideration "is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) (internal quotation marks and ellipsis omitted); *SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*, 642 F. Supp. 2d 206, 210 (S.D.N.Y. 2009) ("A motion for reconsideration is not an invitation to parties to 'treat the court's initial decision as the opening of a dialogue in which that party may then use such a motion to advance new theories or adduce new evidence in response

---

disregard those affidavits. In compliance with Local Civil Rule 6.3, Defendants do not similarly file affidavits with the Court in support of their opposition but request the opportunity to do so if the Court does not disregard Plaintiffs' affidavits and entertains additional evidentiary submissions.

[3] Plaintiffs do not identify which of the six factors set forth in Rule 60(b), if any, provide a valid basis for their Motion.

to the court's ruling.'") (internal quotation and citations omitted); *Polsby v. St. Martin's Press, Inc.*, No. 97 Civ. 960 (MBM), 2000 WL 98057, at *1 (S.D.N.Y. Jan. 18, 2000) (a motion for reconsideration is not a way to "advance new facts, issues or arguments not previously presented to the Court") (internal citation omitted). A motion for reconsideration is also not "an opportunity for making new arguments that could have been previously advanced." *Associated Press v. U.S. Dep't of Def.*, 395 F. Supp. 2d 17, 19 (S.D.N.Y. 2005). "The major grounds for justifying reconsideration are 'an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Terra Sec. ASA Konkursbo v. Citigroup, Inc.*, 820 F. Supp. 2d 558, 560 (S.D.N.Y. 2011) (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)).

On a motion for reconsideration, the "moving party bears the burden of proof." *Freedom, N.Y., Inc. v. United States*, 438 F. Supp. 2d 457, 462 (S.D.N.Y. 2006). The decision to grant or deny a motion for reconsideration is "within 'the sound discretion of the district court.'" *Premium Sports Inc. v. Connell*, No. 10 Civ. 3753 (KBF), 2012 WL 2878085, at *1 (S.D.N.Y. July 11, 2012) (quoting *Aczel v. Labonia*, 584 F.3d 52, 61 (2d Cir. 2009)).

## ARGUMENT

Here, the facts and arguments Plaintiffs now attempt to set forth before the Court regarding Mr. Andueza—without exception—were all in Plaintiffs' possession and control when they filed their Motion to Stay. Those facts and arguments were readily capable of being submitted at that time. Plaintiffs, however, simply chose not to set forth those facts and arguments in support of their Motion to Stay. This deliberate choice is fatal to their Motion for Reconsideration. Under Rule 60(b)(2), a party may not seek relief based on evidence that was not previously submitted to the Court if the party reasonably could have presented the evidence, but chose not to. *See Karimian*

*v. Time Equities*, *Inc.*, No. 10-CV-3773 (AKH), 2013 WL 2254557, at *2 (S.D.N.Y. May 22, 2013) ("A motion for reconsideration is not an opportunity to advance new facts, issues or arguments not previously presented to the Court.") (internal quotation marks omitted)); *United States v. Potamkin Cadillac Corp.*, 697 F.2d 491, 493 (2d Cir. 1983) ("In order to succeed on a motion pursuant to Rule 60(b)(2), the movant must present evidence that is truly newly discovered or could not have been found by due diligence.") (internal quotation marks and ellipsis omitted)). In more colloquial terms, "[ha]aving put all of its eggs in that basket, Plaintiffs are not now entitled to produce a different basket." *Natasi & Associates, Inc. v. Bloomberg*, No. 18-CV-12361, 2020 WL 2555281 * 1 (S.D.N.Y. May 20, 2020) (denying motion for reconsideration after concluding documents movant submitted in support had already been in the movant's possession—but not used—at the time of the underlying briefing).

Here, Plaintiffs clearly concede they strategically chose not to brief the Court on Mr. Andueza's alleged role as "co-conspirator" in support of their Motion to Stay: "Plaintiffs acknowledge that, in their briefing on the motion to stay, they did not alert the Court to their contention (which was reflected elsewhere in the record before the Court) that Mr. Andueza was part of the conspiracy to defraud Plaintiffs" (Mot. at 1); "[t]he record before the Court in this action and the related actions reflects Plaintiffs' contention that Mr. Andueza conspired with Mr. Brooks to defraud Plaintiffs. . . Plaintiffs' briefing on their motion to stay the arbitration should have (but did not) alert the Court to this fact" (*id*. at 2). Indeed, Plaintiffs now allege in their proposed Amended Complaint that they already possessed these facts months before they even filed this action on May 14, 2020, let alone before they briefed their Motion to Stay. *See* Plaintiff's Proposed Am. Compl. (Dkt. No. 117-1) at ¶ 7 ("Andueza's wrongdoing was discovered around the same time as Brooks' scheme"); *cf. id*. at ¶¶ 44-48 (alleging Plaintiffs discovered Defendant Brooks'

9

"fraudulent scheme" within a few days of the closing on January 31, 2020). As such, Plaintiffs' purportedly "new" facts and arguments supporting their Motion for Reconsideration should be disregarded by the Court lest the arbitration proceedings—first demanded by CEW on June 4, 2020—be further delayed to Defendants' injury and detriment. Contrary to the Plaintiffs' suggestion, the Court did not "overlook" anything regarding Mr. Andueza (*see* Mot. at 6); rather, the Plaintiffs deliberately hid Mr. Andueza's newly-alleged role from the Court's review.

Yet even if the Court considered these newly disclosed facts and arguments regarding Mr. Andueza, the Court's denial of Plaintiffs' Motion to Stay remains sound and should be reaffirmed. Notwithstanding Plaintiffs' awareness of the alleged fraud—and Mr. Andueza's role as a "co-conspirator" in the alleged fraud—Plaintiffs (though their General Counsel, Bert Diaz) still willingly and knowingly executed the Amended Closing Statement on February 21, 2020. The Court addressed this Amended Closing Statement already as follows in its Order denying Plaintiffs' Motion to Stay:

> On February 21, 2020, Convergen, CEW, Niantic, and L'Anse signed an Amended and Restated Closing Statement concerning the sale of the Pellet Plant from Convergen to Niantic and which made adjustments to the purchase price and credits due to Niantic. Dkt. No. 64-2. The agreement was signed by Defendant Merle on behalf of Niantic and CEW and by Bert Diaz ("Diaz"), general counsel to Libra, on behalf of Convergen and L'Anse. *Id*. at 3. That agreement "amends, restates and replaces in its entirety any prior closing statement relating to this transaction previously signed by [Niantic] and [Convergen]." *Id*. at 1.

Dkt. No. 109 at 3. In addition, the Amended Closing Statement states as follows:

> The Buyer and Seller agree that there will be no further adjustments or changes to this Amended and Restated Closing Statement after the date hereof, as both Parties have confirmed that this document is now complete and accurate in all regards.
>
> By signing this Amended and Restated Closing Statement, each Party confirms and ratifies that the Closing was completed on the Closing Date.
>
> Other than as expressly modified pursuant to this Amended and Restated Closing Statement, all of the terms, conditions and other provisions of the Acquisition

Agreement and the O&M Agreement are hereby ratified and confirmed and shall continue to be in full force and effect in accordance with their respective terms.

Dkt. No. 64-2 at 2.

Thus, at a time when Plaintiffs were aware of Mr. Andueza's role as "co-conspirator"—and had already investigated his conduct—Plaintiffs still voluntarily reaffirmed and closed the sale of CEW a second time. Moreover, CE represented and warranted to Niantic in the Amended Closing Statement that there was no basis for any litigation or investigation of Brooks, Hansen, Mikkelson, CE or CEW. *See also* Acquisition Agreement, ECF No. 92-2, § 8.2(c)(i) (CE's representation in § 2.16 that there was no basis for litigation is classified by the parties as one of the "Fundamental Representations" of the Acquisition Agreement).

Moreover, as the Court has already observed, Plaintiffs' subsequent conduct further established that Plaintiffs considered the Supply Agreement to be valid, and continued to perform their obligations under it notwithstanding Mr. Andueza's known role as a "co-conspirator":

> Assuming the truth of its allegations, L'Anse had the option to refuse or assume the Supply Agreement. It has chosen to take delivery under the agreement. Thus, even accepting Plaintiffs' version of events, the Supply Agreement was formed and exists. *See, e.g., Ipcon*, 698 F.3d at 62 ("The contracts are each clear on their face as to the obligations of the parties, and both parties duly executed the contracts, indicating that they understood their obligations. [Plaintiff] does not allege that the parties had differing contemplations of their obligations under the contracts, or that the parties defined key terms of the contracts in differing manners.").

Dkt. No. 109 at 11.[4]

---

[4] Unlike here, where Plaintiffs continued to perform on the supply contract—and accept its benefits—even after they knew of their agent's (Andueza's) alleged "co-conspirator" role, Plaintiffs' cited cases do not involve similar facts or contracts. *See, e.g., Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.*, 263 F.3d 26, 28 (2d Cir. 2001) (party unilaterally disavowed its obligations under various reinsurance contracts once it had discovered they were fraudulently induced); *Stevenson v. Tyco Int'l*, 2006 WL 2827635, at *7 (S.D.N.Y. Sept. 29, 2006) (party presented insufficient evidence as to whether agent acted outside his authority in signing an employee retention agreement); *see also Woodstock Iron Co. v. Richmond & D. Extension, Co.*, 129 U.S. 643 (1889) (railroad extension contract); *Hidden Brook Air, Inc. v. Thabat Aviation Int'l*

Plaintiffs now make the surprising claim that "L'Anse did not accept delivery under the supply agreement" and, in support, provide an affidavit from Camilo Patrignani wherein he claims L'Anse changed the way it ordered pellets from CEW "in conjunction with filing this lawsuit." Mot. at 9-10; Decl. of C. Patrignani at ¶¶ 4-6. However, this affidavit—which was not requested by the Court pursuant to Local Civil Rule 6.3 and which has no documentary support—also does not undermine the validity of the Court's ruling because the January 31, 2020 Supply Agreement was honored by the parties for several months after execution, notwithstanding Plaintiffs' knowledge of the alleged "fraudulent scheme" of Defendants and "co-conspirator" Mr. Andueza. If Defendants had, in fact, stopped "taking delivery" under the specific terms of the Supply Agreement—though Mr. Patrignani essentially admits they continued taking delivery of pellets following the filing of this action—that event preceded Plaintiffs' filing of the Motion to Stay. Accordingly, Plaintiffs have waived their opportunity to now raise this argument in purported support of their Motion to Stay. Again, a motion for reconsideration is not "an opportunity for making new arguments that could have been previously advanced." *Associated Press v. U.S. Dep't of Def.*, 395 F. Supp. 2d 17, 19 (S.D.N.Y. 2005).

## **CONCLUSION**

For the reasons set forth herein, Plaintiffs' Motion for Reconsideration should be denied.

---

*Inc.*, 241 F. Supp. 2d 246 (S.D.N.Y. 2002) (airplane purchase agreement); *Meade v. Brothers*, 28 Wis. 689 (1871) (land deed); *Manhattan Life Ins. Co. v. Forty Second & G. St. Ferry R. Co.*, 139 N.Y. 146, 151 (1893) (forged stock certificate).

Dated this 2nd day of September, 2020.

*s/Benjamin LaFrombois, Esq.*
Benjamin D. LaFrombois, Esq.
WI State Bar No. 1027910

William E. Fischer
WI State Bar No. 1045725

von BRIESEN & ROPER, s.c.,
*Attorneys for Defendants, Theodore John Hansen,*
*Brian R. Mikkelson and Convergen Energy WI, LLC*

Direct contact information:
Benjamin D. LaFrombois, Esq.
55 Jewelers Park Drive, Suite 400
Neenah, WI 54956
920.233.4704 direct dial
blafrombois@vonbriesen.com

William E. Fischer
920.232.4843 direct dial
wfischer@vonbriesen.com