UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CONVERGEN ENERGY LLC, L'ANSE WARDEN
ELECTRIC COMPANY, LLC, EUROENERGY
BIOGAS LATVIA LIMITED, and LIBRA CAPITAL
US, INC.

                Plaintiffs,

-against-

STEVEN J. BROOKS, NIANTICVISTA ENERGY
LLC, GREGORY MERLE, RIVERVIEW ENERGY
CORPORATION, DANIEL ESCANDON GARCIA,
RAMON URIARTE INCHAUSTI, CHIPPER
INVESTMENT SCR, SA, URINCHA SL, THEODORE
JOHN HANSEN, BRIAN R. MIKKELSON, and
CONVERGEN ENERGY WI, LLC,

                Defendants.

Index No. 1:20-cv-03746 (LJL)

## DECLARATION OF FIDEL ANDUEZA

I, Fidel Andueza, declare as follows:

**Background**

1. I joined Libra Group (referred to here as the "**Company**") on or about June 18, 2014 with the title of Head of Americas. I was based in New York. On January 1, 2019, I was given the title of Chief Investment Officer. I previously worked in London, Brazil, Spain and Mexico at several companies, including Lehman Brothers and Citigroup, and I attended Harvard Business School's Program for Management Development.

2. Throughout my tenure at the Company, my responsibilities included overseeing the strategic direction of certain of the Company's interests across North, South, and Central America. Up until mid-2019 I was based out of New York and responsible for overseeing Plaintiff Convergen Energy LLC ("**CE**"), its former subsidiary Defendant Convergen Energy

1

Wisconsin LLC (the "**pellet plant**"), Plaintiff L'Anse Warden Electric Company, LLC (the "**power plant**") and Plaintiff Euroenergy Biogas Latvia Limited, among other assets. I also was tasked with identifying investment opportunities.

3. My responsibilities were consistent with the Company's management style of maintaining oversight at the top while empowering senior managers with autonomy to manage assets. While the Company is an international conglomerate with interests in certain business classes in a variety of countries, oversight is tightly controlled by a handful of the most senior executives, many of whom are headquartered in New York. Decisions to either "green light" or "red light" material transactions, including acquisitions and dispositions of Company assets, are made in consultation with these senior executives based in large part on the information and opinions expressed to such senior executives by senior managers of the Company responsible for commercial matters (*e.g.*, Brooks prior to being terminated).

4. I have always reported (on the assets I oversee) to the Chairman and Chief Executive Officer ("**Chairman**") of the Company who is based in the Company's New York headquarters. From 2015 until August 2017, I resided in New York City, where I own an apartment. Commencing in August 2017, my family moved to Madrid but I continued to regularly travel to New York, typically two weeks or more out of every month, during which time I continued to report to the Chairman in New York.

5. On December 28, 2018, I was involved in a near fatal skiing accident that put me on disability in a convalescing state for approximately six months. During this period, due to the extent of my injuries, I was bedridden and unable to work effectively. I recovered at my Madrid residence. When I returned to work in mid-2019, my job responsibilities shifted, and I no longer

commuted to New York on a regular basis. In the latter part of 2019, I traveled to New York but much less frequently than before my accident.

6. Defendant Steven Brooks ("**Brooks**") joined the Company in 2014 and reported initially to me. Beginning in 2016 he helped me manage and oversee a portion of the energy assets, including CE, the power plant and the pellet plant. In mid-2019, the Company's senior executives transferred to Brooks responsibility for managing these energy assets. More specifically, as part of the realignment of my responsibilities after I returned to work in mid-2019 (and documented in a memo to senior executives including Brooks), Brooks assumed sole responsibility for managing the pellet and power plants and ensuring that the strategic purposes and financial objectives for their acquisitions were achieved. On these matters, Brooks reported directly to the Chairman and served as an officer of these entities.

7. By 2019, Brooks was the sole Company executive with first-hand knowledge of the operations and profitability of the pellet and power plants. Brooks controlled the flow of information regarding the pellet and power plants to the Chairman and other executives, including me. Brooks stopped providing monthly reports in the summer of 2019. By this time, Brooks had expressed to me his desire to personally acquire a company on the cheap that he could grow to be significantly more profitable.

### The Pellet Plant Sale

8. At around the time I was returning to work from my accident in mid-2019, Brooks, while he was in New York, asked me to contact Defendant Ramon Uriarte ("**Uriarte**") to see if he was interested in funding the acquisition of the pellet plant. Brooks and Uriarte knew each other because I had introduced them during a weekend ski trip to the Pyrenees mountains (Spain) in the winter of 2018.

9. I know Uriarte to be a professional, sophisticated investor of significant funds, some of which are in investment companies regulated by Spain's securities regulator. He speaks fluent English.

10. As Uriarte was a sophisticated investor, I introduced him to a shipping investment opportunity through a Company affiliate in 2016. Uriarte invested approximately $2 million through one or more of his managed investment vehicles, including Defendant Urincha. The equity tracker agreement between the Company's affiliate and Urincha covered the investment in a Chinese-built vessel owned by a Company affiliate organized in the British Virgin Islands; the agreement is subject to English law and the courts of England.

11. Uriarte knew that I worked for the Company out of New York, commuting from Spain on a regular basis and overseeing certain of the Company's assets in the Americas. He also knew that both Brooks and I worked for the Company's senior executives in the New York office.

12. Uriarte also knew that Brooks was responsible for all aspects of the sale of the pellet plant. Uriarte introduced the pellet plant opportunity to his friend Daniel Escandón Garcia ("**Escandón**"). Uriarte described Escandón as a friend and frequent co-investor; Uriarte said that he and Escandón were considering jointly investing in the pellet plant.

13. I had firmly suggested to Brooks to run a competitive bidding process for the sale of the pellet plant.

14. I have reviewed the declarations of Uriarte and Escandón. They report on a series of communications I had with one or both of them between May and December 2019, not all of which I agree with. Any communications I had with them about the sale of the pellet plant were done at Brooks' behest. To the extent I was involved early on, it was to pass along to Uriarte and

Escandón generalized information prepared or provided by Brooks about the pellet plant and general structure and process of the pellet plant sale. I believe that Uriarte and Escandón communicated directly with Brooks via phone and email while Brooks was in New York.

15. I did not participate in the visit to the pellet plant by Uriarte and Escandón in October 2019. Brooks must have communicated directly with Uriarte and Escandón to arrange that visit.

16. I do recall a lunch meeting with Uriarte and Escandón on November 14, 2019, as they stated in their declarations. At that meeting I informed them that Brooks was and I was not going to provide funding for the pellet plant acquisition. By that time, they knew of Brooks' dual role as the seller's representative and as a principal of the buyer. However, any suggestion that I was involved in or communicated "terms of the investment in the pellet plant" – which I interpret to mean their economics, financial returns, distributions, type of security, voting rights, governance, etc. – is wrong. I was not privy to and, therefore, never discussed such terms.

17. I do recall that after the November 14th meeting, Uriarte told me that he and Escandón were not proceeding with their investment in the pellet plant. I believe that Uriarte and Escandón were negotiating the terms of their investment directly with Brooks.

18. I was not privy to the subsequent negotiations, but I do recall from speaking with Brooks that he continued to negotiate the terms of their investment with Uriarte and Escandón. On December 27, 2019, I spoke with Brooks, who requested that I reach out to Uriarte to see if he and Escandón were proceeding with the investment in the pellet plant. Uriarte told me that they were.

19. While Uriarte and Escandón knew of Brooks' conflicting roles, to my knowledge the most senior leaders of the Company did not know. The Company's in-house counsel in New

York who helped facilitate the closing of the pellet plant sale, Bert Diaz, was among those who, to my knowledge, did not know of Brooks' conflicting roles. Brooks communicated about his role on the "buy" side of the pellet plant sale by using his personal email account. I believe, based on the totality of the circumstances, that Uriarte and Escandón knew of Brooks' undisclosed conflicting roles.

20. Although I understand Brooks was supposed to sign the Acquisition Agreement and Supply Agreement in conjunction with the pellet plant closing in the Company's New York offices on January 31, 2020, Bert Diaz asked me to sign the agreements on behalf of the Company's affiliates because Brooks was not in the office and I was the most senior officer present that day.

21. Until this litigation, I was not familiar with the Spanish company, Defendant Chipper Investment SCR, SA ("**Chipper**").[1] According to Spanish public records, Chipper is managed by a board of directors consisting of three directors, including Urincha (the designated Chairperson and represented by Uriarte) and an entity represented by Escandón. While I did not know the name of the entity that Uriarte and Escandón used to invest in the pellet plant until very recently, I understood from Brooks that Uriarte and Escandón had invested jointly in the pellet plant.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Dated: New York, New York
September 4, 2020

*/s/ Fidel Andueza*
Fidel Andueza

---

[1] Spanish public records refer to Chipper Invest SCR, SA.