UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

CONVERGEN ENERGY LLC, et al.,

                Plaintiffs,

v.                                         CASE NO.: 1:20-CV-03746 (LJL)

STEVEN J. BROOKS, et al.,

                Defendants.

## DECLARATION OF STEVEN J. BROOKS

Steven J. Brooks makes the following declaration under penalty of perjury.

1. I base this Declaration on personal knowledge, and submit it in opposition to Plaintiffs' ("Libra" or the "Libra Group") Motion for a Preliminary Injunction.

2. I understand that the upcoming Preliminary Injunction Hearing is not a trial on the merits, but rather addresses Libra's request for immediate relief by the Court. At an appropriate time and in an appropriate forum, I will respond to the many inaccurate, incomplete and false statements in Plaintiffs' Complaint and proposed Amended Complaint (suffice it to say that I dispute nearly all of Libra's allegations). This Declaration only addresses issues pertinent to the Libra Group's request for relief in advance of adjudication of the merits.

### Libra Devices and Email Archives

3. Contrary to the assertions of Phaedra Chrousos (Libra's Chief Strategy Officer) in her May 18 Declaration, I do not have any Lenovo device. Libra originally issued me a Toshiba computer, which I used for work until approximately 2018, when I returned it to Libra. Libra gave me a Lenovo computer in exchange, but it was too big to use on airplanes, so I returned it to Libra almost immediately after I received it (I believe it was the same day), and exchanged it for a

Hewlett-Packard computer ("HP") that Libra provided me. The HP was my work computer throughout the rest of my employment. Libra apparently did not remember that I had the HP until my attorney told them about it. In addition, I have a personal cell phone (an iPhone 11), but its serial number does not match the serial number given in Chrousos's Declaration.

4. Libra emails were maintained in an archive. To access the archive, users were required to log-in to a separate website. I noticed on multiple occasions during my employment with Libra that large numbers of the archived emails would suddenly go missing. Entire months of email traffic would just vanish. I found this disturbing, and discussed it with Ydalberto (Bert) Diaz, Libra's General Counsel. Diaz said he had seen the same thing, and could not explain it.

5. I also had multiple discussions on this issue with Christoforos Varlas (Libra's Senior IT Manager) and Nikos Batziotis (Libra's Chief Information Officer and head of IT), and noted that I frequently saw long periods over which there were no emails in the archives, such as an entire week with no emails to me from Andueza (and I would never go a week without numerous emails from Andueza). Neither Varlas nor Batziotis were able to explain why Libra emails so often went missing.

6. In either December 2019 or January 2020, I sent an email to Libra's IT department, cc'ing Diaz and Nicholas Logothetis (Libra is a set of privately-held companies owned primarily by members of the Logothetis family). In the email, I explained what I had observed about the missing emails, and I noted that the mass deletion of emails from Libra's archives reeked of concealment. I do not have access to my Libra emails, so I cannot retrieve this email, but Libra should have ready access to it.

**The Sale of CEW**

7. The sale of Convergen Energy WI, LLC ("CEW") was a multi-million-dollar financed transaction, executed under the supervision of BMO Harris Bank N.A. (senior secured lender to both CEW and L'Anse Warden Electric Company, LLC ("L'Anse")). Among other things, BMO required officer certificates and company resolutions demonstrating that each side had proper authority. The acquisition funds and the parties' signatures were placed in escrow and released only after both sides gave written approval to close. Due to the complex nature of the transaction and a delay in getting the many documents together, while the Acquisition Agreement is effective January 31, 2020, the sale of CEW did not actually close (the first time) until February 3, 2020.

8. On the afternoon of February 3, the parties executed the Closing Statement, and the Waiver of Conditions Precedent (signed by Diaz), the final contracts executed in the (first) sale of CEW, and the final purchase funds with which NianticVista Energy, LLC ("Niantic") bought CEW were wired to Libra's accounts. At 1:45 p.m. on February 3, the sale of CEW closed (the first time), when Diaz sent an email to BMO's counsel (on which I was cc'ed), writing:

> Hi Nicholas,
>
> I hereby release our signatures, and confirm that we are closed.
> Many thanks for all your hard work on this transaction!
>
> Regards,
>
> Bert Diaz
> General Counsel

A true and correct copy of this email is attached to this Declaration as Exhibit A. I note that while BMO designated this document as Highly Confidential, both Plaintiffs and Defendants are original

senders or recipients, so they are exempt from this designation under § 9(d) of this Court's Protective Order. (ECF No. 86, ¶ 9(d).)

9. A few days later, BMO was missing some of the original signatures, and sent follow-up emails to the parties. In the course of those discussions, Diaz insisted that he had signed all the necessary documents on behalf of Libra, writing to BMO (in an email on which I was cc'ed):

> I sent the additional originals requested below (that I signed) promptly after they were requested. Please double check. Note that I signed all the docs for the Libra entities. If you can't find them I'll send tracking data next week.

A true and correct copy of this email is attached to this Declaration as Exhibit B. I note again that while BMO designated this document as Highly Confidential, both Plaintiffs and Defendants are original senders or recipients, so they are exempt from this designation under § 9(d) of this Court's Protective Order. (ECF No. 86, ¶ 9(d).) The chart on the page Bates-Stamped BMO_01310_004 is an Excel file whose margins were partially cut off when it was pasted into an email. BMO did not produce the native version of that Excel file, but it did produce the native version of another Excel file (Bates-stamped BMO_01306_0001), which is very similar (among other things, it has the same columns) but not identical to the cut-off chart in BMO_01310_004. So that the Court can see the missing column, I have inserted a legible printed version of the native Excel file BMO_01306_0001 immediately after BMO_01310_004 in Exhibit B. To be clear, this was not part of the original document produced by BMO, but it provides a sense of what the whole chart looked like.

10. On the evening of February 3, 2020 (after Libra had received the purchase funds from Niantic that afternoon), Adamantios Tomazos, President of Libra Capital, called me and asked me to come to Libra's office in New York. I met first with Tomazos and Chourosos, and

then the three of us met with George Logothetis (Libra's Chairman and CEO) in Logotethis's offices. The discussion lasted about 45 minutes.

11. During this "meeting" (it was really an ambush), Tomazos, Chourosos, and Logothetis told me they were aware I had a relationship to Niantic, and Logothetis specifically told me that Libra had known about my relationship with Niantic for months. Tomazos, Chourosos and Logothetis claimed that they were very upset about the CEW sale.

12. At first, I thought they were upset with Fidel Andueza, Libra's Chief Investment Officer, the Manager of Convergen Energy LLC ("CE"), CEW and L'Anse (and my boss). Andueza orchestrated the entire CEW deal, including all the funding, and specifically solicited me (and several of Andueza's friends in Spain) to loan money to Niantic to fund the acquisition. During the discussion, however, it slowly became clear that Tomazos, Chrousos and Logothetis were not upset with Andueza, but with me.

13. During the ambush, Libra also brought up a separate loan that my mother had made to Libra in connection with the purchase of a hotel in Spain (the Marquelia Transaction). This was another deal put together by Andueza, who solicited my mother to loan money for the project. Logothetis told me that my mother had engaged in criminal conduct in connection with the Marquelia Transaction and that both I and my mother would be facing criminal and civil investigations and prosecution. In a subsequent meeting with Logothetis and Chrousos, Chrousos referred to me being "put in handcuffs."

14. Logothetis's threat to me was consistent with Libra's practices when it comes to business disputes. For instance, in the spring of 2019, Andueza told me about a dispute Libra was having with a gentlemen named Luis Santos about money that Santos claimed Libra owed him. Andueza informed me that Logothetis had told Andueza to warn Santos that unless Santos was

patient in getting his money back, Libra would report Santos to the authorities for participation in fraud, and then repeated that if Santos publicized his claim that Libra owed him money, Santos would implicate himself in a big fraud and Libra would report Santos to the authorities.

15. This was not the only time I had witnessed Logothetis or Libra threaten someone with civil and criminal prosecution if they did not do what Libra wanted. I was concerned, given Logothetis's statements, that Libra was coming after me and my family.

16. The next day, on February 4, 2020, Chrousos told me that Andueza had admitted to deleting evidence relating to the sale of CEW. When I heard this, I became even more worried.

17. Andueza was in charge of the CEW sale, and I only acted according to Andueza's directions. But Libra, who claimed they were upset about the CEW sale, were not targeting their purported unhappiness at Andueza, but at me. I was worried that with Andueza deleting evidence and pointing the finger at me, I was being set up.

18. I felt like I had to defend myself and what happened. Knowing that Libra has a history of destroying evidence and the fact that Chrousos told me flat out that Andueza had admitted to destroying evidence about the CEW sale, I was afraid that Libra would delete my Libra work emails, particularly emails showing that it was Andueza who put the CEW deal together. I decided I needed to make a copy of my Libra emails to protect myself. But I don't know anything about computers, or how to copy a set of emails.

19. Michael Knechtel is a friend of mine who knows more about computers than I do. On February 16, I gave my Libra computer to Knechtel, who at the time was living in Norwalk, Connecticut. I asked Knechtel to make a copy of my Libra work emails and any personal files on the desktop of the HP, and to copy them to an external hard drive I provided to Knechtel. I asked Knechtel only to make a copy, not to access or delete any of the files.

**The Second Sale of CEW**

20. Five days later (on February 21), Niantic and CE entered into the Amended and Restated Closing Statement, under which Niantic agreed to pay an additional $618,359.91 to buy CEW, and CE represented that this totally resolved and completed the CEW sale. A few days after that, I signed a separation agreement with Libra and formally ended my employment with Libra. In this agreement, I paid Libra $332,500, so together with Niantic's payment, Libra managed to extract nearly $1 million from Niantic and me in February 2020. At the time, I was willing to pay to put this matter behind me and to protect my mother and the €549,000 loan she had made to Libra in the Marquelia Transaction. Libra acknowledged the loan to my mother and promised to pay it back immediately. However, as of the date of this Declaration, Libra has not paid my mother any of the amount it owes her, and has not responded to multiple attempts my mother has made to communicate with Libra about the loan.

21. February 2020 was one of the worst months of my life, but I thought that by working with Libra and signing the documents, I had put this all behind me. Diaz, Logothetis, Chrousos and Andueza told me respectively that the dispute was "done," "behind us," "all ok," and "closed." Logothetis said he wished me well and encouraged me to run for Congress someday. Both Logothetis and Chrousos asked me to work on a neutral "narrative" statement for internal and external use about leaving Libra. I was focused on the next steps for me, and I didn't think too much about the HP.

**Return of My Libra Devices**

22. By late February, Covid-19 was raging in New York. It was a crazy time. My mother and I were quarantining at our home on Connecticut and hand-washing all our groceries. I did not leave the house during this time. Covid-19 was particularly scary for me because my

7

mother is a senior citizen and a high-risk person in the event she became infected with Covid-19. We were being very cautious.

23. On February 26, Chrousos circled back to me and said that Libra had gathered my personal belongings, and asked me to come pick them up at Libra's New York offices, and at the same time, to return my Libra work computer (which was with Knechtel in Norwalk), and my Libra iPhone 8 work phone (which was in my apartment in Manhattan). I told Chrousos that I was in self-quarantine, but as soon as it was safe to go get my devices, I would do so and return them to Libra (and retrieve my personal belongings). Chrousos replied on March 20 that this was fine, and did not express that Libra was in any particular hurry to get the devices back. Attached to this Declaration as Exhibit C is a true and correct copy of my email correspondence with Chrousos on this subject.

24. After March 20, I did not hear anything about my Libra devices until Libra provided a draft complaint to me in May. Libra still has my personal belongings.

25. On May 11, 2020, Libra's counsel sent us a draft New York state-court lawsuit that counsel stated Libra would file unless we resolved Libra's concerns by noon on May 14. On May 13, Andueza called me and told me that Libra had "hacked" my Gmail account, had access to all my personal emails and knew everything. Andueza told me that I should have my attorney call Libra's attorney, as there was a limited window to resolve the dispute. He told me that if I did not settle, Libra was going to destroy my life. I believe that Logothetis told Andueza to make that call, as: (1) nothing happens at Libra without Logothetis's direct approval; and (2) Andueza had ignored my phone calls to him for weeks (Andueza also relayed that Libra had told him not to have any contact with me and he was going to be following this instruction strictly), before suddenly calling me out of the blue the day before Libra filed this lawsuit.

26. I did not attend the May 19 call with the Court concerning Libra's motion for a TRO. However, as soon as I learned of the TRO, I called Knechtel and told him not to touch the HP. I said there was litigation, that I would be picking up the computer and mailing it to my attorney, and he should leave the computer alone until I retrieved it. I was very clear with Knechtel on this. I do not believe I used the words "TRO" or "injunction" in my communication with Knechtel. Knechtel is not legally sophisticated, and would not have understood what those terms meant, but I was clear and emphatic in my instruction not to touch the computer. My understanding was that the HP had not even been turned on since February or March.

27. On June 2, 2020, I retrieved the HP from Knechtel, and went straight to the post office and mailed the computer and power cord to my attorney. Attached to this Declaration as Exhibit D is a true and correct copy of the mailing receipt. I have redacted the cover email to my attorney from this document.

28. I also retrieved the external hard drive from Knechtel on June 2, and put it in a drawer, untouched. I did not at any time connect that drive to any computer or other device to read its contents. On August 21, I mailed the external drive to my attorney. Attached to this Declaration as Exhibit E is a true and correct copy of the tracking information for this mailing.

29. Over the June 27-28 weekend, I broke quarantine and traveled to Manhattan to retrieve my Libra iPhone 8. I picked up the phone, and mailed it to my attorney. Attached to this Declaration as Exhibit F is a true and correct copy of the mailing receipt.

30. There is personal (and likely privileged) information on the iPhone 8 that I would like to see removed before returning the work information to Libra. Libra never told me that I was not permitted to use my work phone for personal purposes, I did not sign anything to that effect, and Libra never informed me orally or in writing that my occasional personal use of the phone

9

would allow Libra to view my personal files. During my employment with Libra, I observed many other high-level Libra employees using their Libra phones for personal purposes, and none of them ever expressed any concern that Libra might be able to view or access their personal information.

31. I am not an active user of OneDrive. I have not accessed any OneDrive files related to Libra or on any Libra-related account. I note with respect to the other programs indicated in paragraph 51 of Weiss's Declaration (ECF No. 131) that the last access dates were prior to termination of my employment with Libra.

32. I have not accessed, copied, disclosed, conveyed or used and will not access, copy, disclose, convey or use any of my work devices or any Libra emails or information while the Court's May 19 Temporary Restraining Order is in place. I have been obeying all the terms of the Court's TRO and will continue to do so until further Order of the Court.

### Camilo Patrignani's Accusations

33. Camilo Patrignani was not a Libra employee in 2018 or 2019, and only came back to Libra in late March or early April 2020. Patrignani discusses many subjects in his August 26, 2020 Declaration (ECF No. 130) of which he has no personal knowledge. I address some of Patrignani's unfounded accusations.

34. Although the sale of CEW closed effective January 31, 2020 (the first time), Libra continued to ask Theodore Hansen and Brian Mikkelson to help run Libra's businesses and assist with the transition. Attached to this Declaration as Exhibit G is a true and correct copy of an email from Diaz to Hansen on February 11, 2020, telling Hansen to continue to work as the Vice President of L'Anse in the ordinary course.

35. On March 2, 2020, Brian Mikkelson sent an email to Diaz indicating that Mikkelson was still officially overseeing the CHP (combined heat and power) plants owned by CE, and asked

Diaz for guidance on how to facilitate the transition of that management to someone else. Mikkelson also expressed concern that he was still listed as the sole person responsible for the New York sales tax returns filed by the CHP plants. Mikkelson has not received any compensation from Libra for his post-closing services to the CHP plants, and Libra still has not changed the point-person with the state of New York for the CHP's sales tax filings from Mikkelson to someone who still works at Libra. Attached to this Declaration as Exhibit H is a true and correct copy of the March 2 email Mikkelson sent to Diaz, on which I and Hansen were cc'ed.

36. On March 9, 2020, Mikkelson sent required financial information about the CHP plants to BMO, again reflecting that Libra continued to have Mikkelson perform work for the CHP plants well after Mikkelson left Libra. Attached to this Declaration as Exhibit I is a true and correct copy of the cover email Mikkelson sent to BMO, which BMO produced in response to Libra's third-party subpoena during expedited discovery. I have omitted the financial information attached to this email.

37. On April 3, 2020, Patrignani asked Hansen to help Patrignani gain access as a signatory to L'Anse's bank accounts. Hansen responded that Libra needed to update L'Anse's operating agreement to remove me as an officer. Patrignani then asked Diaz to complete these consents, which Diaz provided on that date. While the consents are effective January 31, they were not signed by Diaz until March 1, 2020. Attached to this Declaration as Exhibit J is a true and correct copy of this email chain.

38. On April 15, 2020, Patrignani told Hansen that Patrignani believed Hansen was still the Vice President of L'Anse as of that date. While Diaz later indicated that Patrignani was incorrect, these exchanges reflect the confusion about what roles they still had, including on

Libra's side. Attached to this Declaration as Exhibit K is a true and correct copy of this email chain.

39. Indeed, Hansen, Mikkelson and I continue to be contacted by third-parties with whom we formerly dealt while at Libra, because apparently Libra has not informed them that we are no longer Libra employees. As of the date of this Declaration, Libra on its website still lists CEW as an asset Libra owns, Hansen is still listed as the CEO of CE, and the website displays a quote from Hansen. Attached to this Declaration as Exhibit L is a true and correct copy of selected pages from Libra's website as of the date of this Declaration.

40. In paragraph 10 of Patrignani's Declaration, he discusses a conversation Patrignani had with an unidentified Libra colleague, who allegedly spoke with an unidentified lender about a conversation the unidentified lender purportedly had with me. Libra has over 100 lenders, and I do not know what Patrignani is talking about, nor do I recall having any conversation like the one Patrignani describes.

41. Because Mikkelson remains listed as the party responsible for CHP's New York sales taxes, and (on information and belief) CHP has not paid the New York sales taxes it owes, we became increasingly concerned about Libra's failure to remove Mikkelson from CHP's filings with the state of New York. In early June, Mikkelson received a notice of default from the CHP's senior lender. We were concerned that if the CHP's were in financial trouble, and did not pay their sales taxes, Mikkelson might face liability. I have a working relationship with Kaylas Bhiro of Powergen, a major vendor for Libra's CHP plants, and I called Bhiro on June 2, 2020, to see if he knew anything about the situation. During the call, the notice of default came up, and I told Bhiro that I did not know any of the details, and if he wanted to speak with someone who knew the facts, he should talk to Mikkelson. This was an oral call that to my knowledge was not recorded, so any

"quotes" from that call could only have been written down after the call. I also note that Patrignani does not provide a snapshot of the alleged Whatsapp conversation he had with Bhiro, Patrignani quotes that conversation selectively in paragraph five of his Declaration, and the quotes do not appear to be complete or consecutive.

42.   On June 11, 2020, Mikkelson received a letter from CE's senior secured letter (NYCEEC), noting that CE was in material breach of CE's contract with its senior secured lender (*see* ECF No. 130-1). As Mikkelson, in his role as CE's controller, had traditionally been responsible for working with Libra's auditors on their audits of Libra companies, Mikkelson forwarded the letter without comment to CE's auditors. Patrignani complains that he was cc'ed on the letter. It is not clear if Patrignani is arguing that he would have forwarded the letter himself to CE's auditors if Mikkelson had not done so, but Patrignani goes on to claim that Libra has been damaged by its auditors finding out that CE defaulted on its loan with its senior secured lender.

43.   On July 6, 2020, an email account under the fictitious name "chang chang" sent an email to CEW's business partners, writing: "This is FYI regarding a Complaint (attached) filed on 5/14/20 in Federal Courts against Convergen Energy WI LLC (pellet supplier from Green Bay) for several charges of Fraud. The assigned case number that can be used to look it up on PACER is 1:20-cv-03746." A true and correct copy of this email is attached to this Declaration as Exhibit M. The list of CEW's business partners is not publicly available. On information and belief, the only entity that: (a) knew the identify of CEW's business partners; (b) knew the contact information for all of CEW's business partners; and (c) had motive to interfere with CEW's relationships with its partners, is Libra.

44.   Because CEW continues to receive communications related to Libra (and CEW has no interest in being involved in Libra's business), CEW in July 2020 sent out a bland

communication indicating that it had been sold to Niantic, and any inquiries about Libra should be sent to Libra. (*See, e.g.*, ECF No. 130-2.) On July 7, 2020, CEW, through its generic email account, sent one such communication to Luminor, a secured lender for CE and EuroEnergy Biogas Latvia Limited ("EuroEnergy"). Contrary to Patrignani's unfounded accusation, CEW did not claim that there was any breach of contract or even mention the contract at issue, it simply notified Luminor of the change of ownership, which was made public, among other times, when Libra publicly filed the Complaint in this action in May.

45. Contrary to Patrignani's unsupported contentions (Patrignani had no dealings with Luminor and was not a Libra employee during the times in question), I had no responsibility for Libra's contracts with Luminor. I am not a party to those contracts, did not sign them, and was not meaningfully involved in those dealings. Andueza negotiated and approved those contracts, Diaz had worked on them and arranged for Libra's Country Head of Latvia to have power of attorney to sign, and Andueza and Diaz were fully aware of their terms. I do not see how I am responsible for an alleged breach by Libra of its contract with Luminor, an accusation made by Luminor, not by CEW or by me.

46. Because Libra has breached its promise to pay back my mother the €549,000 debt they owe her, my mother's lawyer wrote a letter to Libra in July 2020 demanding information. I had nothing to do with that letter, which relates to a debt Libra owes my mother on an unrelated matter, and is being addressed by her attorneys in Spain.

47. To the extent I've been involved in the communications about which Patrignani complains (although Patrignani does not have personal knowledge of virtually anything he discusses in his Declaration), my motivation was to protect CEW's executives and its business, and to clarify to third parties the fact that CEW has been sold and is no longer a member of the

Libra Group. Third parties seem confused on that issue because of Libra's failure to inform the third parties Libra deals with that Libra no longer owns CEW. I have no intention of "intimidating" a multi-billion-dollar business conglomerate, and I find it particularly offensive that Libra is accusing me of intimidation, when this all began with Libra's threat (consistent with its *modus operandi* in business disputes) to report my mother and me to the authorities if we did not cave to Libra's demands to pay Libra an additional $1 million.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated this 4th day of September, 2020.

*[signature]*
Steven J. Brooks