UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__9/16/2020__
```

------------------------------------------------------------------X
                                                      :
CONVERGEN ENERGY LLC, L'ANSE WARDEN        :
ELECTRIC COMPANY, LLC, EUROENERGY          :
BIOGAS LATVIA LIMITED, and LIBRA CAPITAL   :
US, INC.,                                  :          20-cv-3746 (LJL)
                                                      :
                    Plaintiffs,            :          OPINION & ORDER
          -v-                                         :
                                                      :
STEVEN J. BROOKS, NIANTICVISTA ENERGY LLC, :
GREGORY MERLE, RIVERVIEW ENERGY           :
CORPORATION, DANIEL ESCANDON GARCIA,      :
RAMON URIARTE INCHAUSTI, CHIPPER          :
INVESTMENT SCR, SA, URINCHA SL, THEODORE  :
JOHN HANSEN, BRIAN R. MIKKELSON, and      :
CONVERGEN ENERGY WI, LLC,                 :
                                                      :
                    Defendants.           :
                                                      :
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Before the Court are several motions brought by the parties.

Defendants Steven J. Brooks ("Brooks"), NianticVista Energy LLC ("Niantic"), Gregory
Merle ("Merle"), Riverview Energy Corporation ("Riverview"), Theodore John Hansen
("Hansen"), Brian R. Mikkelson ("Mikkelson"), and Convergen Energy WI, LLC ("CEW")
move to dismiss this action in favor of arbitration, or alternatively, either to transfer the action to
the Eastern or Western District Courts in Wisconsin or to dismiss the action for failure to state a
claim.  Dkt. No. 91.

Defendants Daniel Escandon Garcia ("Garcia"), Ramon Uriarte Inchausti ("Inchausti"),
Chipper Investment SCR, SA ("Chipper Investment"), and Urincha SL ("Urincha SL")
(collectively, the "Spanish Defendants") move to dismiss the action for lack of personal

jurisdiction and for failure to state a claim for aiding and abetting fraud and breach of fiduciary duty.  Dkt. No. 122.

Plaintiffs Convergen Energy LLC ("Convergen"), EuroEnergy Biogas Latvia Limited ("Biogas Latvia"), Libra Capital US, Inc. ("Libra" or the "Company"), and L'Anse Warden Electric Company, LLC ("L'Anse") move for a preliminary injunction enjoining Defendants from accessing Plaintiffs' files containing trade secrets and non-public information and requiring Defendants to return such files to Plaintiffs.  Dkt. No. 127.  As part of that motion, Plaintiffs also ask the Court to compel production of outstanding discovery and to hold Defendant Brooks in contempt and to issue sanctions for his violation of the temporary restraining order ("TRO") entered by this Court that enjoined Defendants from "[a]ccessing, disclosing, copying, or otherwise conveying Plaintiffs' electronic files during the pendency of this action" and "[d]estroying, deleting, or otherwise modifying" both "data in the euroenergybiogas.com Office 365 account and the euroenergybiogas.com domain" and "all historical emails, data, and audit logs that belong to Plaintiffs, including through the convergenergy.com Office 365 account." Dkt. No. 28.  They also ask the Court to sanction Defendants for tortious interference and harassment.

Finally, Plaintiffs seek reconsideration of this Court's August 5, 2020 Opinion & Order that denied their request to stay arbitration concerning a supply agreement entered into between L'Anse and CEW.  Dkt. No. 118; *see Convergen Energy LLC v. Brooks*, 2020 WL 4500184, at *1 (S.D.N.Y. Aug. 5, 2020).  That motion is accompanied by a motion for leave to file an Amended Complaint that would add allegations about a senior employee, which Plaintiffs argue support their motion for reconsideration.  Dkt. Nos. 116-17.

## BACKGROUND

The Court presumes familiarity with the facts and sets forth details necessary to resolve the motions.

### I.    The Acquisition

Plaintiffs are part of an international conglomerate headquartered in New York and known as the Libra Group ("Libra Group" or the "Group").  Compl. ¶ 2.  Libra Group held a number of energy investments, including a renewable pellet manufacturing plant in Wisconsin (the "Pellet Plant") and an electric power plant in Michigan (the "Power Plant").  *Id.*  The Pellet Plant produces cost-effective fuel alternatives that can be used as a substitute for traditional fossil fuels and burned by the Pellet Plant's customers.  *Id.* ¶ 30.  The Power Plant, acquired by Libra Group in 2016 as part of a strategy of creating a customer for the Pellet Plant, uses the pellets produced by the Pellet Plant to generate electricity in an environmentally sustainable manner.  *Id.* ¶ 31.  Libra Group owned the Pellet Plant through its ownership of Convergen and Convergen's ownership of CEW, which owned the Pellet Plant.  *Id.* ¶ 8.  Libra Group owns the Power Plant through its ownership of Convergen and Convergen's ownership of L'Anse, which owns the Power Plant.  *Id.* ¶ 9.

The Complaint arises out of the sale, in 2019, of the Pellet Plant to Defendant Niantic (the "Acquisition").  At the time, Brooks was Senior Vice President of Investments of Libra Group, though his employment has since been terminated.  *Id.* ¶ 2.  The Complaint alleges that on September 3, 2019, Brooks reached out to Libra Group's general counsel, Bert Diaz ("Diaz"), to request a non-disclosure agreement ("NDA") for Defendant Niantic, a firm Brooks stated was interested in purchasing CEW and its Pellet Plant.  *Id.* ¶ 33.  Brooks represented that Niantic's interest was unsolicited, that Niantic was an affiliate of Defendant Riverview, and that both entities were owned and controlled by Defendant Merle.  *Id.*  The Complaint alleges that Brooks

inserted himself as the "point person" for the deal, facilitating the due diligence and negotiating the sale price and terms. *Id.* ¶¶ 33-34. The Complaint alleges that, at the time, Brooks had an association with Defendants Niantic and Merle (discussed below), but failed to disclose that association to Libra Group.

After the NDA was signed, Defendants Hansen and Mikkelson, under Brooks' direction, provided information about the Pellet Plant to Niantic. *Id.* ¶ 34. The Complaint alleges that, at the time, Hansen was a Convergen employee who served as President of CEW and Vice President of L'Anse, and Mikkelson was Vice President of Convergen, as well as Vice President of CEW and Vice President of L'Anse. *Id.* ¶¶ 22-23.

On November 5, 2019, Merle executed a letter of intent on behalf of Niantic to acquire the Pellet Plant for $5.8 million, which was sent from Merle's Riverview email address and confirmed that Niantic was an affiliate of Riverview. *Id.* ¶ 35. On November 12, 2019, Brooks emailed an executive board member of Libra Group and stated that Merle would be in New York and "had a short window to meet the next morning." *Id.* ¶ 36. Brooks introduced Merle to Libra Group's executive board the next day. *Id.* ¶ 36. Brooks recommended that Convergen accept Niantic's offer to buy CEW and the Pellet Plant, which it did for $5.5 million.[1] *Id.* ¶ 37. Employees of the Pellet Plant, including Hansen and Mikkelson, went to work for the new owner, CEW. *Id.* ¶ 38.

## II.    The Agreements

Effective January 29, 2020, Convergen, CEW, and Niantic signed an agreement to sell CEW, and along with it, the Pellet Plant, to Niantic for $5.5 million (the "Acquisition Agreement"). Dkt. No. 67-1 ("AA"); *see* Compl. ¶ 37. The Acquisition Agreement was signed

---

[1] Brooks negotiated a $300,000 reduction in the sale price from the original $5.8 million offer in exchange for a $1 million deposit from Niantic. Compl. ¶ 37 n.1.

by Merle as CEO of Niantic and by Fidel Andueza ("Andueza") as President of Convergen and

CEW.  AA at 43.  The sale closed on January 31, 2020.  Compl. ¶ 37.

The Acquisition Agreement contains an arbitration clause.  Under the Acquisition

Agreement:

> Any dispute arising between the Parties in connection with this Agreement, which
> cannot be resolved by the Parties themselves, shall be submitted to binding
> arbitration.
> . . . .
> Except as modified herein, the arbitration shall be conducted in accordance with
> the then-prevailing Commercial Rules of the American Arbitration Association.

AA §§ 9.7(a)-(b).  The Acquisition Agreement is to be enforced in accordance with Delaware

law.  *Id.* § 9.8.  As part of, and a condition to, the Acquisition Agreement, Convergen was to

have executed and delivered to Niantic a supply contract in a form attached to the Acquisition

Agreement and "on terms acceptable to the Parties."  AA § 5.9 (stating that supply contract was

attached as Exhibit I to the Acquisition Agreement).  That agreement would become effective on

January 31, 2020 with the closing of the Acquisition.

On February 21, 2020, Convergen, CEW, Niantic, and L'Anse signed an Amended and

Restated Closing Statement concerning the sale of the Pellet Plant from Convergen to Niantic.

The Amended and Restated Closing Statement made adjustments to the purchase price and

credits due to Niantic.  Dkt. No. 64-2.  The agreement was signed by Defendant Merle on behalf

of Niantic and CEW and by Libra Group's general counsel, Diaz, on behalf of Convergen and

L'Anse.  *Id.* at 3.  That agreement "amends, restates and replaces in its entirety any prior closing

statement relating to this transaction previously signed by [Niantic] and [Convergen]."  *Id.* at 1.

It contains a forum selection clause that states:

> Any action or proceeding seeking to enforce any provision of, or based on any right
> arising out of, this Agreement may be brought against any of the parties in the courts
> of the State of New York, County of New York, or, if it has or can acquire
> jurisdiction, in the United States District Court for the Southern District of New

York, and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

*Id.* at 2.

On January 31, 2020, concurrent with the Acquisition, L'Anse entered into the supply agreement with CEW (the "Supply Agreement"). *See* Dkt. No. 64-1 ("SA"). The Supply Agreement provided that CEW, as the seller, would supply to L'Anse, as the buyer, a minimum quantity of 40,000 total tons per year of engineered fuel pellets in return for L'Anse's agreement to pay CEW a base price of $50 per ton, to be adjusted on each anniversary date of the effective date of the Supply Agreement. *Id.* at 2. L'Anse was required to pay invoices no later than 30 days after receipt of each weekly invoice. *Id.* at 3. The Supply Agreement was signed by Merle on behalf of CEW and by Andueza on behalf of L'Anse.

The Supply Agreement also contains an arbitration provision in the attached section on "Additional Terms and Conditions." It requires all disputes arising out of the Supply Agreement to be settled by arbitration. It states in relevant part:

> All Disputes shall be exclusively, finally and conclusively settled by binding arbitration under the Rules of Arbitration of the American Arbitration Association in accordance with its Commercial Arbitration Rules . . . The parties shall continue to perform their respective obligations under this Agreement pending conclusion of the arbitration. As used herein, Dispute means any disagreement, controversy or claim that arises between [CEW] and [L'Anse] regarding the interpretation, fulfillment, or implementation of any provision of this Agreement, or regarding the rights and obligations of the parties (including, without limitation, the validity of the agreement of the parties to arbitrate, the arbitrability of the issues submitted to arbitration hereunder, and any conflict of laws issues in connection with this Agreement).

SA at 6 § 11. The Supply Agreement is to be enforced in accordance with Wisconsin law. *Id.* § 7.

### III.    Discovery of the Alleged Fraudulent Scheme

On February 1, 2020, the day after the closing of the Acquisition, Libra Group learned—somehow—that Brooks may have had an economic interest in Niantic during the negotiation of the Acquisition.  Compl. ¶ 41.  In particular, Brooks signed a personal guaranty of more than $2 million to finance the acquisition of the Pellet Plant, which enabled Niantic to obtain a credit agreement that it needed to close the Acquisition.  *Id.* ¶ 54.  A senior principal of Libra Group confronted Brooks at Libra Group's New York office and recorded the meeting in which Brooks "admitted to having an undisclosed ownership interest in Niantic and to orchestrating the sale of Convergen's asset to his own entity for less than fair market value."  *Id.* ¶ 43.  In response to the question of who benefitted from the transaction, Brooks named himself, Merle, and the Spanish Defendants, and explained that he had raised the funds to buy the Pellet Plant from Merle and the Spanish Defendants.  *Id.*  The Complaint alleges that the Spanish Defendants are financial stakeholders in Niantic who wired funds directly or indirectly to New York for the fraudulent purchase of the Pellet Plant, and who knew that Brooks was overseeing the sale of the Pellet Plant while a senior officer at Libra Group and that he was a stakeholder in Niantic.  *Id.* ¶ 52.

The Complaint makes extravagant claims.  It asserts that after this revelation, Libra Group launched an examination of Brooks and the sale of the Pellet Plan, which uncovered, among other things, that: (1) Brooks undersold the Pellet Plant by at least $10 million; (2) Brooks did not obtain competing bids for the sale of the Pellet Plant and even rebuffed unsolicited interest from an energy sector investment banker; (3) Brooks increased the price of pellets by $10 per ton above the fair market value for such pellets and locked Convergen into a 10-year exclusive deal through the Supply Agreement that shifted $4 million in profit from the Power Plant to the Pellet Plant; (4) prior to closing, Brooks, Mikkelson, and Hansen purchased a new shredder for the Pellet Plant for $350,000 thereby imposing the costs on Convergen and not

on Niantic; (5) Brooks arranged for the Supply Agreement to contain a provision that the Power

Plant would pay for the cost of Hansen's employment at the Pellet Plant; (6) Brooks ensured that

Niantic did not pay Convergen $196,420 that the Pellet Plan had in cash and that was required to

be transferred to Convergen as part of the Acquisition Agreement.  *Id.* ¶¶ 45-50.

In late April, the email account of a Convergen senior manager in Latvia was hacked and

the cybersecurity breach was reported internally to Libra Group's Chief Information Officer.  *Id.*

¶ 56.  When Libra Group's Chief Information Officer in New York contacted Convergen's

senior manager in Latvia to access the Office 365 account to assess the extent of the cyberattack,

he learned he lacked access because Brooks and former Convergen employees still controlled the

Office 365 accounts for Convergen and subsidiaries, Biogas Latvia, the Power Plant, the Pellet

Plan, and other entities.  *Id.*  The Complaint alleges that Mikkelson and Merle refused to give

access to Libra Group, and that separately, Brooks, Mikkelson, and Hansen have also failed to

return company-owned devices.  *Id.* ¶¶ 57-58.  The Complaint alleges that the Office 365

accounts and devices include trade secrets and confidential information, such as "client contracts,

market analysis, potential transactions, investor lists, and strategic discussions," as well as

"unique methods of optimally operating an array of energy assets, a unique and proprietary fuel

mix and sophisticated and energy industry specific legal agreements and work product."  *Id.*

¶ 59.

## PROCEDURAL HISTORY

Plaintiffs initiated the action by Complaint on May 14, 2020, which lists eight counts

alleging claims for: (1) fraud against Brooks; (2) breach of fiduciary duty against Brooks,

Hansen, and Mikkelson; (3) aiding and abetting fraud against all Defendants except Brooks; (4)

aiding and abetting breach of fiduciary duty against all Defendants except Brooks; (5) theft and

misappropriation of trade secrets against Brooks, Hansen, Mikkelson, Niantic, Merle, and CEW;

(6) rescission against Niantic and CEW; (7) violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, against Brooks, Mikkelson, and Hansen; and (8) violation of the Stored Communications Act ("SCA"), 18 U.S.C. § 2701, against Brooks, Mikkelson, Hansen, Niantic, Merle, and CEW.

## I.      TRO and Requested Injunction

On May 19, 2020, Plaintiffs filed an order to show cause with emergency relief. The basis for that request resulted from the transfer of intellectual property ("IP") from Plaintiffs to Defendants as part of the Acquisition. Specifically, Plaintiffs alleged that as part of the Pellet Plant sale, Defendant Brooks and his co-conspirators improperly retained access to active Office 365 email accounts of Convergen and Convergen subsidiaries unrelated to the Pellet Plant, which contained highly proprietary and confidential information, including trade secrets. Plaintiffs alleged these accounts should have been segregated, and they sought emergency relief to:

> (i) cut off Defendants' unlawful and unauthorized access to Plaintiffs' emails and other electronic stored files; (ii) ward off a cyberattack by unknown hackers; (iii) obtain administrator access to certain Plaintiffs' own files, which currently Defendants unlawfully control; and (iv) recover computers and cellphones in the possession of certain defendants that contain Plaintiffs' trade secrets and other proprietary information.

Dkt. No. 25.

The Court held a hearing the same day and issued the TRO. The TRO "[e]njoin[ed] Defendants, their employees, agents, officers, directors, attorneys, and all of those in active concert and participation with any of the foregoing persons or entities who receive actual notice of the Court's order by personal service or otherwise, from:"

> 1. Accessing, disclosing, copying, or otherwise conveying Plaintiffs' electronic files during the pendency of this action.

> 2. Engaging in any activity that uses Plaintiffs' proprietary data or tradesecrets during the pendency of this action.

    3.  Destroying, deleting, altering, or otherwise modifying data in the euroenergybiogas.com Office 365 account and the euroenergybiogas.com domain, and taking any action that would impede or prevent Defendants from complying with any subsequent order of the Court requiring the transfer from Defendants to Plaintiffs of administrator rights to the euroenergybiogas.com Office 365 account and the euroenergybiogas.com domain; and

    4. Destroying, deleting, altering, or otherwise modifying all historical emails, data, and audit logs that belong to Plaintiffs, including those through the convergenergy.com Office 365 account. Defendants shall take all action to preserve such audit logs.

Dkt. No. 28 ¶ 5(a).  It also "[o]rdered that the parties may take expedited discovery to address all issues relevant to the application for a preliminary injunction." *Id.* ¶ 5(c).

    Also, on the same date, the Court scheduled a hearing for the preliminary injunction for June 2, 2020 and scheduled a briefing schedule for the week prior.  Dkt. No 32.  Based on Plaintiffs' desire to present testimony in support of their motion, the Court invited the parties to submit declarations in support of or in opposition to the motion and to take depositions of the declarations to preserve testimony for the hearing.

    After issuance of this order, the parties requested four extensions of these deadlines and of the TRO through August 12, 2020.  *See* Dkt. Nos. 36, 51, 62, 75.  In the meantime, Plaintiffs moved to serve the Spanish Defendants by alternative means, which the Court granted in part and denied in part for the reasons contained in its July 17, 2020 Opinion & Order.  *See Convergen Energy LLC v. Brooks*, 2020 WL 4038353 (S.D.N.Y. July 17, 2020).

    After the parties had failed to submit any briefing or declarations in support of or in opposition to the motion by August 7, 2020, the Court cancelled the hearing and directed Plaintiffs to inform the Court whether Plaintiffs were still pursuing a motion for preliminary injunction, and if so, to provide agreed-upon dates for the submission of briefs and supporting evidence.  Dkt. No. 110.  On August 13, 2020, the parties submitted competing letters.  Dkt. Nos. 113, 114.  Plaintiffs proposed that they would submit their brief and declarations on August 21,

2020, with the opposition brief and declarations due on August 28, 2020.  Dkt. No. 113.

Defendants also proposed that moving papers be submitted on August 21, 2020, with their

opposition brief and declarations due on September 4, 2020.  Dkt. No. 114.  The parties agreed

that depositions of declarants would be unnecessary.  The Court entered a modified schedule,

giving Plaintiffs more time than they had requested and setting moving papers due on August 25,

2020 and opposition papers due on September 4, 2020.  It also scheduled a hearing on the

preliminary injunction motion and said that it would hear argument on certain Defendants'

motions to dismiss at the same time.  Dkt. No. 115.  The Court held the hearing on September

10, 2020.

## II.    Arbitration

On June 4, 2020, Defendant CEW (the owner of the Pellet Plant) filed an arbitration

demand with the American Arbitration Association ("AAA") against Plaintiff L'Anse (the owner

of the Power Plant) seeking to recover payments due under the Supply Agreement.  The

arbitration demand claimed that L'Anse, who was named as respondent, had failed to pay

invoices as required under the Supply Agreement.  CEW sought $235,223.50 plus additional

amounts as they became due, interest, fees, costs, and punitive damages.  Dkt. No. 64-3.  CEW

attached unpaid invoices from April and early May 2020.  *Id.*  According to CEW, the balance

due to CEW is now in excess of $500,000 and continues to accrue, as L'Anse continues to

request pellet fuel on a daily basis and CEW has not received payment since March 2020.  Dkt.

No. 67 ¶¶ 5-6.

L'Anse filed a motion to stay the arbitration on June 23, 2020, which this Court denied

on August 5, 2020.  *Convergen Energy*, 2020 WL 4500184, at *8.  Plaintiffs moved for

reconsideration on August 19, 2020 pursuant to Fed. R. Civ. P. 60(b) and Local Civil Rule 6.3 of

the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York.

### III.    Actions in Wisconsin

Defendants have also brought two actions in Wisconsin state court relating to the same facts.[2]

On May 14, 2020, CEW and Mikkelson filed suit against Convergen, L'Anse, and Libra Group in the Circuit Court for Brown County, Wisconsin seeking a declaratory judgment that they are released from their obligations to Plaintiffs under various agreements, including the Acquisition Agreement and the Amended and Restated Closing Statement, as well as a declaration that the Supply Agreement is fair and reasonable.  The action was subsequently removed to the District Court for the Eastern District of Wisconsin on June 2, 2020 under the caption *Convergen Energy WI, LLC v. Convergen Energy, LLC*, 20-cv-0823 (E.D. Wis.).  On June 25, 2020, Convergen, L'Anse, and Libra Group moved to transfer the case to this Court. On August 7, 2020, the district court stayed the action pending this Court's decision on the motion to dismiss.

On June 10, 2020, CEW filed suit against L'Anse in the Circuit Court for Dane County, Wisconsin seeking injunctive relief requiring L'Anse to continue to perform under the Supply Agreement.  The action was subsequently removed to the District Court for the Western District of Wisconsin on June 15, 2020 under the caption *Convergen Energy WI, LLC v. L'Anse Warden Electric Company*, *LLC*, 20-cv-0543 (W.D. Wis.).  On July 8, 2020, the action was transferred to

---

[2]  The Court may take judicial notice of "matters of public record, such as pleadings and court orders from prior litigation between the parties."  *Reisner v. Stoller*, 51 F. Supp. 2d 430, 440 (S.D.N.Y. 1999); *see Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts, again not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.").

this Court under the caption *Convergen Energy WI, LLC v. L'Anse Warden Electric Company, LLC*, 20-cv-5240 (S.D.N.Y.).  The motion for a preliminary injunction is pending in that action.

## DISCUSSION

## I.     Personal Jurisdiction

"A court facing challenges as to both its jurisdiction over a party and the sufficiency of any claims raised must first address the jurisdictional question" and must dismiss the action against any defendant over whom it lacks personal jurisdiction.  *Lugones v. Pete & Gerry's Organic, LLC*, 2020 WL 871521, at *2 (S.D.N.Y. Feb. 21, 2020) (citing *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963)); *see* Fed. R. Civ. P. 12(b)(2).[3]

"[T]he plaintiff bears the burden of showing that the court has jurisdiction over the defendant."  *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). "[T]he showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.'"  *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  If an evidentiary hearing is not held, plaintiff need make only a prima facie showing by its pleadings and affidavits that jurisdiction exists.  *Id.* at 85.  In contrast, when an evidentiary hearing is held, the plaintiff must demonstrate the court's personal jurisdiction over the defendant by a preponderance of the evidence.  *Id.*; *see also Metro. Life Ins. Co.*, 84 F.3d at 567.

---

[3] At the same time, the Supreme Court has stated that while jurisdictional questions ordinarily must precede merits determinations in dispositional order, "there is no mandatory 'sequencing of jurisdictional issues,'" and "a federal court has leeway to choose among threshold grounds for denying audience to a case on the merits."  *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999)); *see In re Residential Capital, LLC*, 563 B.R. 756, 766 (Bankr. S.D.N.Y. 2016) (deciding arbitration motions before motion to dismiss for lack of personal jurisdiction or failure to state a claim).

This prima facie showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Dorchester Fin. Sec.*, 722 F.2d at 85.  While the Court "construe[s] the pleadings and affidavits in the light most favorable to plaintiffs," *id.*, the Court "will not draw argumentative inferences in the plaintiff's favor" and need not "accept as true a legal conclusion couched as a factual allegation," *In re Terrorist Attacks on Sept. 11, 2011*, 714 F.3d 659, 673 (2d Cir. 2013).

A.      Riverview

Riverview moves to dismiss the action against it based on lack of personal jurisdiction and failure to state a claim for relief.  The Complaint brings two claims against Riverview: aiding and abetting fraud and aiding and abetting breach of fiduciary duty.[4]

Plaintiffs have made no attempt to demonstrate that this Court has personal jurisdiction over Riverview.  Riverview is a Delaware corporation with its principal place of business in Florida, Compl. ¶ 16, and Plaintiffs have not alleged that it conducts business in New York.  Niantic is a special purpose entity and affiliate of Riverview, but Riverview was not a party to the Acquisition Agreement.  *Id.* ¶ 33; *see* Dkt. No. 93 ¶ 5 (attesting that Niantic was "formed to hold the assets of" CEW and "Riverview does not have and has never had any equity, credit, or other financial interest in or dealings with Niantic, CEW, or any of the other companies referenced in the Complaint or the Libra Group, or any of their members, parents or subsidiaries").  Plaintiffs allege "Brooks could not have perpetuated the fraud without funding from . . . Merle and the two entities" but provide no additional detail about this alleged funding.

---

[4] In a footnote, Plaintiffs say that the trade misappropriation claim against Merle should be attributed to Riverview as well.  *See* Dkt. No. 107 at 13 n.6.  But that claim was not alleged against Riverview in the Complaint, and a plaintiff cannot amend a complaint through an opposition brief on a motion to dismiss.  *See, e.g.*, *CAC Grp., Inc. v. Maxim Grp., LLC*, 2012 WL 4857518, at *1 (S.D.N.Y. Oct. 10, 2012), *aff'd*, 523 F. App'x 802 (2d Cir. 2013); *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 432 (S.D.N.Y. 2001).

Compl. ¶ 77; *see* Dkt. No. 93 ¶ 4 (attesting that "Riverview has not derived any benefit, financial or otherwise, from any of the transactions referenced in Plaintiffs' Complaint").  At the meeting in which Brooks introduced Merle to Plaintiffs, he "represented Merle as the CEO of Niantic," rather than Riverview.  Compl. ¶ 36.

The brief submitted by Plaintiffs does not state either a constitutional or statutory basis for personal jurisdiction over Riverview.  At most, the brief states in a footnote that "Merle's statements and acts in New York are attributed to Riverview to establish personal jurisdiction." Dkt. No. 107 at 13 n.6.  Such "'conclusory non-fact-specific jurisdictional allegations' or 'legal conclusion[s] couched as a factual allegation' will not establish a prima facie showing of jurisdiction." *DeLorenzo v. Viceroy Hotel Grp., LLC*, 757 F. App'x 6, 8 (2d Cir. 2018) (summary order) (quoting *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998)). And although a court can exercise personal jurisdiction over a non-domiciliary who, through his agent, commits a tortious act while physically present in the state, N.Y. C.P.L.R. § 302(a)(2), Plaintiffs have not adequately alleged that Merle was acting on behalf of Riverview, rather than in his capacity as Chief Executive Officer of Niantic.

Plaintiffs have also not adequately alleged that Niantic was acting on behalf of Riverview.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2019 WL 1331830, at *8 (S.D.N.Y. Mar. 25, 2019) ("[A]n act taken by a corporate entity's subsidiary or affiliate can be imputed to the entity in certain circumstances for purposes of personal jurisdiction."); *see also Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85-86 (2d Cir. 2018) ("[A]n agency relationship between a parent corporation and a subsidiary that sells securities on the parent's behalf could establish personal jurisdiction over the parent in a state in which the parent 'indirectly' sells the securities.").  To establish personal jurisdiction under N.Y. C.P.L.R.

§ 302(a)(2) "over a principal based on the acts of the agent," a plaintiff must allege that "the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal."  *Id.* at 85 (quoting *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981)).

The only meaningful information about Riverview is the letter of intent between Niantic and CEW provided by Plaintiffs.  Dkt. No. 108-2.  It says that Niantic is an "affiliate" of Riverview and gives a high-level overview of Riverview, describing Riverview as "part of a privately held six-generation, family-owned group."  The letter then refers to a possible synergy between CEW and Riverview's group operations, which involve "developing a refining plant in Indiana."  Because "[a]n additional intended input of the Indiana project will be plastic waste materials," Riverview "see[s] strategic value in [CEW]'s business as it pertains to sourcing, processing and handling plastic waste materials."  *Id.* at 2.  The letter makes no further reference to Riverview.  The letter of intent is signed by Merle in his capacity as Chief Executive Officer of Niantic.  *Id.* at 6.

The letter alone does not establish that Riverview and Niantic were in a principal-agency relationship, nor does it allege the actual exercise of control of Riverview over its affiliate, Niantic.  "It is not enough to allege that defendants had the legal ability to control the alleged agent; plaintiffs seeking to establish jurisdiction under C.P.L.R. § 302(a)(2) must allege the actual exercise of control, based on 'the realities of the relationship.'"  *Hau Yin To v. HSBC Holdings, PLC*, 700 F. App'x 66, 68 (2d Cir. 2017) (quoting *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986)); *see Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, 2018 WL 4681616, at *16 (S.D.N.Y. Sept. 11, 2018).  Without more, Plaintiffs' allegations "shed[] no light on the relationship" between Niantic and Riverview that would allow the Court

to determine whether Niantic's contacts should be imputed to Riverview.  *Schwab*, 883 F.3d at 86.

Finally, the Acquisition Agreement also does not confer personal jurisdiction over Riverview, which was not a signatory to it.  *See JLM Chemicals, Inc. v. DMH Ingredients, Inc.*, 2009 WL 10699037, at *1 (S.D.N.Y. July 8, 2009) (citing *Merrill Lynch, Pierce, Fenner & Smith v. Lecopulos*, 553 F.2d 842, 843 (2d Cir. 1977).  In the absence of personal jurisdiction, the Court cannot compel Riverview to arbitrate.

The Court grants the motion to dismiss Riverview for lack of personal jurisdiction.

**B.     Garcia, Inchausti, Chipper Investment, Urincha SL**

The Spanish Defendants seek to dismiss the action on the basis of personal jurisdiction.[5] Plaintiffs argue that this Court has personal jurisdiction pursuant to N.Y. C.P.L.R. § 302(a)(3)(ii).[6]  That law provides:

> [A] court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:
> . . . .
> 3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.

N.Y. C.P.L.R. § 302(a)(3).  To establish jurisdiction under Section 302(a)(3)(ii), a plaintiff must allege that "(1) the defendant committed a tortious act outside New York; (2) the cause of action

---

[5] Chipper Investment and Urincha SL have their principal places of business in Spain.  Compl. ¶¶ 17-18.  Inchausti and Garcia reside in Spain.  *Id.* ¶¶ 19-20.

[6] The Spanish Defendants also argue that there is no basis for jurisdiction under N.Y. § C.P.L.R. 302(a)(1).  Plaintiffs do not respond to this argument and state that provision "is not at issue here."  Dkt. No. 147 at 16.  They have therefore abandoned that argument.  *See, e.g.*, *Ritchie Capital Mgmt., L.L.C. v. Costco Wholesale Corp.*, 2015 WL 13019620, at *6 (S.D.N.Y. Sept. 21, 2015) (collecting cases).

arose from that act; (3) the tortious act caused an injury to a person or property in New York; (4) the defendant expected or should reasonably have expected the act to have consequences in New York; and (5) the defendant derived substantial revenue from interstate or international commerce." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 946 N.E.2d 159, 162 (2011).

Plaintiffs have not adequately alleged at least the first and fourth elements.

For the first element, the "inquiry at this stage is the preliminary question of jurisdiction, distinct from an inquiry into ultimate liability on the merits," and thus a "plaintiff need not actually prove that defendant committed a tort but rather need only state a colorable cause of action." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 125 (2d Cir. 2002). However, even here, Plaintiffs have failed to state a colorable cause of action.

To establish liability for aiding and abetting fraud under New York law, a plaintiff must allege: (1) the existence of a fraud; (2) the defendant's actual knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission. *See Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014) (citing *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 1993)). "A defendant provides substantial assistance only if [she] affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables [the fraud] to proceed." *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 256 (S.D.N.Y. 2005) (citation omitted).

To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must show: (1) breach of fiduciary obligations to another of which the aider and abettor had actual knowledge; (2) the defendant knowingly induced or participated in the breach; and (3) plaintiff suffered actual damages as a result of the breach. *See In re Sharp Int'l Corp.*, 403 F.3d 43, 49-50 (2d Cir. 2005). Similar to aiding and abetting fraud, a defendant "person knowingly participates

in a breach of fiduciary duty only when he or she provides 'substantial assistance' to the primary

violator," and "[s]ubstantial assistance occurs when a defendant affirmatively assists, helps

conceal or fails to act when required to do so, thereby enabling the breach to occur."  *Lerner*, 459

F.3d at 294-95 (quoting *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 170 (1st Dep't 2003)); *see SPV

Osus Ltd. v. UBS AG*, 882 F.3d 333, 345 (2d Cir. 2018) ("Under New York law, 'the elements of

aiding and abetting a breach of fiduciary duty, aiding and abetting a conversion, and aiding and

abetting a fraud are substantially similar.'") (citation omitted).  Actual knowledge can be met by

"pleading facts sufficient to give rise to a strong inference of conscious avoidance of actual

knowledge, 'such that it can almost be said that the defendant actually knew because he or she

suspected a fact and realized its probability, but refrained from confirming it in order later to be

able to deny knowledge.'"  *In re MF Glob. Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d 157, 182

(S.D.N.Y. 2014), *aff'd sub nom. DeAngelis v. Corzine*, 611 F. App'x 34 (2d Cir. 2015) (citation

omitted).

   The Complaint contains the following allegations regarding the Spanish Defendants:

- When asked who benefitted from the transaction, Brooks named himself, Merle, and the Spanish Defendants, Compl. ¶ 43;

- Brooks explained that he had raised the funds to buy the Pellet Plant from Merle and the Spanish Defendants, *id.*;

- A September 12, 2019 email from Mikkelson to Brooks and copied to Hansen indicated that he and Hansen knew of Brooks' fundraising from the Spanish Defendants at around the time Brooks formally initiated the sale process with Niantic, *id.* ¶ 51;

- The Spanish Defendants knew that Brooks was a senior officer of the Company and knew that he was overseeing the sale of the Pellet Plant and was a financial stakeholder in Niantic, *id.* ¶ 52;

- During the February 3rd "taped confession," Brooks admitted that the Spanish Defendants had funded the fraudulent acquisition of the Pellet Plant. Brooks solicited the Spanish Defendants on the basis that his double dealing was expected

to yield the Pellet Plant at a purchase price several million dollars below its fair market value, *id.*;

- Brooks solicited investments from the Spanish Defendants in September 2019, in and around the time he introduced Niantic to Libra Group, *id.*;

- The Spanish Defendants had extensive contacts with Brooks while he was in New York and employed by the Company in New York, and each wired funds directly or indirectly to New York for the fraudulent purchase of the Pellet Plant, *id.*;

- Hansen and Mikkelson assisted Brooks' efforts to fundraise from the Spanish Defendants, all in an effort to better themselves financially, *id.* ¶ 76; and

- The Spanish Defendants, Merle and his two entities, Riverview and Niantic, knew that Brooks was using his unique position at the Company to double deal and close a fraudulent transaction to their benefit and to the detriment of Plaintiffs. Brooks could not have perpetuated the fraud without funding from the Spanish Defendants, Merle and his entities, *id.* ¶ 77.

Stripped of their characterizations, these allegations do not come close to establishing claims of aiding and abetting either fraud or breach of fiduciary duty.  They do not plead actual knowledge, or even conscious avoidance of a fraud or breach of duty, other than the conclusory statement that "Spanish Defendants knew that Brooks was a senior officer of the Company, knew that he was overseeing the sale of the Pellet Plant and was a financial stakeholder in Niantic." *Id.* ¶ 52.  The Complaint also does not allege that the Spanish Defendants provided "substantial assistance": it is devoid of any allegation that the Spanish Defendants affirmatively aided Brooks or the other Defendants in concealing the alleged fraud or self-dealing, or that the Spanish Defendants had any duty to Plaintiffs that they breached by failing to act.  *See, e.g.*, *Segal v. Bitar*, 2012 WL 273609, at *7-8 (S.D.N.Y. Jan. 30, 2012) (no personal jurisdiction where plaintiffs alleged no facts demonstrating knowledge or substantial assistance); *see also DH Servs., LLC v. Positive Impact, Inc.*, 2014 WL 496875, at *14 (S.D.N.Y. Feb. 5, 2014) (dismissing claims for lack personal jurisdiction where plaintiff failed to demonstrate that defendants' act was tortious).  As a result, Plaintiffs have failed to "aver facts constituting 'a tort

under the law of the pertinent jurisdiction." *Bank Brussels Lambert*, 305 F.3d at 125 (citation omitted).

Similarly, Plaintiffs do not allege facts establishing the fourth element under N.Y. C.P.L.R. § 302(a)(3)(ii). The allegations regarding the Spanish Defendants are limited to their role in providing funding to the Pellet Plant. They did not negotiate the terms of or sign the Acquisition Agreement or Supply Agreement. They travelled to Wisconsin and Michigan to visit the Pellet Plant and L'Anse, respectively, but did not travel to New York in connection with the Acquisition. Andueza's declaration supports that the Spanish Defendants did not travel to New York in the Acquisition and states that Brooks asked Andueza to contact Defendant Inchausti to see if he was interested in the Acquisition. Dkt. No. 149 ¶ 8.

The Complaint alleges that "each" of the Spanish Defendants "wired funds directly or indirectly to New York." Compl. ¶ 52. The declaration submitted by the Spanish Defendants indicates that only Chipper Investment[7] wired $50,000 in funds from Spain to an attorney trust account in New Jersey that represented Niantic in the sale, Clemente Mueller, P.A. ("Clemente Mueller"). Dkt. No. 124 ¶ 21; Compl. ¶ 40.[8] The only allegations with respect to New York are that: (1) the wire transfer was routed through a New York Citibank at the sole direction of Banco

---

[7] Chipper Investment is 50% owned by Urincha SL, which is 51% owned by Defendant Inchausti. Dkt. No. 163 ¶ 14. The other 50% of Chipper Investment is owned by Numala Invest SL, which in turn is 51% owned by Denagon Capital SL, which is fully owned by Defendant Garcia. Dkt. No. 164 ¶ 14.

[8] To support the allegation that Garcia and Inchausti also invested in the Pellet Plant, Plaintiffs point to Brooks' interrogatory response that said Inchausti, Garcia, and Chipper Investment are direct or indirect lenders to 4406 Cypress Lane, LLC ("Cypress"), a Delaware corporation that owns Niantic. Dkt. No. 148 ¶¶ 7, 9. In his amended answer, Brooks clarified that he had no "personal knowledge of Chipper's ownership structure" and that he learned that his initial response as to Garcia and Inchausti was incorrect. Dkt. No. 162-1 at 2. The Spanish Defendants also state that neither they nor Chipper Investment provided any funds or loans to Cypress. Dkt. No. 163 ¶¶ 5, 12, 17; Dkt. No. 164 ¶¶ 5, 12, 19.

Bilbao Vizcaya Argentaria, Dkt. No. 124 ¶¶ 21-22; Dkt. No. 124-1, and (2) Clemente Mueller transferred the funds to the seller, Plaintiff Convergen, which is a Delaware corporation with its principal place of business in New York, Dkt. No. 164 ¶ 16. The Spanish Defendants did not hire Clemente Mueller, direct the funds to New York, or otherwise communicate with Clemente Mueller, which was Niantic's legal representative. Beyond conclusory statements and innuendos, Plaintiffs have failed to allege any facts demonstrating that the Spanish Defendants "expected or should reasonably have expected" that their investment in Niantic (a Delaware company with its principal place of business in New Jersey) to obtain the Pellet Plant (a Wisconsin manufacturing plant) through the purchase of CEW (a Delaware company with its principal place of business in Wisconsin), would have had consequences in New York as required under Section 302(a)(3)(ii).[9] While a court will "construe jurisdictional allegations liberally and take as true uncontroverted factual allegations," *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1996), "[c]onclusory allegations are not enough to establish personal jurisdiction," *Mende v. Milestone Tech., Inc.*, 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003).

Plaintiffs rely on cases where, unlike the situation here, defendants targeted New York such that they could reasonably expect their actions to have consequences here. For example, defendants "direct[ed] false statements to New York via email" and requested additional funds from New York, *Related Companies, L.P. v. Ruthling*, 2017 WL 6507759, at *5 (S.D.N.Y. Dec. 18, 2017), or, in the copyright context, "specifically targeted the plaintiffs who are domiciled in

---

[9] The Complaint lists the Spanish Defendants as co-investors of Niantic, which according to the Complaint, is a Delaware company with its principal place of business in New Jersey. *See* Compl. ¶¶ 14, 17-20. The Spanish Defendants similarly state that Chipper Investment's investment was structured as a purchase of shares in Niantic. *See* Dkt. No. 163 ¶ 16; Dkt. No. 164 ¶ 16.

New York" by filing trademark applications to block plaintiffs' use of such trademark, *Lewis v. Madej*, 2015 WL 6442255, at *4 (S.D.N.Y. Oct. 23, 2015).  The other cases cited by Plaintiffs are similarly inapposite.  *See* Dkt. No. 147 at 14-15 (citing *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 341 (S.D.N.Y. 2000) (defendants entered into agreement in United Kingdom for purpose of trading on the New York COMEX and purposefully engaged in activities related to trading on the New York COMEX); *Nat'l Westminster Bank PLC v. Ret. Care Assocs., Inc.*, 1999 WL 239677, at *3 (S.D.N.Y. Apr. 23, 1999) (defendant entered into contract for services to be performed in New York)).  Here, the allegations indicate that the Spanish Defendants were passive investors in Niantic and, as the reverse of the cases cited by Plaintiffs, were in fact targeted or solicited by Brooks or Andueza.  Nor can the fact alone that Plaintiffs Convergen and Libra have their principal places of business in New York satisfy personal jurisdiction.  "The occurrence of financial consequences in New York due to the fortuitous location of plaintiffs in New York is not a sufficient basis for jurisdiction under § 302(a)(3) where the underlying events took place outside New York."  *Madison Capital Mkts., LLC v. Starneth Europe B.V.*, 2016 WL 4484251, at *5 (S.D.N.Y. Aug. 23, 2016) (citation omitted) ("It is not sufficient that the indirect financial consequences of the events are felt in New York due to the plaintiff's location in New York.").

Plaintiffs have not made a prima facie showing that personal jurisdiction over the Spanish Defendants is appropriate under N.Y. C.P.L.R. § 302(a)(3).[10]  The Court therefore grants the

---

[10] Plaintiffs seek jurisdictional discovery on the question of whether the Spanish Defendants engage in interstate or international commerce.  Chipper Investment, which invested the funds in Niantic, stated that it does not "regularly conduct any business outside of Spain, and it is not licensed to, nor does it conduct any business in New York or the United States and it derives no revenue from New York or the United States." Dkt. No. 124 ¶ 33.  The Acquisition was "Chipper's first and only investment in a project located in the United States," and other than the wire transfer as part of the Acquisition, "Chipper has not wired any other funds into the United

motion to dismiss the action pursuant to Fed. R. Civ. P. 12(b)(2) against Defendants Garcia, Inchausti, Chipper Investment, and Urincha SL.[11]  The Court need not address the alternative arguments for dismissal pursuant to Fed. R. Civ. P. 12(b)(6).

## II.     Motion to Compel Arbitration

"The Second Circuit has recognized that, depending on the facts and arguments presented, a motion to dismiss based on an arbitration clause may be treated as a motion to compel arbitration[.]" *Begonja v. Vornado Realty Tr.*, 159 F. Supp. 3d 402, 405 n.1 (S.D.N.Y. 2016) (citing *Wabtec Corp. v. Faiveley Transp. Malmo AB*, 525 F.3d 135, 139-140 (2d Cir. 2008)).  The motion must either "explicitly or implicitly ask[ ] the court to order arbitration." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016).  Where such a request is made and a movant thus manifests "an intent . . . to compel arbitration," the Court may "treat[ ] motions to dismiss based on mandatory arbitration clauses as motions to compel arbitration." *Id.* at 230 & n.3.  "In such motions . . . courts apply a standard similar to that applicable for a motion for summary judgment." *Id.* at 229.  Defendants' motion to dismiss explicitly requests that the Court compel arbitration.

---

States." *Id.* ¶ 34.  Because the Court does not base its jurisdictional analysis only on this element, the Court declines to grant discovery.  The Court also rejects Plaintiffs' request for discovery about "how the investment was pitched and what was said about Brooks' role and the price of the pellet plant" and "the relationship between each Spanish Defendant and Chipper, the source of Chipper's funds, how Chipper's funds were used to 'pay' Plaintiffs for the pellet plant, and who represented Chipper in the transaction."  Dkt. No. 147 at 7-8.  "Where plaintiffs do not establish a prima facie case that the district court has jurisdiction over the defendant, the district court does not err in denying jurisdictional discovery." *Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 18-19 (2d Cir. 2015) (citing *Jazini*, 148 F.3d at 186).  "A prima facie case requires non-conclusory fact-specific allegations or evidence showing that activity that constitutes the basis of jurisdiction has taken place." *Id.*

[11] Because Plaintiffs have not made a prima facie showing that personal jurisdiction is appropriate under N.Y. C.P.L.R. § 302(a)(3), the Court need not address the question of whether personal jurisdiction "comports with the requisites of due process." *Whitaker*, 261 F.3d at 208-09.

Section 3 of the FAA requires courts to stay litigation of proceedings that are referable to arbitration.  9 U.S.C. § 3.  Before doing so, however, a court must determine: "(1) whether there is a valid agreement to arbitrate; (2) whether a court or an arbitrator should decide if the dispute falls within the scope of the agreement to arbitrate; and (3) whether the dispute does fall within the scope—the question of arbitrability."  *PB Life & Annuity Co. v. Universal Life Ins. Co.*, 2020 WL 2476170, at *5 (S.D.N.Y. May 12, 2020).  "[I]f a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue."  *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019). "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary."  *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003).

When considering whether there is a valid agreement to arbitrate, the Court must determine whether the agreement to arbitrate was properly formed, and if it is, whether the arbitration clause contained therein is valid.  Unlike the "enforceability or applicability" of an arbitration agreement, which may be delegated to an arbitrator, questions regarding the "formation of the parties' arbitration agreement" must be decided by a court.  *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019) (quoting *Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 299 (2010)); *id.* ("Arguments that an agreement to arbitrate was never formed . . . are to be heard by the court even where a delegation clause exists.") (citation omitted); *see also Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (moving party need not "show initially that the agreement would be enforceable, merely that one existed").  That is because "[a]n agreement that has not been properly formed is not merely an unenforceable contract; it is not a contract at all."  *Doctor's Assocs.*, 934 F.3d at 251. "And if it is not a contract, it cannot serve as the basis for compelling arbitration."  *Id.*; s*ee* 9

U.S.C. § 2 ("A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.").

A.     **Validity of the Acquisition Agreement and Arbitration Clause**

As discussed in a prior decision by this Court, where a claim challenges a contract as a whole, and not the arbitration clause in particular, the arbitration clause is enforceable apart from the contract.  *Convergen Energy*, 2020 WL 4500184, at *5; *see Rent-A-Ctr., W., Inv. v. Jackson*, 561 U.S. 63, 70 (2010); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 446 (2006); *Prima Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402 (1967); *see also Rubin v. Sona Int'l Corp.*, 457 F. Supp. 2d 191, 193 (S.D.N.Y. 2006) ("*Buckeye Check Cashing* makes clear that whether [plaintiff] argues that the agreement is void or voidable, [plaintiff] may only avoid arbitration if it can successfully challenge the validity of the arbitration clause itself.").  The limited carve-out to this rule occurs when the agreement was never formed in the first place.  *See Buckeye*, 546 U.S. at 444 n.1.  Formation issues for the court may include "whether the alleged obligor ever signed the contract, whether the signor lacked authority to commit the alleged principal, and whether the signor lacked the mental capacity to assent."  *Id.* (internal citations omitted).

"Whether the parties agreed to arbitrate is determined by state contract law."  *Kurz v. Chase Manhattan Bank USA, N.A.*, 319 F. Supp. 2d 457, 461 (S.D.N.Y. 2004) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).  The Acquisition Agreement is governed by Delaware law, *see* AA § 9.8, under which "a contract is formed if a reasonable person would conclude, based on the objective manifestations of assent and the surrounding circumstances, that the parties intended to be bound to their agreement on all essential terms,"

*Doe v. Cedars Acad., LLC*, 2010 WL 5825343, at *3 (Del. Super. Ct. Oct. 27, 2010) (quoting

*Leeds v. First Allied Conn. Corp.*, 521 A.2d 1095, 1101 (Del. Ch. 1986)).

Plaintiffs argue that the Acquisition Agreement containing the arbitration clause was not

concluded because Andueza, who signed on behalf of Convergen, lacked authority to bind

Convergen to the Acquisition and therefore a contract was never formed in the first place.[12]

Actual authority exists "when, at the time of taking action that has legal consequences for the

principal, the agent reasonably believes, in accordance with the principal's manifestations to the

agent, that the principal wishes the agent so to act." *Parke Bancorp Inc. v. 659 Chestnut LLC*,

217 A.3d 701, 712 (Del. 2019) (quoting Restatement (Third) of Agency § 2.01 (2006)).

The evidence before the Court establishes that Andueza had authority to bind Convergen

to the Acquisition Agreement (or L'Anse to the Supply Agreement).  As manager of Convergen

(in addition to CEW and L'Anse), Andueza was given authority to sign the Acquisition

Agreement.  Convergen's operating agreement grants authority to managers, like Andueza, to

execute agreements such as the Acquisition Agreement, Dkt. No. 92-19 § 4.3, and Plaintiffs do

not contest that Libra Group's general counsel "Diaz asked [Andueza] to sign the agreements on

behalf of the Company's affiliates," Dkt. No. 149 ¶ 20.  That agreement goes so far as to relieve

managers of claims based on the duty of care or duty "so long as such action does not constitute

gross negligence or intentional disregard of the terms of" the operating agreement.  Dkt. No.

92-19 § 4.5.  Finally, the operating agreement makes clear that "each Manager and its affiliates

may pursue such other business opportunities for their respective accounts regardless of whether

---

[12]  Plaintiffs incorporate by reference the arguments they made about the validity of agreements signed by Andueza in their prior briefing on their motion to stay arbitration related to the Supply Agreement.  *See* Dkt. No. 107.  They have expanded upon those arguments and Andueza's role in their motion for reconsideration of the Court's decision on the motion to stay arbitration.  *See* Dkt. No. 119.

they have learned of such opportunity in the course of the Company's business." *Id.* § 4.6. There is no question that the signature on the Acquisition Agreement belonged to Andueza, that he had the actual authority to sign on behalf of Convergen under its operating agreement, and that he had the mental capacity and competency to sign. The Acquisition Agreement thus satisfies all of the conditions of the footnote in *Buckeye*. *See Buckeye*, 546 U.S. at 444 n.1.

In response, Plaintiffs repeat with respect to Andueza the arguments they have made about Brooks. They assert that the Acquisition Agreement was not formed because Andueza, who signed the agreement, "conspired with Mr. Brooks to defraud Plaintiffs." Dkt. No. 119 at 2. In essence, they allege that Andueza knew that Brooks had a financial interest in the Acquisition and signed the agreements nonetheless. But, even accepting the contention that there was something wrongful in Brooks having such an interest, Plaintiffs' argument does not go to whether Andueza had the authority to sign the agreements—he plainly did. Instead, the argument goes to whether that authority was properly and lawfully exercised or whether, in the exercise of that authority, Andueza and/or Brooks defrauded their principal Convergen. To the extent that Plaintiffs could also allege that Niantic, as buyer, fraudulently induced Plaintiffs into the Acquisition through false representations made by Brooks and Andueza, this allegation might go to whether Plaintiffs could disaffirm the contracts, *i.e.*, whether the contracts are voidable and whether Plaintiffs have a defense to compliance with the contract. *See* Restatement (Second) of Contracts, § 164 ("If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient."); *McCaddin v. Se. Marine Inc.*, 567 F. Supp. 2d 373, 380 (E.D.N.Y. 2008) ("[C]ases where there is evidence that the contract is void because it produced no legal obligation [are] separate and distinct from cases where the claim is that the contract is

voidable because of some fraud in the inducement of the contract.").  In other words, Plaintiffs'
allegations, if supported, would assume a valid contract; at most, they would give Plaintiffs the
right to disavow that contract and perhaps sue for damages.

In the alternative, Plaintiffs argue that the forum selection clause in the Amended and
Restated Closing Statement controls.  Dkt. No. 107 at 13-14.  The Amended and Restated
Closing Statement states: "In the event of any conflict or inconsistency between the provisions of
the Acquisition Agreement . . ., as applicable, and the provisions of this Amended and Restated
Closing Statement, the provisions of this Amended and Restated Closing Statement shall
control."  Dkt. No. 64-2 at 2.  However, the arbitration clause in the Acquisition Agreement and
the forum selection clause in the Amended and Restated Closing Statement are not inconsistent
for two reasons: the forum selection clause refers to only actions or proceedings "arising out" of
the Amended and Restated Closing Statement and the clause is permissive, not mandatory.

The dispute relates to the validity of the Acquisition Agreement based on Defendants'
alleged behavior.  That agreement was not superseded by the Amended and Restated Closing
Statement—nor do Plaintiffs argue that it was.  In fact, the Amended and Restated Closing
Statement assumes and refers to the continued existence of the Acquisition Agreement and the
obligations of the parties under the Acquisition Agreement.  The Amended and Restated Closing
Statement states: "Other than as expressly modified pursuant to this Amended and Restated
Closing Agreement, all of the terms, conditions and other provisions of the Acquisition
Agreement . . . are hereby ratified and confirmed and shall continue to be in full force and effect
in accordance with [its] respective terms."  *Id.*  By its terms, the Amended and Restated Closing
Statement was not intended to "constitute the entire understanding and agreement" of the parties.
*Applied Energetics, Inc. v. NewOak Capital Mkts., LLC*, 645 F.3d 522, 523-24 (2d Cir. 2011)

(forum selection clause superseded arbitration clause where provisions were all-inclusive, mandatory, and "neither admits the possibility of the other").

The forum selection clause also does not "expressly modif[y]" or supersede the Acquisition Agreement. The forum selection clause states: "Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement *may* be brought . . . in the courts of the State of New York, County of New York, or, if it has or can acquire jurisdiction, in the United States District Court for the Southern District of New York." Dkt. No. 64-2 at 2 (emphasis added). The forum selection clause addresses only disputes pertaining to the Amended and Restated Closing Agreement, and even then, the clause is not "mandatory," but rather permissive. *Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*, 764 F.3d 210, 216 (2d Cir. 2014). The parties "may" bring such claims in New York, but are not required to do so. There is thus "is ample room for the operation of the forum-selection clause in the many disputes that would not rest on or come within the scope of the" Acquisition Agreement, and the arbitration clause in the Reinsurance Agreement and forum selection clause in the Amended and Restated Closing Statement "can be read in a complementary fashion." *PB Life*, 2020 WL 2476170, at *9; *see also Dome Tech., LLC v. Golden Sands Gen. Contractors, Inc.*, 2017 WL 5071264, at *5 (D. Conn. Nov. 3, 2017) (holding that arbitration clause survives where contractual provisions can be read in complementary fashion and collecting cases).

## B.     Scope of Arbitration

The Court turns to the question of whether the claims fall within the scope of the arbitration clause, and whether it is for the Court or the arbitrator to decide that issue. To determine whether a particular dispute falls within the scope of an agreement's arbitration clause, a court must first determine whether the arbitration clause is broad or narrow. *See Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001). "When

parties use expansive language in drafting an arbitration clause, presumably they intend all issues that 'touch matters' within the main agreement to be arbitrated." *Id.* at 225 (citation omitted).

Section 9.7(a) of the Acquisition Agreement requires "binding arbitration" for "[a]ny dispute arising between the Parties in connection with this Agreement, which cannot be resolved by the Parties themselves." AA § 9.7(a). This language of "all disputes" "arising under or relating to" constitutes "the paradigm of a broad" arbitration agreement. *Offshore Expl. & Prod. LLC v. Morgan Stanley Private Bank, N.A.*, 986 F. Supp. 2d 308, 316 (S.D.N.Y. 2013), *aff'd*, 626 F. App'x 303 (2d Cir. 2015) (quoting *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995)). "Where the arbitration clause is broad, 'there arises a presumption of arbitrability' and arbitration of even a collateral matter will be ordered if the claim alleged 'implicates issues of contract construction or the parties' rights and obligations under it.'" *Louis Dreyfus*, 252 F.3d at 224 (quoting *Collins*, 58 F.3d at 23).

Moreover, the arbitration language in the Acquisition Agreement explicitly incorporates the rules of the AAA. *See* AA § 9.7(b) ("Except as modified herein, the arbitration shall be conducted in accordance with the then-prevailing Commercial Rules of the American Arbitration Association."). It thus vests in the arbitrator the decision whether this dispute falls within the scope of the arbitration clause. "[A] signatory to a contract containing an arbitration clause and incorporating by reference the AAA Rules" may not "disown its agreed-to obligation to arbitrate all disputes, including the question of arbitrability." *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 211 (2d Cir. 2005); *see also Jacobs v. U.S. Anti-Doping Agency*, 2004 WL 5003951, at *4 (S.D.N.Y. May 19, 2004) (where arbitration provision incorporated AAA rules, "the parties . . . agreed that all questions regarding the existence, validity, and scope of their arbitration agreement should be decided by an AAA arbitrator rather than by a court"), *aff'd sub nom.*

*Jacobs v. USA Track & Field*, 374 F.3d 85 (2d Cir. 2004). The Court sends each of the claims to the arbitration panel "in the first instance to determine whether the claim is within the scope of the arbitration clause." *Offshore Expl.*, 986 F. Supp. 2d at 317.

By its language, the Arbitration Agreement binds the parties and signatories to the Acquisition Agreement (*i.e.*, Convergen, CEW, Niantic, Merle) to the dispute. However, there is a question as to whether it binds the non-signatory Plaintiffs and Defendants as well.

The Second Circuit "has made clear that a nonsignatory party may be bound to an arbitration agreement if so dictated by the 'ordinary principles of contract and agency.'" *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) (citation omitted). As the court said in *Dowe v. Leeds Brown Law, P.C.*:

> Two requirements must be satisfied for a signatory to an arbitration clause to be estopped from refusing arbitration against a nonsignatory. First, "the issues the nonsignatory is seeking to resolve in arbitration" must be "intertwined with the agreement that the estopped party has signed." *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 127 (2d Cir. 2010) (citation omitted). Second, "there must be a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement." *Id.* (citation omitted).

419 F. Supp. 3d 748, 757-58 (S.D.N.Y. 2019); *see also Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001).

Here, the issues that Plaintiffs raised in their Complaint and that Defendants seek to arbitrate are "undeniably intertwined" with the Acquisition Agreement signed by Convergen, CEW, Niantic, and Merle. *See Dhaliwal v. Mallinckrodt plc*, 2019 WL 4739045, at *5 (S.D.N.Y. Sept. 29, 2019). Plaintiffs allege that non-signatory Defendant Brooks fraudulently induced the Acquisition, Compl. ¶ 3, and that non-signatory Defendants Hansen and Mikkelson, who were responsible for management of L'Anse and CEW, gave him "knowing assistance" in executing his fraudulent scheme to consummate that transaction, *id.* ¶ 51. It also alleges that, in

connection with the transaction, the non-signatory Defendants took trade secrets to which they were not entitled under the plain language of the Acquisition Agreement and thus engaged in misappropriation.  *Id.* ¶¶ 56-59; *see* Dkt. No. 107 at 10-11.

There is also a relationship among the parties that justifies arbitration.  Courts have "generally found such 'close relationship' in two kinds of situations: (1) where the non-signatory had an active role in the transaction between the signatories, or (2) where the non-signatory had an active role in the company that was the signatory."  *NuMSP, LLC v. St. Etienne*, 2020 WL 2614770, at *12 (S.D.N.Y. May 22, 2020) (quotation marks omitted).  Both conditions are satisfied here.  Brooks was Senior Vice President of Libra Group and allegedly responsible for the negotiations leading up to the Acquisition, Hansen was President of CEW and a Vice President of L'Anse, and Mikkelson was Vice President of CEW, Vice President of Convergen, and a Vice President of L'Anse at the time of the Acquisition.  Compl. ¶¶ 2, 23, 29, 33.  The Acquisition Agreement provided that Hansen would work full-time for CEW, and Hansen and Mikkelson went to work at CEW after the Acquisition.  *Id.* ¶ 38.  Thus, "Plaintiffs not only treated the non-signatory Defendants as affiliates of the signatory Defendants, but also 'admitted and knew' that the non-signatory Defendants would be involved in the performance of the agreements giving rise to arbitration."  *Meridian Autonomous Inc. v. Coast Autonomous LLC*, 2020 WL 496078, at *3 (S.D.N.Y. Jan. 30, 2020) (quoting *Ragone*, 595 F.3d at 128).  Similarly, the non-signatory plaintiffs, L'Anse, Biogas Latvia, and Libra, are required to arbitrate their claims because their claims all arise under the Acquisition Agreement; their intellectual property is alleged to have been misappropriated and L'Anse is alleged to have been fraudulently induced to enter into the Supply Agreement with CEW.  Having alleged that Defendants Brooks, Hansen, and Mikkelson knowingly assisted in arranging and consummating the Acquisition, which sent

"shockwaves through the Group," Compl. ¶ 44, "[P]laintiffs cannot now escape the consequences of those allegations by arguing that" that the non-signatories "lack the requisite close relationship" with the signatories, or that claims by and against non-signatories are unrelated. *Denney v. BDO Seidman*, L.L.P., 412 F.3d 58, 70 (2d Cir. 2005); *see also Mobile Real Estate, LLC v. NewPoint Media Grp., LLC*, 2020 WL 2521451, at *15 (S.D.N.Y. May 18, 2020) ("Numerous courts have found that non-signatory parties are estopped from denying arbitration when they rely on or seek direct benefits under an agreement by, for example, bringing suit under that agreement.").

This conclusion is supported by the Second Circuit's decisions, as described in *JLM Industries*:

> [I]n *Choctaw*, we found that where the merits of an issue between the parties was bound up with a contract binding one party and containing an arbitration clause, the "tight relatedness of the parties, contracts and controversies" was sufficient to estop the bound party from avoiding arbitration. Similarly, in *Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration International, Inc.*, 198 F.3d 88, 98 (2d Cir. 1999), we held that the party attempting to resist arbitration was estopped from doing so because it had treated arguably non-signatory companies and their signatory assignees "as a single unit" in its complaint in a related lawsuit. Most recently, in *Astra Oil Co. v. Rover Navigation, Ltd.*, 344 F.3d 276, 281 (2d Cir. 2003), we found that petitioner Astra could hold respondent Rover to an arbitration clause to which Astra's affiliate AOT was also a signatory because of the "close corporate and operational relationship" between Astra and AOT," because the claims Astra brought against Rover arose under the agreement binding AOT and Rover to arbitration, and because in various respects Rover had treated Astra as a party to the agreement.

387 F.3d at 177-78.

Accordingly, the motion to compel arbitration is granted. Given the Court's decision to refer the parties to arbitration, the motion to dismiss for failure to state a claim is denied as moot.

## III.   Motion for Preliminary Injunction

Even where the parties have agreed to arbitrate a dispute, the "Second Circuit has repeatedly held that courts retain the power, and the responsibility, to consider applications for

preliminary injunctions while a dispute is being arbitrated." *General Mills, Inc. v. Champion Petfoods USA, Inc.*, 2020 WL 915824, at *3 (Feb. 26, 2020) (citing cases); *see Am. Exp. Fin. Advisors Inc. v. Thorley*, 147 F.3d 229, 231 (2d Cir. 1998) ("[C]ourts should consider the merits of a requested preliminary injunction even where the validity of the underlying claims will be determined in arbitration."); *Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co.*, 739 F.2d 124, 125 (2d Cir. 1984) ("The fact that a dispute is to be arbitrated, however, does not absolve the court of its obligation to consider the merits of a requested preliminary injunction."). "[P]ro-arbitration policies reflected in . . . Supreme Court decisions are furthered, not weakened, by a rule permitting a district court to preserve the meaningfulness of the arbitration through a preliminary injunction. Arbitration can become a 'hollow formality' if parties are able to alter irreversibly the status quo before the arbitrators are able to render a decision in the dispute." *General Mills*, 2020 WL 915824, at *3 (quoting *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1053 (2d Cir. 1990)).  The arbitration panel may later declare the party to be "wrongfully enjoined" under Fed. R. Civ. P. 65(c) if it ultimately finds that the enjoined party had at all times the right to do the enjoined act.  *Blumenthal*, 910 F.2d at 1054.

Plaintiffs seek an injunction pursuant to Fed. R. Civ. P. 65 and the DTSA requiring Defendants to turn over files and hardware that contain, or are likely to contain, Plaintiffs' trade secrets and other proprietary information.  The DTSA empowers a district court to issue an injunction "to prevent any actual or threatened misappropriation" and "if determined appropriate by the court," to "require[e] affirmative actions to be taken to protect the trade secret."  18 U.S.C. § 1836(b)(3)(A)(i)-(ii).  It also authorizes the court to award "damages for actual loss caused by the misappropriation of the trade secret" and permits recovery of "damages for any unjust enrichment . . . not addressed in computing damages for actual loss" and of "exemplary

damages" in cases where the trade secret was willfully and maliciously misappropriated." *Id.* § 1836(b)(3)(B)-(C).

The standard for an injunction seeking to preserve the status quo pending arbitration is the same as for preliminary injunctions generally. *See Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 894-95 (2d Cir. 2015). The movant seeking a preliminary injunction must establish that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Id.* at 24.

## A.    Irreparable Harm

"Irreparable harm is 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.'" *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (quoting *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999)). "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley*, 559 F.3d at 118. "The moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered," and in "the absence of a showing of irreparable harm, a motion for a preliminary injunction should be denied." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (citation omitted); *see also Hello I Am Elliot, Inc. v. Sine*, 2020 WL 3619505, at *14 (S.D.N.Y. July 2, 2020) (declining to address elements beyond irreparable harm).

Plaintiffs' motion for a preliminary injunction is based on trade secrets that Defendants allegedly improperly acquired during the Acquisition in violation of the DTSA and New York common law. Plaintiffs seek to require Defendants to turn over emails, electronic files, and

company-issued computers and cellphones that "contain (or most likely contain) Plaintiffs' trade secrets or other proprietary information."  Dkt. No. 128 at 11.

Plaintiffs fail to establish that irreparable harm will flow if the Court does not enter an injunction pending a final determination of this case.  Several facts together give rise to that conclusion.  First, this is not a case where former employees threaten or did in fact take trade secrets to a competitor, which "could cause loss of revenue and competitive advance," *Mission Capital Advisors LLC v. Romaka*, 2016 WL 11517104, at *2 (S.D.N.Y. July 29, 2016), as well as "the loss of client relationships and customer goodwill," *Medicrea USA, Inc. v. K2M Spine, Inc.*, 2018 WL 3407702, at *10 (S.D.N.Y. Feb. 7, 2018).  The alleged trade secrets are Plaintiffs' files left on company computers and phones that had yet to be removed from devices, or were left accessible by Defendants through a cloud-based device, the Office 365 accounts.  The devices were turned over as part of the sale of a subsidiary to a third party, and that acquisition contemplated a continued relationship with the third party in the form of a supplier arrangement. The circumstances, as alleged by Plaintiffs, do not demonstrate that Defendants intended to misuse this information, or in fact to use them in any other way than through the normal operation of CEW and the Pellet Plant.  Instead, the principal dispute is whether the trade secrets transferred were intended to be transferred under the Acquisition Agreement.[13]

Second, Plaintiffs have described most of the trade secrets at such a level of high generality that it is difficult to determine whether there is a risk of competitive harm.  The Second Circuit has not articulated a specificity requirement for pleading a trade secret, but the pleading standard set forth in *Twombly* and *Iqbal* would require the Complaint "to allege facts

---

[13] Both parties state that allegations that Defendants unlawfully controlled administrator access to certain Plaintiffs' files or prevented Plaintiffs from eliminating the risk of cyberattacks have been resolved since the filing of the TRO.  *See* Dkt. No. 128 at 6 n.1.

sufficient to identify the information for which protection is claimed and sufficient information about its nature, value, and measures taken to safeguard it to support an inference that the information qualifies as a trade secret." *Universal Processing LLC v. Weile Zhuang*, 2018 WL 4684115, at *3 (S.D.N.Y. Sept. 28, 2018); *see Medidata Sols., Inc. v. Veeva Sys. Inc.*, 2018 WL 6173349, at *3 (S.D.N.Y. Nov. 26, 2018) ("[D]istrict courts in this circuit routinely require that plaintiffs plead their trade secrets with sufficient specificity to inform the defendants of what they are alleged to have misappropriated.").

Trade secrets are defined in the DTSA as "all forms and types" of information that "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). "To qualify as a trade secret, the owner of the trade secret must have taken 'reasonable measures' to keep it a secret and the trade secret itself must acquire economic value from not being generally known or easily obtained by others who would gain economic value from the use or disclosure of it." *Kraus*, 2020 WL 2415670, at *4 (quoting 18 U.S.C. § 1839(3)(A)). To determine whether a trade secret exists under New York law, courts consider the following factors to be relevant:

> (1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and to [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990).

Plaintiffs allege that such trade secrets include not only "client contracts, market analysis, potential transactions, investor lists, and strategic discussions, but also unique methods of

optimally operating an array of energy assets, a unique and proprietary fuel mix and sophisticated and energy industry specific legal agreements and work product."  Compl. ¶ 59.  In a declaration in support of their preliminary injunction, the president of Convergen and L'Anse states that documents wrongfully kept on Brooks' laptop contain "highly sensitive information belonging to Plaintiffs," including "[p]roposed partnership negotiations," "internal financials" for L'Anse, "projections, strategy reports and board reports of [Convergen]," and valuations of Biogas Latvia.  Dkt. No. 130 ¶¶ 14(b), (c)-(d), (g)-(i).  Libra Group's Chief Strategy Officer Phaedra Chrousos ("Chrousos") further elaborates on the trade secrets, which include: "(i) a unique fuel mix developed over years by the Power Plant that optimizes thermal power plants; (ii) asset management protocols of distribution for a network of combined heat/power and biogas plants; (iii) unique energy contracts and documentation that Plaintiffs invested significant funds to create and reflect years of Plaintiffs' experience."  Dkt. No. 122 ¶ 22.

Some of that information is too general to constitute trade secrets.  *See Lawrence v. NYC Med. Practice, P.C.*, 2019 WL 4194576, at *5 (S.D.N.Y. Sept. 3, 2019) ("Listing general categories of information . . . does not adequately plead the existence of a trade secret.").  Others, though, such as "unique methods of optimally operating an array of energy assets," "a unique and proprietary fuel mix," and the information described in the Chrousos declaration, could constitute trade secrets.  *See, e.g.*, *Tesla Wall Sys., LLC v. Related Companies, L.P.*, 2017 WL 6507110, at *9 (S.D.N.Y. Dec. 18, 2017) (complaint adequately described trade secrets as "technical data, internal pricing information, work product, research, engineering designs"); *Medtech Products Inc. v. Ranir, LLC*, 596 F. Supp. 2d at 789 (S.D.N.Y. 2008) (complaint adequately described trade secrets as "manufacturing cost details, drawings, test data, and other information about the design and manufacturing process for its dental protectors"); *E.J. Brooks*

*Co. v. Cambridge Sec. Seals*, 2015 WL 9704079, at *9 (S.D.N.Y. Dec. 23, 2015) (finding description of trade secret as "manufacturing processes used to create" security seals sufficiently specific). But Plaintiffs' allegations make it "extraordinarily difficult to determine whether and, if so, how much of, the information . . . is public and readily available to [] competition." *Int'l Bus. Machines Corp. v. Johnson*, 629 F. Supp. 2d 321, 336 (S.D.N.Y.), *aff'd*, 355 F. App'x 454 (2d Cir. 2009) (allegations regarding trade secrets were "long on generalities and rather short on details").

Third, for the information that is described in more detail, Plaintiffs have not presented evidence of a risk that Defendants will, or are in a position to, exploit the information. At most, Plaintiffs have stated that there are "scenarios" where competitors would be privy to Plaintiffs' internal deliberations if they obtained access to this information. Dkt. No. 128 at 14. Such an allegation is too "speculative" and insufficient as a basis for injunctive relief. *See, e.g.*, *Schwartz v. Cerner Corp.*, 804 F. App'x 85, 87 (2d Cir. 2020) ("District courts commit no abuse of discretion when they deny requested preliminary injunctions and the evidence supporting a claim of imminent irreparable harm consists only of the plaintiffs' conjecture that the defendant might take a harmful step at some point in the future.").[14]

Plaintiffs further argue that Defendants used trade secrets to gain a competitive edge in the Acquisition, but they fail to adequately allege how Defendants used such information to "jump ahead of Plaintiffs . . . in the fraudulent pellet plant transaction." Dkt. No. 128 at 14. As

---

[14] Plaintiffs allege that Defendants contacted third parties with whom Plaintiffs maintain business relationships to defame Plaintiffs and interfere with their relationships. Dkt. No. 128 at 24-25. They have not alleged that Defendants employed trade secrets to do so or that they disclosed such trade secrets to these third parties. *See ExpertConnect, LLC v. Fowler*, 2020 WL 57518, at *8 (S.D.N.Y. Jan. 6, 2020) (recognizing reputational harm resulting from clients' loss of confidence in plaintiff's ability to protect its proprietary information).

alleged, the Acquisition was accomplished through Brooks' alleged self-dealing rather than by use of trade secrets, the misappropriation of which would have occurred post-Acquisition.  Even if Plaintiffs had provided such evidence, however, it would constitute a "business injury" that can be "fully compensable by money damages."  *ExpertConnect*, 2020 WL 57518, at *2; *see Faiveley*, 559 F.3d at 118-19 ("Indeed, once a trade secret is misappropriated, the misappropriator will often have the same incentive as the originator to maintain the confidentiality of the secret in order to profit from the proprietary knowledge.").  Plaintiffs have not made any showing that any such harm cannot be remediated with damages or why the issue of ownership over the trade secrets could not await final resolution of the action.[15]

Fourth, and importantly, defense counsel establish in their papers and at oral argument that the alleged trade secrets have either since been returned or are in sole possession of counsel or an outside consultant.  The accounts in connection with the hacking of Biogas Latvia have been segregated and removed from the CEW system and transferred to Plaintiffs; Hansen and Mikkelson's hard drives are in the possession of an outside forensic consultant, copies of which will be sent to Plaintiffs; and CEW sent 47,000 "Libra-only" emails to Plaintiffs as well as emails representing a mutual business interest of both Plaintiffs and Defendants but that do not contain trade secrets.  Dkt. No. 143 ¶¶ 3-6.  In addition, Brooks' laptop and external hard drive are in the exclusive possession of a third-party forensic firm; Brooks allowed Plaintiffs' forensic expert to access that laptop; and Brooks' iPhone 8 is in counsel's exclusive possession.  Dkt. No. 151 ¶¶ 3-8.  It is uncertain what trade secrets remain in Defendants' possession, other than

---

[15] This finding is also made in light of the fact that since the TRO, Plaintiffs have been able to obtain administrator access to their own files that they were previously prevented from accessing, "thus eliminating the need for Court intervention on [this] issue."  Dkt. No. 128 at 6 n.1.

Brooks' iPhone 11, which his counsel states is a personal device.  Dkt. No. 151 ¶ 35.  Thus, on the present record, any risk that the alleged trade secrets would be misused has been addressed and court intervention is not necessary.  *See Hernandez v. N.Y. State Bd. of Elections*, 2020 WL 4731422, at *12 (S.D.N.Y. Aug. 14, 2020) (no strong showing of irreparable harm as "actual and imminent" where defendants represented they have or will implement the proposed measures).

In the absence of a showing of irreparable harm, the Court declines to address the remaining elements necessary to obtain a preliminary injunction.  *See Rodriguez*, 175 F.3d at 234; *see also Coscarelli v. ESquared Hosp. LLC*, 364 F. Supp. 3d 207, 221 (S.D.N.Y. 2019) ("[I]f a party fails to show irreparable harm, a court need not even address the remaining elements" of the preliminary injunction standard).  Plaintiffs' motion for a preliminary injunction is denied.

### B.        Injunction for Harassment and Tortious Interference

Plaintiffs also ask the Court to enjoin Defendants from harassing and interfering with Plaintiffs' business relationships with particular third parties.  These claims were not raised in the Complaint because they occurred after such filing; however, Plaintiffs do not seek to add these claims in their proposed amended complaint.

To state a claim for tortious interference with business relations under New York law, a plaintiff must show that "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship."  *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015) (citation omitted).

In their brief supporting their motion for a preliminary injunction, Plaintiffs allege that Defendants "orchestrated a series of communications to non-parties with whom Plaintiffs

maintain business relationships with no legitimate purpose other than to defame Plaintiffs and

interfere with Plaintiffs' relationships," which include the following:

- On June 2, 2020, Brooks called the manager of Powergen, a combined heat and power ("CHP") vendor that operates Convergen's power plants in Manhattan, to "warn" Powergen about Convergen's creditworthiness. The Powergen manager subsequently explained to Convergen that he understood this communication to be a "warning" that Powergen should terminate its relationship with Convergen and shut the plant down because Convergen would not be able to pay.

- On or about May 12, 2020, Defendant Mikkelson received a pro forma letter from a vendor of Convergen seeking payment on an overdue invoice for services provided to a Manhattan hotel client of Convergen. Mikkelson received the letter after his employment terminated presumably because he never notified this particular vendor that he no longer served as the contact person. The overdue payment was the result of COVID-19's impact on Convergen's hotel client and the vendor was subsequently paid off. Even though Plaintiffs' senior personnel was also copied on the letter, Mikkelson forwarded the letter to Convergen's auditors on June 11, 2020. There was absolutely no basis for doing so other than to manufacture problems for Convergen with its auditors.  Because of the way in which the pro forma demand letter was sent to the auditors, it will now appear in CE's audited financials and may impair CE's ability to secure financing.

- On July 7, 2020, one or more of the Defendants sent an email to a business partner of Plaintiffs, Luminor Bank in Latvia, claiming that Plaintiffs breached an agreement with the bank by failing to disclose the sale of the Pellet Plant to the bank. It was Brooks' responsibility to notify the bank of the sale of the Pellet Plant while he worked for Plaintiffs.

- Over the last few months Brooks spoke with a lender of an affiliate of Plaintiffs, again with no legitimate basis for doing so. After speaking with Brooks, the lender unexpectedly opted not to extend the loan to the affiliate.

- On or about July 29, 2020, Brooks' mother had a lawyer send a misleading demand letter to a joint venture partner of Plaintiffs with information about Plaintiffs in connection with the joint venture. Brooks' mother had no privity with that joint venture partner or any other reason to correspond except to negatively impact Plaintiffs' relationship with that partner.

Dkt. No. 128 at 24-25.

While "the Second Circuit regards damage to business relationships significant," *TVT*

*Records v. Island Def Jam Music*, 225 F. Supp. 2d 398, 405 (S.D.N.Y. 2002), Defendants

provide explanations for some of these incidents that this Court finds credible.  Defendants

explain that: "Because Libra has not informed third parties that it sold CEW," "third parties continue to contact Defendants requesting Libra information"; "Libra refuses to remove Mikkelson as the person responsible for paying the New York state sales taxes of the CHP plants [Convergen] owns," which caused him to receive a notice of default and led Brooks to contact Powergen; "Counsel for Brooks' mother wrote a letter to Libra about the €549,000 debt that Libra acknowledged it owes to Brooks' mother, but has not paid back, a matter being handled by counsel for Brooks' mother in Spain—not Brooks." Dkt. No. 150 at 8; *see also* Dkt. No. 152 ¶¶ 35, 39, 41, 46; Dkt. No. 152-8.

With respect to the remaining incidents, including the email sent to Luminor Bank (which the parties dispute) and the letter sent to the auditor (which Mikkelson states he would have normally shared with auditors, though he sent it one month after receipt and only after the filing of this action), the Court declines to enjoin Defendants based on Plaintiffs' failure to show likelihood of success on the merits or to make any arguments as to irreparable harm.

## IV.    Motion for Contempt Order and Sanctions

Plaintiffs move for a contempt order and sanctions against Defendant Brooks, alleging that on May 31, 2020 he copied files from his company-owned laptop onto an external hard drive and also deleted certain files in violation of the TRO's prohibition on "[a]ccessing, disclosing, copying, or otherwise conveying Plaintiffs' electronic files during the pendency of this action" and "[d]estroying, deleting, or otherwise modifying" both "data in the euroenergybiogas.com Office 365 account and the euroenergybiogas.com domain" and "all historical emails, data, and audit logs that belong to Plaintiffs, including through the convergenergy.com Office 365 account." Dkt. No. 28. They also allege that he deleted files on February 28, 2020 and March 20, 2020, before the TRO was signed on May 19, 2020 and the action was filed on May 14, 2020, but after he had notice of the action.

"[A] contempt order is a 'potent weapon' that is inappropriate if 'there is a fair ground of doubt as to the wrongfulness of the defendant's conduct.'" *Latino Officers Ass'n City of N.Y., Inc. v. City of N.Y.*, 558 F.3d 159, 164 (2d Cir. 2009) (internal citations omitted).  Therefore, a "contempt order is warranted only where the moving party establishes by clear and convincing evidence that the alleged contemnor violated the district court's edict." *Id.* (quoting *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995)).  The "movant must establish that (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *Id.*  "[A] defendant is 'not reasonably diligent' when he or she ignores the order or takes only superficial actions that 'strain both the language and intent of the order.'" *Medina v. Buther*, 2019 WL 581270, at *25 (S.D.N.Y. Feb. 13, 2019) (citation omitted).

For his part, Brooks does not dispute that certain files were deleted, but claims that only personal files were deleted and were done so by a third party.  Brooks submits a declaration from a friend, Michael Knechtel ("Knechtel"), who asserts that that Brooks gave him his work laptop on February 16, 2020—before the filing of this action—and asked him to make a copy of his emails and personal files and to place them on an external hard drive.  Dkt. No. 153 ¶ 4. Knechtel was unsuccessful in copying Brooks' emails and was able to copy only Brooks' personal files onto an external hard drive.  *Id.* ¶ 63.  He had the laptop until June 2, 2020.  *Id.* ¶ 24.

In a series of unfortunate events, Knechtel states that his own computer and cellphone were hacked and that he decided to use Brooks' computer to recover his own files throughout February and March 2020.  *Id.* ¶¶ 6-7.  To recover his own files, Knechtel was required to reinstall the operating system on his computer; however, he needed a blank USB drive to do so.

*Id.* ¶¶ 7-8.  He connected a USB drive to Brooks' laptop and moved his files from his USB drive

to the recycling bin on Brooks' laptop, which he asserts is the only way to delete information

from a USB drive.  *Id.* ¶ 9.  In doing so, however, Brooks' laptop likely connected to the internet

and automatically synched to OneDrive.  *Id.* ¶ 10.  Knechtel thought he might be able to use

some of the programs he had on his USB drive on Brooks' laptop and ended up connecting a

series of USB drives to Brooks' laptop because they were all unlabeled and looked the same.  *Id.*

¶ 11.  Because he did not have the administrator password, however, he could not install any

such programs.  *Id.*  Eventually Knechtel put aside the computer, leaving his files on Brooks'

laptop, and did not access it again until mid-May 2020, when Brooks contacted him and told him

he needed to pick up his laptop to send to his attorney in connection with litigation.  *Id.* ¶¶ 11,

15.  Knechtel emptied the recycling bin on Brooks' laptop, which still contained his personal

files and which he swears contained only his personal files that he put on Brooks' laptop.  *Id.*

¶ 18.  Knechtel reviewed the filenames for the list of files that Plaintiffs' expert says were

deleted on May 31, 2020, and states that they are either his own personal files, or links to other

files and not actual data files (*i.e.*, ".lnk" files), which means that they exist on a computer.  *Id.*

¶¶ 20-21; *see* Dkt. No. 131 ¶ 22.  He denies deleting the ten files on March 24, 2020 but notes

that eight of them are .lnk files, which means that they exist on a computer.  Dkt. No. 153 ¶ 19;

*see* Dkt. No. 131 ¶ 22.  He does not recognize the remaining two files, "AC Power Download"

and "downloads3.txt."  Knechtel states that he did not tell Brooks that he had done any of this,

and when Brooks contacted Knechtel in mid-May, Brooks specifically instructed him not to

touch the computer.  *Id.* ¶¶ 15, 19.[16]

---

[16] Plaintiffs seek to make much of the deletion of an electronic file entitled "Smoking Gun," but Defendants submitted such file to the Court under seal and it contains only personal ruminations about a past relationship of Knechtel's.

The declaration submitted by Plaintiffs' forensic expert, Aaron Weiss ("Weiss"), is not to the contrary. It describes, among other behavior: the connection of ten different USB storage devices to Brooks' laptop, Dkt. No. 131 ¶ 10; synchronization of the laptop to the OneDrive account, *id.* ¶ 11; deletion of files in March and May, *id.* ¶ 14; repeated failed attempts to log in as administrator, *id.* ¶ 14; and internet searches about "create usb boot drive," "windows 10 iso download," "usb recovery windows 10 iso" and "windows 10 bootable usb tool," *id.* ¶ 31. That evidence is consistent with Knechtel's declaration.

Weiss further states there is evidence of behavior consistent with an attempt to communicate securely using encrypted messages. *Id.* ¶ 12. That evidence consists of: a portable tool used for encrypting messages and files was on a USB drive connected to the laptop (but not on the laptop itself), *id.* ¶ 26; evidence that a user logged onto an email account with Protonmail, which advertises to be an encrypted email service, *id.* ¶ 39; and a shortcut file (but not the file itself) for an encrypted electronic evidence discovery program that decrypts password-protected items was created on the laptop in March and deleted on May, *id.* ¶ 42. Those facts alone do not establish that someone attempted to delete Plaintiffs' files from Brooks' laptop, and Knechtel denies that he sent encrypted email using Brooks' laptop and that he installed any of the programs listed in Weiss' declaration. Dkt. No. 153 ¶¶ 12-13.

The declarations do not establish by "clear and convincing" evidence that Plaintiffs' files were accessed or deleted in violation of the TRO order. Knechtel confirms that with the exception of two unidentifiable files—which Plaintiffs do not assert are their property—he deleted only his own personal files. Other items that Plaintiffs claim were deleted were shortcuts to files, but not actual files themselves. Significantly, the hard drive with Brooks' personal files have been retained, the files to which the .lnk files refer were not deleted, and Knechtel has

preserved his own USB drives for inspection.  Dkt. No. 154 ¶ 5, 12-13; *see Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 442 (S.D.N.Y. 2010) (no sanctions were information was preserved and recoverable).  Weiss further states that certain programs were created on the laptop, Dkt. No. 131 ¶¶ 27, 43-50, but Defendants' forensic expert Vaidhyanathan Swaminathan contests this and states that none of those tools were created on the laptop, Dkt. No. 154 ¶ 13.  Knechtel confirms that those tools were on his USB drives, but that he did not use or install them onto Brooks' laptop.  Dkt. No. 153 ¶ 12.  In light of the competing declarations on this point, Plaintiffs have not established by "clear and convincing evidence" that civil contempt sanctions are warranted.  *Latino Officers Ass'n City of N.Y.*, 558 F.3d at 164.

Even if Knechtel had installed the programs, and to the extent Knechtel accessed Plaintiffs' files through synchronization with the OneDrive in violation of the TRO, Plaintiffs have not alleged that Knechtel was in "active concert and participation" with Defendants, their employees, agents, or officers, so as to be bound by the TRO.  Fed. R. Civ. P. 65(d).  Nor have Plaintiffs alleged that the files were destroyed with a "culpable state of mind," *Klipsch Grp., Inc. v. ePRO E-Commerce Ltd.*, 880 F.3d 620, 628 (2d Cir. 2018), or that there was "intent to deprive another party of the information's use in the litigation," Fed. R. Civ. P. 37(e)(2), so as to establish spoliation and warrant an adverse inference instruction.[17]  Knechtel used Brooks' laptop for his personal means and before learning of the litigation, sought only to delete his personal files when he learned of the litigation, and did not inform Brooks of his conduct until

---

[17] *See* Fed. R. Civ. P. 37, Advisory Committee Notes to 2015 Amendment (Fed. R. Civ. P. 37(e)(2) "authorizes courts to use specified and very severe measures . . . but only on finding that the party that lost the information acted with the intent to deprive another party of the information's use in the litigation," and it "rejects cases such as *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002), that authorize the giving of adverse-inference instructions on a finding of negligence or gross negligence").

after he had returned the laptop.  *See Orbit One Commc'ns*, 271 F.R.D. at 442 (party removed

data from the servers for "reasons entirely independent of any potential lawsuit; indeed, he was

unaware that any litigation was anticipated").  As "[t]he determination of an appropriate sanction

for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a

case-by-case basis," this Court denies Plaintiffs' motion for sanctions.  *Fujitsu Ltd. v. Fed. Exp.*

*Corp.*, 247 F.3d 423, 436 (2d Cir. 2001).  How to treat the deleted information and whether any

further consequences flow from this series of events will now be for the appropriate

factfinders—the arbitrators.

Finally, Plaintiffs also seek to compel Defendants to produce "outstanding" discovery

pursuant to the TRO.  The TRO orders "that the parties may take expedited discovery to address

all issues relevant to the application for a preliminary injunction."  Dkt. No. 28 ¶ 5(c).  Such

provision is general and permits Plaintiffs to take discovery, but does not order Defendants to

produce any specific items.  More importantly, expedited discovery was to be in service of the

motion for preliminary injunction and to occur during the pendency of the TRO.  If Plaintiffs had

problems with Defendants' responses to discovery, the time to raise those issues with the Court

was before their proposed dates for the preliminary injunction hearing.  The Court's Individual

Practices in Civil Cases are clear.  The parties are required to attempt to meet and confer, but if

parties fail to do so within 48 hours of a request, "any party may file a letter-motion" with the

Court seeking relief.  *See* Individual Practices in Civil Cases, Rule 4(B).  Plaintiffs failed to seek

any such relief when it would be helpful and when they had the right and obligation to seek such

relief.  They will not be heard to complain now if they were not able to get all the discovery they

sought during the extended period the Court permitted them to engage in expedited discovery.

The problem is of their own manufacture.  For these reasons, and in light of its decision to compel arbitration, the Court declines to compel further discovery.

## V.    Motion for Reconsideration

A motion for reconsideration should be granted only if the movant identifies "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013) (citation omitted).  Reconsideration of a court's previous order is an "extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources."  *In re Health Mgmt. Sys., Sec. Litig.*, 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000) (citation omitted).  It is not an "vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'"  *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) (quoting *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998)).

Plaintiffs move for reconsideration of the Court's decision denying a stay of arbitration related to the Supply Agreement based on two facts: (1) Andueza was engaged in a conspiracy with Brooks to defraud L'Anse and lacked authority to bind it to the Supply Agreement; and (2) L'Anse took delivery under the terms of the Supply Agreement.

For the reasons stated earlier in this decision as well as in its prior opinion, the Court denies reconsideration with respect to the argument that Andueza lacked authority to bind L'Anse to the Supply Agreement.  *See supra*; *Convergen Energy*, 2020 WL 4500184, at *5. Those reasons alone are sufficient to deny reconsideration, though the Court also notes that Plaintiffs admitted that they learned of Andueza's alleged role in the fraud "around the same time as Brooks' scheme," which was discovered on February 1, 2020, Dkt. No. 120-2 ¶¶ 7, 44, and therefore they had these arguments in their possession at the time they filed the briefing.

50

*See, e.g.*, *Nastasi & Assocs., Inc. v. Bloomberg, L.P.*, 2020 WL 2555281, at *1 (S.D.N.Y. May 20, 2020) ("[A] party may not seek relief based on evidence that was not previously submitted to the Court if the party reasonably could have presented the evidence, but chose not to.").

As to the second argument, Plaintiffs cites to this Court's prior opinion in which it stated, "Assuming the truth of its allegations, L'Anse had the option to refuse or assume the Supply Agreement. It has chosen to take delivery under the agreement. Thus, even accepting Plaintiffs' version of events, the Supply Agreement was formed and exists." *Convergen Energy*, 2020 WL 4500184, at *6.  Plaintiffs argue that L'Anse has not chosen to take delivery under the terms of the Supply Agreement because (1) it has accepted pellets in quantities lower than the minimum quantities required by the Supply Agreement and (2) L'Anse has told Defendants it would not pay for any pellets until the dispute with Defendants is resolved.  Dkt. No. 119 at 9 (citing Dkt. No. 121 ¶¶ 5-6).  Plaintiffs argue that there is a material factual question as to whether L'Anse ratified the Supply Agreement by accepting delivery of pellets at the lower quantities and that CEW has the burden of proving whether ratification occurred.  Moreover, they argue that ratification is for a court, and not an arbitrator, to decide.

That observation, however, was not critical to the Court's conclusion.  The Court concluded that Plaintiffs had failed to raise issues as to contract formation sufficient to satisfy the *Buckeye* footnote, that there were no allegations that went to the formation of the arbitration agreement itself, and that the dispute fell within the terms of the arbitration agreement.  Nothing raised by Plaintiffs now changes that conclusion.

## VI.   Leave to Amend the Complaint

Plaintiffs move for leave to amend the Complaint with allegations about Andueza's alleged self-dealing, specifically "to allege facts pertinent to Andueza to eliminate the false

suggestion that he had the authority to act on behalf of Plaintiffs, including the authority to execute the operative contracts." Dkt. No. 117 at 3. They do not seek to add him as a defendant.

Fed. R. Civ. P. 15 instructs courts to "freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). Leave to amend may "properly be denied for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'" *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

As discussed earlier, the Court finds that Andueza had authority to act on behalf of Plaintiffs and that the Acquisition Agreement and Supply Agreement, and their arbitration clauses, are valid and enforceable. The new allegations Plaintiffs would bring—which also appear to be wholly conclusory—do not change that result. In light of that conclusion, and the Court's decision to compel arbitration, the motion for leave to amend the Complaint is denied as futile. *See Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) ("Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend.") (quoting *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir.1993) (per curiam)).

## CONCLUSION

For the foregoing reasons, the Court orders the following relief:

- The motion to compel arbitration at Dkt. No. 91 is GRANTED, except with respect to Defendant Riverview, which is dismissed from this action due to lack of personal jurisdiction. The other bases of requested relief for dismissal in the motion are DENIED as moot.

- The motion to dismiss the Spanish Defendants at Dkt. No. 122 is GRANTED.

- The motion for preliminary injunction at Dkt. No. 127 is DENIED. The Court also declines to issue civil contempt or Fed. R. Civ. P. 37 sanctions against Defendants and denies Plaintiffs' request for outstanding discovery.

- The motion for reconsideration at Dkt. No. 118 is DENIED.

- The motion for leave to file an amended complaint at Dkt. No. 116 is DENIED.

A stay of proceedings is mandatory after "all claims have been referred to arbitration and a stay [has been] requested" by a party. *Katz v. Cellco P'ship*, 794 F. 3d 341, 345 (2d Cir. 2015). In this case, all claims have been ordered to be submitted to arbitration and Defendants have requested that the Court enter a stay pending the result of the arbitration. *See* Dkt. No. 92 at 24. This case is STAYED pending the outcome of the arbitration.

The Clerk of Court is respectfully directed to close Dkt. Nos. 91, 116, 118, 122, 127, and to stay the case.


SO ORDERED.


Dated: September 16, 2020
       New York, New York                           LEWIS J. LIMAN
                                                United States District Judge