K9ATCONA

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CONVERGEN ENERGY LLC, et al.,

4                Plaintiffs,

5           v.                              20 CV 3746 (LJL)
                                            Telephone Conference
6   STEVEN J. BROOKS, et al.,

7                Defendants.

8   ------------------------------x
                                            New York, N.Y.
9                                           September 10, 2020
                                            4:03 p.m.
10
    Before:
11
                       HON. LEWIS J. LIMAN,
12
                                            District Judge
13

14

15               APPEARANCES VIA TELEPHONE

16  SEIDEN LAW GROUP, LLP
         Attorneys for Plaintiffs
17  BY:  MICHAEL STOLPER
         DOV B. GOLD
18       JACOB NACHMANI

19  VON BRIESEN & ROPER S.C.
         Attorneys for Defendants Convergen Energy Wisconsin LLC,
20  Theodore John Hansen and Brian R. Mikkelson
    BY:  BENJAMIN LaFROMBOIS
21
22  KOHNER, MANN & KAILAS S.C.
         Attorneys for Defendants Steven J. Brooks, Gregory Merle,
    Nianticvista Energy LLC and Riverview Energy Corporation.
23  BY:  RYAN M. BILLINGS

24

25

K9ATCONA

1            (The Court and all parties appearing telephonically)

2            THE COURT:  Good afternoon, this is Judge Liman, I'm

3    here with the court reporter on the Convergen matter.

4            Matt, will you take appearances?

5            LAW CLERK:  Yes.  I believe we're waiting for one

6    counsel, Judge, Vincent Filardo on behalf of Chipper

7    Investments and a few other defendants.  I don't believe he is

8    on the line yet.

9            THE COURT:  Well, it is 4:03 p.m. and this was called

10    for 4 o'clock, so we're going to get started.

11            Why don't we start with whoever is on the phone.

12            LAW CLERK:  Yes.  So can I have plaintiffs please

13    state your appearance first for the court reporter?

14            MR. STOLPER:  Sure, this is Michael Stolper on behalf

15    of plaintiffs.  Two of my colleagues are on the call but won't

16    be speaking, Dov Gold and Jake Nachmani.

17            THE COURT:  Good afternoon, Mr. Stolper.

18            MR. STOLPER:  Good afternoon, your Honor.

19            LAW CLERK:  And for defendants, for the movant and

20    Mr. Brooks, starting with Mr. Billings, please state your

21    appearance.

22            MR. BILLINGS:  Good afternoon, your Honor, this is

23    Ryan Billings for defendant Steven Brooks, Greg Merle,

24    NianticVistaEnergy, LLC and Riverview Energy Corporation.

25            THE COURT:  Good afternoon, Mr. Billings.

K9ATCONA

1          LAW CLERK:  Next for Convergen and other defendants?

2          MR. LaFROMBOIS:  This is attorney Ben LaFrombois for

3     defendant Convergen Energy Wisconsin, Ted Hansen and Brian

4     Mikkelson.

5          THE COURT:  Good afternoon, Mr. LaFrombois.

6          Do we have any other counsel for defendants on the

7     phone?

8          All right.  Very well.  So we'll get started.  I've

9     got a series of motions in front of me, including the motion

10    for a motion preliminary injunction and the motion to dismiss

11    in favor of arbitration, which I construed to be in the

12    alternative a motion to compel arbitration.  I also have in

13    front of me a motion by the Spanish defendants to dismiss, I

14    have got a motion for reconsideration, and I may have

15    additional motions, but I think those are the principal ones.

16         What I would like to do today is I'm going to give

17    each plaintiff and defendants about half an hour.  You can

18    spend it however you want, but what I would like to rule on

19    quickly and would like to hear argument on is the motion for a

20    preliminary injunction and the motion to dismiss in favor of

21    arbitration.  Spend the time however you want.

22         We'll start with you, Mr. Stolper.  The first thing,

23    though, that I would like to do is just to confirm with you,

24    Mr. Stolper, a couple of things, and I will confirm with

25    defense counsel.

K9ATCONA

 1        First of all, can you just lay out for me the

 2   declarations and the evidence that you are relying upon for

 3   your motion for preliminary injunction?

 4        MR. STOLPER:  Sure.  This is Michael Stolper on behalf

 5   of plaintiff, your Honor.

 6        We're relying on two client declarations, and we are

 7   relying on one declaration from our computer forensic

 8   consultant.  His name is Aaron Weiss.  And we also have put in

 9   a declaration from my colleague at our law firm, Dov Gold, who

10   is on the phone, to put in documents that are lawyer related,

11   so to speak.  So those are the declarations and their exhibits

12   that we're relying on for the injunction.

13        THE COURT:  And the two clients are Camilo Patrignani,

14   is that correct, and Phaedra Chrousos?

15        MR. STOLPER:  Yes, it's Camilo Patrignani, and I refer

16   to him as Camilo since that's easier than trying to pronounce

17   his last name, and his colleague and my client is Phaedra

18   Chrousos.  I also refer to her as Phaedra just because that's

19   easier than Chrousos.

20        THE COURT:  Okay.  And do you consent to me

21   adjudicating the motion for the preliminary injunction on the

22   basis of the declarations that I have in front of me without

23   any live testimony or cross-examination, and with today being

24   limited to oral argument which I'm hearing remotely?

25        MR. STOLPER:  I appreciate the opportunity that you

K9ATCONA

| 1 | have given us today.  I know it's never easy for all involved,
| 2 | particularly the Court, to deal with an application like this
| 3 | by phone.  You probably saw that there were just two rounds of
| 4 | briefing.  We put in our brief and our supporting declarations
| 5 | and the other side put in their declarations and their brief.
| 6 | We didn't reply because we didn't have an opportunity to reply,
| 7 | which is fine, except that they do raise technical issues in
| 8 | their opposition, and we do have feedback from Aaron Weiss, our
| 9 | technical consultant, and also from our chief information
| 10 | officer of the client, we have feedback from him and also have
| 11 | some feedback from our client.
| 12 |        So I think that if you were to rule today, it would be
| 13 | incumbent upon me to try to articulate the issues that they
| 14 | have raised with the papers that we received.  And I'm going to
| 15 | admit to you, your Honor, that -- I could express it, but if
| 16 | you're asking me to consent, I would say I was hopeful that the
| 17 | better course of action would be to put some witnesses in front
| 18 | of you.  And if you were not so inclined, then the alternative
| 19 | to that is to take some depositions of those who put up
| 20 | declarations so that we have a chance to cross-examine them on
| 21 | what they have said.  Because as I say, the things that have
| 22 | been put in front of you, a number of the statements that were
| 23 | put in front of you are incredible, and it shouldn't be that
| 24 | hard to demonstrate the lack of credibility on some of those
| 25 | statements, and I would welcome the opportunity to do that.

K9ATCONA

1       THE COURT:  Okay.  Well, this is the way we're going

2  to handle it then:  I'm going to turn to defense counsel and

3  ask similar questions, but I'm going to consider your motion

4  for a preliminary injunction on the basis of the evidence that

5  you have presented and we'll see whether on the basis of that

6  evidence you've satisfied the requisite standards for a

7  preliminary injunction.  I hear what you're saying in terms of

8  the defendant's evidence and the opportunity to rebut that, and

9  to the extent that any decision that I would make would be

10  based upon what the defendants are offering.  You can make a

11  proffer to me as to the evidence that you would submit in

12  response.

13       Let me ask defense counsel, who is going to be

14  speaking with respect to the preliminary injunction on the

15  defense side?

16       MR. BILLINGS:  Your Honor, this is Ryan Billings.

17  Mr. LaFrombois and I are going to split on discrete issues.  We

18  represent different clients.  I think Mr. LaFrombois will

19  primarily address what Convergen Wisconsin has been doing, and

20  I will address some of the larger issues, such as arbitration.

21  And the declarations that we're offering are my declaration,

22  the declaration of Steven Brooks, the declaration of Michael

23  Knechtel, and the declaration of Mr. Swaminathan.  We call him

24  Vaidhy because, again, we have difficulties pronouncing his

25  last name.  And also there were some contracts that were put in

K9ATCONA

1   in connection with our motion to dismiss, 92, I think it's 1

2   through 24, we intend to rely on those as well.

3          THE COURT:  Do you object to me adjudicating the issue

4   of preliminary injunction on the papers, limiting it today to

5   argument?

6          MR. BILLINGS:  I do not.

7          THE COURT:  All right.  Very well.  We'll start with

8   you, Mr. Stolper.  I would advise you also to spend your time

9   on the trade secrets and the motion to compel arbitration

10  issues.  I'm, quite frankly, less interested in the discovery

11  issues.

12         MR. STOLPER:  Okay.  I will start with the injunction

13  and then I'll address any questions you may have on the

14  injunction and then we could segue over to the motion to

15  dismiss, if that's all right with your Honor.

16         THE COURT:  That's fine.

17         MR. STOLPER:  So on the injunction, we have pointed

18  out in our papers that we have been able to narrow down the

19  scope of the injunction that we seek from the initial

20  application due in large part to the work we were able to

21  achieve with Mr. LaFrombois, distinct from Mr. Billings, but

22  Mr. LaFrombois, who represents Convergen Energy Wisconsin or

23  CEW, we were able to -- only recently, but we did receive a

24  number of the emails that we were asking for, and we were able

25  to resolve a lot of the email issues which implicated hacking

K9ATCONA

1    and concerns about some future cyber attacks.  Nevertheless, we

2    still seek an injunction.

3           And to answer the question you posed earlier, I think

4    that the papers that we put in certainly establish the grounds

5    for an injunction moving forward.  And that's basically because

6    under our trade secret claim and talking about

7    misappropriation, the defendants admit they're still in

8    possession of our trade secrets, and there's still the

9    possibility that our trade secrets are with third parties that

10   we don't have discovery from.  We don't know who they are.  And

11   that's because what we have discovered -- we've only been given

12   from Mr. Billings, we've gotten our company laptop back, but

13   again you have seen the declarations on that front.  What we

14   got back we got back certainly late in the game, and a lot

15   happened to that laptop before it was handed over to

16   Mr. Billings who then coordinated a forensic copy of that

17   laptop to be made.  But one of the things that we discovered

18   with that laptop is that hard drives were accessed, cloud-based

19   applications were accessed with that laptop.  So we don't know

20   to what extent our information, our non-public information, has

21   been disseminated.

22          Now they gave us interrogatory answers to identify who

23   they tell us they gave it to, but I think your Honor will

24   appreciate the fact that we're not going to take only their

25   word for what they say, in particular Mr. Brooks, because we

K9ATCONA

 1    have been given -- we've got evidence in front of us, not just

 2    allegations, that Mr. Brooks has not been honest in this

 3    process, both before the litigation and during the litigation.

 4            I just want to highlight a couple of things from our

 5    papers.  You have them.  In our fraud claim we start with the

 6    fact that Mr. Brooks didn't tell his employer or anybody at the

 7    company that he was on both sides of this deal.

 8            THE COURT:  Let me interrupt you for a second,

 9    Mr. Stolper, and just ask you about the trade secret issue and

10    the irreparable harm issue.  I'm looking at paragraph 27 of the

11    Chrousos declaration which addresses irreparable harm.  You

12    might want to pull that up.

13            MR. STOLPER:  I'm doing that.

14            Got it.  You said paragraph 27?

15            THE COURT:  27.

16            MR. STOLPER:  Okay.

17            THE COURT:  And that makes several assertions.  The

18    first assertion is that the defendants are depriving Convergen

19    of the ability to protect its own data, especially from unknown

20    hackers.  With respect to that assertion, what evidence have

21    you put in front of me that would indicate that if I do not

22    grant this injunction there is a real, immediate, and

23    substantial risk that the data that is in the possession of the

24    defendants will be hacked by unknown hackers, or put another

25    way, that the defendants will not protect your data?

K9ATCONA

1          MR. STOLPER:  The hacking concern, as I indicated

2     early on -- the hacking that we know about happened with

3     respect to the Latvian emails, and I believe that issue has

4     been put to bed.  So when I said that we narrowed down our

5     injunction application, that was with respect to hacking with

6     what they had.

7          But your question actually is interesting in that

8     there is still the risk that the files that they have, that are

9     not in the possession of their lawyers but they still have,

10     could be hacked.  But our application is no longer predicated

11     on that sentence, on that concern about hacking.

12          THE COURT:  So the next sentence then goes on to say:

13     Defendants are unlawfully granting themselves continued access

14     to plaintiffs' proprietary and confidential information and

15     trade secrets.  Is there any evidence in front of me that would

16     indicate that there is a risk that the defendants will exploit

17     the trade secrets or confidential proprietary information in

18     the interim between now and a final resolution to the detriment

19     of your clients?

20          MR. STOLPER:  Yes, your Honor.  I will start with the

21     Aaron Weiss declaration, which really goes unresponded to on

22     this point.  That's our forensic consultant.  What he put in

23     his declaration is that he's identified 4,100 documents that

24     were copied -- or 4,150 I believe is the right number.  He

25     identified that many documents of ours that have been copied

K9ATCONA

1   and may have been uploaded to cloud-based applications of

2   Mr. Brooks that we have not been given access to, and their

3   declarations don't discuss making forensic copies or taking any

4   prophylactic steps with respect to what Mr. Brooks has in the

5   cloud.

6           So these are plaintiff files that we identified, that

7   Mr. Weiss identified from emails, and then I will go with the

8   first name, Camilo, he also identifies in his declaration his

9   understanding based on file names things that were copied,

10  things that were deleted.  So these are files that have nothing

11  to do with the pellet business that was acquired now we saw

12  fraudulently, but the pellet business is what was acquired.

13          But the information that's in front of you identifies

14  strategic planning documents and valuations of other businesses

15  unrelated to the pellet business or the power plant business,

16  but also including the power plant business, which they didn't

17  buy.  So there are copies of documents that have nothing to do

18  with the pellet plant that were made after Mr. Brooks was

19  terminated and no longer affiliated with us in any way.

20          THE COURT:  Right.  But my question on this point is:

21  What evidence have you put in front of me that the defendants

22  will exploit that information to your clients' detriment?  They

23  may have it, at the end of the day you may get it back,

24  depending on who owns it.  They may retain it.  But in the

25  interim, what evidence is there that they will use it in a way

K9ATCONA

1    that hurts your client that cannot be compensated by money

2    damages?

3              MR. STOLPER:  Well, two things.  One, the mere act of

4    copying it is indicative of use, and we cite to case law that

5    says what you're to infer from unlawfully copying files.  But

6    we also put in both of our client declarations from Phaedra and

7    Camilo that those files are highly sensitive, took millions of

8    dollars of investment over the years to generate, and if they

9    were to use them would be irreparable because it has to go with

10   competitive information about valuations of businesses,

11   businesses plural.  So that's laid out in both declarations.

12             The irreparable harm here, how do I quantify monetary

13   damages for unlawful access to our proprietary information?

14   It's Black letter law.  Access to that and use of that

15   information is worthy of an injunction and leads to irreparable

16   harm.  You can't measure the damage of stealing our internal

17   information, particularly in this case where they have

18   information from the power plant which they're now suing over a

19   business relationship that they have with that entity.  So now

20   they have information from an entity that they say they're in

21   contract with.  This is a textbook case of irreparable harm and

22   when an injunction should be issued.  That, to me, is the

23   easiest of the issues that's been put in front of you.

24             THE COURT:  All right.  Let's keep walking through

25   this.  The next sentence in paragraph 27 is, "Defendants are

K9ATCONA

denying Convergen access to the email files of the pellet plant

prior to the sale, which is, as stated above, needed for future

compliance requirements."  Is that still the case, that you

don't have access to the email files of the pellet plant prior

to sale?

MR. STOLPER:  Well, that's an open question, your

Honor, and that is under review because we were handed -- they

put in their declaration that they identified 248,000 emails

that we were seeking, so that would fit into this category, and

they provided us with 48,000 or 42,000 of that number, and that

was given to us later on at the very end of August.  So we're

in the process of reviewing that.

We had agreed with Mr. LaFrombois as to the three

categories that the emails would fit into, and he, on his end,

went through and allocated the documents that he said into

those three buckets.  We have to review that to see what it was

that we were given and the like.  We still have a debate.  But

what we did reach an agreement over is whether we are entitled

to Convergen Energy Wisconsin files, not just trade secrets of

non-Convergen Energy Wisconsin companies that were resident in

those files but the files of Convergen Energy Wisconsin.  Those

files that we need for regulatory and accounting purposes that

existed prior to the sale, they have objected to providing us

with those, so we do have a debate over that.

In terms of the injunction, they say that they have

K9ATCONA

1    identified our trade secrets and proprietary information.

2    Again, they unilaterally determined that.  We now need to vet

3    that.  That's going to take a little bit of time.  So the short

4    answer to the question is:  It's an open issue, it's not

5    resolved, but it's not something that we ask you to rule on

6    today because we don't know what they have done.

7              THE COURT:  Okay.  Last question I've got with respect

8    to the trade secrets, there may be others that come to mind,

9    but there's a contract here that has some pretty broad language

10   in terms of what your client sold the defendants.  It includes

11   trade secrets that are not used by the pellet plant but may be

12   owned by the pellet plant or previously by CEW.  What evidence

13   have you given me that the trade secrets and the assets that

14   we're talking about actually belong to you as opposed to the

15   defendants?

16             MR. STOLPER:  Well, I'm glad you asked that question

17   because that is one area that I believe we resolved, and

18   Mr. LaFrombois can confirm that when he has a chance to speak.

19   I believe we resolved that because we are not seeking any trade

20   secrets that belong to the pellet plant, at least not at this

21   point in time.  If there's the secret formula on how to make a

22   pellet, that was one of the buckets that he was able to put

23   emails in other documents, perhaps attachments to emails, and

24   segregate those out and not produce them to us under the

25   identity of trade secrets that belong to CEW.

K9ATCONA

1          THE COURT:  So what specifically do you know of now

2     that the defendant has that has not been returned to you and

3     that they are improperly retaining specifically?  Because my

4     injunction, if I were to grant one, has to be specific.

5          MR. STOLPER:  Well, we know that they have -- they're

6     not denying it, they have our files on certain hardware,

7     phones, computers.  They claim they have been copied.  But as

8     in the case of Mr. Brooks' laptop, the only one that we've been

9     given access to, information that was on that laptop made its

10    way electronically out of the laptop and into the cloud and

11    elsewhere, into an external hard drive, and so our information

12    is resident on those pieces of equipment.

13         What they're saying in their papers to you is they're

14    now in the hands of their lawyers and they have been copied,

15    date uncertain, and so there won't be any further use.  But as

16    we point out, as I'm saying now, in the case of the laptop that

17    we do have, we do know that that information, prior to being

18    given to Mr. Brooks' lawyer on June 2nd, a lot happened to that

19    laptop, including deletions and copying to the external hard

20    drive and the cloud.

21         And as Mr. Weiss points out in his declaration, there

22    are a number of files that have our name on them that are

23    proprietary to my client.  So very specifically we know that

24    those files were copied and we can't tell you where they are.

25    But the point they make on this issue of being very specific,

K9ATCONA

1    one of the points that they make that the defendants put in

2    their opposition to the injunction is that the burden is on the

3    plaintiffs to identify specifically what they stole, and

4    there's no case law that shifts that burden to us.  We know

5    that they had our servers.  We know that they have the servers

6    and email account.

7              THE COURT:  You gave them your servers.  Of course you

8    know that.  You gave them to them.  You say that the

9    transaction was fraudulent, but I've got some separate

10   questions about that.  Assume that the transaction was not

11   fraudulent, they didn't steal your servers.

12             MR. STOLPER:  No, your Honor, they did, because let's

13   nuance that.  There's the pellet plant, right, so let's assume

14   this was an honest transaction, there was the pellet plant, but

15   they had the files of a Latvian entity, they had the files of

16   the power plant that is now on the opposite side of the

17   business arm in deals.  They kept that.  And the problem here

18   is that the very people that were working for us that were

19   tasked with making sure that our information was protected

20   are -- well, one of them is on the phone, Mr. Hansen, Brian

21   Mikkelson, another defendant, and Steve Brooks.

22             And just to your point, they have cited to the amended

23   closing statement.  I'm sure that's going to come up when we

24   talk about the motion to dismiss.  They cited to that document.

25   In that document, one of the provisions in there is that we

K9ATCONA

asked to have Brian Mikkelson serve as a consultant to help run

these businesses during the transition period because we

thought he was on our side.  We thought he was an honest

broker.  We had no idea that he was working with them, that he

was supporting this fraud.  We didn't know that then.  We only

learned that as the investigation proceeded, and we didn't get

to file our complaint until May.

So the very people, these three individuals who are

now individual defendants in the case, were the very people

that were tasked with this.  If this were an honest deal, that

information would have been segregated off those servers.  But

there's not a piece of paper that says as part of the sale we

gave them the Latvian entity's information, the power plant

information or Convergen Energy, the parent of Convergen Energy

Wisconsin, we never gave them those files.  Those were supposed

to be segregated.  The problem was the fox was guarding the

henhouse, and that's how they ended up with it.

THE COURT:  Besides the fox guarding the henhouse,

assuming that I reject that assertion, isn't it correct that

the files that you're talking about were on the servers that

were handed over?  Assume that I conclude that this was not a

fraudulent transaction whatsoever, what argument do you have?

MR. STOLPER:  Well, if it's not fraud then you're

saying that you have to conclude that there were no material

misrepresentations and that there were no material omissions as

K9ATCONA

1    to what happened here.  And in our complaint we refer to a

2    recorded admission by Mr. Brooks.  In his declaration to you

3    here he says that he's not getting into the merits of the case,

4    but then he goes on to talk about how he thought he resolved

5    everything by paying us a million dollars in a document that

6    doesn't have a release or anything like that.

7           But he doesn't deny what you just said, he doesn't

8    deny the basic allegations of this case, that there were

9    insiders that self dealt themselves, the pellet plant, and the

10   very people that were supposed to segregate that -- there's no

11   one else here to hey, make sure that when you sell those

12   servers -- and everything is based in Wisconsin because that's

13   how we ran all of these entities and they're all related --

14   that as part of the sale you must claw them back.  We were

15   paying Hansen and we were paying Mikkelson post-closing to

16   handle these things for us because we thought they were loyal

17   to us.

18           THE COURT:  Let me ask you another question,

19   Mr. Stolper.  Do you dispute that Mr. Andueza had the corporate

20   authority to sign a transaction of the magnitude of this

21   transaction, that he had the corporate authority to sign?

22           MR. STOLPER:  Yes, your Honor.  That's the subject of

23   our amended complaint and that's the subject of our motion for

24   reconsideration.  We pointed out in those papers that it was

25   also in the record that we referred to him as our

K9ATCONA

co-conspirator, and that the defendants have also taken issue
with Mr. Andueza.  And Mr. Brooks in his own declaration to you
in this case in opposition to the injunction says this whole
fraudulent scheme was Andueza.

          THE COURT:  But let's just assume hypothetically that
it is in the seller's interest that the buyer get financing,
and that one way that the buyer can get financing is to get it
from somebody who was with the seller.  That's not an unusual
transaction, right?  That happens all the time.  Is there
anything per se wrongful about that as long as the seller
knows?

          MR. STOLPER:  Well, there's two parts to that.  The
seller has to know, but you also have to disclose that you have
an interest in this transaction, not only on the seller's side
in trying to sell something, but also on the buy side.  And
there's no denial that they didn't tell anybody, and we allege
they didn't tell anybody.

          THE COURT:  But did they tell Andueza?

          MR. STOLPER:  Andueza was part it.  He's part of the
adverse interest exception.  That's what we cite to.  You can't
hold -- Andueza can't bind the company because he's
compromised.  And that goes back to the 1800s and the case law
that we cited.  He is compromised of what he does.  You cannot
repute his conduct or knowledge to the company.  And at the
same time you've got Brooks saying:  I'm innocent, it's this

K9ATCONA

<table>
<tr><td>1</td><td>other guy, Andueza did it all.  But now in this situation they</td></tr>
<tr><td>2</td><td>are sort of taking the intellectual side of the position and</td></tr>
<tr><td>3</td><td>suggesting to you that Andueza had the authority to sign it,</td></tr>
<tr><td>4</td><td>yet he's compromised.</td></tr>
<tr><td>5</td><td>THE COURT:  So who is it that you're saying at the</td></tr>
<tr><td>6</td><td>seller would have had the authority to permit Brooks to invest</td></tr>
<tr><td>7</td><td>on the other side of the transaction?</td></tr>
<tr><td>8</td><td>MR. STOLPER:  Any one of senior managers, if the</td></tr>
<tr><td>9</td><td>company had known.</td></tr>
<tr><td>10</td><td>THE COURT:  No, which individual?  Companies are</td></tr>
<tr><td>11</td><td>comprised of individuals.  Which individual at the company</td></tr>
<tr><td>12</td><td>would have had the authority to permit Brooks to invest on the</td></tr>
<tr><td>13</td><td>other side of the transaction?</td></tr>
<tr><td>14</td><td>MR. STOLPER:  George Logothetis is the chairman of the</td></tr>
<tr><td>15</td><td>company.  He would have been the one.  He was the one that</td></tr>
<tr><td>16</td><td>Brooks pitched this deal to and Brooks failed to tell him that</td></tr>
<tr><td>17</td><td>he had an interest in this.  And he failed to tell us that his</td></tr>
<tr><td>18</td><td>longtime friend, Greg Merle, was actually a friend.  He</td></tr>
<tr><td>19</td><td>introduced him as a third party, arm's length business deal.</td></tr>
<tr><td>20</td><td>That's in our complaint, and also I believe in the -- I'm</td></tr>
<tr><td>21</td><td>sorry, Judge, I don't remember if it's the Phaedra declaration</td></tr>
<tr><td>22</td><td>or the Camilo declaration.  There have been too many briefs in</td></tr>
<tr><td>23</td><td>a short period of time.  But it's in front of you that</td></tr>
<tr><td>24</td><td>Brooks -- that the fraud here was both by misrepresentation and</td></tr>
<tr><td>25</td><td>by omission and it was not telling the company.</td></tr>
</table>

K9ATCONA

1          THE COURT:  Is there evidence that you've given me
2     that the buyer did not know that Andueza lacked the requisite
3     authority and that permission for Brooks to invest on the other
4     side would have to come from -- is it Mr. Logothetis, what's
5     his name?
6          MR. STOLPER:  Logothetis.  Sorry, Judge, there are a
7     lot of tough names in this case on both sides of the aisle.
8     Yes, trying to think, it's in our complaint.  That's what we
9     allege in our complaint.
10          THE COURT:  But the complaint is not evidence.
11          MR. STOLPER:  No, I'm going through the check list of
12     what is in front of you.  We have a declaration from Andueza
13     that goes to that point.  Trying to think what else.  For some
14     reason I'm drawing a blank, your Honor, but there's certainly
15     other evidence.
16          But we're talking about -- here the injunction, we're
17     talking about really principally the individual defendants.  As
18     you say, companies act through people, talking about Hansen,
19     Mikkelson and Brooks, and they certainly were the ones who were
20     orchestrating this and they were the ones who were keeping the
21     secret from their bosses, from Logothetis and the other
22     executives at the company.
23          And those people are tied to CEW and themselves, and
24     that's who the injunction is geared towards.  And that's what
25     you're asking me now, not in the context of the motion to

K9ATCONA

1   dismiss but on likelihood of success in the context of an

2   injunction you're asking for evidence.  And those three, those

3   three, they knew, because they participated in this.

4          And we put in an email, in terms of Mikkelson and

5   Hansen, they knew that Brooks was soliciting money from the

6   Spanish defendants back in the fall, in November I want to say,

7   of 2019, and none of them disclosed any of this to anybody at

8   this company.  In fact, Brooks was operating through his

9   personal email and was communicating with the other individuals

10  through his personal email.  We only have a few examples of

11  that because we haven't been given access to their personal

12  emails.  That's one of the discovery issues that we have.

13          THE COURT:  Okay.  What else do you have?

14          MR. STOLPER:  Well, I'll talk about the motion to

15  dismiss because I think -- looking through my notes, I think

16  that we touched on the documents, and the concern that I

17  mentioned about the injunction, the types of things that are in

18  the declaration, the type of documents, there's client

19  contracts, market analysis, investor lists, strategic

20  discussions, these are not things that were sold.  And these

21  are things that were unrelated to the company that they have no

22  business having, and there's absolutely no justification for

23  it.  And we cite to case after case that, in these

24  circumstances, grant injunctions.

25          On the motion to dismiss we really run into some of

K9ATCONA

1    the same issues that the Court addressed in the stay of the

2    arbitration motion, and that's the issue of contract formation

3    versus inducement.  And what we've stated, your Honor, in our

4    motion for reconsideration and in the amended complaint and in

5    these papers here in opposition to the motion to dismiss is

6    that our position is that this is a formation issue, that we

7    never get to the terms of the contract because of what I said

8    about Andueza.

9            And they knew, the defendants knew that Andueza was

10   compromised because he was a co-conspirator.  Now Brooks is now

11   telling you in his declaration that it was really Andueza who

12   was the kingpin here.  And he doesn't go so far as to say he

13   was innocent, but he says that Andueza was the one who raised

14   the money and was the one who was behind the whole sale and the

15   whole keeping it a secret.

16           And as I said a few minutes ago, in that role, Andueza

17   can't bind the company.  And frankly, the only person who could

18   have at that point would have been George Logothetis, the

19   chairman, who they all reported to.  So we fall within the

20   exception of *Buckeye*.  You cite to the *Buckeye* case in your

21   decision, and we do fall into that exception, that when there's

22   an issue about authorization, it goes to formation.  And that's

23   an issue for the Court to decide, it's not an issue for the

24   arbitrator to decide.  This isn't an inducement case, these are

25   contracts that are permeated by fraud.

K9ATCONA

1          We never had a clear chance to decide whether we

2    wanted to be in it, to do this deal or not, because the very

3    people who were tasked with making it happen, Brooks, Hansen,

4    Mikkelson and Andueza, were compromised.

5          THE COURT:  So let me ask you a question on contract

6    formation, and maybe it's easiest to do this through focusing

7    on the supply agreement.  Is it your position that the pellet

8    plant could simply say to you there's no contract, you've got

9    no right to pellets, this contract is a nullity?

10          MR. STOLPER:  You're asking if the pellet plant has

11   the right to say that to us now?

12          THE COURT:  Yes.

13          MR. STOLPER:  Yes, that contract is not binding or

14   enforceable.  We never treated it as binding or enforceable.

15   And that's part of what is in the Camilo declaration to you,

16   and that is we never bought under that contract.

17          THE COURT:  So your proposition is that if the pellet

18   plant had said to you, "Listen, there's no contract here, no

19   supply agreement contract," they would be perfectly within

20   their rights to do so and to cut you off entirely?

21          MR. STOLPER:  100 percent.  100 percent.  That is not

22   an issue.

23          THE COURT:  That has to be what you're saying, right?

24          MR. STOLPER:  Exactly.

25          THE COURT:  Because you're saying this is a

K9ATCONA

meaningless piece of paper.  So if I find, for example, that
the acquisition agreement was not fraudulent, your position
would be the pellet plant can still walk away from this
transaction.

MR. STOLPER:  Because the supply agreement would be
fraudulent but the acquisition agreement would not be.

Look, our position pretty straightforward.  The supply
agreement is not binding on anyone, the acquisition agreement
is not binding on anyone.  There was fraud in the formation and
we are adjudicating our rights based on that right now.  And
you had indicated in the stay decision, in denying the stay you
had made reference to fact that we were buying pellets under
the supply agreement.

And I think the defendants may have confused the
record here, and we attempted to clean it up in our motion for
reconsideration, but I could state it very simply now.  Just as
I said a few minutes ago, the very people that were running the
pellet plant and the power plant in the period of time after
the closing while we are investigating the fraud and trying to
figure out what happened here are Hansen and Mikkelson.
They're now defendants in this case.  When we figured out whose
side they were on, what they had done, we put them on the other
side of the V and named them in this lawsuit.  But there was a
period of months in which they were still operating, and while
they were doing that they were buying pellets.  And what Camilo

K9ATCONA

1   says in his declaration is that they were having the power

2   plant buy more pellets than the power plant could use legally

3   because it would be an environmental violation for them to have

4   used the amount of pellets, the volume of pellets they were

5   using, and aside from the fact that the price terms were

6   inflated and not consistent with market.

7           But that was being done by the defendants, and as soon

8   as we, the plaintiffs, were able to figure out that they were

9   compromised, we fired them, took it over, stopped paying for

10  the pellets because we now realized they owed us money, and

11  certainly didn't take any orders anywhere near the requirement

12  that -- the minimum requirements that the supply agreement had.

13  So we never ratified that supply agreement, never, as the

14  record in front of you shows.

15          THE COURT:  Let me hear from your adversary.  Thank

16  you.

17          MR. BILLINGS:  Thank you, your Honor, this is Ryan

18  Billings.  And I know that Mr. LaFrombois would like to be

19  heard, especially about the supply agreement and what's

20  happened on the Convergen side.  So I will try to do my part in

21  half the time that Mr. Stolper took.  I'm happy to answer any

22  questions or address any concerns that the Court has, but I

23  have kind of a logical priority of analysis that I think might

24  be helpful.

25          THE COURT:  Okay.

K9ATCONA

1          MR. BILLINGS:  So in the motion to dismiss, there's a

2     lot to chew on there, a lot of different arguments kind of in

3     levels, and I don't want to waste of the Court's time talking

4     about level five when we don't get past level one, which is

5     arbitration, which your Honor asked us to address.  So I would

6     like to focus my arguments on that, but if you have any

7     questions about the others, please do.

8          THE COURT:  Between the two of you, who is going to be

9     addressing the question of irreparable harm in the preliminary

10    injunction?

11         MR. BILLINGS:  Either of us could.  We have different

12    clients who have different windows into this, but I think

13    either of us could talk about that issue.

14         THE COURT:  Well, let me be specific.  I would like to

15    hear what the defendants have to say about the plaintiffs'

16    claim that the intellectual property in the possession of the

17    defendants belongs to the plaintiff and should be returned to

18    the plaintiff pending a final resolution of this matter,

19    whether it be in an arbitration or in a court proceeding.

20         MR. LaFROMBOIS:  Your Hour, this is Attorney

21    LaFrombois.  If Attorney Billings could address the issue of

22    what Mr. Brooks had in his possession and I can address the

23    issues of what Convergen had in its possession or has in its

24    possession that might be helpful to the Court, because that's

25    how we prepared for today's hearing.

K9ATCONA

1          THE COURT:  Mr. Billings, why don't you address that

2     question first and then I will turn to Mr. LaFrombois and then

3     I will hear from you on the motion to compel.

4          MR. BILLINGS:  Okay.  So there are three devices, work

5     devices or information storing devices, that Mr. Brooks had and

6     no longer has.  One is the laptop, the HP.  I allowed Aaron

7     Weiss, plaintiffs' forensic expert, to take charge of the

8     computer and make a copy.  I sent it to him.  He got it back in

9     June.  That computer is in the possession of Digital

10    Intelligence, our outside consultants.  Neither I nor

11    Mr. Brooks have access to it.

12         The second device is the iPhone 8 that Mr. Brooks used

13    for work.  That device has been forensically imaged.  It has

14    not been in use since I got it and answered some questions that

15    plaintiffs had for me about it.  It was then powered down.

16    Digital Intelligence has a copy, I have the original.  It has

17    been off since I believe July 6.

18         Third is the external hard drive on which information

19    was copied.  And that's discussed in Mr. Brooks' declaration,

20    Mr. Knechtel's declaration, and Mr. Swaminathan's declaration.

21         What Mr. Brooks had asked back in February -- very

22    different context, but back in February he wanted a copy of his

23    emails and his personal files on that hard drive.  So he gave

24    it to a friend who knew more about technology than Mr. Brooks

25    did, the friend was able to copy the files that were on the

K9ATCONA

1    desktop of the computer but not the emails because of the way

2    Libra had set up that computer.   The files that went onto the

3    external hard drive were never accessed by Mr. Brooks.

4    Mr. Swaminathan explains in his declaration that he could prove

5    forensically that Mr. Brooks never looked at it.   That external

6    drive is now in the exclusive possession of Digital

7    Intelligence.   Mr. Brooks does not have the access to it.

8            THE COURT:   So the bottom line, Mr. Billings, is that

9    Mr. Brooks is no longer in possession of any of the plaintiffs'

10   alleged trade secrets.   Is that your bottom line?

11           MR. BILLINGS:   Correct.   That is my bottom line.

12           THE COURT:   Go ahead.

13           MR. BILLINGS:   I want to correct one issue that

14   Mr. Stolper said that is not correct.   So Mr. Weiss says that

15   information was copied onto the external drive.   He does not

16   ever suggest or say that anything went into the One Drive.

17   That's not there.   He says that the laptop was synced with the

18   One Drive, but unless Mr. Knechtel had the password, which he

19   didn't, he couldn't even have logged on.   And Mr. Brooks says

20   that he has not accessed anything on One Drive and will not

21   pursuant to order of this Court.   So I wanted to correct that,

22   but yes, that's the bottom line.

23           THE COURT:   All right.   Mr. LaFrombois, why don't you

24   address it from the buyer's perspective.   What information does

25   your client have that the plaintiff alleges belongs to him?

K9ATCONA

1          MR. LaFROMBOIS:  We have the Convergen Energy in an
2     Office 365 account which had the email for the company running
3     through it.  The email was on a separate server and was not
4     ever in the possession of Convergen.  So Libra, on August 17 --
5     Mr. Stolper indicated the end of August we provided them these
6     approximately 48,000 emails, we provided that to them on
7     August 17.  So we took all the emails that we believe
8     reasonably would be appropriately in Libra's possession.  We do
9     not desire to have possession of it.  It's under review on
10    their part.  We have other categories of emails that we believe
11    do not contain any other categories of Libra trade secret
12    information.  So we do have some, but this has been protected
13    and we're following the order to preserve and protect this
14    data.  There's no evidence that it's at risk of being disclosed
15    to third parties.

16          We have two hard drives that were owned by CEW at the
17    time of the transaction used by Mikkelson and Hansen.  Those
18    have been preserved by our third-party expert and that
19    third-party expert retains those hard drives.  They have been
20    ghosted, I'm not sure the technical term, but they have been --
21    the entire drive has been preserved.

22          Those are the two outstanding areas.  As noted, we
23    worked through the Latvian emails to know they're off of our
24    system entirely, which we're pleased to have that information.
25    So your Honor, it would only be emails on the Office 365

K9ATCONA

account held in the normal course, and of course they have been

backed up and preserved.

THE COURT:  Let me ask you this question and also ask

Mr. Billings a similar question.  With respect to the

information that is held in the possession of a third party,

the consultants, is there -- I guess I could ask the question

two ways.  One is:  Is there any restriction that is currently

in place that would prevent that consultant from turning it

over to your client to exploit?  And is there any reason why an

injunction should not issue pending arbitration or a trial on

the merits that would keep whatever is in the possession of the

consultant in the possession of that consultant?

MR. LaFROMBOIS:  Your Honor, we would agree that on

our side that our consultant would hold that drive and not be

directed to disclose that information.  Some of that

information may still reside on their work laptops.  The

definitions here have been pretty broad and have not been

narrowed.  But unless I would instruct Mr. Miller to send that

hard drive for those inappropriate purposes, I do not believe

that that would happen.  He's not under the direction of

Mr. Hansen or Mr. Mikkelson, he would be under my direction to

release that hard drive.

THE COURT:  Mr. Billings, same question with respect

to the information in the possession of your consultants.

MR. BILLINGS:  So I have given my consultants both the

K9ATCONA

1   Court's protective order and the TRO.  They are forensic

2   professionals.  They understand the norms and expectations of

3   this industry.

4        In addition, the HP is encrypted.  There's a password

5   that I don't have, that Mr. Brooks doesn't have, that only

6   Digital Intelligence has.  And they set it up so there were

7   abilities to access it.  I assume it's a pretty long key that

8   can't be easily copied elsewhere.  So not only do they have it,

9   but even if they gave it to me today or gave it to Mr. Brooks,

10  we couldn't access what's on it because of the encryption.  And

11  my instructions to them are:  You maintain possession of this

12  so there's no issue of anybody on the defendants' side having

13  possession of anything that putatively belongs to Libra.

14       THE COURT:  Mr. Stolper, why doesn't that give you all

15  of the protection that you would be entitled to pending a

16  resolution on the merits?

17       MR. STOLPER:  Your Honor, our concern is not with

18  consultants.  I don't have a concern with the consultants.  We

19  have a concern with what is not with the consultants.  So you

20  have in front of you, you've got -- in the Aaron Weiss

21  declaration you have files, our files, plaintiffs' files, that

22  have nothing to do with the pellet plant, being uploaded into

23  the cloud.  And there were files uploaded into the One Drive

24  account; and they didn't come from the laptop, they came from

25  another source.

K9ATCONA

1          So what you know, what have in front of you in your

2     record, you know that Mr. Brooks could have emailed him and put

3     in front of you the attachment to the Phaedra declaration.  She

4     asked for it in February, she asked for the hard drive, and he

5     tells her they're in an apartment in New York City.

6          THE COURT:  You know what, you're wasting your breath

7     on the allegations with respect to Mr. Brooks.  Unless you've

8     got some facts that you can give me that would undermine the

9     affidavits and explain to me why you -- well, unless you've got

10    some facts that would undermine Mr. Brooks' affidavit and the

11    affidavit of his client, you're wasting your breath.

12         MR. STOLPER:  I was getting there, your Honor.  We

13    have in front of you emails where he's telling the company that

14    he can't access the information because it's in an apartment in

15    New York City.  What he put in front of you is the declaration

16    that said:  Oh, no, it was my friend Knechtel, and that all

17    these files that are were copied and deleted and all this extra

18    software that shouldn't be there about copying the --

19    forensically protecting what people could see, that was all his

20    friend, not him.

21         THE COURT:  What else do you have?

22         MR. STOLPER:  Our files are in the cloud.  They

23    haven't given them to us and they're not saying anything to you

24    about our files that are in the cloud.  I don't care about what

25    is with the consultant, but you have evidence in front of you

K9ATCONA

1     that our files went to Drop Box, went to Office 365, went to a

2     number of places that they haven't given access to and they

3     haven't said anything about them, and that's the issue with

4     Brooks.

5            In terms of CEW, it's the same thing.  They don't tell

6     you the date that these copies of their hardware were made.  We

7     don't know what copies of our files were made.  All three were

8     caught, and while they were caught, before they gave any of

9     their equipment to their lawyers, we know that with Brooks,

10    copies and things were deleted, and there's a whole

11    inconsistent story that's being told.  That's why I asked for

12    discovery as to that to further flesh it out for you.

13           THE COURT:  Okay.  I have heard enough from you, I'm

14    going to turn back to the defendants.

15           With respect to discovery, I will just say and correct

16    something that I said before, which is I granted you expedited

17    discovery.  I also let you set the deadline, the date for the

18    preliminary injunction hearing.  So the record should be clear

19    that you did not raise with me, before you scheduled a motion

20    for a preliminary injunction, any issues with respect to

21    discovery.

22           Let me hear for from defense counsel.

23           MR. STOLPER:  Your Honor, we only learned about these

24    things from the papers they just submitted the other day.  We

25    never heard of the name Michael Knechtel before.  We never knew

K9ATCONA

1     that.  Brooks told us his laptop was in the city.

2             THE COURT:  You had every opportunity to do expedited

3     discovery, every opportunity to do expedited discovery.  You

4     had every right to call me before scheduling the motion for the

5     preliminary injunction.  If you were concerned that there were

6     discovery obligations that had not been satisfied, you didn't

7     do so, and I'm going to rule on the motion for a preliminary

8     injunction on the basis of the evidence I've got in front of

9     me.

10            Defense counsel can continue.

11            MR. BILLINGS:  Thank you, your Honor, this is

12    Mr. Billings, and I think we've covered irreparable harm.

13    Everything is protected, everything is preserved, Mr. Brooks

14    doesn't even have access to it on my side, and it's a similar

15    situation with respect to Mr. LaFrombois.

16            I would like to talk briefly about the arbitration

17    issue, which I think is pretty open and shut under the Supreme

18    Court's clear precedent.

19            So Mr. Stolper claims -- this isn't their briefing,

20    but he told you that only Mr. Logothetis would have authority

21    to sign off on this sale.  That's an extraordinary claim given

22    that Mr. Logothetis had no position with any of the companies

23    involved.  They were managed by two people, Mr. Andueza and

24    Mr. Diaz, and both of them signed off on this deal multiple

25    times.  There's no legitimate formation question.

K9ATCONA

1          And I will put back to the plaintiffs the same

2    question this Court asks in your August 5 order with respect to

3    the supply agreement:  What happened after the contract was

4    executed?  How did the parties perform?  Libra didn't ask for

5    its company back.  It didn't say:  Oh, my gosh, I accidently

6    sold my company, this didn't happen.  The sale happened, and

7    the contracts under which it happened are not in dispute.

8    These are the agreements.  They're in front of the Court, they

9    are unambiguous, they require arbitration, and under the clear

10   precedent of the Supreme Court, that's what was discussed.

11          THE COURT:  How do you draw the distinction in the

12   *Buckeye Cashing* footnote between an issue that goes to contract

13   formation that is for the Court and a question of fraudulent

14   inducement or the improper exercise of authority that might go

15   to an arbitrator?

16          MR. BILLINGS:  That is a great question, and I think

17   the courts have struggled with it.  That's why we keep getting

18   opinions from the Supreme Court on related issues.  But I think

19   in this case it is not difficult.

20          So as your Honor correctly pointed out in your

21   August 5 order, *Buckeye* identified basically three areas in the

22   cases interpreting it under which a Court could step in.  So

23   they are whether the agreement was ever actually signed, is the

24   signature valid, whether the signatory had authority and

25   whether the signatory had capacity.  So there's no dispute even

K9ATCONA

1    raised by plaintiffs that the signatures aren't the actual

2    signatures of the people involved, and there's no question that

3    any of the signers lacked capacity.

4           The issue they raise is authority.  And specifically,

5    they claim that Mr. Andueza was in some sort of conspiracy with

6    Mr. Brooks and therefore he lacks authority to bind Andueza.

7    Now there's no evidence before the Court that there was any

8    such conspiracy.  Mr. Brooks doesn't say he was conspiring with

9    Mr. Andueza, what he says is Mr. Andueza asked me to provide

10   funding for this deal.  That's what he said.  And Mr. Andueza,

11   as the manager of Convergen, had actual authority to make that

12   request under the operating agreement which gives the managers

13   broad authority which expressly waives the duty of loyalty, the

14   duty of undivided loyalty, and provides that these companies

15   are run by managers.  The operating agreements further provide

16   that Mr. Andueza's or Mr. Diaz's signature on a document is

17   conclusive evidence that they had authority and bound the

18   company.  That's in Section 4.3 of the operating agreement of

19   Convergen Energy, which I believe is ECF 92-19.

20          Now we have signatures left and right from Mr. Andueza

21   and Mr. Diaz.  Mr. Brooks walks through the facts that this was

22   a financed transaction where money from banks changed hands.

23   BMO Harris Bank was monitoring this and making sure that

24   everything -- every I was dotted and every T was crossed.  And

25   signatures were put in escrow, they were released by Mr. Diaz

K9ATCONA

February 3rd and after they admit they discovered the alleged

fraud.  And then 18 days later, Mr. Diaz signed an agreement

again.  So there are agreements left and right signed by

Mr. Andueza and Mr. Diaz.  There's no legitimate question of

contract formation and there's no legitimate dispute about the

fact that the company was sold and it was done so pursuant to

these documents.

        So I don't think contract formation is a legitimate

issue here.  It's more a question of they believe the documents

should have been different, the sale price should have been

higher, the supply agreement price should have been lower, the

cost for the services of Mr. Hansen and Mr. Mikkelson should

there been lower, the shredder should not have happened.  Those

are the kinds of arguments they make.

        What they're saying is because of an alleged fraud,

the contracts have the wrong terms.  But that's a hypothetical

question.  That's a question about what the world should have

been.  In the real world, these are the contracts, and there's

no genuine dispute that these are the documents under which the

sale of Convergen Energy was executed multiple times.

        So on the question of whether there was a contract

formed, that very threshold question, there is no legitimate

dispute on the evidence submitted to this Court.  There is a

legitimate dispute about whether the terms are proper, whether

the negotiation was appropriate, and how it all played out, how

K9ATCONA

1    we got to that point.  But the fact that that is what happened

2    is not a legitimate dispute, at least on the evidence submitted

3    to this Court.

4              THE COURT:  Okay.  What else do you have?

5              MR. BILLINGS:  So I think, like I said, there are

6    other levels to our motion to dismiss, but I think the analysis

7    begins and ends with arbitration.  I don't think this is an

8    issue where there are two sides, there's only one side.  The

9    precedent is unless the Court can say with positive assurance

10   that there is no interpretation of the arbitration clause at

11   issue under which the dispute falls under it, you have to send

12   it to arbitration.  It's not one in which the Court has

13   discretion because of the congressional policy in favor of

14   arbitration which has been affirmed continually by the Supreme

15   Court I think three times last year and already this year.

16   It's black and white.

17             And the only issue that they pointed to late -- I

18   would point out the declaration of Mr. Andueza was submitted

19   last Friday, well past the deadline for preliminary injunction

20   evidence, it was submitted in the context of the Spanish

21   investors' motion to dismiss, not even this motion, but it also

22   doesn't make any difference.

23             THE COURT:  Why not?

24             MR. BILLINGS:  The only issue is arbitration.  I could

25   answer questions about the other causes.

K9ATCONA

| | |
|---|---|
| 1 | THE COURT:  But assume that on the motion to compel I |
| 2 | should look at Mr. Andueza's declaration.  I'm just looking at |
| 3 | it.  What do you have to say about that? |
| 4 | MR. BILLINGS:  So he says that he knew that Mr. Brooks |
| 5 | had a relationship with Niantic and he said that he didn't tell |
| 6 | Mr. Logothetis.  My response is:  So what?  Mr. Andueza had the |
| 7 | authority under the operating agreement.  Mr. Logothetis is not |
| 8 | an officer, a director, manager or have any position with the |
| 9 | companies involved.  He's way up several holding companies away |
| 10 | from any of this.  He has no rights and he has no -- his |
| 11 | authority is not only not needed, it has no legal effect |
| 12 | because the operating agreements provide that Andueza and Diaz |
| 13 | both have authority to bind the company by their signature |
| 14 | conclusively, and both did multiple times. |
| 15 | THE COURT:  Okay. |
| 16 | MR. BILLINGS:  I don't think makes a lick of |
| 17 | difference. |
| 18 | THE COURT:  Let me hear from your co-counsel. |
| 19 | MR. BILLINGS:  Thank you. |
| 20 | MR. LaFROMBOIS:  Thank you, your Honor, I will briefly |
| 21 | comment on Mr. Andueza's declaration.  From our viewpoint, the |
| 22 | declaration of Mr. Andueza makes no difference.  He does |
| 23 | acknowledge that he was aware he had the authority to act as |
| 24 | Mr. Billings described.  And the bottom line is it just doesn't |
| 25 | make any difference because it's just another aspect of the |

K9ATCONA

| | |
|---|---|
| 1 | conclusory, broad allegations that have been part of this |
| 2 | matter since day one. |
| 3 | I would focus on the supply agreement and make a |
| 4 | couple of comments to that agreement.  The Court asked |
| 5 | questions about what is the appropriate remedy if there was a |
| 6 | breach of that agreement.  That agreement has an important and |
| 7 | somewhat unique clause in that there's a duty on each side to |
| 8 | continue to perform until such time as certain notice |
| 9 | provisions and time frames have passed to the lender who is |
| 10 | secured by that agreement, which is BMO Harris. |
| 11 | In this case we really have a form of self-help and |
| 12 | just attempting to not perform under the agreement.  This type |
| 13 | of take-or-pay contract is essential to the financing of these |
| 14 | types of transactions wherein a party requires a certain supply |
| 15 | of a product, in this case very specialized pellets to produce |
| 16 | electricity that will be sold to the primary buyer.  Then, of |
| 17 | course, the proceeds from the electricity is needed to pay for |
| 18 | the pellet plant.  So it's a virtuous cycle which the lender |
| 19 | looks for their repayment from both parties because they're a |
| 20 | lender to both parties.  It's a pretty easy contract to |
| 21 | understand.  So for one party just to unilaterally breach the |
| 22 | contract is a significant detriment to the other party, and has |
| 23 | been to Convergen.  It doesn't take much to imagine that if |
| 24 | your primary source of revenue is suddenly gone without any |
| 25 | true legal proceeding coming before the cessation of activity |

K9ATCONA

under the contract, that's a very material harm.

So I mention that point that there is a very specific process in the contract to deal with the issues of a dispute between the parties, and I would point out both the supply agreement arbitration clause and the purchase agreement arbitration clause are very broad.  They expressly call out issues of arbitrability would fall within that clause.  There's been no allegation that fraud goes to the -- except in a general sense, goes to the arbitration clause.

I think when you read *Prima Paint* and *Buckeye* together and several of the other cases that dealt with this issue that it's clear that wherever you have an express broad contract that calls for arbitration and expressly calls for arbitrability, there's no question that those issues should be left to the arbitrator.

The other issue that I point out on these fraud cases is the reading of the warranties and representations within the acquisition agreement is helpful to understand what the parties were intending.  And the warranties and reps are usually heavily negotiated in contracts like this, and I assume there's no reason why these wouldn't have been.

And the time frame is very interesting here.  You have a January 31 partial close, and by the plaintiff's own admission, a February 1 discovery, they allege.  Then as Mr. Billings points out, 18 days later they sign an agreement

K9ATCONA

1   which reaffirms the terms of the acquisition agreement, and

2   during those 18 days, by their own admission, knew about these

3   circumstances of which they now complain.

4           And so it's really hard to understand, or I would

5   think from a plaintiffs' point of view, to argue that they

6   weren't aware, that they didn't very knowingly enter into an

7   agreement that didn't even request a warrant deed from the

8   other side about who was purchasing.  They could have asked for

9   one, certainly, but it's not there.

10          So just to argue there was an omission, what was the

11  duty of that?  Where does the duty arise to make that omission

12  under the circumstances?  So I think it adds color and insight

13  into these allegations of fraud is that they're very broad, but

14  it's interesting that in all the pleading that there's not one

15  time that they point to a warrant and rep that was violated.

16          THE COURT:  Okay.

17          MR. LaFROMBOIS:  And I think that's very telling.

18          THE COURT:  Okay.  I think I have enough.

19          Is there anything further from you, Mr. Stolper?

20          MR. STOLPER:  Just very briefly, your Honor, just a

21  couple of points in fact in the record for you.  The Brooks --

22  I mentioned I have given you the name Logothetis.  Mr. Brooks

23  said in his declaration to you, paragraph 25, that's document

24  152, he said all decisions flow through Logothetis.  That's in

25  his own declaration.

K9ATCONA

1          In Andueza's declaration he said that no one at the

2     company knew of the conflict, that no one knew that Brooks was

3     self-dealing or about Hansen and Mikkelson.  So very early on

4     in the case, the fraud is there.  It's proven.  It's about

5     knowledge and about keeping things secret.  It's in their

6     declarations in the early onset of the case.

7          So the issue about whether to arbitrate formation or

8     not, we have a conflict over what Andueza did or didn't do.  If

9     he weren't compromised, he had the authority because of his

10    position.  But the point is he's compromised.  And it's not

11    just us saying it, Brooks says in his declaration to you that

12    this whole scheme was Andueza, not me.  That's what he said in

13    his declaration.  So they can't have it both ways.  They can't

14    point the finger at Andueza and say any wrongdoing is this

15    guy's fault, but yet he has the authority to sign the

16    contracts.

17          THE COURT:  I don't think that they are saying there's

18    wrongdoing.

19          Anything further that you've got?

20          MR. STOLPER:  You had asked counsel if there was

21    evidence of the conspiracy, and we had put in -- among other

22    things, we put in the private email chat not done through the

23    Libra emails but privately through Hot Mail and Gmail accounts

24    between Andueza and Brooks about sources and uses of the monies

25    that would be put together.  So I was just answering the

K9ATCONA

1    question that you posed to counsel and thinking about the

2    answer and pointing that out to you.  That's it.

3            THE COURT:  Okay.  All right.  So I'm going to reserve

4    decision and you should get an opinion from me in the next

5    couple of days.

6            Thank you all very much, we're adjourned.

7            MR. STOLPER:  Thank you.

8            (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25