## IN THE AMERICAN ARBITRATION ASSOCIATION
## CHICAGO REGIONAL OFFICE

STEVEN J. BROOKS,  NIANTICVISTA
ENERGY, LLC, AND GREGORY MERLE,

          Claimants,

v.                                                                                Case No.

LIBRA CAPITAL US, INC., L'ANSE WARDEN
ELECTRIC COMPANY, LLC, EUROENERGY
BIOGAS LATVIA LIMITED, CONVERGEN
ENERGY LLC, FIDEL ANDUEZA, YDALBERTO
DIAZ, AND GEORGE LOGOTHETIS,

          Respondents.

## COMPLAINT AND DEMAND FOR ARBITRATION

As and for their Complaint and Demand for Arbitration ("Complaint") against Respondents

Libra Capital US, Inc., L'Anse Warden Electric Company, LLC, EuroEnergy Biogas Latvia

Limited, Convergen Energy LLC, Fidel Andueza, Ydalberto (Bert) Diaz and George M.

Logothetis ("Respondents"), Claimants Steven J. Brooks, NianticVista Energy, LLC, and Gregory

Merle ("Claimants") demand arbitration and allege as follows:

### <u>INTRODUCTION</u>

Claimants have been the targets of a ruthless campaign directed by George Logothetis and

the companies he controls to bully, blackmail and extort Claimants to pay a never-ending stream

of money and to ruin their lives. This arbitration is brought to restore Claimants' livelihoods and

good names against Logothetis's smear campaign, and to recover the substantial damages

Logothetis and his "multi-billion-dollar" companies have caused and are continuing to cause

Brooks, Merle and Niantic to suffer.

## EXHIBIT A

## FACTS

### A.    PARTIES AND RELATED ENTITIES.

#### 1.    Respondents are members or executives of the Libra Group.

1.    The Libra Group ("Libra," "Libra Group" or the "Group") is a "multi-billion-dollar" international conglomerate of companies, active in 35 countries across six continents, which operates in the aviation, energy, hospitality, real estate, shipping and diversified investments industries. It is wholly-owned by members of the Logothetis family.

2.    Respondent Libra Capital US, Inc. ("Libra Capital"), is a Delaware corporation with its principal place of business located in New York, NY. Libra Capital's registered agent for service of process is Corporation Service Company at 251 Little Falls Drive, Wilmington, DE 19808. Libra Capital operates as a services company, and is the employer of record of many of Libra's employees. Libra Capital's employees provide services to the companies that hold Libra's core assets.

3.    Respondent L'Anse Warden Electric Company, LLC ("L'Anse"), is a Delaware limited liability company with its principal place of business located in L'Anse, MI. L'Anse's registered agent for service of process is also Corporation Service Company at 251 Little Falls Drive, Wilmington, DE 19808. L'Anse owns and operates a power plant in Michigan, and is a member of the Libra Group.

4.    Respondent EuroEnergy Biogas Latvia Limited ("EuroEnergy") is a Cyprus company with its principal place of business located in the Republic of Latvia. EuroEnergy's registered address for service of process is 284 Arch. Markarios III Avenue, Fortuna Court, Block

**EXHIBIT A**

B, 2nd Floor, 3105 Limassol, Cyprus. EuroEnergy is also a member of the Libra Group, and owns and operates biogas facilities in the Republic of Latvia.

5.      Respondent Convergen Energy LLC ("CE") is a Delaware limited liability company with its principal place of business located in New York, NY. CE's registered agent for service of process is Corporation Service Company at 251 Little Falls Drive, Wilmington, DE 19808. CE is a Libra holding company that currently owns L'Anse and EuroEnergy and formerly owned Convergen Energy WI, LLC ("CEW") until CEW was sold. CE also owns several combined heat and power ("CHP") plants.

6.      Non-party CEW is a Delaware limited liability company that owns and operates a plant located in Green Bay, Wisconsin, which manufactures renewable fuel pellets that can be burned to create energy. L'Anse is one of CEW's customers, and burns fuel pellets provided by CEW. CEW was formerly a Libra company but was sold in early 2020.

7.      Respondent Fidel Andueza ("Andueza") is an adult resident of Spain and New York, who resides part of the time at 5 Guadalajara St., Floor 1 J, Madrid, 28042. Andueza also maintains a permanent apartment in New York City, regularly resides in New York, and regularly conducts business in New York on Respondents' behalf in the normal course of his job duties. Andueza is Libra's Chief Investment Officer, and was a Manager of CE, L'Anse, and CEW until at least January 31, 2020.

8.      Respondent Ydalberto (Bert) Diaz ("Diaz") is an adult resident of the state of New York, who resides at 23 Dunnings Drive, Tarrytown, NY 10591. Diaz is Libra's General Counsel,

**EXHIBIT A**

as well as the other Manager (with Andueza until at least January 31, 2020) of CE and L'Anse. Diaz was also a co-Manager of CEW with Andueza until CEW was sold.

9.      Respondent George M. Logothetis ("Logothetis") is an adult resident of the state of New York, who resides at 13 E. 94th Street, New York, NY 10128. Logothetis is Libra's Chairman and CEO, and describes himself as having "principal executive responsibility for the Libra Group."

> **2.      Claimants are a former Libra employee, a company that purchased CEW, and the indirect owner of CEW.**

10.     Claimant Steven J. Brooks ("Brooks") is an adult resident of the state of Connecticut. Brooks was hired by Libra Capital in 2014. Andueza was Brooks' direct supervisor during Brooks' employment with Libra Capital. Brooks was also an "officer" (a statutory position created by the operating agreements) of CE and L'Anse until January 31, 2020. Brooks currently has no employment relationship with Libra.

11.     Claimant NianticVista Energy LLC ("Niantic") is a Delaware limited liability company with its principal place of business located in New Jersey. Niantic purchased CEW from CE in early 2020.

12.     Claimant Gregory Merle ("Merle") is an adult resident of the state of Florida. Merle is an energy executive with substantial experience in the industry. Merle is the Manager and indirect owner of Niantic, the company that purchased CEW from CE.

-4-

**EXHIBIT A**

**B.      LIBRA IS A SHELL GAME.**

**1.      Libra comingles assets to address frequent capital problems.**

13.      Libra has recurring cash problems. It asked Brooks and his family multiple times to address its capital shortages by loaning it money, before deciding that extorting Claimants was easier.

14.      Soon after accepting employment with Libra Capital, Brooks was surprised to learn that, despite its carefully crafted public image as a powerhouse international conglomerate, Libra entities are constantly short on cash.

15.      As just one of many examples, Libra was unable to meet payroll on multiple occasions during Brooks' employment. At other times, Libra delayed payment of bonuses because it did not have the funds, or overdrew accounts to make payroll.

16.      As another example, Libra purchased a hotel in St. Moritz, Switzerland, in 2013, and began a renovation project. Libra ran out of funds shortly after beginning the renovation and the hotel was left a gutted shell.

17.      Because it is continually short on funds, Libra is always hunting for outside parties to inject badly-needed capital into the organization. Its institutional practice is to "rob Peter to pay Paul," comingling funds and moving money fluidly among entities to meet the urgent cash needs of Libra's various companies.

18.      Even more troublingly, loans and investment funds provided by outside parties to one Libra entity are regularly moved to another entity, immediately upon receipt, to meet the emergency needs of another Libra entity.

-5-

**EXHIBIT A**

19.     Another regular Libra practice is to transfer funds to subsidiaries on the day of a loan covenant test, and transfer the funds back out immediately after the test.

20.     Libra also frequently solicits investments in the form of Equity Tracker Fee ("ETF") contracts, which allow Libra to keep those investments off its balance sheets and present the image that Libra owns or has equity in assets when in fact Libra's economic interests are pledged to ETF counterparties.

21.     Oftentimes, Libra's transactions and comingling of funds violate contracts, loan covenants, collateral requirements, the expectations of and Libra's representations to outside sources of capital, and banking laws.

22.     For example, a November 12, 2019 article from the Financial Times reported that Libra is implicated in a criminal investigation in Greece for money laundering, including "a series of transfers abroad of funds in violation of capital controls," and the article reports that a counterparty with Libra was fined €5.2 million by the European Central Bank for wrongful conduct in connection with transfers that benefitted Libra.

23.     As another example, a March 13, 2018 article by Bloomberg cited a report by Greece's Anti Money-Laundering Authority indicating that Logothetis has been the beneficiary of money laundering of millions of euros that passed from company to company for Logothetis's ultimate benefit, and the article reports that the same managers who run Libra manage the company that initiated the illegal transfers.

24.     Logothetis controls the movement of funds across Libra entities. No money changes hands within the Libra organization without Logothetis's direct approval.

-6-

**EXHIBIT A**

25.     Libra also sponsors various charities and non-profit entities. Funds are comingled among Libra's social programs and for-profit businesses. In addition, Libra uses its social programs to forge political connections and peddle influence.

26.     For instance, Libra, through a non-profit organization created by the Logothetis family called Concordia, has for years sponsored summits for world leaders. Libra pays politicians and other financial and business leaders to travel to and speak at the summits and network with other political and financial players, and Libra uses the opportunity to develop ties with world leaders and influence political results.

27.     In 2016, Libra invited the Prime Minister of Greece, Alexis Tspiras, to speak at a Concordia Summit. Logothetis told Brooks and others that providing a speaking opportunity to Tspiras was critical in buying Libra legal cover in Greece. Shortly after the Summit, Greece dropped a criminal investigation of Libra and Logothetis.

28.     Thus, not only does money flow freely among Libra's for-profit entities, Libra comingles funds among its charities and its non-profit businesses, and Libra uses organizations that ostensibly have a charitable purpose to advance Libra's business goals and provide political cover.

**2.      Andueza plays a key role in Libra's fund-raising.**

29.     One of the primary responsibilities Logothetis has delegated to Andueza in his role as Libra's Chief Investment Officer is to find people and entities who are willing to inject money into the Libra Group to meet the Libra companies' urgent, incessant needs for capital. When Libra needs money (as it constantly does), Andueza is often tasked with raising it.

-7-

**EXHIBIT A**

30.     Logothetis and Libra are largely indifferent as to who provides capital to meet its needs, and frequently borrows money or accepts investments from employees of Libra Capital and other Libra executives. These kinds of incestuous transactions are a common institutional practice across Libra, and Libra often prefers such dealings, because investors and creditors with an existing relationship to Libra are less likely to ask probing questions.

### C.     LIBRA MADE FREQUENT PLEAS TO BROOKS TO PROVIDE CAPITAL TO LIBRA COMPANIES.

31.     For the first part of Brooks' employment with Libra, Libra found Brooks and his family to be a reliable source of funds to address Libra's shortages of capital.

32.     Consistent with its regular practices, Libra, through Andueza, frequently asked Brooks and members of Brooks' family to loan money to the Group.

33.     For instance, in 2016, Libra wanted to purchase a large portfolio of multi-family real estate in southern U.S. States, but did not have the funds required, and sought a bridge loan to complete the acquisition.

34.     Fulfilling his normal duties on Libra's behalf, Andueza approached Brooks and asked if Brooks or members of Brooks' family could help finance the acquisition. Ultimately, one of Brooks' relatives agreed to provide a bridge loan. Brooks and Logothetis later expressly discussed this bridge loan, and Logothetis told Brooks that he was pleased that the Brooks family had pitched in to help Libra.

35.     In 2017, Logothetis wanted to purchase a ship, but again Libra did not have the necessary funds. Logothetis tasked Andueza to find investors for the ship. Again, Andueza on

-8-

**EXHIBIT A**

Libra's behalf solicited Brooks as a source of capital. Brooks discussed the matter with Logothetis, and Logothetis encouraged Brooks to invest in the acquisition, which Brooks ultimately did.

36.     In 2018, a loan taken out by L'Anse became due, and Libra did not have the funds to repay the loan. Again, Logothetis tasked Andueza to find parties to lend Libra money to cover the loan. Andueza on Libra's behalf approached Brooks and his family once again, asking the Brooks family to provide Libra a loan, and the Brooks family ultimately agreed to do so. Again, Brooks discussed the loan with Logothetis, and Logothetis thanked Brooks for helping Libra out.

### D.     RESPONDENTS' PLAN TO EXTORT CLAIMANTS IN CONNECTION WITH THE SALE OF CEW.

#### 1.     The setup.

37.     While, on no less than three prior occasions, Libra had solicited Brooks and the Brooks family to provide loans or other investments in Libra companies and thanked Brooks and his family for doing so, Libra decided to use the same mechanism to extort money from and otherwise injure Claimants for Libra's benefit.

38.     In 2019, Libra wanted to sell a hotel it owned in the Canary Islands. Again, Logothetis tasked Andueza to find purchasers who would pump money into the Libra organization through the sale of the hotel. Andueza on Libra's behalf made yet another pitch to the Brooks family to finance the transaction, and Brooks' mother agreed to provide a loan to facilitate that sale (the "Marquelia Transaction"). To disguise the fact that Libra was ending its investment in the hotel, Libra used an ETF contract.

39.     Later in 2019, Libra wanted to complete a business combination between Greenwood Energy and Goldenset Capital Partners, as part of Libra's investment in Greenwood

-9-

**EXHIBIT A**

Energy, but needed $1 million to fund the deal. Logothetis believed that Greenwood Energy represented the "future" of energy production, but Libra did not have the funds to finance the deal. At the same time, Libra also had a pressing need to generate substantial amounts of cash quickly to meet loan covenants that required Libra to have millions of dollars in available liquid capital. These loan covenants were tested on December 31 of each year.

40.    Logothetis and Andueza decided that the solution to both problems (needing to generate capital to invest in Greenwood Energy and to generate funds to meet loan covenants) could be found by selling CEW. This made operational sense to Logothetis and Andueza, as they did not think much of the future prospects of CEW. Logothetis told Brooks in that regard that the future of energy production did not involve companies that "burn things." Because CEW creates renewable fuel pellets that are burned to generate electricity, to Logothetis, CEW represented the past, not the future.

41.    Thus, Logothetis became very interested in selling CEW, ideally before the end of 2019. He expressed concern to Brooks (reiterated by Andueza), however, about presenting any public perception that Libra was engaged in an *en masse* selling of its assets.

42.    Moreover, Andueza had negotiated and approved loan agreements as CE's Manager with a Latvian lender under which CEW had been pledged as collateral. Diaz further worked to provide Libra's Country Head of Latvia with power of attorney to sign the documents. Both Andueza and Diaz were fully aware of this agreement and its terms. The sale of CEW without the lender's approval could violate these loan agreements (a position the Latvian lender took post-sale).

-10-

**EXHIBIT A**

43.     To raise funds without tipping off the Latvian lender, Logothetis wanted to sell CEW quickly, quietly, and preferably to parties who had dealt with Libra in the past and would be comfortable making the purchase without extensive due diligence that might raise questions about Libra's collateral obligations to its Latvian lender.

44.     Once again, Logothetis tasked Andueza with the job of finding a buyer for CEW. And once again, Andueza on Libra's behalf turned to Brooks and the Brooks family to provide badly-needed funds. Brooks and his family did not consider Andueza's request to be out of the ordinary, because Libra had turned to the Brooks "well" as a source of capital numerous times in the past, at Logothetis's direction and with Logothetis's approval. What Brooks did not know at the time, however, is that Logothetis, Diaz and Andueza were setting Brooks up.

45.     Prior to consummation of the sale, Brooks expressed concern to Logothetis that CEW had been pledged as collateral to the Latvian lender, but Logothetis told Brooks in response that it would be "fine" to sell CEW, because Libra was going to sell EuroEnergy as well, and that would satisfy the Latvian loan, freeing up the sale of CEW. Brooks also expressed his concerns to Andueza, and Andueza confirmed that Libra was negotiating the sale of EuroEnergy and thus able to sell CEW. Diaz was also aware of these conversations and requirements.

46.     Based upon and relying on Logothetis's and Andueza's material representations to Brooks that the sale of CEW would be compliant with Libra's collateral obligations to the Latvian lender and Diaz's failure to advise Brooks that the sale would violate these obligations, Andueza ultimately convinced Brooks and a member of the Brooks family to provide funding for the purchase of CEW.

# EXHIBIT A

47.     At Andueza's request and at Andueza's direction, Brooks approached Merle, a former acquittance of Brooks who was well-known to Andueza (who had met Merle on multiple occasions), to see if Merle might be interested in purchasing CEW. Merle has significant experience in the energy industry and was particularly attracted by the fact that CEW creates fuel pellets that represent a renewable, environmentally-friendly and sustainable means of generating energy.  Merle agreed to lend his experience to the project.

48.     Ultimately, CEW was sold to Niantic, a company that Merle formed in 2019 for the purpose of holding CEW's assets. The sale was supposed to close at the end of 2019, but the original sales documents were ultimately effective January 31, 2020.

**2.      The sale of CEW.**

49.     The sale of CEW was very unusual. Rather than using an escrow account, Logothetis insisted that Niantic provide a "hard deposit" of $1 million in connection with the sale, which would be non-refundable if the sale failed to close. $750,000 of the hard deposit had to be provided by the end of 2019, and the remaining $250,000 by January 21, 2020. This was a commercially unheard-of feature of the sale.

50.     Logothetis wanted the "hard deposit" because Libra needed immediate funds to invest in Greenwood Energy and to meet Libra's loan covenants. Logothetis did not want any problem with the closing of the sale of CEW to threaten those needs. Further, the hard deposit did not create any security interest on Niantic's part. Logothetis structured the hard deposit this way because a UCC filing indicating Niantic's security interest could violate Libra's loan covenants. Diaz commented to Brooks about the extraordinary nature of this hard deposit.

-12-

**EXHIBIT A**

51.     Logothetis believed that Niantic would agree to his unusual request because Logothetis knew that Libra was dealing with parties who had engaged in multiple transactions with Libra and were familiar with Libra's unusual ways of doing business. No third-party who had not previously dealt with Libra would agree to a "hard-deposit" of $1 million in a complex commercial transaction of this kind, a fact of which Logothetis was well aware. Logothetis confirmed to Brooks in writing that the hard deposit absolutely needed to be provided.

52.     Andueza, as CE's, CEW's and L'Anse's Manager and Libra's Chief Investment Officer, negotiated the key business terms of the sale of CEW, including the purchase price. Diaz, as CE's, CEW's and L'Anse's other Manager and Libra's General Counsel, negotiated and drafted the sales documents and determined the key legal terms of the sale. Andueza was well aware of Brooks' involvement as a lender to CEW's purchaser, Niantic. In addition, Diaz received documents prior to the sale that clearly showed Brooks' relationship to Niantic.

53.     The principal sale contract was an Acquisition Agreement (accompanying this Complaint as Exhibit 1), dated January 29, 2020 (the "Acquisition Agreement"), under which CE sold 100% of CE's membership interest in CEW to Niantic. This sale included substantial intellectual property, described in nearly six pages of the Acquisition Agreement, that CE sold to Niantic. The Acquisition Agreement was negotiated, drafted, and approved by Andueza and Diaz, the two Managers of CE, CEW, and L'Anse, and executed by Andueza on behalf of CE, CEW, and L'Anse.

**EXHIBIT A**

54.    CE made several material misrepresentations to Niantic in the Acquisition Agreement. First, CE falsely represented that there was no basis for litigation against or investigation of any CE or CEW manager or key employees. Specifically, CE represented:

> CEW has not received notice of any pending litigation or governmental or administrative proceeding or investigation. To CE's Knowledge, no litigation or governmental or administrative proceeding or investigation has been threatened: (a) against CEW; (b) affecting the property or assets of CEW; or (c) as to matters related to CEW, against any manager, member or key employee of CEW in their respective capacities in such positions. **To CE's Knowledge, there has not occurred any event, and there does not exist any condition, on the basis of which any litigation** or governmental or administrative proceeding **or investigation may reasonably be asserted. There has been no litigation**, governmental or administrative proceedings **or, to CE's Knowledge, investigations involving CEW or any of its managers, CE or key employees in connection with the Business, occurring, arising, or existing during the past five (5) years.**

55.    This representation was false when CE first made it in January 2020, and false when CE reaffirmed it in February 2020 (discussed below), as CE was actively investigating and planning litigation against Brooks and other key CE or CEW employees at the times CE made this false representation and warranty.

56.    Second, CE represented and warranted that:

> Except as set forth in Section 2.2(b) of the Disclosure Schedule**, the execution and delivery of this Agreement** and all agreements, documents and instruments executed and delivered by CEW and CE pursuant hereto, and the performance of the Contemplated Transactions, **do not and will not**: (i) **violate or result in a violation of**, conflict with or constitute or result in a default (whether after giving of notice, lapse of time or both) or loss of benefit under **any contact or obligation to which CEW is a party or by which its assets are bound**, or any provision of the Organizational Documents, or cause the creation of all liens, claims,

-14-

**EXHIBIT A**

options, charges, pledges, security interests, deeds of trust, voting agreements, voting trusts, encumbrances, rights or restrictions of any nature upon any of the assets of CEW; (ii) to the best of CE's Knowledge violate, conflict with or result in a violation of, or constitute a default (whether after the giving of notice, lapse of time or both) under, any provision of law, regulation or rule, or any order of, or any restriction imposed by, any court or Government Authority applicable to CEW; (iii) **require from CEW any notice to, declaration or filing with, or consent or approval of any** Government Authority or other **third party**; or (iv) violate or result in a violation of, or constitute a default (whether after the giving of notice, lapse of time or both) under, accelerate any obligation under, or give rise to a right of termination of any agreement, permit, license or authorization to which CEW is a party or by which CEW is bound, which has not been waived in writing.

57. This representation was also false when made in January 2020 and affirmed in February 2020, as, despite Logothetis's representation to Brooks that selling CEW was "fine" and not in violation of CE's loan covenants to the Latvian lender, CEW was contacted after the sale by that lender, who claimed that CEW had been pledged as collateral in loans the lender made to CE, and that CEW could not be sold without the Latvian lender's prior consent, which had not been given.

### 3.      Libra's claims of ignorance.

58. In furtherance of its extortion scheme, Libra has falsely claimed in other settings that it was unaware of Brooks' relationship to CEW (as a lender and guarantor to CEW's owners, including Niantic) until it "fortuitously" learned about Brooks' involvement on February 1, 2020, the day after the effective date of the CEW sale. This is a demonstrable falsehood.

59. First, Andueza, who solicited Brooks to provide funding to the buyer (Niantic), orchestrated the entire sale at Libra's behest, and directed, in his capacity as Manager of CE, CEW

-15-

**EXHIBIT A**

and L'Anse, all of Brooks' involvement in the sale of CEW. Indeed, Libra has in other contexts claimed that Andueza was a co-conspirator with Brooks, and was fully aware of Brooks' relationship to Niantic. Andueza himself has submitted a sworn statement indicating that he knew all along that Brooks had a relationship to Niantic. Astonishingly, Andueza remains a high-level executive with Libra, despite Libra's public accusation that Andueza conspired with Brooks to defraud Libra!

60.     Second, Diaz, who acted in the dual capacity of Libra's General Counsel and Manager of CE, CEW and L'Anse, was provided written documents in advance of the sale of CEW that clearly identified Brooks' relationship to the buyer of CEW. Despite full knowledge of Brooks' involvement, Diaz never advised Brooks that there was anything wrong with Brooks' involvement or did anything to try to prevent the transaction from closing.

61.     Third, Logothetis later admitted to Brooks that he had been aware "for months" before the effective date of the original sale that Brooks was providing financing, as Brooks and his family had done many times at Libra's request and for Libra's benefit in the past.

62.     Fourth, while the sale agreement is dated January 31, 2020, the sale did not actually close until February 3, 2020. Libra has admitted in other proceedings that it knew of Brooks' involvement no later than February 1, 2020, but did nothing to stop the sale from closing two days later. Diaz himself released Libra's signatures from escrow on February 3 and confirmed that the sale was closed.

63.     Thus, with express knowledge of Brooks' involvement in the acquisition of CEW, CE represented and warranted to Niantic in the Acquisition Agreement that CE was unaware of

**EXHIBIT A**

any basis for a claim, litigation or any investigation concerning the activities of CE, CEW, or any of their managers or key employees (including Brooks).

64.     With clear knowledge of the facts, and with the intent to use those facts to extort Claimants, Libra induced Claimants to finalize and execute the agreements consummating the purchase of CEW by Niantic.

### 4.     Springing the trap.

65.     Despite Libra's demonstrable knowledge of Brooks' involvement at every level, Libra ambushed Brooks just after the sale of CEW closed. After carefully ensuring that Libra had received the CEW purchase funds from Niantic on February 3, Logothetis, Adamantios Tomazos, President of Libra Capital ("Tomazos"), and Phaedra Chrousos, Libra's Chief Strategy Officer ("Chrousos"), lured Brooks to Libra's New York offices. Secretly recording the conversation, Logothetis, Tomazos and Chrousos executed a carefully orchestrated script in which they feigned "shock" and "outrage" that Brooks had provided funding to Niantic for the sale, when Brooks was a Libra Capital employee and an "officer" of CE and L'Anse, and thus had (a disclosed, solicited and directed) involvement on both sides of the CEW transaction.

66.     Brooks was bewildered by this ambush. Like any innocent person, he expressed remorse that he had somehow unwittingly upset Libra, and immediately offered to help Libra rescind the transaction, an offer Brooks repeated several times. Logothetis refused Brooks' offers, as Libra had spent the purchase money the second it came in the door. Indeed, Logothetis was careful to verify that the funding had come and gone before he sprung his trap on Brooks.

**EXHIBIT A**

67.     During the same ambush, Logothetis, Tomazos and Chrousos expressed additional "shock" and "outrage" that Brooks' mother had lent money to facilitate the Marquelia Transaction. To intimidate Brooks, they told Brooks that Brooks and his mother would be facing criminal and civil investigations and prosecution for their wrongdoing, unless they quickly came to a deal with Libra.

68.     However, during this conversation, Logothetis made a critical mistake. He inadvertently let slip that he had known all along that Brooks was involved. The next day, Chrousos also made a key error, disclosing that Andueza had admitted to destroying evidence relating to this dispute. With the benefit of hindsight, these statements and other facts confirm the premediated nature of Libra's plans.

### 5.     The payoff.

69.     The reason Libra sandbagged Brooks became apparent shortly after the February 3 meeting. The ambush was nothing more than a setup, to shake more money from the Brooks tree. This time using Diaz and Chrousos as its mouthpieces, Libra insisted that Niantic agree to a second closing in which Niantic paid CE an additional $618,359.91 to purchase CEW. Libra's demand that Niantic pay this additional amount to purchase CEW was memorialized in an Amended and Restated Closing Statement, dated February 21, 2020 (the "Second Closing"). The Second Closing was negotiated, drafted and approved by Manager and General Counsel Diaz, and executed by Diaz on behalf of CE and L'Anse.

70.     At the same time, Libra insisted that Brooks execute a Separation & Cooperation Agreement, dated February 26, 2020 (the "Separation Agreement"), in which Brooks had to pay

-18-

**EXHIBIT A**

Libra an additional $332,500 and release any and all claims that Brooks had as of the date of the execution of the Separation Agreement against the Libra Group. Libra told Brooks that if he refused to sign, Brooks and Brooks' mother would be going to jail.

71.    As a further (false) incentive, Libra agreed to acknowledge the €549,000 debt Libra owed to Brooks' mother in connection with the Marquelia Transaction, and to "take all steps necessary" to repay Ms. Brooks. To date, Libra has not paid a single penny of the debt it acknowledged and agreed to pay Brooks' mother promptly as consideration for Brooks signing the February 2020 Separation Agreement, and has not responded to multiple inquiries from Ms. Brooks as to the status of repayment.

72.    The early drafts of the Separation Agreement contained a broad release by Libra of all liability on Brooks' part. However, Libra changed this language in later drafts. Brooks asked Diaz why his Separation Agreement contained a broad release of Brooks' claims against Libra, and release of any claims Libra had against Brooks concerning the Marquelia Transaction, but did not reference the CEW acquisition. Diaz and Chrousos expressly told Brooks on multiple occasions in February 2020 before Brooks executed the Separation Agreement that the reason Brooks' Separation Agreement did not reference the CEW acquisition was that the issues Libra had with that acquisition were fully resolved in the Second Closing. As both Diaz and Chrousos told Brooks on multiple occasions in February 2020, the Second Closing "takes care of Convergen [CEW]," and thus there was no need to address the CEW sale in Brooks' Separation Agreement.

73.    Indeed, Libra made numerous representations in February 2020, before the Second Closing and Separation Agreement were executed, that the almost $1 million Claimants paid Libra

**EXHIBIT A**

pursuant to those agreements resulted in a full and final resolution of any claims Libra had concerning the sale.

74.     For instance, after February 3 but prior to the execution of the Second Closing and Separation Agreement, Diaz told Brooks that he expected to work with Brooks again after the agreements were signed. Diaz told Brooks that Brooks' involvement was not a big deal, that Brooks should not be a "tough guy" and should sign the agreements to put this dispute behind him. In addition, Diaz told Brooks that Libra's first priority was to solve the CEW situation, and confirmed, when the terms of the Second Closing were agreed upon, that the CEW dispute was "done." Moreover, on February 4, 2020, Diaz promised to tell Brooks if Libra thought negotiations with Brooks were not going well and intended to pursue litigation instead of resolving the dispute through the Second Closing and Separation Agreement. Diaz never gave Brooks any such warning.

75.     Andueza too assured Brooks that executing the Second Closing and Separation Agreement would finally resolve any issue relating to the CEW sale. Andueza told Brooks that Brooks had done a "good job" working with Libra on these documents, that the dispute "would be over" and "closed." Bizarrely, while Libra has accused Andueza in other settings of conspiring with Brooks to injure Libra in the CEW sale, Andueza remains a high-level Libra executive.

76.     Chrousos, at Logothetis's direction, also repeatedly reassured Brooks that executing the Second Closing and Separation Agreement would fully resolve any dispute with Libra. Like Diaz, she represented on multiple occasions that the Second Closing "takes care of Convergen [CEW]." Chrousos on multiple occasions offered to work with Brooks on his "narrative," to craft a statement to be circulated within Libra and to outside parties that would

-20-

**EXHIBIT A**

reflect Libra's and Brooks' amicable parting of ways. She told Brooks that everything was "all ok" when the terms of the Second Closing and Separation Agreement had been agreed upon, and reminded Brooks that he should work on his "ending language" to put the matter behind him. She also told Brooks that his agreements reflected Brooks' conversations with Logothetis.

77.     Logothetis told Brooks to work with Chrousos to "close this and put this behind us." Like Chrousos, Logothetis said he would work with Brooks on the statement Brooks and Libra would give about Brooks' amicable departure. He told Brooks that Niantic and Brooks agreeing to pay another nearly $1 million was a "key element in closing up our matters quickly." He told Brooks on February 18 that if the parties did not execute the final document immediately, Libra would "file a lawsuit in the next days." Logothetis also told Brooks in February 2020 that he was a "good kid," that he wished Brooks all the best and that Brooks should run for Congress someday.

78.     Consistent with these representations, the language of the Second Closing Statement provided in pertinent part:

> By signing this Amended and Restated Closing Statement each Party confirms and ratifies that **the Closing was completed on the Closing Date**.
> …
> The Buyer and Seller agree that **there will be no further adjustments or changes** to this Amended and Restated Closing Statement after the date hereof, as both Parties have confirmed that this document **is now complete and accurate in all regards**.
> …
> Other than as expressly modified pursuant to this Amended and Restated Closing Statement **all of the terms, conditions and other provisions of the Acquisition Agreement…are hereby ratified and confirmed and shall continue in full force and effect in accordance with their respective terms.**

# EXHIBIT A

79.     By reaffirming the terms of the Acquisition Agreement, the Second Closing repeated and confirmed CE's representation that there was no basis for litigation against or investigation of any of CEW's or CE's key employees.

80.     Logothetis promised Brooks that any money Libra received from the Separation Agreement would go to charitable efforts sponsored by Libra, not Libra's for-profit businesses. However, at the time of payment, Libra directed the funds paid in the Separation Agreement to go to Libra's business accounts. On information and belief, Libra kept the money for its own for-profit purposes and did not provide any of the funds to charitable enterprises.

81.     Relying upon Diaz's, Andueza's, Logothetis's, and Chrousos's representations on Logothetis's behalf, as well as the language Respondents proposed in the Second Closing, Brooks agreed to the Separation Agreement, and Niantic agreed to the Second Closing. Through these documents, Libra secured almost $1 million in additional funds from Claimants.

### E.     AFTER SUCCESSFULLY SECURING ADDITIONAL PAYMENTS IN FEBRUARY, LIBRA BROUGHT SUIT IN MAY TO EXTORT CLAIMANTS A SECOND TIME.

82.     Libra never had any intention of honoring its representations in the Second Closing or the Separation Agreement. In fact, Diaz, testified in a sworn statement: "I had no intention of relinquishing the [Libra's] fraud claims with the amended closing statement." Of course, Libra's secret intent (at the time they were executed) not to honor these agreements was not shared with Claimants, and is in direction contradiction to the express language of the contracts and Claimants' stated purpose in signing them.

-22-

**EXHIBIT A**

83.     For the next two months, CEW and its agents worked to help Libra complete audits and transition new management of CE's subsidiaries including the CHP plants, significant work that took an average of 20 hours per week, even though several of these services were not required by any of the sale documents and CEW and its agents received no compensation for providing many of them. However, once Libra had received the benefit of substantial free labor from CEW, and just a few months after the Second Closing, Libra dropped a bomb on Brooks, Merle, and Niantic, informing Claimants and other parties that, unless Libra's demands were satisfied within 72 hours, Libra would be filing suit in New York, and seeking more than ten million dollars in alleged damages.

84.     To put further pressure on Brooks, Andueza called Brooks shortly before the 72-hour deadline had expired. During that call, Andueza told Brooks that Libra had been investigating Brooks and preparing a lawsuit since February, and had hacked Brooks' private Gmail account. Andueza told Brooks that, unless Brooks gave Libra what Libra wanted (even more money), Libra would initiate criminal and civil proceedings against Brooks and ruin Brooks' life. On information and belief, Logothetis directed Andueza to make the call and relay this information.

85.     At this point, Brooks recognized Libra's tactics for what they were—another shakedown. With the benefit of hindsight, it became clear that Libra had set up Brooks, Niantic and Merle, soliciting their involvement in the purchase of CEW so that Libra could grab the quick cash it needed, but with every intention of springing their trap on Brooks, Niantic and Merle after the purchase money was paid, and repeatedly extorting Claimants for more money.

-23-

**EXHIBIT A**

86.     If that were not bad enough, when Brooks, Niantic and Merle refused to be extorted again by Libra, Libra filed an action in May 2020 in the United States District Court for the Southern District of New York, captioned *Convergen Energy LLC, et al. v. Brooks, et al.*, and pending as Case No. 1:20-CV-03746 (the "New York Litigation").

87.     In the New York Litigation, Libra seeks more than $10 million in compensatory damages, as well as punitive damages and its attorneys' fees. Although the sale of CEW has been consummated twice (in January and February of 2020), Libra also brought an *ex parte* emergency injunction motion, asking the Court in the New York Litigation to bar CEW from accessing many of its business records and seeking to require Niantic to turn over intellectual property that Niantic had purchased from Libra (twice). CE, EuroEnergy, and L'Anse have all made frivolous claims for damages in connection with the intellectual property CE sold to Niantic (twice). Conveniently, Libra did not mention the Second Closing in its Complaint or *ex parte* motion for an injunction. The Complaint also did not mention Andueza by name or disclose his role (belatedly acknowledged by Libra months later) as an alleged "co-conspirator."

88.     The purpose of the New York Litigation is abundantly clear—to put as much pressure on Claimants as possible and extort them into providing Libra with more money.

**F.      LIBRA'S PATTERN OF ENGAGING IN SIMILAR TACTICS.**

89.     The allegations of the New York Litigation bear a striking similarity to allegations that Libra brought in Cyprus against a different Libra executive in 2019 (the "Cyprus Litigation"). A July 2020 article by the Greek Reporter, purportedly based on review of an Affidavit Libra submitted in the Cyprus Litigation, describes the allegations Libra has made in that action. A

-24-

**EXHIBIT A**

comparison to the allegations in the Cyprus Litigation (as described by the Greek Reporter)  and

New York Litigation is revealing:

| **Allegations in 2019 Cyprus Litigation** | **Allegations in 2020 New York Litigation** |
|---|---|
| Libra accuses a senior executive, who allegedly had considerable degrees of autonomy, of abusing the trust Libra had placed in him by defrauding Libra to enrich himself. | Brooks was the "senior most officer charged and trusted with vetting and overseeing" Libra's interests, "afforded and empowered with considerable discretionary authority," but Libra had "unknowingly entrusted the fox with guarding the hen house." |
| Libra accuses the executive of holding a secret personal financial interest in companies that Libra understood to be wholly independent, and engaging in transactions in which the executive represented both the buyer and seller. | Brooks "secretly engaged in self-dealing for his own personal benefit and to the detriment of the Company with respect to those very assets under his watch," representing both the buyer (Niantic) and seller (CE) in the sale of CEW. |
| Libra accuses the "fraudster" of engaging in wrongful deals that benefitted (at Libra's expense) the companies in which the executive had an interest, effectively constituting theft. | Brooks engaged in a "self-serving scheme to shift as much profit" as possible from Libra to the entities in which Brooks had an interest, to "loot his employer of additional monies for the benefit of" Brooks' personal interests. "The pressing question for [Libra] was how much damage Brooks had caused the Company as a result of his faithlessness and thievery." |
| Libra claims that the fraud was accomplished through a conspiracy perpetrated by the executive and his accomplices. | Brooks "benefitted from the knowing assistance he received from his co-conspiring underlings" and "could not have perpetrated the fraud without [their] substantial assistance." |
| Libra confronted the executive about his purported wrongdoing. During the confrontation, the executive allegedly confessed to his fraud. | Libra "confronted Brooks with his self-dealing scheme in a face-to-face recorded meeting in Manhattan, Brooks, after repeated denials, confessed to his fraudulent conduct." |
| Libra brought suit and sought a Court Order to limit the activities of companies associated with the executive. | Libra brought suit and sought an injunction to limit the activities of companies associated with Brooks. |

-25-

**EXHIBIT A**

90.     The parallels between the two actions are remarkable. Simply put, Libra has engaged in these same tactics in the past. The two actions are also comparable in another significant respect. The Greek Reporter notes that the Affidavit it received self-described the Cyprus Litigation as something that "could be very well taken out of a film." The Complaint in the New York Litigation reads like a similar work of fiction, telling a tale of "corporate betrayal at the highest level."

91.     Libra's tactics are also in line with an incident Andueza shared with Brooks in 2019. Libra was having a dispute with Luis Santos, an individual who claimed Libra owed him money. Andueza told Brooks that he was instructed by Logothetis to tell Santos that, unless Santos stopped complaining, Libra would implicate Santos in a fraud, and that if Santos went public with the debt, Libra would report him to the authorities for participating in a big fraud. This a recurring pattern of behavior by Libra.

### G.     LIBRA CONTINUES TO INTERFERE WITH CEW'S BUSINESS.

92.     After filing the New York Litigation and seeking an *ex parte* injunction, Libra continues to pressure and harass CEW. On information and belief, Logothetis arranged for Libra to create a fake email account under the fictitious name "Chang Chang," and directed "Chang Chang" to send emails to CEW's business partners, providing a copy of the Complaint in the New York Litigation, informing CEW's business partners that the Complaint alleges "several charges of Fraud," and providing information on how CEW's business partners can find the New York Litigation on PACER. The clear intent in doing so was to encourage CEW's business partners to stop doing business with CEW.

-26-

**EXHIBIT A**

93.     The identity of CEW's business partners is not publicly known. On information and belief, the only entity that: (a) knew who all of CEW's business partners are; (b) had the correct contact information for each business partner; and (c) had motive to interfere with CEW's relationships with its partners, is Libra.

94.     The damage to Claimants has already been substantial. The frivolous accusations Libra has levelled in the New York Litigation have threatened to destroy Brooks' and Merle's lives and livelihoods, when Brooks' intent was to *benefit* Logothetis and the Libra companies at their request by helping them raise badly needed funds.

95.     On account of the substantial and longstanding wrongdoing directed by Logothetis and knowingly orchestrated by Andueza, Diaz, Libra Capital, CE, L'Anse, and EuroEnergy, Claimants initiated this arbitration.

## H.     BASIS FOR ARBITRATION

96.     The Acquisition Agreement provides that "Any dispute arising between the Parties in connection with this Agreement, which cannot be resolved by the Parties themselves, shall be submitted to binding arbitration." It further provides that "Except as modified herein, the arbitration shall be conducted in accordance with the then-prevailing Commercial Rules of the American Arbitration Association."

97.     The Acquisition Agreement also provides that "Within ten (10) days after service" of written notice of arbitration, "each Party shall designate one arbitrator. If either Party fails to designate its arbitrator in a timely fashion, the other Party may designate an arbitrator on behalf of that Party."

-27-

**EXHIBIT A**

98.    The Acquisition Agreement goes on to provide that "The two arbitrators so named shall designate a third arbitrator, who shall be an attorney licensed to practice law in the State of Delaware, to act as head arbitrator; provided, however, that should the partisan arbitrators be unable to agree upon a third arbitrator, then the third arbitrator shall be named pursuant to the applicable rules of the American Arbitration Association upon the application of either Party."

99.    The Acquisition Agreement further provides that "In rendering their decision and award, the arbitrators shall not add to, subtract from or otherwise modify the provisions of this Agreement, but rather shall be bound thereby. Each Party shall bear its own costs and expenses in connection with the arbitration and the costs and expenses of the arbitrators shall be borne equally; provided, however, that if the arbitrators determine that either party has intentionally breached his or its obligations under this Agreement, the arbitrators shall assess all costs and expenses of the prevailing Party against the Party found to have intentionally breached its obligations."

100.    The Acquisition Agreement further specifies that it shall be governed by, interpreted and enforced in accordance with the laws of the State of Delaware, without giving effect to any conflicts of law provisions.

101.    The Second Closing allows for *permissive* venue in New York state or federal courts for disputes relating specifically to the few terms of the two-page Second Closing, but it also provides that "Other than as expressly modified pursuant to this Amended and Restated Closing Statement, all of the terms, conditions and other provisions of the Acquisition Agreement and [a related contract] are hereby ratified and confirmed and shall continue to be in full force and effect in accordance with their respective terms."

-28-

**EXHIBIT A**

102.    As Libra has admitted in a related action, this dispute has its genesis in the sale of CEW, and the parties' claims are related to and centered around that sale. Under the Acquisition Agreement, this dispute must be arbitrated.

103.    The arbitration clause in the body of the Acquisition Agreement does not specify the place where the arbitration is to take place. However, a supply contract ("Supply Agreement") that was executed simultaneously with the Acquisition Agreement, attached as an exhibit to the Acquisition Agreement and made an express condition of closing provides that arbitration shall take place in the English language in Madison, Wisconsin. That Supply Agreement also provides that the arbitration shall occur on an expedited basis, with the final hearing to take place within 90 days after delivery of a party's demand for arbitration, and decision issued within 30 days after the final hearing. Accordingly, Claimants request expedited proceedings.

104.    CEW has already brought an arbitration under the Supply Agreement, alleging that L'Anse has breached its contractual obligations to CEW under the contract. The American Arbitration Association has assigned Case Number 01-20-005-5043 to that arbitration between CEW and L'Anse (the "Related Arbitration"). The Court in the New York Litigation has ruled that the parties' dispute under the Supply Agreement must be arbitrated. The Related Arbitration is limited to that specific contract and contains claims by CEW (not a party here) that are unique to that proceeding.

### COUNT I: BREACH OF CONTRACT (BY NIANTIC, AGAINST CE)

105.    Claimants repeat and reallege the allegations contained in the preceding paragraphs of this Complaint.

-29-

**EXHIBIT A**

106.    CE and Niantic entered into the Acquisition Agreement.

107.    As described above, CE breached the Acquisition Agreement.

108.    Among other things, CE breached the representations and warranties in the Acquisition Agreement by representing to Niantic that CE was unaware of any basis for litigation against or investigation of CE, CEW or any of their officers.

109.    Among other things, CE further breached the Acquisition Agreement by selling extensive intellectual property to Niantic and then bringing legal action to obtain an *ex parte* temporary restraining order barring Niantic from enjoying the use of that property, and requiring Niantic to return to Libra the intellectual property Niantic had purchased from CE in the Acquisition Agreement.

110.    Among other things, CE further breached the Acquisition Agreement by falsely representing and warranting to Niantic that CEW was unencumbered and free and clear of any and all undisclosed loans, contracts, and obligations, when CE was aware that CE had pledged CEW as collateral in CE's loan agreement with the Latvian bank.

111.    CE's breaches of the Acquisition Agreement were intentional, and thus, under the terms of the Acquisition Agreement, Niantic is entitled to recovery of all of its costs and expenses, including AAA fees, the arbitrator's costs, attorneys' fees, and other costs incurred by Niantic in connection with this dispute.

112.    As a proximate result of CE's breaches of the Acquisition Agreement, Niantic has been damaged, in an amount to be determined after a hearing.

-30-

**EXHIBIT A**

113.    Niantic has complied with all conditions precedent to his right of recovery hereunder.

## COUNT II: BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING (BY NIANTIC, AGAINST CE)

114.    Claimants repeat and reallege the allegations contained in the preceding paragraphs of this Complaint.

115.    Under Delaware law, the implied covenant of good faith and fair dealing inheres in every contract and requires parties in a contractual relationship to refrain from arbitrary and unreasonable conduct that has the effect of preventing the other party to the contract from receiving the fruits of the bargain.

116.    CE and Niantic entered into the Acquisition Agreement.

117.    Respondents have deprived Niantic of the fruits of Niantic's contractual purchase of CEW, by, among other things, selling CEW's trade secrets to Niantic and then barring Niantic from using them, insisting that Claimants enter into contracts that Respondents had no intention of honoring (including the Supply Agreement between CEW and L'Anse that is the subject of the Related Arbitration, the Second Closing and related contracts and the Acquisition Agreement itself), and targeting CEW's business partners to encourage them to stop doing business with CEW.

118.    Through their continuous and meddlesome interference and bad-faith conduct, Respondents have deprived Niantic of the benefits of owning CEW and the contractual rights Niantic secured in the Acquisition Agreement.

**EXHIBIT A**

119.    As a proximate result of Respondents' breaches of their covenants of good faith and fair dealing, Claimants have been injured, in an amount to be determined after a hearing.

### COUNT III: TORTIOUS INTERFERENCE (BY NIANTIC, AGAINST ALL RESPONDENTS)

120.    Claimants repeat and reallege the allegations contained in the preceding paragraphs of this Complaint.

121.    CE and Niantic entered into the Acquisition Agreement, under which CE sold CEW to Niantic.

122.    Further, CEW developed contractual and prospective business relationships with CEW's business partners.

123.    Respondents were aware of the Acquisition Agreement, and, having owned CEW for many years, were aware of CEW's contractual and prospective business relationships with CEW's business partners.

124.    As described above, Respondents have intentionally interfered with the Acquisition Agreement and CEW's contractual and prospective business relationships with CEW's business partners.

125.    Respondents other than CE have intentionally interfered with the Acquisition Agreement by engaging in wrongful conduct that has deprived Niantic of the fruits of its purchase, including but not limited to barring Niantic from using the intellectual property Niantic purchased from CEW, and insisting that Claimants enter into contracts that Respondents had no intention of honoring (including the Supply Agreement between CEW and L'Anse that is the subject of the

-32-

**EXHIBIT A**

Related Arbitration, the Second Closing and related contracts and the Acquisition Agreement itself).

126.    All Respondents, including CE, have intentionally interfered with CEW's contractual and prospective business relationships with CEW's business partners, among other things by sending, on information and belief, false accusations about CEW directly to CEW's actual and prospective business partners, and using CEW's proprietary information in furtherance of their wrongful interference.

127.    As a proximate result of Respondents' interference, Niantic has suffered damages, including, among other things, damages related to Respondents' interference with Niantic's ownership of CEW and the value of CEW as an investment, reputational damage and other injuries, in an amount to be determined after a hearing.

128.    Respondents' wrongful behavior was intentional, malicious, and demonstrated a wanton disregard of Claimants' rights. Accordingly, Claimants are entitled to punitive damages.

## <u>COUNT IV: FRAUD (BY ALL CLAIMANTS, AGAINST CE, L'ANSE, LIBRA CAPITAL, ANDUEZA, DIAZ, AND LOGOTHETIS)</u>

129.    Claimants repeat and reallege the allegations contained in the preceding paragraphs of this Complaint.

130.    Logothetis, Diaz, Andueza, and Libra Capital all made affirmative material misrepresentations to Claimants, including but not limited to representations that, by entering into the Second Closing, the Separation Agreement and related contracts, all liability against Claimants for events relating to the Acquisition would be extinguished.

**EXHIBIT A**

131.    Further, CE, L'Anse, and Andueza and Diaz (acting as the authorized representatives of CE and L'Anse), made material misrepresentations to Niantic, including but not limited to written representations to Niantic that there was no basis for litigation against Niantic or any officer of CE (including Brooks), or any basis of investigation of claims against Niantic, Brooks, or Merle. These representations were false when made, as Respondents were actively investigating Claimants with the intention (after extorting additional funds from Claimants) of bringing additional litigation against Claimants.

132.    Indeed, CE, L'Anse, Libra Capital, Andueza, Diaz and Logothetis intended, at the time these fraudulent misrepresentations were made, to induce Claimants to enter into the Second Closing, the Separation Agreement and related contracts, so that Libra could extort an additional $1 million out of Claimants, and then follow up with a lawsuit to shake down Claimants a second time.

133.    CE, L'Anse, Libra Capital, Andueza, Diaz and Logothetis also intentionally withheld material facts from Claimants about CE's, L'Anse's, Libra Capital's, Andueza's, Diaz's and Logothetis's intentions and plans to sue Claimants soon after they had fraudulently induced Claimants to enter into the Second Closing, the Separation Agreement and related contracts, and had received an additional $1 million payout from Claimants.

134.    Claimants justifiably relied, to their detriment, upon each of the misrepresentations set forth above in entering into the Acquisition Agreement, the Second Closing, the Separation Agreement and related contracts with CE, L'Anse and Libra Capital.

-34-

**EXHIBIT A**

135.    As described above, Claimants have been injured as a proximate result of each of these fraudulent acts and concealments.

136.    These injuries include but are not limited to the following: (a) Niantic was fraudulently induced to pay $618,359.91 more for its acquisition of CEW; (b) Brooks was fraudulently induced to enter into a contract related to the Second Closing in which he paid $332,500 to Libra Capital and waived certain claims he (unknowingly) then had against Libra; (c) Through the improper New York Litigation, Libra has wrongfully obtained trade secrets and other proprietary information belonging to the Claimants or otherwise interfered with Claimants' rights concerning that intellectual property; and (d) Claimants have incurred substantial costs, including reasonable attorneys' fees and other third-party expenses in defending against the New York Litigation and in pursuing their rights in this arbitration.

137.    Respondents' fraudulent scheme was intentional, malicious, and demonstrated a wanton disregard of Claimants' rights. Accordingly, Claimants are entitled to punitive damages.

## COUNT V: AIDING AND ABETTING FRAUD (BY ALL CLAIMANTS, AGAINST EUROENERGY)

138.    Claimants repeat and reallege the allegations contained in the preceding paragraphs of this Complaint.

139.    CE, L'Anse, Libra Capital, Diaz, Andueza and Logothetis fraudulently induced Claimants to enter into the Acquisition Agreement, the Second Closing, and related contracts.

140.    EuroEnergy knew about the fraudulent scheme, and substantially assisted CE, L'Anse, Libra Capital, Andueza, Diaz and Logothetis in every facet of the scheme by, among other things, advancing claims in the New York Litigation that Niantic possesses confidential and trade

-35-

**EXHIBIT A**

secret information belonging to EuroEnergy (when all such intellectual property was sold to Niantic), and that EuroEnergy had an emergency need to reacquire that intellectual property on an *ex parte* basis.

141.    EuroEnergy further provided confidential CEW information and otherwise assisted CE, L'Anse, Libra Capital, Andueza, Diaz and Logothetis in perpetrating the fraud, and CE, L'Anse, Libra Capital, Andueza, Diaz, and Logothetis could not have fully perpetrated the fraud without the substantial assistance of EuroEnergy.

142.    As a proximate result of EuroEnergy's misconduct, Claimants have suffered substantial damages as explained above, in an amount to be determined after a hearing.

143.     EuroEnergy's misconduct was intentional, malicious, and demonstrated a wanton disregard of Claimants' rights. Accordingly, Claimants are entitled to punitive damages.

## COUNT VI: RESCISSION OF SECOND CLOSING AND SEPARATION & COOPERATION AGREEMENT (BY NIANTIC AND BROOKS, AGAINST CE, L'ANSE, AND LIBRA CAPITAL)

144.    Claimants repeat and reallege the allegations contained in the preceding paragraphs of this Complaint.

145.    CE and L'Anse fraudulently induced Niantic to enter into the Second Closing, including but not limited to by claiming that there was criminal and civil wrongdoing that necessitated an adjustment to the purchase price of CEW and other material changes to the terms of the sale and related agreements, and further representing that entering into the Second Closing would fully and totally rectify any such wrongdoing.

**EXHIBIT A**

146.    Niantic reasonably relied upon CE's and L'Anse's material misrepresentations in entering into the Second Closing, and would not have done so if CE and L'Anse had not made these material misrepresentations.

147.    Niantic exercises its choice of remedy as rescission of the Second Closing, demanding that CE and L'Anse return all funds paid by Niantic and assume all liability assumed by Niantic in the Second Closing.

148.    Rescinding the Second Closing would restore the status quo just prior to entering into that fraudulent agreement, allowing Niantic to obtain the benefit of the bargain it struck with Libra in the Acquisition Agreement and remedying the fraud in which Respondents engaged to trick Niantic into executing the Second Closing.

149.    Further, Libra Capital fraudulently induced Brooks to enter into the Separation Agreement, by falsely claiming among other things that Brooks and Brooks' mother had criminal and civil liability to Libra, and that entering into the Separation Agreement, coupled with the Second Closing, would totally resolve that liability. Libra Capital further fraudulently induced Brooks to enter into the Separation Agreement by telling Brooks that, if Brooks executed the Separation Agreement, Brooks' mother would be promptly repaid the €549,000 debt Libra owes to Ms. Brooks.

150.    Brooks reasonably relied upon Libra Capital's material misrepresentations in entering into the Separation Agreement, and would not have done so if Libra Capital had not made these material misrepresentations.

**EXHIBIT A**

151.    Brooks exercises his choice of remedy as rescission of the Separation Agreement, demanding that Libra Capital restore all funds Brooks paid to Libra Capital pursuant to the Separation Agreement.

152.    Rescinding the Separation Agreement will equitably restore the status quo prior to Brooks entering into the Agreement, restoring him to the position he maintained before he was fraudulently induced to executed the Separation Agreement.

153.    Niantic and Brooks have complied with all conditions precedent to their right of recovery hereunder.

## COUNT VII: INDEMNIFICATION (BY ALL CLAIMANTS, AGAINST CE AND L'ANSE)

154.    Claimants repeat and reallege the allegations contained in the preceding paragraphs of this Complaint.

155.    Until January 31, 2020, Brooks was an officer of CE and L'Anse.

156.    CE's operating agreement provides that: "The Company [CE] shall indemnify and hold harmless each Manager and each officer of the Company from and against all claims and demands to the maximum extent permitted under the Act [Delaware Limited Liability Company Act]."

157.    Similarly, L'Anse's operating agreement provides that: "Subject to the standards and restrictions, if any, set forth in this Agreement, the Company [L'Anse] shall, to the fullest extent permitted by law, indemnify and hold harmless the Managers or any officer or agent of the Company, made, or threatened to be made, part to an action or proceeding, whether civil or criminal, by reason of the fact that such person is or was a Manager, or an officer or agent of the

-38-

**EXHIBIT A**

Company, against amounts paid in settlement and reasonable expenses, including attorneys' fees, actually or necessarily incurred by him, her or it in connection with the defense or settlement of such action, or in connection with an appeal therein; *provided, however*, that no indemnification shall be made to or on behalf of the Managers or any officer, agent or other person if a judgment or other final adjudication adverse to such person establishes (a) that his, her or its acts were committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated, or (b) that he, she or it personally gained in fact a financial profit or other advantage to which such person was not legally entitled."

158.    The New York Litigation brings claims against Brooks for acts undertaken in his capacity as an officer of CE and L'Anse.

159.    Subject to narrow exceptions not applicable here, CE and L'Anse agreed to indemnify Brooks for both liability and his expenses, including attorneys' fees, in connection with his defense or settlement of any such action.

160.    Brooks has incurred expenses, including but not limited to attorneys' fees, in defending against the New York Litigation, and will continue to incur such expenses, including but not limited to attorneys' fees, until the New York Litigation is finally resolved.

161.    Further, while he denies any and all wrongdoing alleged in the New York Litigation, Brooks may be subject to a judgment, settlement, or other liability in connection with the New York Litigation for his conduct in connection with his position as an officer of CE and L'Anse. CE and L'Anse both agreed to indemnify Brooks for any such liability.

# EXHIBIT A

162.    In bringing an action against Brooks in the New York Litigation for conduct in connection with his position as officer of CE and L'Anse, CE and L'Anse have engaged in an anticipatory repudiation of their operating agreements or otherwise breached their indemnification obligations to Brooks in their operating agreements.

163.    Brooks has incurred damages as a proximate result of CE's and L'Anse's failure to indemnify him as required under their operating agreements.

164.    Brooks has been further damaged by CE's and L'Anse's pursuit of liability on Brooks' part for which CE and L'Anse expressly agreed to indemnify Brooks.

165.    Brooks seeks payment of all expenses, including attorneys' fees, in defending the New York Litigation and all related actions, including his efforts to compel CE and L'Anse to honor their indemnification obligations in this arbitration.

166.    Brooks further seeks a declaratory judgment that CE and L'Anse must indemnify him for any judgment or settlement reached in the New York Litigation and this arbitration. After the panel makes its decision and issues an award (or if the New York Litigation is resolved by judgment or settlement) Brook seeks an award requiring CE and L'Anse to indemnify him for all of Brooks' costs and expenses. As part of the hearing on this matter, all facts necessary to give rise to Brooks' indemnification rights should be tried before the panel.

167.    Brooks has complied with all conditions precedent to his right of recovery hereunder.

168.    In addition, CE agreed in the Acquisition Agreement to indemnify Niantic "from and against and in respect of all claims, losses, damages, judgments, penalties, deficiencies,

-40-

**EXHIBIT A**

liabilities, costs and expenses (including without limitation, reasonable attorneys' fees and costs of litigation), including but not limited to responsibility for payments of any amounts due in connection with an audit by the IRS or the State of Delaware (collectively, "**Claims**") asserted against, resulting to, imposed upon or incurred by the NVE [Niantic] Indemnified Persons, directly or indirectly, by reason of or resulting from any misrepresentation or breach of any representation or warranty, or noncompliance with conditions, covenants or other agreements, given or made by CE in this Agreement or in the Schedules or Exhibits attached hereto or in any document furnished by or on behalf of CEW or the Indemnifying Party pursuant hereto or thereto."

169.    "NVE Indemnified Persons" are defined in the Acquisition Agreement as Niantic, as well as "its officers, directors, shareholders, employees, representatives, agents, predecessors, successors, subsidiaries, Affiliates and assigns."

170.    Merle is the Manager and indirect member of Niantic, as well as its representative and agent, and qualifies as an NVE Indemnified Person.

171.    As described above, CE has engaged in misrepresentations, breached its representations and warranties in the Acquisition Agreement and/or otherwise failed to comply with the conditions, covenants or other agreements given or made by CE in the Acquisition Agreement or in the Schedules or Exhibits attached thereto or in any document furnished by or on behalf of CE pursuant hereto or thereto.

172.    In bringing an action against Niantic and Merle in the New York Litigation concerning events for which CE must indemnify Niantic and Merle under the Acquisition Agreement, CE has engaged in an anticipatory repudiation of its indemnification obligations under

EXHIBIT A

the Acquisition Agreement or otherwise breached its indemnification obligations to Niantic and Merle in the Acquisition Agreement.

173.    As a proximate result of CE's breaches and other failures to fulfill its obligations under the indemnification provisions of the Acquisition Agreement, Niantic and Merle have been injured, in an amount to be determined after a hearing. Due to its breaches and other obligations, CE is required to indemnify Niantic and Merle for costs, expenses and other items meeting the definition of "Claims" in the Acquisition Agreement, including but not limited to reasonable attorneys' fees and costs of litigation, that Niantic or Merle have incurred, directly or indirectly, in connection with CE's breaches or other failures to comply with its obligations.

174.    The New York Litigation is a direct result of CE's misrepresentations and breaches of the Acquisition Agreement and other qualifying documents. Accordingly, among other things, Niantic and Merle seek payment of all expenses, including but not limited to reasonable attorneys' fees and court costs, in defending the New York Litigation and all related actions, including their efforts to compel CE to honor its indemnification obligations in this arbitration.

175.    The Acquisition Agreement provides caps on indemnification liability, depending on the nature of the breach, but provides that these limits shall not apply with respect to any Claims incurred by Niantic and Mere as a result of fraud committed by CE. All Claims sought here are a result of fraud committed by CE, and therefore no cap applies.

176.    In the alternative, if the panel determines that one or more of CE's breaches or other failures were not the result of fraud, then Niantic and Merle seek indemnification up to the full amount of the applicable cap.

-42-

**EXHIBIT A**

177.    Niantic and Merle further seek a declaratory judgment that CE must indemnify them for any judgment or settlement reached in the New York Litigation and this arbitration. After the panel makes its decision and issues an award (or if the New York Litigation is resolved by judgment or settlement) Niantic and Merle seek an award requiring CE to indemnify him for all of their costs, expenses, and other qualifying Claims. As part of the hearing on this matter, all facts necessary to give rise to Niantic's and Merle's indemnification rights should be tried before the panel.

178.    Niantic and Merle have complied with all conditions precedent to their right of recovery hereunder.

### COUNT VIII ABUSE OF PROCESS (BY ALL CLAIMANTS, AGAINST ALL RESPONDENTS)

179.    Claimants repeat and reallege the allegations contained in the preceding paragraphs of this Complaint.

180.    Respondents used the legal process with an improper or wrongful purpose, intending to extort Claimants a second time to pay additional un-owed money to Libra.

181.    Respondents engaged in one or more willful acts not proper in the regular course of legal proceedings, including but not limited to hacking Brooks' personal email and spoliating evidence favorable to Claimants.

182.    As a proximate result of Respondents' misconduct, Claimants have been damaged, in an amount to be determined after a hearing.

183.    Respondents' wrongful behavior was intentional, malicious, and demonstrated a wanton disregard of Claimants' rights. Accordingly, Claimants are entitled to punitive damages.

**EXHIBIT A**

## COUNT IX: CIVIL CONSPIRACY (BY ALL CLAIMANTS, AGAINST ALL RESPONDENTS)

184.    Claimants repeat and reallege the allegations contained in the preceding paragraphs of this Complaint.

185.    Respondents entered into a confederation or combination with the intent to extort money from Claimants and engage in other unlawful conduct to Claimants' detriment.

186.    As described above, Respondents committed one or more unlawful acts in furtherance of their conspiracy, including but not limited to illegally hacking Brooks' personal email and destroying evidence related to this dispute.

187.    As a proximate result of Respondents' conspiracy, Claimants have been damaged, in an amount to be determined after a hearing.

188.    Respondents' wrongful behavior was intentional, malicious, and demonstrated a wanton disregard of Claimants' rights. Accordingly, Claimants are entitled to punitive damages.

## COUNT X: NEGLIGENCE (BY BROOKS, AGAINST ANDUEZA AND DIAZ)

189.    Claimants repeat and reallege the allegations contained in the preceding paragraphs of this Complaint. This claim is brought in the alternative to Counts III, IV, V, VIII and IX.

190.    As the Managers of CE, CEW (pre-sale) and L'Anse, and Brooks' supervisors, Andueza and Diaz owed duties of care to Brooks, including the duty to supervise Brooks appropriately and to advise Brooks if his good-faith conduct that Andueza and Diaz directed and were aware of would later be deemed wrongful by CE, CEW or L'Anse.

191.    Further, in his additional role as Libra's General Counsel, Diaz owed a duty of care to Brooks.

-44-

**EXHIBIT A**

192.    Andueza and Diaz breached these duties by inducing and directing Brooks to raise money for the purchase of CEW, and creating a culture in which Brooks believed in good-faith there was nothing wrong with doing so. As the Managers of CE, CEW, and L'Anse with broad powers and full authority to determine the duties of officers, it was Andueza's and Diaz's responsibilities to establish guidelines, expectations and controls to give clear direction to Brooks as to appropriate behavior.

193.    Instead of doing so, Andueza and Diaz, through negligent conduct, led Brooks to believe that raising money for the purchase of CEW was in CE's, L'Anse's and Libra's best interest and would be not only acceptable but was strongly desired by Libra. In other words, Andueza and Diaz negligently misled Brooks to believe that the behavior Plaintiffs in the New York Litigation allege is wrongful was helpful, solicited, and needed by Libra and the entities involved.

194.    As a proximate result of Andueza's and Diaz's negligence, Brooks has been damaged, in an amount to be determined after a hearing.

**COUNT XI: CONTRIBUTION (BY ALL CLAIMANTS, AGAINST ANDUEZA, DIAZ AND LOGOTHETIS)**

195.    Claimants repeat and reallege the allegations contained in the preceding paragraphs of this Complaint.

196.    Claimants deny all liability to Plaintiffs in the New York Litigation. However, for the reasons discussed above, Andueza, Diaz and Logothetis are jointly and severally liable for any judgment against Claimants that Plaintiffs in the New York Litigation may obtain concerning the Acquisition and related dealings.

-45-

**EXHIBIT A**

197.     Further, as the persons at Libra responsible for directing Brooks, approving transactions (including all of the transactions at issue in this dispute), providing legal advice to and managing CE, L'Anse and other Libra entities, Andueza, Diaz and Logothetis bear such a disproportionately heavy level of fault compared to Claimants that it would be inequitable to distribute common liability equally among them, and the relative degrees of fault among Claimants, Andueza, Diaz and Logothetis should be considered in determining their pro rata shares, including under 10 Del. C. § 6032(d).

198.     Accordingly, Claimants bring claims against Andueza, Diaz and Logothetis for contribution pursuant to 10 Del. C. §§ 6302, 6306 and other applicable law, in an amount to be determined after a hearing.

199.     Claimants seek both a declaratory judgment that Andueza, Diaz and Logothetis are liable to Claimants for contribution, an assessment of their relative degrees of fault, and an award requiring Andueza, Diaz and Logothetis to pay their proportionate share of any judgment or settlement in the New York Litigation, should any such judgment be entered or settlement occur in the New York Litigation. As part of the hearing on this matter, all facts necessary to give rise to Claimants' contribution rights should be tried before the panel.

<strong><u>PRAYER FOR RELIEF</u></strong>

WHEREFORE, Claimants demand an award in their favor against Libra as follows:

A.     For a monetary award in an amount to be determined after a hearing.

B.     For the declaratory awards requested above.

-46-

<strong>EXHIBIT A</strong>

C.      For reimbursement of expenses and attorneys' fees in connection with Brooks', Niantic's and Merle's defense of the New York Litigation and in prosecuting their claims in this arbitration.

D.      For punitive and exemplary damages in an amount to be determined after a hearing;

E.      For Claimants' fees, expenses and costs and disbursements in this action; and

F.      For such other relief as the panel deems just and equitable.

Dated this 16th day of September, 2020

By:      s/ Ryan M. Billings
         Ryan M. Billings
         **KOHNER, MANN & KAILAS, S.C.**
         4650 N. Port Washington Road
         Milwaukee, WI 53212-1059
         Telephone:      (414) 962-5110
         Facsimile:       (414) 962-8725
         Email:            rbillings@kmksc.com

         **Attorneys for Claimants Steven J. Brooks, NianticVista Energy, LLC, and Gregory Merle**

-47-

**EXHIBIT A**